42

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAY 0 1 2002

Michael N. Milby
Clerk of Court

KRISTA SALDANA, INDIVIDUALLY      §
AND AS REPRESENTATIVE OF          §
THE ESTATE OF DAVID SALDANA       §
AND AS NEXT FRIEND OF JAGGER      §
SALDANA                           §
                                  §
VS.                               §
                                  §          CIVIL ACTION NO. B-00-176
                                  §
ITT INDUSTRIES, SIKORSKY          §
AIRCRAFT CORPORATION, A           §
SUBSIDIARY OF UNITED              §
TECHNOLOGIES CORPORATION,         §
THE ESTATE OF LT. COL. MARC       §
LEE HOHLE AND THE ESTATE OF       §
CAPTAIN MATTHEW BRENT THOMAS      §

### DEFENDANT ITT INDUSTRIES, INC., NIGHT VISION'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW ITT INDUSTRIES, INC., NIGHT VISION one of the Defendants in the above styled and numbered cause (hereinafter referred to as Movant), and respectfully submits this Brief in Support of Defendant's Motion for Summary Judgment.

### NATURE OF SUIT

1.    This case involves an aircraft (helicopter) mishap that occurred on April 19, 1999 in the Pacific ocean near Okinawa, Japan. Cpl Saldana (decedent) was enlisted and on active duty with the United States Marine Corps. On the night in question Cpl Saldana was a crew chief/observer on one of a flight of two (2) CH-53E helicopters conducting low light level training with the Aviator's Night Vision Imaging System AN/AVS-6 (V)1, Night Vision

-1-

Goggles (hereinafter ANVIS-6). While executing a lead change (the trail aircraft takes over the lead while the lead aircraft falls into trail or last position) Cpl Saldana's aircraft crashed into the Pacific ocean. All souls onboard were lost.

2.   Plaintiff alleges theories of strict liability, negligence, breach of implied warranties, failure to warn, defective design, breach of express warranty, and gross negligence, yet provides no specifics regarding an alleged defect, failure to warn or even the cause of the mishap. Movant strenuously denies any liability on any basis. Therefore, given the purely military nature of the ANVIS-6 and the manner in which they were designed, developed and procured by the United States Government/Military, Movant respectfully submits that the Government Contractor Defense will apply.

3.   The facts of this case so squarely fall within the scope of the United States Supreme Court's ruling in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S. Ct. 2510 (1988), that it could be used as the definitive example of the Government Contractor Defense. As shown in explicit detail below, the ANVIS-6 were procured by the United States Army Communications-Electronics Command (hereafter CECOM) for the United States Army, Marine Corp, Air Force, Navy and numerous other U.S. Government agencies pursuant to a Government Contract which set forth the precise design specifications for the product. The Contract, in fact, included design drawings and

-2-

specifications for every part and component of the ANVIS-6. The manufacturer was required to use the design provided by the Government and could not vary from it without Government approval in writing ( Nowak Aff. Exhibit A pg.2-3; see also Bell Aff. Exhibit C pg.2). The ANVIS-6 in question were manufactured in compliance with those specifications and that the compliance was certified by Government representatives called Quality Assurance Representatives (QARs) located on site at the manufacturing facility (Bell Aff. Exhibit C pg.1-2). Moreover, the United States Military has been and continues to be involved with  the design and development of the ANVIS-6; they have been and continue to be intimately familiar with the use of the product. At the time of the mishap in question the U.S. Military had accrued over eighteen (18) years of experience and use with Night Vision Goggles. The manufacturer had no knowledge of risks involved in the design of the ANVIS-6 Night Vision Goggles that were not also known to the United States Marine Corp(ANVIS-6 TM, Exhibit G pg.a and 2b; see also MAWTS-1 Exhibit H pg. 1-13, 2-53, 7-IV-3,7-X-1,8-I-11).

4.    Having produced evidence that affirmatively establishes, as a matter of law, the three elements set out in the *Boyle* decision, Movant brings Defendant's Motion for Summary Judgment asserting their Government Contractor Defense.

## STANDING FOR GRANTING SUMMARY JUDGMENT

5.    Under Federal Rule of Civil Procedure 56, Summary Judgment is proper where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A movant is entitled to Summary Judgment where the pleadings, depositions, Answers to Interrogatories and Admissions on file, together with Affidavits, if any, show that there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-334 (1986); *Kelly v. Price-Macemon, Inc.,* 992 F.2d 1408, 1413 (5th Cir. 1993); Krim v. Bank Texas Group, Inc., 989 F.2d 1435, 1444 (5th Cir.1993). The court must view the evidence and all justifiable inferences drawn from that evidence in a light most favorable to non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Nonetheless, mere possibilities and conjecture will not overcome a Motion for Summary Judgement. Thus, if the motion is to be defeated, the evidence must be such that it would lead a rational trier of fact to find there is a genuine issue for trial in order to defeat the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 578 (1986).

6.    The Federal Rules of Civil Procedure favor Summary Judgments. Indeed, they are treated as an "integral" part of the Federal Rules as a whole, which are designed:

> "to secure the just, speedy and inexpensive determination of every action."

Fed. R. Civ. P. 1.

Summary Judgment serves to root out, narrow and focus the issues in the case, if not resolve the case completely, with the benefit going to the litigants, the courts, those waiting in line for trial, and the American public in general. *See Celotex*, 477 U.S. at 322-334; *Calpecto 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1415 (5th Cir.1993); see also *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2nd Cir. 1986)(citing *Anderson*, 477 U.S. 242). Not only is Summary Judgment encouraged, it is, in fact, "mandated" by the language of Rule 56. *Celotex* at 322.

7.    Procedurally, the moving party bears the initial burden of establishing that there are no issues of material fact.    They must sustain that burden by informing the Court of the basis for their motion, and by identifying portions of the record which reveal that there are no issues for trial.    Once such a showing is made, the burden shifts to the non-movant to set out specific facts in the record showing that a genuine issue exists. *Celotex* at 323-325; *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2nd Cir.1988).

8.    Where the moving party has the burden of proof, as in this case regarding Movants' affirmative defense, its showing must be sufficient to establish each element of the affirmative defense. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986).    In Defendant's

-5-

Motion for Summary Judgment, Movant asserts the affirmative defense commonly referred to as the Government Contractor Defense.  Movant has established each element of that defense.

### GOVERNMENT CONTRACTOR DEFENSE

9.    Under the Government Contractor Defense, as formulated in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S. Ct. 2510 (1988), a government contractor is immunized from civil liability arising out of the performance of federal procurement contracts when the following elements are established:

1.    The government approved reasonably precise specifications;

2.    The equipment conformed to those specifications; and

3.    The contractor warned the government about the dangers in the use of the equipment that were known to the contractor but not to the government.

*Boyle*, 108 S. Ct. at 2518; *In re Air Disaster at Ramstein AB*, 81 F.3d 570, 574 (5ᵗʰ Cir.1996); *Sout v. Borg-Warner Corp*, 933 F.2d 331, 334 (5ᵗʰ Cir.1991); *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 798 (5ᵗʰ Cir.1993).

10.    The defense stems from the government's immunity for "discretionary functions" pursuant to the Federal Tort Claims Act, 28 USC § 2860(a).    *Boyle*, 487 U.S. at 511.    The government's participation in the selection or design of military equipment is an exercise of a discretionary function.    The *Boyle* court stated:

"[the selection of the design of military equipment] often involves not merely engineering analysis but

judgment as to the balancing of many technical, military,
and even social considerations, including specifically
the trade off between greater safety and greater combat
effectiveness. And we are further of the view that
permitting 'second-guessing' of these judgments through
state tort suits against contractors would produce the
same effect sought to be avoided by the FTCA exemption."

*Boyle* at 511 [citations omitted].

11. The first two elements of this defense assure that the
suit is within the area where the discretionary function of the
government is exercised, i.e., that the design feature in question
was considered by a government officer, and not merely by the
contractor itself. *Boyle* at 512. The third condition protects from
creating an incentive for the manufacturer to withhold knowledge of
risks. *Id*.

12. By satisfying the first two elements, the contractor
establishes that a conflict exists between state law, which might
impose liability, and the duty imposed by the government contract.
*Boyle* at 511 (selection of the appropriate design for military
equipment is assuredly a discretionary function).

**FACTS EVIDENCING DEFENSE**

13. The ANVIS-6 are an exclusively military product.
Procurement of the ANVIS-6 is limited to the U.S. Military, other
U.S. Government agencies, and select military allies. The ANVIS-6
were procured by the United States Government under Government
Contract Number DAAB07-93-C-KOO5 (Bell Aff. Exhibit C, pg. 2).
(Hereinafter, Contract DAAB07-93-C-K005 will be referred to as "the

Contract)."

14. The Commander U.S. Army CECOM exercises oversight and control for the ANVIS-6 procurement program. The Contract prescribes the exact design specifications, including detailed specifications for the ANVIS-6 light level requirements (Nowak Aff. Exhibit A pg.2-3; Nowak Depo Exhibit F pg.12, 62; see also Bell Aff. Exhibit C pg.4). Paragraph 1.1 of the Statement of Work for ANVIS-6 originally incorporated into the Contract, explicitly lists the Military Specifications for the ANVIS-6. Clause H.2 of the Contract states that: ..."The Government shall furnish to the contractor enough copies, including extra expendable copies, of TECHNICAL MANUALS ...as required by this contract." (Bell Aff. Exhibit C pg.2-3).

15. The U.S. Government's design drawings and precise specifications far exceeded a simple description of the ANVIS-6. They consisted of detailed design drawings from which the ANVIS-6 could be manufactured, all the way down to a specification for labels on the package. There was no design work called for in the Contract. The U.S. Government provided the manufacturer with precise specifications and drawings, then quite simply said, "Make it to this" (Nowak Depo. Exhibit F pg.14, 15, and 62).

16. The U.S. Marine Corps was already familiar with the design and use of the ANVIS-6 in the Contract because they had been using night vision devices since the 1980's. The design had been

thoroughly evaluated by the U.S. Marine Corps and used in both training and actual combat situations. The ANVIS-6 have endured testing by physicists around the world and in all types of environmental conditions. ANVIS-6 specifications, developed by the Government have been subjected to review and approval by the U.S. Army CECOM, Ft. Belvoir, Virginia.

17. The ANVIS-6 were manufactured in strict compliance with the military design specifications reflected in MIL-A-49425 through MIL-P-49429. The Contract expressly approved the design specifications set forth in Military Specifications MIL-A-49425 through MIL-P-49429, which had been previously reviewed, tested, approved and used extensively by CECOM, the Army Material Command, the U.S. Army, Navy, Marines and Air Force (Bell Aff. Exhibit C pg.2; Reeder Aff. Exhibit B pg.2; see also Nowak Depo. pg. 14 and 15).

18. There were no risks associated with the design or use of the ANVIS-6 that were known to the manufacturer but not known to the U.S. Marines at the time of the mishap in question. The U.S. Marine Corps, as well as other U.S. Government agencies have worked closely and along side the Movant throughout the development, design, and manufacture of the ANVIS-6. The U.S. Marine Corps can in no way be reasonably assumed to be ignorant of the danger. The Marines Corps own self-generated Night Vision Device Manual (MAWTS-1) contains instructions and training methods regarding high light

level and low light level flight modes under the ANVIS-6.
Moreover, the Marine Command Mishap Investigation (JAGMAN)
determined that the mishap in question occurred due to air crew
error (MAWTS-1 pg.1-13,2-53,7-IV-2-3,7-X-1,8-I-ll; see also LtCol
Samples Depo. pg.20:14-20). ANVIS-6 have been used extensively by
the Marines, Army, Navy, and Air Force since the 1980's (Nowak
Depo. pg.23: 4-5).

19. In summary, it is incontrovertible that the ANVIS-6 were
manufactured pursuant to complete, detailed precise design
specifications. The Contract actually incorporated and required
adherence to the design drawings and other specifications in
paragraph 1.1 of the Statement of Work. The ANVIS-6 were tested,
inspected and approved as complying with the Contract's precise
specifications by both the manufacturer and by government Quality
Assurance Representative (QAR) at the manufacturer's plant.
Finally, the manufacturer had no knowledge of risks associated with
the design or use of the ANVIS-6 mandated by the government that
were not known to the United States government.

**ARGUMENT**

20. This is precisely the case the United States Supreme
Court intended to bar when it crafted the Government Contractor
Defense. The government designed, developed and tested the ANVIS-
6, then exercised its discretion and procured ANVIS-6 for use by
the United States Military. The government was familiar with the

-10-

ANVIS-6, including the risks inherent in using them in transitioning from high light levels to low light levels while flying over large bodies of water. As stated in the MAWTS-1 pg.3-21 VII SUMMARY ...

> "There is an inherent tendency for the newcomer to anticipate too much from NVDs (Night Vision Devices). "WHAT YOU SEE IS NOT ALWAYS WHAT YOU GET." Treat the NVD visual display with healthy disrespect and cross-check with other instruments to enhance situational awareness through validation of the "true" attitude, altitude and airspeed."

21. Having decided to purchase the ANVIS-6 for the U.S. Marine Corps, the government issued a Contract which required the chosen contractor to manufacture the ANVIS-6 in strict compliance with the design specification previously reviewed, approved and utilized by the United States Military.  The government then stationed its own people, the QARs, at the manufacturer's plant to inspect and test the ANVIS-6 prior to government acceptance and shipment by the Movant, ITT Industries, Inc., Night Vision, to assure compliance with those specifications.  The United States Marine Corps, which had been using night vision devices since the 1980's, as evidenced by the MAWTS-1 Manual: 5th edition (Exhibit H), knew all there was to know about the risks of using the required design, so failure to warn is not an issue (Nowak Depo. pg.45:4-9).

22. All of the elements of the Government Contractor Defense have been established.  Under these circumstances, the manufacturer

is not liable to Plaintiffs and their claims must be dismissed.

<u>**ANTICIPATED ARGUMENTS OF PLAINTIFF**</u>

23.  Movant anticipates that Plaintiffs may argue that the government's approval in this case amounts to a mere "rubber stamp" without the necessary exercise of discretion.  *See Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir. 1989).  *Cf. Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1320 (11th Cir. 1989).  Nothing could be farther from the truth.  Indeed, the "rubber stamp" doctrine presents no impediment whatsoever to application of the Government Contractor Defense in this case.

24.  The development of high technology, military night vision devices, such as the ANVIS-6, are uniquely in the province of the government.  Second guessing by civilian courts is inappropriate. *Boyle* at 511; *See also, In re Agent Orange Product Liability Litigation MDL No. 381*, 818 F.2d 187, 191 (2nd Cir. 1987).  The "rubber stamp" approval disallowed in *Trevino* occurs only where the government has delegated its discretion over the design feature in question and then merely accepts the contractor's work without substantive review and evaluation.  Where, as here, a substantive review is made, the first element of *Boyle* is met.  *Stout v. Borg-Warner Corp.*, 933 F.2d at 335-336.  In this case, the review and evaluation was extensive, substantive and continuing.  Where the approval comes after extensive review of detailed design drawings, then the approval is

sufficient.   *In re Brooklyn Navy Yard Asbestos Litigation*, 971 F.2d 831, 839 (2nd Cir.1992);   *Lewis*, at 86.   Here, the government not only approved the design after extensive review, evaluation and actual experience with the product, it actually provided the precise design specifications and required that the ANVIS-6 be built according to the design drawings provided.   This is not a "rubber stamp" case.   Movant has therefore satisfied the first element of the Defense (Nowak Depo pg.46:18-22, pg.47:1-15).

25. Plaintiff may also argue that the Movant is required to prove each element of the *Boyle* defense with respect to the particular product feature upon which the claim is based.   *See Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794 (5th Cir. 1993) and *Gray v. Lockheed Aeronautical Systems Co.*, 125 F.3d 1371 (11th Cir. 1997).   Here, however, Plaintiff has not identified any defect in the ANVIS-6.   On the contrary, the JAGMAN investigating officer's review of the maintenance records for all five (5) ANVIS-6's of the mishap crew found no discrepancies.   Additionally, the mishap crew, was required by Standard Operating Procedure to perform a detailed pre-operational check prior to flight (LtCol Samples Depo. Exhibit D pg.50:15-16; Paul Depo. Exhibit E pg.19:6-25 and pg.20:1-4; see also ANVIS-6 TM pg.2-7 through 2-15; see MAWTS-1 Chap. 5 Pre-Flight Ops).   Therefore, Movant respectfully submits that the deficiencies in Plaintiff's pleadings and proof offer no obstacle

to application of the *Boyle* defense  because the Contract specified
<u>all</u> of the design details.   Since all of the product's features
were specified by the Contract, all are shielded by the Government
Contractor Defense.

26.   Lastly, Plaintiff may argue that the Movant failed to
warn the United States Government and its foreseeable users to
exercise caution when flying from high ambient light conditions to
low ambient light conditions.   Nothing could be further from the
facts.   The only warning required was a warning to the Government
of dangers known to the supplier but not to the Government.   *In re
Joint Eastern and Southern District New York Asbestos Litigation,* 897 F.2d 626, 638
(2nd Cir.1990).  The U.S. Government developed, designed, and tested
the ANVIS-6 and thus, the manufacturer/movant had no knowledge of
risks associated with the design and or use of the ANVIS-6 mandated
by  the Government that were not known to the United States
Government.   The Government's explicit knowledge of flying from
high ambient light to low ambient light levels is demonstrated by
the Warning contained in the ANVIS-6  Technical Manual (hereafter
TM) page a, 2b under the title of WARNING which states:

"To avoid personal injury and property damage when using the
ANVIS, carefully read and understand the following safety
precautions...
- Exercise extreme caution when flying over low-contrast
terrain such as ... large bodies of water...
- Exercise extreme caution when flying from high ambient
light conditions to low ambient light conditions.  Under

-14-

low light conditions the goggles lose some of the resolution that they have under high light conditions. Flying from high light to low light conditions quickly reduces the sharpness and definition of terrain images."

27. The Communications-Electronics Command, CECOM writes and produces the ANVIS-6 TM. Moreover, if the manufacturer desires to make a change to the TM, it must submit the desired change and or modification to the Commander at CECOM who will either approve or disapprove the request (Nowak Aff. Exhibit A pg. 3, Bell Aff. Exhibit C pg.2; see also ANVIS-6 TM pg. i). Lastly, the MAWTS-1 contains warnings and instruction regarding flying from high light levels to low light levels (MAWTS-1 Exhibit H Chapters 1,3,4,7, and 8).

**EVIDENTIARY SUPPORT**

28. The facts supporting the Movant's Government Contractor Defense are contained in the Affidavits, ANVIS-6 Technical Manual, Marine Aviation Weapons and Tactics Squadron -1 Night Vision Device Manual 5th Edition, Marine Command Mishap Investigation Report (JAGMAN), and Deposition Excerpts attached as Exhibits hereto, including the documents referenced therein. To aid the Court in considering the evidence, a short synopsis of each Exhibit is provided below.

29. Affidavit of Glen Lewis Nowak. Mr. Nowak is a Physicist Scientist employed by the U.S. Government, Department of the Army, Night Vison Optics. His testimony provides the basis for his

knowledge concerning the development, design and production of the ANVIS-6. He explains that he was assigned to the research and development program, as the team leader which developed the night vision goggle, ANVIS-6. That from the very inception of the ANVIS-6 program there was and continues to be coordination with other government agencies, specifically, but not limited to the U.S. Army, Marines, Navy, Air Force, and ITT Industries Inc., Night Vision. That the United States Government, specifically, the U.S. military and the Communications-Electronics Command (CECOM) worked closely with ITT Industries, Inc., regarding the development, specifications and fielding of the ANVIS-6. Mr. Nowak explains that as a result of this coordinated effort, the U.S. Government, CECOM, and the Army Material Command establshed, developed and approved the precise specifications for the manufacture of the ANVIS-6, and that the ANVIS-6 conform to those precise specifications.

30.    Mr. Nowak states that ITT Industries, Inc., Night Vision, warned the U.S. Government to exercise extreme caution when flying from high ambient light levels to low ambient light levels. That the Warnings contained in the ANVIS-6 TM were published by the U.S. Government.    Additionally, Mr. Nowak explains that in accordance with the procurement contract, a TM is included in every ANVIS-6 Case with a set of goggles. That the Communications-Electronics Command, through government regulation controls what

material, be it Notes, Warnings, or Cautions, go into the ANVIS-6
TM.    Lastly, Mr. Nowak explains that any and all changes or
modifications to the TM must be submitted through and approved by
CECOM.    That no contractor may place anything into the TM without
specific written governmental approval.    That the ANVIS-6 TM is
provided to the contractor by the U.S. Government and that no other
warnings, labels or instructions are permitted in the manual, on
the ANVIS-6 goggles, or in the case.

     31.   Affidavit of Mr. Francis O. Bell.  Mr. Bell is employed
by the Defense Contract Management Agency of the United States
Government, as a Quality Assurance Representative (QAR).  Mr. Bell
is assigned as the resident QAR at ITT Industries, Night Vision in
Roanoke, Virginia.    Mr. Bell's testimony affirms that the
government developed, and approved precise specifications and that
the ANVIS-6 conform to those precise specifications.  Mr. Bell's
duties include, but are not limited to the inspection of the ANVIS-
6 for the Commander, U.S. Army CECOM in accordance with the terms
of Contract Number DAAB07-93-C-K005 (hereinafter the contract) and
the specifications incorporated therein.  Mr. Bell explains that he
inspects a random sample of the ANVIS-6 by the Quality Assurance
Letter of Instruction issued by the Army Project Manager, Night
Vision & Electro-Optics, Fort Belvoir, VA.  During the inspection
Mr. Bell explains that he verifies each ANVIS-6 sampled meets the
drawing requirement of 5002490, Night Vision Sight Assembly of the

contract.  Mr. Bell explains in detail the Military Specifications, MIL-A-49425 through MIL-P-49429 incorporated into the contract as the minimum requirements for the ANVIS-6.

32.  Additionally, Mr. Bell explains that Paragraph 2.1.2 of MIL-A-49425, Drawing No. 5002500, ANVIS-6, "forms a part of the specification to the extent specified herein."  Drawing No. 5002500, calls out additional drawings, including Drawing No. 5002490, Night Vision Sight Assembly.  Paragraph 1.1 specifies the "General Requirements" which read as follows:

> "...The Aviator's Night Vision Imaging System (ANVIS)...are Image Intensifier Systems for use with military helicopters as a pilot's aid to vison during the night time low level or nap of the earth (NOE) flight..."

33. Mr. Bell also explains Clause H.2 of the contract which states:

> "The government shall furnish to the contractor enough copies, including extra expendable copies, of TECHNICAL MANUALS... that immediately upon receipt of shipment of government-furnished literature, the contractor will inspect the shipment and advise the U.S. Army CECOM of the total quantity of each publication received and any shortages thereof."

34.  In closing, Mr. Bell states that all inquires and correspondence with respect to government-furnished literature (ANVIS-6 Operator's Manual/Technical Manual) shall be directed to the CECOM Commander in Fort Monmouth, NJ.

35.  <u>Affidavit of Mr. Philip B. Reeder</u>.  Mr. Reeder is the Senior Configuration/Data Management Specialist at ITT Industries,

Inc., Night Vision, in Roanoke, VA. He is responsible for the control of all engineering, manufacturing, and procurement specifications and drawings. He is the point of contact for configuration and logistics matters with the U.S. Government. Additionally, he participates in the validation and verification of Operator's and Maintenance Manuals with U.S. Army and Marine Corps personnel. Mr. Reeder's affidavit corroborates the facts of Mr. Bell's and Mr. Nowak's affidavits, that the U.S. Government approved precise specifications for the ANVIS-6 and that the ANVIS-6 conform to those government designed and developed specifications. That the manufacturer and the U.S. Government coordinated back and forth regarding the precise specifications and conformity to those specifications of the ANVIS-6. Moreover, Mr. Reeder explains the Warnings contained in the ANVIS-6 TM regarding flying from high ambient light levels to low ambient light levels. That the U.S. Government furnishes to ITT Night Vison the TM 11-5855-263-10 (ANVIS-6 Operator's/Technical Manual). That ITT Night Vison's point of contact for the Technical Manual is the CECOM Commander in Fort Monmouth, NJ. Mr. Reeder also explains and thus corroborates Mr. Bell's, as well as Mr. Nowak's affidavits that CECOM is responsible for the content of all documentation relating to the ANVIS-6, including the TM. Mr. Reeder states that ITT Night Vision may propose a modification to the TM by submitting to the Government a DD Form 1664 entitled DESIGN CHANGE NOTICE. CECOM

will review, evaluate, and ultimately either approve or deny the proposed modification. That any and all changes to the Operator's/Technical Manual, can only be added subsequent to U.S. Government (CECOM) approval. Mr. Reeder states that the Commander, U.S. Army CECOM exercises total control over both the original compilation of the TM and any and all revisions, to the TM.

36. Lastly, Mr. Reeder concludes that each ANVIS-6 is built according to the precise design specifications as set forth by the U.S. Government's design. That the TM for the ANVIS-6 is not controlled by ITT Industries, Inc., Night Vision, and cannot be revised by ITT without governmental approval, and the government requires ITT to ship the Technical Manual, and no other manual, with each ANVIS-6. Mr. Reeder attaches as an Exhibit (Exhibit A of Reeder Affidavit) an Army TM 11-5855-263-10, ANVIS-6 Operator's/Technical Manual (Army TM is the NAVY NAVAIR 16-35AVS-7 see top right corner of the manual for Service Identification; TM is used synonymously with Operator's Manual).

37. _Deposition Testimony of LtCol David W. Samples_. LtCol Samples was the Marine Command Mishap Investigating Officer who through his investigation produced the JAGMAN report. LtCol Samples states that after reviewing the facts and opinions of the investigation that the mishap in question occurred due to air crew error. "That the mishap was the result of controlled flight into the water." LtCol Samples' opinion is that the aircrew

-20-

inadvertently began a descent as they executed their left turn out to sea. That the low light level, low ceiling, low visibility, created a loss of visible horizon and that the aircrew did not transition to the instruments in time: However, LtCol Samples believes that the aircrew was attempting to recover the aircraft, to arrest their descent, based upon injuries sustained by the crew (Samples Depo. pg21:13-24; pg.98:14-24).

38. LtCol Samples testified that the investigation found all systems on the mishap aircraft to be operational at the time of impact. That after reviewing the maintenance records of all five (5) sets of ANVIS-6 Night Vision Goggles aboard the mishap aircraft, that no discrepancies were found. That the investigation found no evidence at all that the goggles were in any way defective or not operating properly (Samples Depo. pg.50:11-20; pg.88:21-25).

39. LtCol Samples testified that the Night Vision Manual he referred to in the JAGMAN report was the Marine Aviation Weapons Squadron -1 (MAWTS-1). That the MAWTS-1 is compiled and drafted by the United States Marine Corps, and that the Marines are ultimately responsible for writing and publishing the MAWTS-1 NVD Manual(Samples Depo. pg.56:23-25; pg.57:1-81; pg.90:17-22; and pg.55:16-23). LtCol Samples read into the record one of the warnings given by the MAWTS-1 regarding low light level flight regimes as: "the most difficult and demanding environment to

operate in."

40.    Finally, LtCol Samples testified that when the visible horizon is lost, the air crew should fly utilizing the instruments and gauges of the aircraft because of Instrument meteorological conditions, not the ANVIS-6 goggles.    LtCol Samples' based his testimony on the NATOPs (Naval Flight Operations Manual) as exhibited in the JAGMAN report, enclosure (103)-1 which states: "IMC (Instrument Meteorological Conditions) exist anytime a visible horizon is not distinguishable.    In other words, the mishap crew, upon turning out to sea and losing the visible horizon should have transitioned to the aircraft instruments and gauges instead of attempting to maintain visual conditions through the ANVIS-6 (Samples Depo. pg.78:1-15; JAGMAN, enclosure (103)-1).

41.    Deposition of Maj Matthew J. Paul USMC.    Major Paul was the Night Instructor Pilot in the lead aircraft which witnessed the mishap in question.    He is currently assigned to the United States Presidential Flight Detachment at Quanico, VA.    Major Paul's deposition testimony states that all goggles undergo a pre-operational check by the aircrew prior to flight.    That he is familiar with the ANVIS-6 TM provided with each set of goggles, however, the TM is not utilized by Marine Corps Flight Operations. That the Marines utilize the MAWTS-1 manual instead of the ANVIS-6 TM (Paul Depo. Pg.15:1-19, pg.17:8-22).    Major Paul also explains that transition flight from goggles to instruments should occur

-22-

whenever the ocean and sky become undistinguishable. That anytime an aircrew loses the visible horizon their immediate action should be to transition to the instruments. Paul also explains that the ANVIS-6 have a look under capability which allows the aircrew to look at the instruments of the aircraft to maintain straight and level flight. Additionally, Major Paul states that the MAWTS-1 manual trains Marine aircrews for High Light Level transitions to Low Light Level transitions. Lastly, Major Paul believes that the mishap in question occurred due to controlled flight into the water (Paul Depo. pg.29:5-24; pg.87:1-8, pg.34:6-12, pg.35:7-17, and pg.47:11-12.

42. <u>Deposition Testimony of Glen Lewis Nowak</u>. Mr. Nowak's deposition testimony mirrors his affidavit. Specifically, that the U.S. Government researched, developed, and designed precise specifications for the manufacture of the ANVIS-6 Night Vison Goggles. That the ANVIS-6 confirmed to those precise specifications. That there were no risks associated with the design of the ANVIS-6 that were known to the manufacturer but not known to the U.S. Government/Marines Corps (Nowak Depo. pg.11:17-22, pg.12:1-22, pg.14:10-21, pg.24:5-22, and pg.25:1-22). Additionally, Mr. Nowak explains that the Commander U.S. Army CECOM exercises complete control over the ANVIS-6 TM. That no changes can be made to the TM by the manufacturer without U.S. Governmental approval. Lastly, that the U.S. Government and ITT Industries,

Night Vision, went back and forth and worked closely together in the development and manufacture of the ANVIS-6 Night Vision Goggles (Nowak Depo. pg.26:1-22, pg.43:11-17, and pg.15:1-22.

43. <u>Marine Aviation Weapons and Tactics Squadron-1</u>. MAWTS-1 Helicopter Night Vison Device (NVD) Manual:5th Edition. Marine Corps publication designed to assist commanding officers and aircrew operators with the challenges associated with planning, briefing and executing Assault Support Night Vision Device (NVD) aided missions. (Attached as Exhibit H). LtCol Samples cited to the MAWTS-1 in the JAGMAN FoF 178 that:

> "...manual does not adequately address considerations when transitioning from a high light level area/high cultural lighting/visible horizon to one of no light/no horizon or from a VFR scan to an immediate IFR scan technique."

44. <u>Marine Command Mishap Investigation (JAGMAN Exhbit I)</u>. Investigation report conducted by U.S. Marine Corps regarding the mishap in question, investigating officer LtCol David W. Samples. JAGMAN opinion number one (1) states: "That the mishap was the result of controlled flight into the water."[FoF 102-111]

45.<u>ARMY TM 11-5855-263-10/NAVY NAVAIR 16-35AVS-7 (Exhibit G)</u>. AVIATOR'S NIGHT VISION IMAGING SYSTEM (ANVIS) AN/AVS-6(V)1. This is the Operator's Manual/Technical Manual for the ANVIS-6 Night Vision Goggles. This Technical Manual is produced and controlled by the U.S. Government, specifically the Commander, U.S. Army Communications-Electronics Command (CECOM). Additionally, distribution, changes and or recommendations are all controlled by CECOM (Cover page, pg.C2, pg.C1, pg.i, and pg.1-4). Lastly, page

a and 2 b contain warnings associated with the use of the ANVIS-6. Specifically the warning states:

> "Exercise extreme caution when flying from high ambient light conditions to low ambient light conditions. Under low light conditions the goggles lose some of the resolution that they have under high light conditions. Flying from high light to low light conditions quickly reduces the sharpness and definition of terrain images."

## CONCLUSION

46. The undisputed Summary Judgment facts establish Movant's right to Summary Judgment on all actions brought by the Plaintiff. This is a classic Government Contractor Defense Case. Movant has established each of the required elements with uncontroverted Summary Judgment evidence, despite Plaintiffs inability to identify even a scintilla of evidence in support of the actions alleged against the Movant. Therefore, the Movant, ITT Industries Inc., Night Vision is entitled to Summary Judgment dismissing this case in its entirety with prejudice. Defendant ITT Industries, Inc., Night Vision has agreed to pay its own cost of court.

Respectfully submitted,

GENDRY & SPRAGUE, P.C.
645 Lockhill Selma
San Antonio, Texas  78216
Telephone:  (210) 349-0511
Telecopier: (210) 349-2760

By: _____
RON A. SPRAGUE
State Bar No. 18962100
Fed. I.D. # 151
ATTORNEYS   FOR   DEFENDANT,   ITT
INDUSTRIES INC., NIGHT VISION

-25-

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was mailed, certified mail, return receipt requested, to Mr. Ray Marchan, Watts & Heard, L.L.P., 1926 E. Elizabeth, Brownsville, Texas 78520 and by regular mail to Mr. Robert F. Ruckman, Jackson Walker, L.L.P., 901 Main Street, Suite 6000, Dallas, Texas 75202, and Mr. Joe Valle, Attorney at Law, 1120 East Tenth Street, Brownsville, Texas 78520, on this the ___2ªᵈ___ day of ___APRIL___, 2002.

_____
RON A. SPRAGUE

w:\wry\saldana\msjbrief.gcd

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

KRISTA SALDANA, INDIVIDUALLY      §
AND AS REPRESENTATIVE OF          §
THE ESTATE OF DAVID SALDANA       §
AND AS NEXT FRIEND OF JAGGER      §
SALDANA                           §
                                  §
          Plaintiffs              §
VS.                               §
                                  §        CIVIL ACTION NO. B-00-176
ITT INDUSTRIES, SIKORSKY          §
AIRCRAFT CORPORATION, A           §
SUBSIDIARY OF UNITED              §
TECHNOLOGIES CORPORATION,         §
THE ESTATE OF LT. COL. MARC       §
LEE HOHLE AND THE ESTATE OF       §
CAPTAIN MATTHEW BRENT THOMAS      §
                                  §
          Defendants              §

**AFFIDAVIT OF GLEN LOUIS NOWAK**

STATE OF VIRGINIA          §

COUNTY OF PRINCE WILLIAM          §

"I am GLEN LOUIS NOWAK.  I am over the age of eighteen (18) and fully competent to make this Affidavit.  The facts contained herein are true of my personal knowledge based on my experience and documents reviewed by me.

I am currently employed by the U.S. Government, Department of the Army, Night Vision Electronic Sensors Directorate.  My current duty title is Physicist Scientist.  I am currently assigned to the Land Warrior Program at Fort Belvoir, Virginia.



I began working for the U.S. Government as an instructor in night vision in 1975. Subsequently I was assigned to the research and development program which developed the night vision goggle, AN/AVS-6 as it is today. The research and development phase for the AN/AVS-6 lasted approximately twenty (20) years. From the very inception of the AN/AVS-6 research and development program there has been coordination with the other services, including, but not limited to, the USMC, U.S. Army, U.S. Navy, and U.S. Air Force, as well as ITT INDUSTRIES, INC., Night Vision. To the best of my knowledge, this coordination continues to this day. The United States Government, specifically, the U.S. Military and CECOM (Communication Equipment Command) worked closely with ITT INDUSTRIES, INC. and continuously communicated back and forth with ITT INDUSTRIES, INC. regarding the development, specifications, and fielding of the AN/AVS-6.

As a result of the aforementioned coordinated research and development, the U.S. Government, CECOM, and the Army Material Command established, developed and approved precise specifications for the manufacture of the AN/AVS-6. The AN/AVS-6 conforms to those precise specifications.

ITT INDUSTRIES, INC. developed the warning with the U.S. Government to exercise extreme caution when flying from high ambient light conditions to low ambient light conditions using the

-2-

AN/AVS-6. It also warned the U.S. Government that flying from high light to low light conditions quickly reduces the sharpness and definition of terrain images seen through the AN/AVS-6. Additionally, ITT INDUSTRIES, INC. developed the warning with the U.S. Government to exercise extreme caution when using the ANVIS-6 while flying over low-contrast terrain such as large bodies of water.

I was on the original team that developed the AN/AVS-6 Operators Manual. The U.S. Army, Marines, and Navy also participated in the development of the Operators Manual. The AN/AVS-6 Operators Manual is published by the U.S. Government and contains cautions and warnings regarding high light level and low light level flight. Moreover, in accordance with the procurement contract, an Operators Manual is included in every AN/AVS-6 case with a set of goggles. Warnings regarding High Light Level flight to Low Light Level flight have been in the Operators Manual since at least early 1991. CECOM controls through military regulation what material e.g., Notes, Warnings, Cautions, Operational Checks, etc., go into the AN/AVS-6 Operators Manual. Additionally, any and all changes to the AN/AVS-6 Operators Manual must be submitted via a DA Form 2028 or Equipment Improvement Recommendations through CECOM, who will then either approve or deny the request. No contractor may place anything into the Operators Manual without

-3-

specific written governmental approval.   The U.S. Government furnishes to the contractor, the Operators Manual for packing with the AN/AVS-6 as required by the contract.   No other warnings, labels or instructions are permitted in the manual, on the AN/AVS-6 goggles or in the case.

FURTHER, AFFIANT SAYETH NOT."

GLEN LOUIS NOWAK

SWORN and SUBSCRIBED to before me on this the _12_ day of April, 2002 by GLEN LOUIS NOWAK, Affiant.

Notary Public in and for Virginia
My commission expires: _01/31/2003_

w:\wry\saldana\aff.nowak

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
                   BROWNSVILLE DIVISION

KRISTA SALDANA, INDIVIDUALLY     §
AND AS REPRESENTATIVE OF         §
THE ESTATE OF DAVID SALDANA      §
AND AS NEXT FRIEND OF JAGGER     §
SALDANA                          §
                                 §
            Plaintiffs            §
                                 §
VS.                              §     Civil Action No.: B-00-176
                                 §
ITT INDUSTRIES, INC., SIKORSKY   §
AIRCRAFT CORPORATION, A          §
SUBSIDIARY OF UNITED             §
TECHNOLOGIES CORPORATION,        §
THE ESTATE OF LT. COL. MARC      §
LEE HOHLE AND THE ESTATE OF      §
CAPTAIN MATTHEW BRENT THOMAS     §
                                 §
            Defendants            §
```

## **AFFIDAVIT OF PHILIP B. REEDER**

STATE OF VIRGINIA            §

COUNTY OF _____    §

"I am PHILIP B. REEDER. I am over the age of eighteen (18) and fully competent to

make this Affidavit. The facts contained herein are true of my personal knowledge based on my

experience and documents reviewed by me.

I am currently employed by ITT Industries, Night Vision. My title is Senior

Configuration/Data Management Specialist. I am currently assigned to ITT Industries, Inc.,

Night Vision, in Roanoke, Virginia. My duties include control and processing of Engineering

Changes. I am responsible for the control of all engineering, manufacturing, and procurement

specifications and drawings. I am the current point of contact for configuration and logistics



matters with the U.S. Government.   I am responsible for the coordination between ITT and the

U.S. Army regarding the development of their Maintenance/Logistics Policy for Night Vision

Equipment.  Additionally, I participate in the validation and verification of several Operator's

and Maintenance Manuals with U.S. Army and U.S. Marine Corp personnel.

The United States Government's General Requirements under Contract Number

DAABO7-93-C-K005 for the ANVIS-6 are: "Image Intensifier Systems for use with military

helicopters as a pilot's aid to vision during the night time low level or nap of the earth (NOE)

flight.  The ANVIS shall provide the imagery required for take off, landing, and hover as well as

enroute flight at below 200 feet above ground level, to include NOE at air speeds up to 150

knots."

The United States Government furnishes to ITT  Night Vision, copies, to include extra

expendable copies, of the ARMY TM 11-5855-263-10 (-10 Operator's Manual/Technical

Manual for ANVIS-6; hereinafter referred to as the -10 Operator's Manual) for use by the United

States Marine Corp (USMC).  Each ANVIS-6  is built as to precise government specifications

and standards as described in MIL-A-49425 through MIL-P-49429 per Contract Number

DAAB07-93-C-K005.  Each ANVIS-6 produced pursuant to the aforementioned contract  is

packaged and shipped with a copy of  the -10 Operator's Manual.  A copy of that manual is

included in the carry case with each ANVIS-6 shipped from ITT.  ITT Night Vision's  point of

contact for  Government-furnished literature is the Commander, U.S. Army Communications-

Electronics Command (CECOM), AMSEL-ME-PES, Fort Monmouth, NJ 07703.   I have

attached as Exhibit A an ARMY TM 11-5855-263-10.

The U.S. Government (CECOM) is responsible for the content of  all documentation

relating to the ANVIS-6, to include the -10 Operator's Manual.  ITT Night Vision may propose a modification to that documentation by submitting to the Government a DD Form 1664 entitled DESIGN CHANGE NOTICE.  CECOM will review and evaluate the proposed modification and ultimately make the decision to accept/reject the modification.  Any and all changes and or modifications to government-furnished documentation, specifically the -10 Operator's Manual, can only be added subsequent to U.S. Government (CECOM) approval.   The Commander, U.S. Army Communications-Electronics Command  thereby exercises total control over both the original compilation of the -10 Operator's Manual and any and all revisions, to that manual.

I am aware of the Warning/Equipment Limitations contained throughout the -10 Operator's Manual.  Specifically, page a and change 2 b of the -10 Operator's Manual which states:

**WARNING**

**Equipment Limitations**

To avoid personal injury and property damage when using the ANIVS, carefully read and understand the following safety precautions.

- The equipment requires some night light (moonlight, starlight, etc.) To operate.  The level of performance depends on the level of light.

- Night light is reduced by such factors as passing cloud cover and objects that produce shadows.

- The equipment is less effective viewing into shadows and other darkened areas.

- The equipment is less effective through rain, fog, sleet, snow, smoke, and other reflective materials.

- Adjust speed and altitude to prevent overflying the field of view when

3

conditions of possible reduction or loss of vision exist.

- Exercise extreme caution when flying over low-contrast terrain such as snow-covered territory, sandy desert environments, large bodies of water, or grassy hills. Under ambient starlight conditions, low-contrast environments degrade visibility, thereby disguising or masking changes in the terrain. This is especially true under low-light conditions (e.g. starlight and overcast starlight) and higher speeds.

### WARNING

#### Equipment Limitations (cont.)

- Exercise extreme caution when flying from high ambient light conditions to low ambient light conditions. Under low light conditions, the goggles lose some of the resolution that they have under high light conditions. Flying from high light to low light conditions quickly reduces the sharpness and definition of terrain images. . . ."

In addition to the aforementioned equipment limitations, the term "Warning" is defined on page 1-12 of the -10 Operator's Manual as:

"WARNING. Conditions, practices, or procedures that must be observed to avoid personal injury or loss of life."

The warnings contained in the -10 Operator's Manual and the content of the technical manual is controlled by the U.S. Government. The -10 Operator's Manual is printed according to and in conformity with government specifications as per the Commander, U.S. Army CECOM, AMSEL-LC-LEO-E-ED-P, Ft. Monmouth, NJ 07703-5000, as well as the Commanding Officer, Naval Air Technical Services Facility, 700 Robbins Ave., Philadelphia, PA 19111. Each ANVIS-6 is built according to the precise design specifications as set forth by the U.S. Government design. The -10 Operator's Manuals are not controlled by ITT, and cannot be revised by ITT without government approval, and the government requires ITT to ship the -10 Operator's Manual, and no other manuals, with each ANVIS-6 Night Vision Goggle System.

4

FURTHER, AFFIANT SAYETH NOT."

PHILIP B. REEDER,  AFFIANT

SWORN and SUBSCRIBED to before me on this the ___11___ day of December, 2001 by PHILIP B. REEDER, Affiant.

Notary Public in and for Virginia

My commission expires:  _02/29/04_

`w:\wry\saldana\Reeder.aff`

5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

KRISTA SALDANA, INDIVIDUALLY        §
AND AS REPRESENTATIVE OF             §
THE ESTATE OF DAVID SALDANA          §
AND AS NEXT FRIEND OF JAGGER         §
SALDANA                              §
                                     §
                                     §
                         Plaintiffs  §        §

VS.                                  §                    Civil Action No.: B-00-176
                                     §
ITT INDUSTRIES, INC., SIKORSKY       §
AIRCRAFT CORPORATION, A              §
SUBSIDIARY OF UNITED                 §
TECHNOLOGIES CORPORATION,            §
THE ESTATE OF LTC. MARC LEE          §
HOHLE AND THE ESTATE OF              §
CPT. MATTHEW BRENT THOMAS            §
                                     §
                         Defendants  §        §

## AFFIDAVIT OF FRANCIS O. BELL

STATE OF VIRGINIA          §

COUNTY OF ROANOKE                      §

"I am FRANCIS O. BELL. I am over the age of eighteen and fully competent to

make this Affidavit. The facts contained herein are true of my personal knowledge based on my

experience and documents reviewed by me.

I am currently employed by the Defense Contract Management Agency. My title is

Quality Assurance Specialist. I am currently assigned as resident Quality Assurance

Representative (QAR) at ITT Industries, Night Vision in Roanoke, Virginia.

One of my duties is to inspect the Aviator's Night Vision Imaging System (ANVIS)

AN/AVS-6 for the Commander, US Army CECOM in accordance with the terms of Contract

Number DAAB07-93-C-K005 ("the Contract") and the specifications incorporated therein. I



DEFENDANT'S
EXHIBIT

conduct my inspection prior to government acceptance and shipment by ITT Industries, Night Vision.

I do not inspect each and every AN/AVS-6 delivered by ITT Industries, Night Vision. Instead I inspect a random sample in accordance with the Quality Assurance Letter of Instruction issued by the Army Project Manager, Night Vision & Electro-Optics, Fort Belvoir, VA on August 19, 1993 to the Commander, DCMAO Baltimore. During the inspection I also verify that each AN/AVS-6 sampled meets the drawing requirement of 5002490, Night Vision Sight Assembly. The drawing includes a list of parts to be included in the assembly. Item number 10 is the ANVIS Operator's Manual, Army TM 11-5855-263-10. Consequently, during the inspection, I verify that each AN/AVS-6 sampled contains the ANVIS Operator's Manual. Note 1 on the drawing states that item number 10 shall be provided by the Government. I do not inspect the contents of the Operator's Manual.

According to paragraph 1.1 of the Statement of Work for AN/AVS-6(V) originally incorporated into the Contract, the requirements defined in the following Military Specifications are the minimum requirements for the AN/AVS-6:

MIL-A-49425  - Aviator's Night Vision Imaging System AN/AVS-6(V) 1, AN/AVS-6(V)2

MIL-L-49426 – Lens Assembly, Objective for Aviator's Night Vision Imaging System, AN/AVS-6(V)1, AN/AVS-6(V)2

MIL-L-49427 - Lens Assembly  Eyepiece for Aviator's Night Vision Imaging System, AN/AVS-6(V)1, AN/AVS-6(V)2

MIL-I-49428 – Image Intensifier Assembly 18mm, Microchannel Wafer, MX-10160/UV

MIL-P-49429 – Power Supply for ANVIS 18 mm Microchannel Wafer.

According to Paragraph 2.1.2 of MIL-A-49425, Drawing No. 5002500,  Aviator's Night Vision Imaging System AN/AVS-6(V)1,  "forms a part of the specification to the extent specified herein." Drawing No. 5002500, calls out additional drawings, including Drawing No.5002490, Night Vision Sight Assembly.

Paragraph 1.1 of the Statement of Work for AN/AVS-6(V) originally incorporated into the contract includes a paragraph entitled "General Requirements." The first two sentences of this paragraph read as follows:

> The Aviator's Night Vision Imaging System (ANVIS) AN/AVS-6 (V1) and AN/AVS-6 (V2) are Image Intensifier Systems for use with military helicopters as a pilot's aid to vision during the night time low level or nap of the earth (NOE) flight. The ANVIS shall provide the imagery required for take off, landing, and hover as well as enroute flight at below 200 feet above ground level, to include NOE at air speeds up to 150 knots.

Clause H.2 of Contract No. DAAB07-93-C-K005 as it originally appeared in the contract reads as follows:

H. 2 Government-Furnished Literature  (APR 1991)

1. The government shall furnish to the contractor enough copies, including extra expendable copies, of TECHNICAL MANUALS in sufficient time for packing with the equipment as required by this contract.

2.  Immediately upon receipt of shipment of government-furnished literature, the contractor will inspect the shipment and advise the US Army Communications – Electronics Command of:

a. the total quantity of each publication received:

b. description of shortages, including type and quantity.

3. If the contractor has not received the government-furnished literature 60 days prior to the delivery date of the first production quantity of equipment, the contractor will immediately advise the Administrative Contracting Officer and the US Army Communications-Electronics Command.

4. All inquires and correspondence with respect to government-furnished literature shall be directed to Commander, US Army Communications – Electronics Command, ATTN: AMSEL-AC-CCB-CG(QUA), Fort Monmouth, NJ 07703-5000

5. The contractor will safeguard all government-furnished literature to assure its availability for packing with the equipment.

I do not know whether the Statement of Work or Clause H.2 were amended by any of the modifications to the contract.

FURTHER, AFFIANT SAYETH NOT."

FRANCIS O. BELL, AFFIANT

SWORN and SUBSCRIBED to before me on this the _10_ day of October, 2001 by FRANCIS O. BELL, Affiant.

Notary Public in and for Virginia

My commission expires: _02/29/2004_

w:\wry\saldana\bell.aff

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| KRISTA SALDANA, INDIVIDUALLY | § | |
| AND AS REPRESENTATIVE OF | § | |
| THE ESTATE OF DAVID SALDANA | § | |
| AND AS NEXT FRIEND OF JAGGER | § | |
| SALDANA | § | |
| | § | |
| Plaintiffs | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. B-00-176 |
| ITT INDUSTRIES, SIKORSKY | § | |
| AIRCRAFT CORPORATION, A | § | |
| SUBSIDIARY OF UNITED | § | |
| TECHNOLOGIES CORPORATION, | § | |
| THE ESTATE OF LT. COL. MARC | § | |
| LEE HOHLE AND THE ESTATE OF | § | |
| CAPTAIN MATTHEW BRENT THOMAS | § | |
| | § | |
| Defendants | § | |

## AFFIDAVIT OF RON A. SPRAGUE
## AUTHENTICATING DAVID W. SAMPLES DEPOSITION

THE STATE OF TEXAS    §

COUNTY OF BEXAR       §

BEFORE ME, the undersigned authority, on this day personally appeared RON A. SPRAGUE, known to me to be the person whose name is subscribed to the foregoing instrument who, after duly sworn and deposed, says:

"I, RON A. SPRAGUE, am over twenty-one (21) years of age and fully competent to make this Affidavit. The following matters are true and in my personal knowledge. Attached hereto and made a part of Defendant's Brief in

Support of Motion For Summary Judgment are true and correct

copies of excerpts from the oral deposition of DAVID W.

SAMPLES, taken on December 17, 2001.

    Further, Affiant sayeth not."

_____
RON A. SPRAGUE, Affiant

    SWORN and SUBSCRIBED to before me by RON A. SPRAGUE on this the 26th day of April, 2002.

_____
Notary Public in and for Texas
My commission expires: 1/17/05

JAMIE GONZALES
NOTARY PUBLIC
STATE OF TEXAS
My Comm Exp. 01-17-2005

w:\wry\saldana.affDWS

DAVID SAMPLES                                        DECEMBER 17, 2001

Page 20

1    your investigation.  Do you have that conclusion?

2                    THE WITNESS:  I have that as opinion?

3                    UNIDENTIFIED:  Right.

4                    THE WITNESS:  Correct.

5                    UNIDENTIFIED:  That paper, you give what your

6    opinion was.

7         A.    Okay.  My opinion is the cause of the accident was

8    air crew error.

9         Q.    All right, sir.  And when you say air crew error,

10   can you be more specific as to what the air crew error was, sir?

11   And you can read it out of your report if you would like, sir.

12   It is on page --

13                   MR. MARCHAN:  Is it number 15 on page 24?

14        A.    "Based on the above findings of facts and opinions,

15   it is the opinion of the investigating officer that the mishap

16   destruction of marine heavy helicopter squadron 361 CH 53 Echo

17   Aircraft, NO-162-007, and the deaths of Lieutenant Colonel Marc

18   L. Hohle, Captain Matthew B. Thomas, Sergeant Abdullo R. Munoz,

19   III and Corporal David Saldana were the result of air crew

20   error."

21        Q.    Okay, sir.  There is another opinion I am going to

22   ask your conclusion that is somewhat more specific.  All right,

23   sir.  I will come back to that later.  If you would, sir, on

24   paragraph two, excuse me, page 23, opinions is what I have.  We

25   may not --  Does everybody have opinions on page 23?  Okay.  I

DEFENDANT'S
EXHIBIT
D

Page 21

1    think yours and I are the same.  I think everybody else has a

2    different one.  Paragraph two of opinions, sir, would you read

3    that, please?

4         A.    "That the aircraft impacted the water with a five

5    degree left wing down, five degree nose down pitch attitude with

6    zero vertical speed indication and a 125 degree heading at an

7    air speed of 70 to 75 knots.  From the instrumentation readings

8    and physical injuries sustained by both Lieutenant Colonel Hohle

9    and Captain Thomas, it appears that at the time of impact, they

10   were attempting to recover."

11        Q.    Okay, sir.  Right above that paragraph one, please,

12   that is what I am looking for.

13        A.    "That the mishap was the result of controlled

14   flight into the water."

15        Q.    Thank you, sir.  Can you explain for the jury which

16   pretty much paragraph two --  Please explain to the jury

17   controlled flight into the water, what that means, sir, for the

18   person walking on the street.

19        A.    Controlled flight into water, you know, it is not

20   something that you want to practice every day.  But basically,

21   the air crew allowed themselves to let that airplane impact the

22   water.  You know, the aircraft was functioning.  The crew was

23   functioning.  And for whatever reason, the aircraft impacted the

24   water.

25        Q.    So it is my understanding, sir, that the air crew

DAVID SAMPLES                                    DECEMBER 17, 2001

Page 50

1    standard, standard goggles.  What you have is you have --  There

2    are goggles out there that are better, say the omnibus four.

3    Different types of tubes in those that give you a little bit

4    better resolution under different light conditions.  So what you

5    don't want to do on a flight is have one crew member who sort of

6    sees at a certain level and another crew member sees at a better

7    level.  You want to basically have everybody seeing at the same

8    level.  Try not to introduce to where, you know, one crew member

9    can't see something that somebody else can.  It basically kind

10   of levels the playing field for everybody in the aircraft.

11          Q.    All right, sir.  And you reviewed the maintenance

12   records of the goggles for the mishap, did you not, the

13   investigation?

14          A.    Correct.

15          Q.    You found no discrepancies in the ANV-6 goggles in

16   all five sets?

17          A.    No.

18          Q.    No discrepancies.  All right, sir.  Sir, did you

19   find any evidence that they were preflighted as per the MAWTS by

20   the crew?

21          A.    I would have to refer back to find out.  Normally,

22   the procedure that we would do is when we check out goggles from

23   our flight equipment shop, they would check out certain battery

24   levels before they would issue it out to make sure that you had

25   full operational batteries.  They have gauges which can check

Page 55

1    error because the crew is not on the instruments and thus they

2    are nose low, left wing low, in a descending left turn into the

3    water?  If they were on the instruments, would that have

4    happened?

5                    MR. MARCHAN:  Objection, form.

6                    MR. YOUNG:  Objection is noted.  You can

7    answer the question, sir.

8                    UNIDENTIFIED:  I don't know if that is within

9    the scope.

10                   MR. YOUNG:  All right.  I will withdraw the

11   question.

12       Q.    (By Mr. Young)  Okay, sir.  Page 22, paragraph 176.

13   If you would read that paragraph, please, sir.

14       A.    "That the MAWTS-1 helicopter NVD manual --"

15       Q.    Yes, sir.

16       A.    "That the MAWTS-1 helicopter NVD manual states in

17   chapter four, tactical formations on NVGs and low light level

18   section.  The low light level flight regime is the most

19   difficult and demanding environment to operate in.  It requires

20   detailed briefing, excellent crew coordination and a vigilant

21   scan.  Lack of visual cues, decreased depth perception and poor

22   external lighting require reduced separation between aircraft,

23   tighter formation in order to adequately maintain sight of lead.

24   Under low ambient light conditions and when atmospheric

25   conditions deteriorate, wing man should decrease lateral

Page 56

1    separation to stay close enough to the lead aircraft to

2    recognize any attitude, altitude or air speed changes.  Tactic

3    turns are not recommended under low light level conditions."

4         Q.    Was that a tactical turn that Tiger 0-7 made before

5    impacting the water?

6         A.    That is what it would be defined as.

7         Q.    All right, sir.  Sir, paragraph 177, page 23.  Next

8    page, sir.

9         A.    "That the NVD manual states in Chapter seven,

10   Section four, formation flight in the maneuver element section

11   that experience has shown that due to limited contrast provided

12   when using NVGs over a smooth water surface, pilots have

13   difficulty perceiving a gradual loss of altitude."

14        Q.    All right, sir.  On opinion, sir, same page,

15   paragraph nine, sir.

16        A.    "That is night vision device --"

17        Q.    Yes, sir.

18        A.    "That the night vision device manual does not

19   adequately address considerations when transitioning from a high

20   light level area slash high cultural lighting slash visible

21   horizon to one of no light, no horizon or from a BFR scan to an

22   immediate IFR scan."

23        Q.    Okay, sir.  That is finding of fact 178.  Sir,

24   can --  I need you to expound upon this statement of your

25   opinion.  First of all, the night vision device manual, what

DAVID SAMPLES                                        DECEMBER 17, 2001

Page 57

1   night vision device manual were you referring to, sir?

2          A.      That is the MAWTS-1 night vision device manual.

3          Q.      All right, sir. · What does the MAWTS stand for?

4          A.      Marine Aviation Weapons and Tactic Squadron.

5          Q.      Okay, sir.  Who writes that manual?

6          A.      That is Marine Aviation Weapons and Tactic Squadron

7   one.  They are sort of our tactical squadron which helps develop

8   tactics, techniques and procedures.

9          Q.      Okay, sir.  Do you have one of those with you

10  today?

11         A.      No, I do not.

12                 MR. MARCHAN:  I believe there is one of your

13  enclosures.

14         A.      I have the relevant portions of enclosures in my

15  JAG.

16         Q.      Okay, sir.  I will get one into evidence later.

17  Okay, sir.

18                 MR. YOUNG:  I am just going to have him

19  identify it.

20                 MR. MARCHAN:  Sure.

21                 MR. YOUNG:  Let the record reflect at this

22  time shown to opposing counsel the MAWTS-1 helicopter night

23  vision device manual.

24         Q.      (By Mr. Young)  Sir, this is the manual?  Would you

25  identify it as the manual you were you referring to in you

Page 78

1      A.    If you had no reference to horizon and you had no

2    other outside references to help keep you the attitude of your

3    airplane, to know what your attitude was, you should be IMC

4    flying on your instruments.

5      Q.    All right, sir.  Bad question on my part.  Based on

6    what Captain Raffini states here, that you couldn't make out a

7    horizon, you couldn't tell where the sea ended and the horizon

8    began, what type of flight is that, sir?  Based only on what

9    Captain Raffini states there in his answer to you?

10             UNIDENTIFIED:  Objection, form.

11     A.    That would be IMC.

12     Q.    All right, sir.  IMC flight, sir.  Once again for

13   the jury, how should they be flying that aircraft under those

14   conditions as stated by Captain Raffini?

15     A.    On your instruments.

16     Q.    On the instruments.  Looking through the goggles?

17     A.    Well, again, if you are on your instruments, you

18   are looking below your goggles.

19     Q.    If you look through the goggles under those

20   conditions --

21     A.    You don't see anything.

22     Q.    Okay.  So the instruments is the only way you are

23   going to be able to fly that aircraft safely; is that correct?

24     A.    Correct.

25     Q.    Thank you.  Okay, sir.  Enclosure 58-9 --

Page 88

1    objection to form but I feel it is only proper to let you know

2    what that is.  Do you mean according to this manual?

3                    MR. YOUNG:  According to NATOPS, that's

4    correct.

5                    MR. MARCHAN:  That would be on --

6                    MR. YOUNG:  I stand corrected.  I will make

7    that very clear.

8         Q.    (By Mr. Young)  According to the NATOPS, the bible

9    as you say, sir, given to the crews to fly their particular

10   aircraft under instrument meteorological conditions, when IMC

11   conditions exist, no visible horizon, how should the air crew be

12   flying that aircraft?

13                   UNIDENTIFIED:  Objection, form.

14        A.    Under the instruments.

15        Q.    Under the instruments.  Thank you, sir.  Sir, were

16   you able to determine under the investigation, or to your

17   knowledge, or the medical examiner, was he able to determine

18   that the crews indeed had the goggles down at the time of the

19   mishap?

20        A.    I don't know.

21        Q.    Okay, sir.  Okay, sir.  You have already answered

22   this earlier.  I want to wrap this up.  Did you find any

23   evidence at all in your investigation, sir, that the goggles

24   were in any way defective or not operating properly?

25        A.    No, I did not.

Page 90

1  question?

2          A.    What he just asked me, correct?

3          Q.    Yes.  You remember he asked you did ITT have

4  anything to do with it.  Let's examine.  From your experience in

5  the military, do governmental contractors coexist and work with

6  the military regarding the products they sell to the military?

7                  MR. YOUNG:  I am going to object to the

8  question.  It is outside the JAG man report.

9                  MR. RUCKMAN:  Objection, form.

10                 MR. MARCHAN:  I am asking for his actual

11  experience and no opinion.

12                 MR. YOUNG:  Objection.  32 CFR states the

13  scope of this deposition is limited to that report.

14                 MR. MARCHAN:  I am waiting for his counsel to

15  instruct.  It is only because he undertook to answer the

16  question that ITT has nothing to do with this manual.

17         A.    Well, I guess my answer would be MAWTS is

18  responsible for writing the manuals.

19         Q.    Sure.

20         A.    They may obtain technical information but they are

21  still ultimately responsible for the writing of the manual and

22  what is published.

23         Q.    You in your actual experience, you are an attorney?

24  Are you an attorney?

25         A.    No.

DAVID SAMPLES                                          DECEMBER 17, 2001

Page 98

1    Counselor, and I stand corrected.  Thank you.

2         Q.    (By Mr. Marchan)  In your investigation, you

3    determined that at the point of impact with the water, that the

4    helicopter was turning or had a left degree, five degree down

5    and five degree forward, I would call it a list because I am

6    used to vessels, downward position when it struck the water; is

7    that correct?

8         A.    That's correct.

9         Q.    All right.  And you also made the determination

10   that from the positions or from the information you gathered,

11   that the pilot, Lieutenant Colonel Hohle and Captain -- let's

12   see here -- who was the captain?

13        A.    Thomas.

14        Q.    -- Captain Thomas were trying to take evasive

15   action or avoid the collision?

16        A.    My opinion was that they were trying to recover

17   based on injuries sustained.

18        Q.    When you say try to recover versus trying to avoid

19   the collision, what is the difference?

20        A.    Well, one is that they recognize that they have a

21   situation that is going on that they are trying to, you know,

22   basically it was a five degree left wing down, five degree nose

23   down.  So they know they are in a descent.  They are trying to

24   arrest their descent.

25        Q.    Okay.  And from your investigation, wasn't it --

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

KRISTA SALDANA, INDIVIDUALLY   §
AND AS REPRESENTATIVE OF   §
THE ESTATE OF DAVID SALDANA   §
AND AS NEXT FRIEND OF JAGGER   §
SALDANA   §
  §
       Plaintiffs   §
VS.   §
  §   CIVIL ACTION NO. B-00-176
ITT INDUSTRIES, SIKORSKY   §
AIRCRAFT CORPORATION, A   §
SUBSIDIARY OF UNITED   §
TECHNOLOGIES CORPORATION,   §
THE ESTATE OF LT. COL. MARC   §
LEE HOHLE AND THE ESTATE OF   §
CAPTAIN MATTHEW BRENT THOMAS   §
  §
       Defendants   §

**AFFIDAVIT OF RON A. SPRAGUE**
**AUTHENTICATING MAJOR MATTHEW J. PAUL DEPOSITION**

THE STATE OF TEXAS   §

COUNTY OF BEXAR     §

BEFORE ME, the undersigned authority, on this day personally appeared RON A. SPRAGUE, known to me to be the person whose name is subscribed to the foregoing instrument who, after duly sworn and deposed, says:

"I, RON A. SPRAGUE, am over twenty-one (21) years of age and fully competent to make this Affidavit. The following matters are true and in my personal knowledge. Attached hereto and made a part of Defendant's Brief in

Support of Motion For Summary Judgment are true and correct copies of excerpts from the oral deposition of MAJOR MATTHEW J. PAUL, taken on February 11, 2002.

Further, Affiant sayeth not."

_____
RON A. SPRAGUE, Affiant

SWORN and SUBSCRIBED to before me by RON A. SPRAGUE on this the 26th day of April, 2002.

_____
Notary Public in and for Texas
My commission expires: 1/17/05

JAMIE GONZALES
NOTARY PUBLIC
STATE OF TEXAS
My Comm Exp. 01-17-2005

w:\wry\saldana.affMJP

-2-

**DEFENDANT'S EXHIBIT "E"**

Page 15

1    there down to flight equipment, you withdraw your

2    gear, and that's where you withdraw your night

3    vision goggles also at flight equipment.  The

4    proper procedure would be to initially inspect

5    your night vision goggles as far as making sure

6    that nothing is broken on the goggles, making sure

7    that the lenses are clean, the batteries are in

8    place.  Once the batteries are in place, you check

9    it up on your helmet to make sure that the

10   batteries are not dead, that you do in fact have

11   operable goggles before you walk outside.  There

12   is an NVG eye lane provided which allows you to

13   adjust the goggles down to a certain visual

14   acuity, and that is also a step or a procedure

15   that you are supposed to do prior to actually

16   going out and flying on the night vision goggles.

17         Q.    Sir, what guides your inspection of

18   those goggles?

19         A.    The MAWTS manual.

20         Q.    Can you tell the jury what the MAWTS

21   manual is and what MAWTS stands for?

22         A.    Marine Aviation Weapons and Tactics

23   Squadron.  They are the duty experts on night

24   vision goggle devices, how we fly on the night

25   vision goggles, and they put out the NVG manual

Page 17

1    manual?

2           MR. YOUNG:   That is correct. I'm sorry.

3    BY MR. YOUNG:

4           Q.   I'll explain that.  Major Paul, if you

5    would, just at the top right corner it says NAVAIR

6    and there is an NSN to the right of it, if you

7    would read that off.

8           A.    Navy NAVAIR 16-35 AVS-7.

9           Q.   Are you familiar with that manual at

10   all?

11          A.    I am familiar with the fact that it

12   exists.  This manual is not something that

13   typically we use as a Bible to guide us in our

14   flight operations.  I think it's something that is

15   provided with every set of goggles when we buy

16   them from the manufacturer, but it's not typically

17   something that we use to guide us in our flight

18   operations.

19          Q.   Do you use something instead of that

20   manual?

21          A.   We use the MAWTS manual that I spoke of

22   earlier.

23          Q.   Sir, if you would just continue.

24          A.    Okay.  After Captain Ruffini and myself

25   briefed, we went down to the flight equipment and

MAJOR MATTHEW J. PAUL                                    FEBRUARY 11, 2002

Page 19

1      A.    I'm responsible for the conduct of that
2  flight, okay.
3      Q.    That flight, does that consist of both
4  CH-53s?
5      A.    Yes.
6      Q.    Let me ask you another question here
7  real quick and I'll let you get back to the
8  mission.  You said you preflighted the goggles as
9  per the MAWTS.  So you, Captain Ruffini -- did
10  your crew preflight their goggles with you also?
11      A.    They did not preflight them with us, so
12  I couldn't tell you if they used the night vision
13  goggle lane that evening or not.
14      Q.    Sir, do you know if Major Select Hohle
15  and Captain Thomas, do you know if they or their
16  crew preflighted their goggles that night?
17      A.    I did not visually see them do either.
18  I was not there when they drew their gear.
19      Q.    It's correct though that subsequent to
20  your preflight of the goggles, that you know you
21  have an operational set of goggles before you walk
22  out to that aircraft; is that a correct statement,
23  sir?
24      A.    Yes.  And additionally, before we were
25  goggled, meaning we had the goggles down and are

Page 20

1   using them and looking through the goggles from

2   chalk to chalk, meaning from the time that we

3   started aircraft and taxied until we got back that

4   evening.

5           Lieutenant Colonel Hohle's aircraft

6   taxied out first on the runway and we followed

7   them.  We took off I think about five minutes

8   late, about 19:35, proceeded outbound via course

9   rules there from Futenma Air Base in Okinawa.  And

10  there's two night vision goggles routes that you

11  can follow that are published routes that we are

12  allowed to fly at night there.  One is the

13  southern route and one is the northern route.  The

14  southern route takes you around the southern tip

15  of the island and the northern route takes you

16  around the northern tip of island.

17          Q.   Let me interrupt you again, sir.  Did

18  you, and if you did, receive a weather brief prior

19  to your mission, could you go over what the

20  weather brief gave you and tell us about the

21  weather when you actually got out on your route,

22  sir?

23          A.   The weather brief is always given by

24  the operations duty officer prior to the brief.  I

25  don't recall what he called the weather at.  I

Page 29

1    location where your aircraft is right then --

2         Q.    Let me interrupt you.  You said you

3    transitioned to the instruments?

4         A.    Yes, sir.

5         Q.    If you would, sir, explain to the jury

6    what transition to the instruments entails.

7         A.    It's a transition from using primarily

8    visual references for flying to using instrument

9    references for flying.  Obvious differences

10   between the two.  Basically I'm looking outside

11   when I am flying on the goggles for the most part

12   when I have stuff to look at.  When we turn left

13   out toward the ocean, the difference between the

14   ocean itself and the sky is not discernible or is

15   not discernible under the conditions that we are

16   flying that night.  With that you really can't

17   tell if you are descending or if you are in a turn

18   left or right or if you are climbing unless you

19   are looking at your instruments.

20        Q.    What do the instruments provide you

21   with, sir?

22        A.    Well, they provide you exactly that,

23   altitude, air speed, attitude of the aircraft,

24   whether or not you're descending --

25        Q.    What is attitude of the aircraft?

Page 35

1    NAVAIR publication.

2        Q.    When you say NAVAIR, who controls that?

3    Or who is NAVAIR, if you will?

4        A.    Well, Naval -- Navy air is what you

5    think when you think NAVAIR.  Who the controlling

6    custodian is, I couldn't tell you.

7        Q.    Sir, have you been, either in flight

8    school or once you left flight school, trained on

9    high light level transitions to low light level

10   transitions under the goggles?

11       A.    Yes.

12       Q.    Who trains you for those procedures?

13       A.    Well, again, the MAWTS manual is the

14   basic ingredient, if you want to call it that.

15   That's the manual we will refer to most often when

16   it comes to having anything to do with flying

17   under the night vision goggles.

18       Q.    Sir, on the night of the mishap, do you

19   recall if during the preadmission brief an

20   inadvertent IMC was briefed?

21       A.    Yes, sir.

22       Q.    If you would explain to the jury

23   inadvertent IMC in the brief that took place, sir.

24       A.    Okay.  You can cover inadvertent IMC in

25   a lot of ways.  All it is is flying in the clouds

Page 34

1    instruments, or if you have them dialed a fair

2    amount away from your face, you sometimes don't

3    even have to do that.  But you give away some of

4    the field of view that the goggles provide if you

5    push them further away from your face.

6              Basically, look under capability refers

7    to the ability to look under the goggles at your

8    instruments easily so that you can transfer from

9    flying on the goggles looking through them for

10   your visual references to when you no longer have

11   them, being able to look under for the references

12   that the instruments provide you.

13             Q.   Sir, what manual or training guides

14   your actions once you have lost a visible horizon?

15             A.   Well, the MAWTS manual that we spoke

16   about earlier talks to it, and the instrument

17   flight manual, which is another manual used

18   regarding principles of instrument flight, talks

19   about it as well.  Basically it's instilled in us

20   from the time that we show up at flight school and

21   start flying instruments all the way through the

22   training.

23             Q.   And the instrument manual, if you know,

24   who creates that document?

25             A.   Instrument flight manual I think is a

Page 47

1    for training purposes, to make it easier on the

2    individual being evaluated, you would put him on

3    whichever side made that particular mission or

4    task easier or less difficult for him?

5        A.    Yes, sir.

6        Q.    Sir, if you would -- and I'm almost

7    finished here -- would you give us your opinion as

8    to what happened on the night in question?  The

9    one that's in his statement.

10        MR. RISHEL:  Okay.

11        THE WITNESS:  My thoughts are that it

12    was controlled flight into the water, that nothing

13    mechanically was wrong with the aircraft, and that

14    essentially they flew it into the water because of

15    their loss of visual references.  There was no

16    indication on the radio that the aircraft that

17    went into the water, that anything was wrong with

18    the plane -- I didn't get any radio calls from

19    them -- and there was no indication that -- there

20    was no indication that they knew what was coming.

21        What happened to them that night could

22    happen to anybody if you lost your visual

23    references, you didn't transition to an instrument

24    scan, i.e., you kept looking outside for something

25    to look at when there is nothing to look at, and

MAJOR MATTHEW J. PAUL                                    FEBRUARY 11, 2002

Page 87

1    at when they lost their immediate horizon?

2         A.    Their immediate transition should be to

3    the instruments, utilizing the lookdown capability

4    of the goggles, being able to see underneath them.

5    Their primary references should have gone straight

6    to the instrumentation and the cues that

7    instruments provide you advice which you can see

8    outside.

9         Q.    Major Paul, if you would, sir, the

10   operator's manual that you have right there, if

11   you would refer to page 2-A, that's the first

12   page.

13        A.    Okay.

14        Q.    Tell you what, let's come back to that.

15   Let's go to page 1-4.

16        A.    Okay.

17        Q.    In the lower left, would you read first

18   the heading of 1-5 and then read that paragraph,

19   please.

20        A.    1-5, "reporting equipment improvement

21   recommendations"?

22        Q.    Yes, sir, please.

23        A.    "If your ANVIS needs improvement, let

24   us know.  Send us an EIR" -- which is equipment

25   improvement recommendation -- "send us an EIR.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

KRISTA SALDANA, INDIVIDUALLY          §
AND AS REPRESENTATIVE OF              §
THE ESTATE OF DAVID SALDANA          §
AND AS NEXT FRIEND OF JAGGER         §
SALDANA                              §
                                     §
          Plaintiffs                 §
VS.                                  §
                                     §          CIVIL ACTION NO. B-00-176
ITT INDUSTRIES, SIKORSKY             §
AIRCRAFT CORPORATION, A              §
SUBSIDARY OF UNITED                  §
TECHNOLOGIES CORPORATION,            §
THE ESTATE OF LT. COL. MARC          §
LEE HOHLE AND THE ESTATE OF          §
CAPTAIN MATTHEW BRENT THOMAS         §
                                     §
          Defendants                 §

### AFFIDAVIT OF RON A. SPRAGUE
### AUTHENTICATING GLEN LUIS NOWAK DEPOSITION

THE STATE OF TEXAS    §

COUNTY OF BEXAR       §

BEFORE ME, the undersigned authority, on this day personally appeared RON A. SPRAGUE, known to me to be the person whose name is subscribed to the foregoing instrument who, after duly sworn and deposed, says:

"I, RON A. SPRAGUE, am over twenty-one (21) years of age and fully competent to make this Affidavit. The following matters are true and in my personal knowledge. Attached hereto and made a part of Defendant's Brief in

Support of Motion For Summary Judgment are true and correct

copies of excerpts from the oral deposition of GLEN LUIS

NOWAK, taken on December 18, 2001.

    Further, Affiant sayeth not."

_____
RON A. SPRAGUE, Affiant

    SWORN and SUBSCRIBED to before me by RON A. SPRAGUE on this the
26th day of April, 2002.

_____
Notary Public in and for Texas
My commission expires: 1/17/05

JAMIE GONZALES
NOTARY PUBLIC
STATE OF TEXAS
My Comm Exp. 01-17-2005

w:\wry\saldana.affGLN

-2-



DEFENDANT'S EXHIBIT F

Glen Lewis Nowak                                    December 18, 2001

Page 11

1    intensifier tube, and we had to make sure that

2    performed like it should be.  We worked out a lot

3    of different light levels for accident -- for

4    developing accident investigation type things.  We

5    would develop criteria, for instance, you could --

6    I think if I recall, you have to see a three

7    centimeter branch when you're going 40 knots, two

8    clearances away from the roller clearance,

9    something like that.  So you had to be able to see

10   something that small with the goggles --

11        Q.    Okay, sir.

12        A.    And then we developed speeds, how fast

13   it could actually drive with these type of things.

14        Q.    Okay.  Were you developing these -- was

15   the idea for aviation or ground personnel, or

16   both?

17        A.    I worked on two different programs,

18   pre-AN/AVS, it was entirely aviation.  So, I did

19   ground as well.

20        Q.    All right, sir.  And when you say your

21   team developed.  Did that encompass also the

22   specifications as you stated as far as what they

Page 12

1    should see, did your team that develope these

2    specifications also?

3         A.   Yes, very specific specs on light levels

4    which you could see on how the goggles performed.

5    And it was a continuing development over a lot of

6    years.

7         Q.   All right, sir.

8         A.   We went into all kinds of weather, that

9    is another interesting thing.  We went to Germany,

10   we went to Panama, we went to the Pacific, we went

11   to Alaska, just to see the different types of

12   weathers.  We had -- our physicist actually took a

13   survey all over the world and developed what

14   weather, and how quickly it could change and even

15   things like, did you have an early warning system,

16   you know, that type of thing.

17        Q.   All right, sir.  So was there a

18   governmental agency above you that approved the

19   specifications that your team set forth in

20   designing AN/AVS?

21        A.   Well, actually let's see if I can go

22   back.  These are going to be accurate, AMC and

Glen Lewis Nowak                                                                    December 18, 2001

Page 14

1    would have to use the military spec that was

2    developed and then continue as they made

3    improvements to keep that spec updated.  That was

4    part of the requirements.

5         Q.   All right, sir.  When you say to keep --

6    could you repeat that?  Just read the record back

7    regarding the requirements.

8              (Answer read.)

9              BY MR. YOUNG:

10        Q.   In order to maintain those

11   specifications as you stated, it's your

12   testimony -- did the AN\AVS 6 conform to those

13   specifications?

14        A.   Absolutely.

15        Q.   The original specifications as the

16   improvements continued, the specifications that

17   the government placed upon ITT, the AN\AVS 6 did

18   conform to those specifications?

19        A.   I guess the best way to put that is that

20   they couldn't field any equipment unless it met

21   those specs.

22        Q.   Okay.

Page 15

1      A.    So we did a lot of reliability standard

2   testing.   Nothing could go out the door unless

3   they were tested.

4      Q.    Okay, and it was tested by your

5   governmental team?

6      A.    A government witness was there all of

7   the time.

8      Q.    All right, sir.

9      A.    I performed that duty as well.

10     Q.    What would you say to the statement that

11  the government and ITT worked closely and went

12  back and forth regarding the development,

13  specifications and fielding of the AN/AVS 6?

14     A.    I would say that that would be

15  absolutely true, that as the government and ITT

16  worked together, let's see if I can remember some

17  of these things.   There are specs for everything.

18  There is a spec for -- labels on the package,

19  there is a spec for how they're packaged, but the

20  most important specs are the performance type

21  specs that take care of how the tube operates, how

22  the lenses are made, what kind of filters are on

Page 23

1    fielding, and they're getting the system into

2    their inventory and they're accepting it.

3         Q.   All right.

4         A.   So the Marine Corps had to have these

5    systems right from the beginning.

6         Q.   Okay.  Sir, are there any notes,

7    warnings or cautions entailed in that operators

8    manual?

9         A.   Yes.  Because this is, this particular

10   manual is for aviation -- all our manuals have

11   cautions and notes in there.  And there is also

12   something called a Distribution C Statement that

13   says only military can get these manuals so they

14   don't go out to any one else except maybe for

15   military sales.

16        Q.   All right.

17        A.   So the distribution is controlled -- and

18   there is even a destruction, how to get rid of

19   this manual, how to get rid of the equipment if

20   there is a case like that.  But the key things are

21   the caution, how to handle the goggles, and all

22   this is right up front so the guy can't miss them.

Glen Lewis Nowak                                    December 18, 2001

1      Q.   All right, sir.  Sir, it your testimony,

2  sir, that this manual is a limited distribution

3  document?

4      A.   Oh, yeah.

5      Q.   All right, sir.  Sir, if you would --

6  counsel, I would direct you to Page 1-7.  I'm

7  sorry, 1-12, I stand corrected.  1-12.  Mr. Nowak.

8  On Page 1-12 do you see the term, "warning" in

9  capitalized print followed by the definition?

10     A.   1-12?

11     Q.   I have 1-12.

12     A.   Yeah, I see it now.

13     Q.   Would you read that definition of

14  warning to us as stated in the goggles?

15     A.   Yeah, "Conditions, practices or

16  procedures that must be observed to avoid personal

17  injury or loss of life."

18     Q.   Sir, can you expound on that, exactly

19  what that means to the person walking on the

20  streets that is using this pair of goggles?

21     A.   Sure.  He has got to know if his goggles

22  are working right, and what maintenance has to be

Page 25

1    done on them before he can leave and get them into

2    an aircraft and take off.  So all of those things

3    that are necessary for him as a pre-flight include

4    checking these goggles to make sure they're

5    operating properly.

6         Q.    And if he doesn't heed the warning, if

7    you will, what is the possible result?

8         A.    Possibly is he could get into an

9    accident.

10        Q.    Sir, if you would, the first page is

11   alpha.

12        A.    I have got it.

13        Q.    Mr. Nowak, do you have any experience

14   with any of these warnings as far as placing them

15   in the manual, or how they came to be placed into

16   the manual, or the background regarding the

17   fielding to put these warnings in the manual?

18        A.    Yes, I do.

19        Q.    Can you tell me what that is?

20        A.    First of all, we have got a regulation

21   that tells them exactly what goes into this

22   manual.

Page 26

1      Q.    Who has that?

2      A.    CECOM.

3      Q.    CECOM has a regulation?

4      A.    How is it to be worded, as well.

5            MR. MARCHAN:  Wait.

6            BY MR. YOUNG:

7      Q.    I'm sorry, you're right. Strike my

8   comments.

9      A.    Okay.  The manual that -- it's a TM,

10   it's instructions how to put the TM together.

11   Where the cautions go, how they're worded, how

12   many should be in there, that type of stuff.  And

13   if, through the experience of the pilots or

14   through our developmental type testing or

15   operational testing, we find that there are things

16   that he should specifically be looking for, then

17   we put them right up front here in the warnings or

18   cautions.  And we also define what a warning and a

19   cause is.  That is what we read the first time.

20            So a caution is not as strict as a

21   warning, but it's making him aware of certain

22   things that he's got to be before he takes off.

Page 43

1    you find any mistakes or if you know a way to

2    improve the procedures, please let us know.  Mail

3    us your letter or DA Form 20-28, recommended

4    changes to publications and blank forms directly

5    to Commander, U.S. Army CECOM, Electronics

6    Command, Fort Mamouth."  And then it gives the

7    address to send it to.

8         Q.   Okay?

9         A.   It also gives the address for the Marine

10   Corps and for the Air Force.

11        Q.   Okay, sir.  Assume with me, if you

12   would, Mr. Nowak, that an employee at ITT wishes

13   to change something regarding the goggles for the

14   manual.

15        A.   Okay.

16        Q.   Can he make that change at ITT?

17        A.   Not without a government approval.

18        Q.   So he has to go through the government

19   to get it approved?

20        A.   If he wants to make a change to -- let's

21   say he wants to make a change to this manual, or

22   he wants to make a change to a working procedure,

Page 45

1          Q.   All right, sir.

2               Just give me a moment to review my

3     notes.  I'm almost finished, Mr. Nowak.

4               Sir, to make sure I understand, you all

5     began the development in the early '80s, is that

6     correct?  Was it '84 you stated?

7          A.   I was on program actually in '81.

8          Q.   '81.  And the Marine Corps was involved

9     with you at that time?

10         A.   In the testing, they were involved.

11         Q.   About or approximately what year did

12    that begin, sir?

13         A.   Before '84.

14         Q.   All right, sir.

15         A.   We do a material fielding plan to

16    everyone that gives us money, I guess is the way

17    to put it.  So the Marine Corps got a material

18    fielding plan, and the Army got one by, you know,

19    Europe and everyone else was still broken down

20    into different kinds of divisions they had, and

21    they all had a signed material fielding plan.  So

22    that at that time that the material fielding plan,

Page 46

1   that manual is finished.

2        Q.   All right sir.  To your knowledge, sir,

3   are the AN/AVS 6 and the Night Vision Goggle

4   program, is it staying the same, or is it growing

5   larger in the military?  Is it becoming a more

6   widely used technology in the U.S. Military, or is

7   it pretty much status quo where its been, or do

8   you have knowledge at all?

9        A.   It's getting larger right now.  I have

10  to say that it's getting larger because of the

11  additional fieldings that are going on out there.

12  With the improvements to the image intensifier

13  tubes that the Army wants the newer tubes.  And so

14  they're constantly upgrading their systems.

15            I have upgraded the Army systems five

16  times in the last seven years.  I literally went

17  around and switched parts out, improved on them.

18       Q.   All right, sir.  Mr. Nowak, just to

19  summarize your testimony, am I correct in

20  understanding that governmental teams of which you

21  were involved, designed, developed and tested the

22  AN/AVS 6, designed, developed and produced?

Page 47

1    A.    Correct.

2    Q.    Produced the specifications for the

3  manufacturer?

4    A.    You're correct.

5    Q.    All right, sir.  And is it your

6  testimony that the AN/AVS 6 performed to those

7  specifications -- those precise specifications?

8    A.    They wouldn't get out the door if they

9  didn't perform.

10    Q.    All right, sir.  And regarding a warning

11  for high light level flight to low light level

12  flight transition from, there have been warnings

13  in this manual as early as 1991, correct?

14    A.    That's the best I can do for you unless

15  I go back and do a little research.

16    Q.    That is fine.  At this time, I would

17  like to enter the Operators Manual as Exhibit

18  Number 6.

19        (Document referred to was marked

20  Deposition Exhibit No. 6 for identification.)

21        MR. MARCHAN:  We have no objection to

22  the manual being attached to this deposition as

Page 62

1    acquisition out on the street, and we told them

2    what we wanted and we handed them the drawings,

3    and we said, make it to this.  And then they came

4    back and showed us that they could make it.

5              The acquisition process today has

6    changed.  And so, I guess the best way I can put

7    it, they kept reducing the size of the government

8    down since Reagan.

9         Q.   Sure.

10        A.   So we don't have enough people to keep

11   up writing these specs, so we do business a little

12   different now.

13        Q.   And how is that?

14        A.   I ask for best value contract.  Here is

15   what we want, here is the drawing package, but you

16   tell me if you can make it any better.

17        Q.   A little more competition that way?

18        A.   Yep.

19        Q.   A little more outsourcing of work that

20   way?

21        A.   Well, there is only so many goggles we

22   can make so --