

**COPY**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
**FILED**

**JUN 0 3 2002**

Michael N. Milby
**Clerk of Court**

| | | |
|---|---|---|
| KRISTA SALDANA, Individually and as Representative of the ESTATE OF DAVID SALDANA and as Next Friend of JAGGER SALDANA<br>　　　Plaintiff,<br>v.<br><br>MELQUIADES SALDANA and AURELIA SALDANA,<br>　　　Intervenors,<br>v.<br><br>ITT INDUSTRIES, SIKORSKY AIRCRAFT CORPORATION, a Subsidiary of UNITED TECHNOLOGIES CORPORATION, the ESTATE OF LT. COL. MARC LEE HOHLE and the ESTATE OF CAPTAIN MATTHEW BRENT THOMAS,<br>　　　Defendants. | § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. B-00-176 |

## BRIEF IN SUPPORT OF DEFENDANT SIKORSKY AIRCRAFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT

ROBERT F. RUCKMAN
Attorney-in-Charge
State Bar No. 17367000
Southern District Bar No. 12018

STUART B. BROWN, JR.
Of Counsel
State Bar No. 24006914
Southern District Bar No. 23545

**JACKSON WALKER L.L.P.**
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:　(214) 953-6000
Telecopy:　(214) 953-5822

ATTORNEYS FOR DEFENDANT SIKORSKY
AIRCRAFT CORPORATION, A SUBSIDIARY OF
UNITED TECHNOLOGIES CORPORATION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

I.      SUMMARY OF THE ARGUMENT ................................................................. 1

II.     ISSUES TO BE RULED UPON BY THE COURT ........................................... 2

III.    NATURE AND STATE OF THE PROCEEDING ............................................ 3

IV.     STATEMENT OF FACTS ................................................................................ 3

V.      ARGUMENT - THE GOVERNMENT CONTRACTOR DEFENSE ................ 5

        A.      The *Boyle* Test. ................................................................................. 5

        B.      Navy Approved Specifications. ........................................................ 10

        C.      Sikorsky's Compliance with the Specifications. .............................. 15

        D.      Dangers Known by Sikorsky but Not Known by the Navy. .............. 18

VI.     CONCLUSION ............................................................................................... 24

CERTIFICATE OF SERVICE ............................................................................... 26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aircraft Crash Litigation Frederick, Maryland, May 6, 1981*, 752 F. Supp. 1326
(S.D. Ohio 1990)..........................................................................................................8

*Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505 (1986) .................................................2, 3

*Boyle v. United Technologies Corp.*, 487 U.S. 500,
108 S.Ct. 2510 (1988)..............................................2, 7, 8, 10, 15, 18, 19, 24

*Boyle v. United Technologies Corp.*, 792 F.2d 413 (4th Cir. 1986) .........................6, 7, 10

*Bynum v. FMC Corp.*, 770 F.2d 556 (5th Cir. 1985).........................................................8

*Garner v. Santoro*, 865 F.2d 629 (5th Cir. 1989) ...............................................................8

*Harduvel v. General Dynamics Corp.*, 878 F.2d 1311
(11th Cir. 1989)..................................................................5, 6, 9, 10, 15, 18, 19

*Hendrix v. Bell Helicopter Textron, Inc.*, 634 F. Supp. 1551 (N.D. Tex. 1986) ...............17

*Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431 (5th Cir. 2000)....................................19

*Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698 (4th Cir. 1989)............8, 10, 16, 19

*Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67 (3d Cir. 1990).........................................7

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348 (1986) ...........3

*Monks v. General Electric Co.*, 919 F.2d 1189 (6th Cir. 1990)...........................................8

*Niemann v. McDonnell Douglas Corp.*, 721 F. Supp. 1019 (S.D. Ill. 1989)...........8, 18, 19

*Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946 (4th Cir. 1989) .............................8, 18

*Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736 (11th Cir. 1985)...............................18

*Skyline Air Service, Inc. v. G. L. Capps Co.*, 916 F.2d 977 (5th Cir. 1990) ............7, 11, 12

*Smith v. Xerox Corp.*, 866 F.2d 135 (5th Cir. 1989).......................................2, 3, 8, 10, 11

*Tozer v. LTV Corp.*, 792 F.2d 403 (4th Cir. 1986) .............................................................8

*Trevino v. General Dynamics, Corp.*, 865 F.2d 1474 (5th Cir. 1989).......................10, 19

*Zinck v. ITT Corp.*, 690 F. Supp. 1331 (S.D.N.Y. 1988)........................................................19

## FEDERAL STATUTES

50 U.S.C. App. §§2061 *et seq.*...........................................................................................14

50 U.S.C. App. §2073 ........................................................................................................14

15 C.F.R. 700.3 .................................................................................................................14

15 C.F.R. 700.7 .................................................................................................................14

15 C.F.R. 700.11 ...............................................................................................................14

15 C.F.R. 700.74................................................................................................................14

## FEDERAL RULES

Fed. R. Civ. P. 56(c) ...........................................................................................................2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| KRISTA SALDANA, et al. | § | |
|     Plaintiff, | § | |
| v. | § | Civil Action No. B-00-176 |
| ITT INDUSTRIES, et al. | § | |
|     Defendants. | § | |

## BRIEF IN SUPPORT OF DEFENDANT SIKORSKY AIRCRAFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE HILDA G. TAGLE, UNITED STATES DISTRICT JUDGE:

COMES NOW Sikorsky Aircraft Corporation, a subsidiary of United Technologies Corporation ("Sikorsky"), one of the Defendants in the above-styled and numbered cause, and files this its Brief in Support of its Motion for Summary Judgment based on the government contractor defense, and would respectfully show the Court the following:

### I.
### SUMMARY OF THE ARGUMENT

Plaintiff and Intervenors (hereinafter collectively referred to as "Plaintiff") allege liability on the part of Sikorsky for the death of Corporal David Saldana arising from the crash of a Marine Corps helicopter into the Pacific ocean near Okinawa, Japan. Plaintiff alleges that Sikorsky's failure to give proper warnings and/or the defective design of the CH-53E helicopter when using Night Vision Goggles was the cause of the accident in question. Plaintiff's expert further contends that the radar altimeters used in the CH-53E helicopter, besides giving a visual warning, should have also contained an aural low altitude warning to alert a helicopter crew using Night Vision Goggles. The summary judgment evidence establishes that the U.S. Navy approved reasonably precise specifications for the helicopter involved in this accident; that the helicopter conformed to those specifications; and there were no dangers associated with the use of the helicopter which were unknown to the United States military, so as to preclude Plaintiff's

claims under the government contractor defense. The evidence further establishes that: (i) the radar altimeters about which Plaintiff complains were government furnished equipment (not manufactured or designed by Sikorsky); (ii) well before this accident, the government was fully aware of the potential dangers involved in using Night Vision Goggles while transitioning from high light levels to low light levels; and (iii) well before this accident, the government was fully aware of the need for an audible low altitude warning in the CH-53E helicopter. The United States Navy maintained sole possession and control over the helicopter involved in this case after its acceptance on April 18, 1984. Based on the foregoing evidence, Sikorsky is entitled to final summary judgment under the government contractor defense outlined in *Boyle v. United Technologies Corp.,* 487 U.S. 500, 503-04, 108 S.Ct. 2510, 2518 (1988).

## II.
## ISSUES TO BE RULED UPON BY THE COURT

Sikorsky submits that the government contractor defense precludes Plaintiff's claims against Sikorsky. The government contractor defense is set forth in *Boyle v. United Technologies Corp.*, 108 S.Ct. 2510 (1988).

Summary Judgment is proper where "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A movant is entitled to summary judgment where the pleadings, depositions, discovery, together with affidavits, establish that there is no genuine issue as to any material fact. *Smith v. Xerox Corp.*, 866 F.2d 135, 137 (5th Cir. 1989).

Once movant establishes that there are no issues of material fact, the burden shifts to the non-movant to set out specific facts in the record showing that a genuine issue exists. *Id.* The Court must view the evidence and all justifiable inferences drawn from that evidence in a light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2513

(1986). However, "[m]ere allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are not enough." *Xerox Corp.*, 866 F.2d at 137 (citation omitted). For a motion to be defeated, the evidence must be such that it would lead a rational trier of fact to find there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S.Ct. 1348, 1351 (1986). Summary judgment should be granted if the non-moving party's evidence is merely colorable, or is not significantly probative. *Anderson*, 106 S.Ct. at 2510-11.

## III.
## NATURE AND STATE OF THE PROCEEDING

This matter involves a helicopter mishap that occurred on April 19, 1999, in the Pacific ocean near Okinawa, Japan. Plaintiff's decedent, Corporal Saldana, was an aerial observer on a CH-53E helicopter that was conducting a low light level training mission utilizing Night Vision Goggles. During the execution of a lead change with another CH-53E helicopter, Corporal Saldana's helicopter crashed into the Pacific ocean. All aircrew on board were killed.

Plaintiff contends that Sikorsky should be held liable for the accident described above and alleges negligence, negligence per se, *res ipsa loquitur*, strict liability, breach of express and implied warranties, failure to warn, defective design, and gross negligence as theories of recovery. Based upon the evidence presented herein, including evidence that the helicopter at issue was built based upon reasonably precise military specifications, and on the fact that the United States government knew of the possible need for an audible low altitude warning for numerous years prior to this accident, Sikorsky respectfully submits that the government contractor defense applies to this matter and thus, precludes all of Plaintiff's claims.

## IV.
## STATEMENT OF FACTS

During the late evening of April 19, 1999, two Marine CH-53E helicopters departed for a mission above the landscape around Okinawa, Japan. (Ex. "A", *JAGMAN Report*: Enclosure 56,

Statement of Maj. Paul). The mission of the Night Vision Goggle ("NVG") training flight was to simulate a recovery mission with one downed pilot evading enemy troops. (Ex. "A", *JAGMAN Report*: Finding of Fact #64, 80, pp. 11-12). Captain Matthew Thomas, the pilot of the aircraft involved in the accident (the "mishap aircraft"), was conducting his first NVG flight in low light level conditions. (Ex. "A", *JAGMAN Report*: Finding of Fact #73, p. 12). Plaintiff's decedent, Corporal David Saldana, was the aerial observer in the mishap aircraft. (Ex. "A", *JAGMAN Report*: Finding of Fact #4, p. 6).

After their initial take-off, both helicopters proceeded south and landed at Ie Shima. (Ex. "A", *JAGMAN Report*: Finding of Fact #90, 94, 95, pp. 13-14). The helicopters then departed Ie Shima and proceeded north along a NVG route. (Ex. "A", *JAGMAN Report*: Finding of Fact #96, 97, p. 14). Unable to locate a landing zone at Fire Base Jones, the helicopters turned south and paralleled the coast line. (Ex. "A", *JAGMAN Report*: Finding of Fact #98, 99, p. 14). At this time, the weather to the south was poor, thus, the pilots decided to turn back north; the mishap aircraft was behind and to the right of the second helicopter. (Ex. "A", *JAGMAN Report*: Finding of Fact #100, 102, 103, pp. 14-15).

In order to return north, Captain Paul, the pilot of the second helicopter, instructed the mishap aircraft to turn first and he would follow. (Ex. "A", *JAGMAN Report*: Finding of Fact #103, p. 15). This lead change maneuver was not one that had been pre-briefed by the pilots. (Ex. "A", *JAGMAN Report*: Finding of Fact #107, p. 15). The mishap aircraft thus commenced a left turn, away from the coast (towards the ocean). (Ex. "A", *JAGMAN Report*: Finding of Fact #104, p. 15). Once the mishap aircraft had begun its left turn, the second helicopter followed. (Ex. "A", *JAGMAN Report*: Finding of Fact #110, p. 15). About half way through its turn, a bright flash occurred off the left side of the second helicopter. (Ex. "A", *JAGMAN Report*: Finding of Fact #110, p. 15). The mishap aircraft had impacted the water. (Ex. "A", *JAGMAN*

*Report*: Finding of Fact #3, p. 6). None of the crew on the other helicopter "heard, saw, or sensed anything unusual" with the mishap aircraft prior to the accident. (Ex. "A", *JAGMAN Report*: Finding of Fact #108, p. 15). All crew members of the mishap aircraft were killed. (Ex. "A", *JAGMAN Report*: Finding of Fact #5, p. 6).

It was determined that all aircraft systems were operational at the time of the mishap and testing and analysis showed that all engines were turning at the time of the impact with the water. (Ex. "A", *JAGMAN Report*: Finding of Fact #150, 151, pp. 19-20).

A United States Marine Corps JAGMAN investigation found that the accident and resulting aircrew deaths were "the result of aircrew error." (Ex. "A", *JAGMAN Report*: Opinion #15, p. 24).

The mishap aircraft was manufactured by Sikorsky under contract with the United States Navy and in accordance with precise design specifications provided, approved and required by the United States government. (Ex. "C", *Affidavit of Gordon E. Leach ("Leach Aff.")*, p. 3, ¶11). The NVGs utilized by the aircrew were manufactured by ITT Industries, a co-defendant in this suit. The radar altimeters, of which Plaintiff complains, were government furnished equipment ("GFE"), meaning that they were designed and manufactured by a third-party vendor chosen by the United States government. (Ex. "C", *Leach Aff.*, p. 4, ¶12).

## V.
## ARGUMENT - THE GOVERNMENT CONTRACTOR DEFENSE

A.    The *Boyle* Test.

The United States Supreme Court has recognized that in certain areas of "uniquely federal interests" state law must be preempted and, if necessary, replaced by federal common law. One such area of uniquely federal interest is the government's selection of military hardware, in which the government must exercise discretion. *Harduvel v. General Dynamics*

*Corp.*, 878 F.2d 1311, 1315 (11th Cir. 1989). Just as the United States is protected from liability when it exercises its own discretion, the government's agents should likewise be immunized via a government contractor defense when their actions reflect the government's discretionary approval of those actions. *Id.* In the landmark case of *Boyle v. United Technologies Corp.*, which involved the Sikorsky CH-53D helicopter, the predecessor to the helicopter involved in this case, the U.S. Supreme Court firmly defined the parameters needed for a government contractor to avail itself of the government contractor defense.

On April 27, 1983, a Sikorsky CH-53D Marine Corps helicopter crashed in the ocean off the coast of Virginia. *Boyle v. United Technologies Corp.*, 792 F.2d 413, 414 (4th Cir. 1986). David Boyle, the co-pilot of that CH-53D, was the only person killed in the crash. *Id.* Boyle's surviving relatives sued Sikorsky alleging negligence and breach of warranty in the design of the co-pilot's escape hatch and the re-work of the helicopter's control system. *Id.* The jury returned a general verdict for the plaintiffs. *Id.*

Sikorsky appealed to the Fourth Circuit which reversed and remanded with directions to enter judgment for Sikorsky. *Id.* In doing so, the Fourth Circuit held that Sikorsky was immune from liability for any design defects because it had satisfied the requirements of the government contractor defense. *Id.* at 415. In determining if Sikorsky had met the requirements for this defense, the Fourth Circuit looked to the testimony of Mr. Thomas Dixon, a Sikorsky witness. In commenting on the evidence presented by Mr. Dixon and Sikorsky at the trial court level, the Fourth Circuit stated the following:

> Sikorsky and the Navy worked together to prepare detailed specifications for the CH-53 helicopter. One of Sikorsky's program engineering managers for the CH-53 [Mr. Dixon] described in some detail the back-and-forth discussions between Sikorsky and the Navy. We have previously said that this type of exchange of information will normally suffice to establish government approval of the design in question. (Citation omitted). In addition, Sikorsky built a mock-up of the cockpit with all the instruments and controls, . . . . The Navy reviewed the mock-up and

approved the design. As a result, Sikorsky has adequately demonstrated that the Navy approved reasonably detailed specifications for [the system in question].

*Id.* at 414-415.

The *Boyle* plaintiffs were granted *certiorari* by the United States Supreme Court where they contended that in the absence of legislation specifically immunizing government contractors from liability for design defects there was no basis for the judicial recognition of the government contractor defense. *Boyle*, 108 S.Ct. at 2513-14. The Supreme Court disagreed and adopted the government contractor defense as applied by the Fourth Circuit. The test for immunity under the government contractor defense has since been coined the "*Boyle* Test" and was detailed by the Supreme Court as follows:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* 108 S.Ct. at 2518.

The Supreme Court adopted this test after concluding that to do otherwise would frustrate the "discretionary function" of the United States government when exercising its judgment by balancing many technical, military, and even social considerations involved in procuring military equipment. The Court noted that this discretionary function often involves a trade-off between greater safety and greater combat effectiveness. *Id.* at 2517-18.

Since the recognition of the government contractor defense in *Boyle*, numerous government contractors have been granted summary judgment upon a showing that the *Boyle* elements were satisfied. *See, e.g., Skyline Air Service, Inc. v. G. L. Capps Co.*, 916 F.2d 977 (5th Cir. 1990) (Bell Helicopter motion for summary judgment upheld in helicopter crash litigation); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67 (3d Cir. 1990) (summary judgment for helicopter

manufacturer upheld regarding helicopter crash litigation); *Monks v. General Elec. Co.*, 919 F.2d

1189 (6th Cir. 1990) (summary judgment for helicopter engine manufacturer upheld regarding

helicopter crash litigation); *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698 (4th Cir.

1989); *Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946 (4th Cir. 1989); *Smith v. Xerox Corp.*,

866 F.2d 135 (5th Cir. 1989); In re *Aircraft Crash Litigation Frederick, Maryland, May 6, 1981*,

752 F.Supp. 1326 (S.D. Ohio 1990); *Niemann v. McDonnell Douglas Corp.*, 721 F.Supp. 1019

(S.D. Ill. 1989).  The government contractor defense is a broadly applied shield of immunity,

which is applicable to all liability of a military contractor for injury caused by a design defect.

*Boyle*, 108 S.Ct. at 2513.  *Boyle* does not limit the defense to strict liability actions or any

particular theory of recovery, but instead refers to "liability" under "state law." *Id.*  at 2518.

The application of the broad sweep of the *Boyle* Test can be seen in the Fifth Circuit case

of *Smith v. Xerox Corp.*, 866 F.2d 135 (5th Cir. 1989).  The Smith plaintiff was injured when an

anti-tank weapon simulator misfired.  The Fifth Circuit summarized the plaintiffs' claims against

the equipment's manufacturer as follows:

> His allegations against [defendant] included negligence in the design and/or
> manufacture of the weapon; strict liability for injuries caused by a weapon
> unreasonably dangerous for its normal use; failure to warn or instruct [plaintiff]
> regarding the possibility of the weapon's firing when armed, when [defendant]
> had knowledge that the weapon had malfunctioned in a similar manner
> previously; and breach of warranty of fitness for intended use.

*Id.* at 136.  After addressing each of the above causes of action individually, the Fifth Circuit

concluded that the defendant manufacturer was immune from liability on all of these grounds

based on the government contractor defense.  *Id.* at 137-140.  Another Fifth Circuit case applied

the government contractor defense to a failure to warn claim.  *Garner v. Santoro*, 865 F.2d 629

(5th Cir. 1989).  *See also, Tozer v. LTV Corp.*, 792 F.2d 403, 405 (4th Cir. 1986) (government

contractor defense precludes recovery for negligence as well as strict liability); *Bynum v. FMC*

*Corp.,* 770 F.2d 556, 574 n. 24 (5th Cir. 1985) (government contractor defense applied equally to design defect and failure to warn).

Plaintiff alleges theories of negligence, negligence per se, *res ipsa loquitur,* strict liability, breach of warranty, defective design, failure to warn and gross negligence against Sikorsky. All of these theories of liability arise under state law and relate to injury caused by an alleged product defect. It is clear from the above cited authorities that if this Court finds that Sikorsky has met the elements of the government contractor defense, then Sikorsky is entitled to summary judgment on all of Plaintiff's claims. As the court in *Harduvel* noted, "[i]f a defect is one inherent in the product or system that the government has approved, it will be covered by the [government contractor] defense." *Harduvel,* 878 F.2d at 1317.

In order to demonstrate that there is no genuine issue as to any material fact regarding the government contractor defense, Sikorsky will address the three elements of the *Boyle* defense individually. Sikorsky's government contractor defense is substantiated by the testimony of one present and two former Sikorsky employees, whose affidavits are included in the Appendix filed herewith. Additionally, stronger than the proof in *Boyle,* one of these former employees, Mr. Robert Guay, is also a former United States Marine Corps officer who was the Naval Class Desk Officer responsible for the CH-53 program, and, therefore, was the military officer who was most intimately involved in the development and production of the CH-53D and CH-53E helicopters.

The affidavit testimony of these three witnesses establishes that the United States Navy approved reasonably precise specifications for the design of the CH-53E helicopter, that the CH-53E helicopter conformed to those specifications, and that Sikorsky did not fail to warn the United States Navy about the dangers in the use of the helicopter that were known to Sikorsky but not to the United States Navy. These affidavits show extensive back and forth discussions

between Sikorsky and the Navy and establish that Sikorsky built a mock-up of the helicopter with all the instruments and controls, that the Navy reviewed and approved. As noted earlier, this was the identical proof which entitled Sikorsky to immunity from liability under the government contractor defense when the *Boyle* case was appealed to the Fourth Circuit. This proof should likewise entitle Sikorsky to final summary judgment regarding all of Plaintiff's claims herein.

**B.    Navy Approved Specifications.**

The first leg of the *Boyle* Test is that the United States Navy must have approved "reasonably precise" specifications for the design of the CH-53E helicopter involved in the accident giving rise to this lawsuit. *Boyle*, 108 S.Ct. at 2518. The case law, regarding the proof required to satisfy this particular element, is well established. The proof must show more than that the government merely "rubber stamped" the contractor's design, *see Trevino v. General Dynamics, Corp.*, 865 F.2d 1474 (5th Cir. 1989), but when, as here, there is much "back and forth discussion between the government and the contractor," proof that the United States provided general specifications and approved various stages of development meets the requirements of this test. *See e.g., Xerox Corp.*, 866 F.2d at 138; *Kleemann*, 890 F.2d at 701-03; *Harduvel*, 878 F.2d 1311.

In the Fourth Circuit *Boyle* opinion, the court found that Sikorsky had adequately demonstrated that the Navy had approved reasonably precise specifications for the CH-53D where Sikorsky and the Navy worked together to prepare detail specifications; there existed back and forth discussions between Sikorsky and the Navy; Sikorsky built a mock-up of the helicopter; and the Navy reviewed the mock-up and approved the design. *Boyle*, 792 F.2d at 414-15. This factual analysis was cited with approval by the Fifth Circuit, when discussing the requirements to be met by a military contractor in proving the first leg of the *Boyle* defense, in *Xerox Corp.*, 866 F.2d at 138.

The Fifth Circuit has also emphasized that the government contractor defense only requires that the government approve reasonably precise specifications, which is met where the contractor incorporated government performance specifications into a design that the government subsequently reviewed and approved. *Id.* As noted earlier, the *Xerox* case involved an injury to a U.S. Army soldier when a cartridge in a shoulder mounted weapon simulator exploded prematurely. *Id.* at 136. The Fifth Circuit affirmed summary judgment for Xerox, the manufacture of the weapon, based on the government contractor defense. *Id.* at 139-140. In discussing the evidence presented by Xerox in support of its motion for summary judgment, the court stated the following:

> Although Xerox failed to produce complete specifications for the original VIPERS it manufactured, Xerox did produce a listing of those specifications, as well as a copy of the original government performance criteria dictating the environmental specifications the government wanted the VIPER to meet . . ., and a production contract furnished by Xerox for a series of VIPERS containing specific references to government-approved specifications. Further, Lawrence Gallagher, an employee of Xerox from approximately 1975 to 1983 who was involved with the development of the VIPER system, testified at his deposition that the Army reviewed and approved the drawings and specifications prepared by Xerox. The government contractor defense requires only that the government approve reasonably precise specifications. Because the government in this case supplied the relevant environmental specifications it wanted the VIPER to meet, which were incorporated into Xerox's production contract, and Gallagher's unrebutted deposition testimony was that the government reviewed and approved Xerox's final drawings and specifications for the VIPER, we find that Xerox has satisfied its burden of proof on this issue.

*Id.* at 138 (court's emphasis).

The Fifth Circuit performed a similar factual analysis in upholding a summary judgment for a helicopter manufacturer based on the government contractor defense. *See Skyline Air Service,* 916 F.2d 977. In discussing the proof provided by Bell Helicopter, the defendant in *Skyline,* the court stated that the affidavit testimony provided by Bell showed that "Bell was required to 'strictly adhere to previously established, Government-approved specifications'; to

follow government specified procedures to assure compliance with those specifications; and to design and manufacture the helicopter precisely in accordance with the specifications - '[n]o deviations to the specifications or drawings were permitted without Government approval.'" *Id.* at 978.

In the instant case, the first leg of the *Boyle* defense is supported by the affidavits of Robert P. Guay (Ex. "B"), a retired Marine Corps officer who as Naval Class Desk Officer was directly responsible for the CH-53E program, the affidavit of Gordon E. Leach, (Ex. "C"), a retired Sikorsky employee who was responsible for the development contract and initial production contracts for the Navy CH-53E program, and by documents cited in these affidavits. In particular, relevant portions from the contract governing the CH-53E helicopter involved in this case and the Detail Specification governing the design and production of this helicopter are Exhibits "E" and "F," respectively. This proof establishes the following undisputed facts.

The aircraft involved in this case was a CH-53E helicopter manufactured by Sikorsky and accepted by the United States Navy on April 18, 1984. (Ex. "C", Leach Aff., p. 5, ¶15). The CH-53E is a design evolution of the CH-53D helicopter, which was derived from the CH-53A helicopter. (Ex. "B", Guay Aff., p. 2, ¶7). The CH-53A program can be traced to the United States Navy's efforts to procure a heavy lift assault helicopter for the United States Marine Corps during the early 1960's. (Ex. "B", Guay Aff., pp. 3-4, ¶¶13-15).

After delivery of the first production model of the CH-53A, the Marine Corps determined that it would be desirable to modify the CH-53A by incorporating larger, more powerful engines and a larger gear train. This new aircraft was designated the CH-53D model helicopter. (Ex. "B", *Guay Aff.,* p. 6, ¶25).

With the United States heavily involved in the Vietnam War, the U.S. military was in need of a helicopter that provided more lifting capabilities. Therefore, the Navy authorized

Sikorsky to study and test the concept for a "heavy lift" helicopter. (Ex. "C", *Leach Aff.,* p. 2, ¶6). Based on Sikorsky's results of their study and testing, the Navy received funding to proceed with the design and fabrication of two prototype CH-53E aircraft. (Ex. "C", *Leach Aff.,* p. 2, ¶7).

The work on the CH-53E prototypes involved design, fabrication and testing. (Ex. "C", *Leach Aff.,* p. 2, ¶8). This process was closely monitored by Navy engineering specialists who were resident in the Navy Representatives Office ("NAVPRO") at Sikorsky's plant and by frequent visitations and Program Reviews attended by Navy and Sikorsky personnel. (Ex. "B", *Guay Aff.,* pp. 3, 9, ¶¶10, 41) (Ex. "C", *Leach Aff.,* pp. 4-5, ¶¶14, 16).

Based on the results of the prototypes, the Navy issued a Development Contract allowing Sikorsky to proceed with the design and fabrication of two pre-production CH-53E helicopters. (Ex. "C", *Leach Aff.,* p. 3, ¶9). As the Development Contract progressed, the Navy was successful in securing funding for a production contract. (Ex. "C", *Leach Aff.,* p. 3, ¶10). At all times during the aircraft's development stage, Sikorsky was required to adhere to the Navy's specific requirements. (Ex. "C", *Leach Aff.,* p. 3, ¶9). To initiate this production program, the Navy issued a contract requiring the first production CH-53E helicopters to comply with Detail Specification SD-552-3-1, as well as undergo specific testing requirements. (Ex. "C", *Leach Aff.,* p. 3, ¶10). The extensive program of communication and coordination, established during the development stage, was utilized by Sikorsky and the Navy in order to monitor each aspect of the contract and production. (Ex. "C", *Leach Aff.,* p. 3, ¶10).

The United States Navy also required Sikorsky to provide full scale aircraft mock-ups in accordance with specific military standards. (Ex. "B", *Guay Aff.,* p. 8, ¶36). The mock-ups were completed by Sikorsky and approved by the United States Navy after extensive inspection and testing. (Ex. "B", *Guay Aff.,* p. 8, ¶36). Upon approval of the design of components and/or systems by the Navy, changes in the design could not be unilaterally made by Sikorsky. Any

design change originating from Sikorsky required the submission of a formal Engineering Change Proposal to the Naval Air Systems Command ("NAVAIR") Configuration Control Board for consideration. If approved by the Navy, a Contract Change Notice would be issued by NAVAIR to Sikorsky. (Ex. "B", *Guay Aff.*, p. 8, ¶40). Sikorsky would then be required to conform production to the amended specification.

On May 21, 1982, the Navy approved SD-552-3-6 (the "Detail Specification") which is the Detail Specification for production Lot VI CH-53E helicopters under Contract No. N00019-82-C-0230 (the "Contract"). (Ex. "C", *Leach Aff.*, p. 3, ¶11) (*See also*, excerpts from Contract and Detail Specification for production Lot VI CH-53E helicopters, attached as Ex. "E" and Ex. "F," respectively). This Contract governed the production of the CH-53E involved in the instant case. (Ex. "C", *Leach Aff.*, p. 3, ¶11).[1] This Contract provided that the CH-53E helicopter at issue would be built in accordance with the Detail Specification issued by the Navy. (Ex. "C", *Leach Aff.*, p. 3, ¶11) (Ex. "E", Contract, p. 2-1). The Detail Specification provided precise specifications and requirements to be used by Sikorsky in producing the CH-53E helicopter. (Ex. "B", *Guay Aff.*, p. 8, ¶40) (Ex. "C", *Leach Aff.*, p. 3, ¶11).

Navy personnel at NAVAIR were intimately involved in every detail of the design, component testing, manufacturing, flight testing and acceptance testing of the CH-53E helicopter at issue. (Ex. "B", *Guay Aff.*, pp. 8-9, ¶41, 45) (Ex. "C", *Leach Aff.*, p. 5, ¶17). Sikorsky was required to follow the specifications dictated to them by the Navy unless receiving permission to do otherwise from the Navy. (Ex. "B", *Guay Aff.*, p. 8, ¶40) (Ex. "C", *Leach Aff.*, p. 3, ¶11).

---

[1] This Contract was a "rated order" contract, containing a "DO-A1" priority rating. (See Ex. "E", Contract, box 4). This means, as a rated order contract, it took "preference over all unrated orders as necessary to meet required delivery dates." *See* 15 CFR 700.3 and 700.11. Compliance with the rated order regulations was required by The Defense Production Act (50 U.S.C. App. §§2061 *et seq.*). Failure to comply could have exposed Sikorsky to criminal penalties. 15 CFR 700.7 and 700.74; 50 U.S.C. App. §2073.

As prime contractor for the CH-53E program, Sikorsky was responsible for assembling the helicopter, which was made up of parts manufactured by Sikorsky and other companies. Many of the parts that made up the CH-53E were government furnished equipment ("GFE"). (Ex. "B", *Guay Aff.*, p. 10, ¶47). Detail Specification SD-552-3-6 (the one applicable to the helicopter at issue) provides a list of items that are GFE. (Ex. "C", *Leach Aff.*, p. 4, ¶12) (Ex. "F", Detail Specification, pp. 25, 81, 127). The two radar altimeters installed in the CH-53E were GFE. (Ex. "B", *Guay Aff.*, p. 10, ¶47) (Ex. "C", *Leach Aff.*, p. 4, ¶12) (Ex. "F", Detail Specification, pp. 81, 129, 135). This means that Sikorsky did not design or manufacture the radar altimeters in the CH-53E. Instead, the U.S. government contracted with an outside vendor to design and manufacture the radar altimeters and provide them as GFE to Sikorsky for incorporation in the CH-53E fleet. (Ex. "B", *Guay Aff.*, p. 10, ¶47)(Ex. "C", *Leach Aff.*, p. 4, ¶12).

The above procedures and requirements clearly indicate that there is no genuine issue of material fact as to the first leg of the *Boyle* government contractor defense. The United States approved <u>reasonably</u> precise specifications for the design of the CH-53E helicopter at issue. Moreover, the radar altimeters which Plaintiff complains were GFE; therefore, Sikorsky had no control over their design or manufacture.

## C.    Sikorsky's Compliance with the Specifications.

The second requirement of the *Boyle* Test is that the CH-53E in question must have conformed to specifications provided by the United States Navy. *Boyle*, 108 S.Ct. at 2518. This step of the *Boyle* Test has been interpreted to have been satisfied upon the government's acceptance of the product unless there is a showing that the product was defectively manufactured. *Harduvel,* 878 F.2d at 1321. When a government approved design has been reduced to detailed design drawings, which themselves have been reviewed and approved by the government, compliance with the specifications contained in those drawings can also establish

the second prong of the government contractor defense. *Kleemann,* 890 F.2d 698. A product conforms to reasonably precise specifications if it satisfies an intended configuration even if it may produce unintended and unwanted results. *Id.* at 703.

In an opinion dedicated primarily to defining the second leg of the *Boyle* Test, the Fourth Circuit noted that much of the evidence of government involvement required as proof for the first leg of the *Boyle* Test is also relevant to the second leg showing conformity with government specifications. *Kleeman,* 890 F.2d 698. In summarizing this viewpoint, the court wrote:

> It is this salient fact of governmental participation in the various stages of the aircraft's development that establishes the military contractor defense. Indeed, active governmental oversight is relevant to all three elements of defendant's burden. Where, as here, the Navy was intimately involved at various stages of the design and development process, the required government approval of the alleged design defect is more likely to be made out. (citation omitted). Similarly, the Navy's extensive participation, including reservation of the power to approve or disapprove design modifications, enhances the likelihood of final product conformity. . . . [E]xtensive governmental participation provides tangible evidence of the strong federal interest which justifies the creation of a federal common law defense for government contractors in the first place.

*Id.* at 701.

In light of the above quoted passage, much of the previous factual discussion regarding the first leg of the *Boyle* Test applies to the proof required under the second leg. As was shown above, the Navy was intimately involved in all stages of the design and production of the CH-53E helicopter involved in this case. The affidavits of Mr. Guay and Mr. Leach provide additional information relevant to the conformity element of the *Boyle* Test.

The CH-53E Contract established the configuration and contract specifications for the new, more powerful CH-53E helicopters. Sikorsky was not permitted to deviate from the configurations specified by the Navy without Navy approval. Under the Contract, the Navy could unilaterally change the design, but Sikorsky could not change the design without approval of an engineering change proposal by the NAVAIR Configuration Control Board. In this way,

the Navy retained and exercised control over the CH-53E helicopter's design configuration. (Ex. "B", *Guay Aff.*, p. 8, ¶40). NAVPRO inspectors stationed at Sikorsky supervised the production of the CH-53E helicopters to ensure conformity to the contract specifications. (Ex. "B", *Guay Aff.*, p. 9, ¶41).

Throughout the production of the CH-53E helicopters, Sikorsky produced each aircraft in strict compliance with the Navy design specifications and under extensive scrutiny by Navy engineers. (Ex. "B", *Guay Aff.*, p. 9, ¶46) (Ex. "C", *Leach Aff.*, p. 5, ¶17). The Navy maintained a substantial staff at Sikorsky's Stratford, Connecticut, plant to ensure that Sikorsky complied fully with specifications applicable to the Navy contracts. (Ex. "B", *Guay Aff.*, p. 3, ¶9) (Ex. "C", *Leach Aff.*, p. 4, ¶14). This staff (NAVPRO) included engineers, quality controllers and contract administrators. (Ex. "C", *Leach Aff.*, p. 4, ¶14). The function of NAVPRO was supplemented by Navy Test Pilots who tested every CH-53E prior to delivery. (Ex. "C", *Leach Aff.*, p. 5, ¶15). The Navy witnessed the acceptance tests, inspected each completed CH-53E helicopter, and upon delivery issued a Material Inspection Receiving Report (known as the DD-250) certifying that all contract requirements were satisfied. (Ex. "B", *Guay Aff.*, p. 9, ¶42) (Ex. "C", *Leach Aff.*, p. 5, ¶15). No helicopter was delivered by Sikorsky to the Navy without the completion of a DD-250. (Ex. "C", *Leach Aff.*, p. 5, ¶15).

The helicopter at issue conformed to its required specifications, as illustrated by the DD-250 dated April 18, 1984, signed by the authorized government representative. (*See* Material Inspection and Receiving Report (DD-250), Ex. "G"). By executing this form, the government inspector stated "Acceptance of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents." This DD-250, therefore, conclusively establishes that the equipment conformed to the contract specifications. *See Hendrix v. Bell Helicopter Textron, Inc.*, 634 F.Supp. 1551, 1557 (N.D. Tex. 1986).

Courts have been unwilling to second guess the government's decision that a product conforms to contractual specifications and design requirements. For example, in *Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946, 951 (4th Cir. 1989), the court held that "Nothing in the record suggests to us that the Navy found the [product] not to conform to specifications. It is not our province, of course, to make such a finding in the Navy's behalf. (citation omitted). We accordingly conclude that no issue exists as to the [product's] conformity to Navy specifications." *Id.* Where, as here, the government inspected and accepted the aircraft as produced, the second prong of the government contractor defense is satisfied. *Niemann,* 721 F. Supp. at 1027.

The helicopter involved in the instant case was accepted by the Navy on April 18, 1984. The helicopter thereafter was maintained and operated by the United States Navy, which had exclusive control over the manner in which it was maintained and operated (Ex. "B", *Guay Aff.*, p. 9, ¶43). There is certainly no genuine issue of material fact as to the establishment of the second leg of the *Boyle* defense.

**D.      Dangers Known by Sikorsky but Not Known by the Navy.**

The final element of the *Boyle* Test requires that Sikorsky warn the United States military about possible dangers in the use of the CH-53E that were known to Sikorsky but not to the Navy. *Boyle,* 108 S.Ct. at 2518. This part can be broken down into three separate elements. First, Sikorsky must have had knowledge of some danger regarding the use of the helicopter. Second, it must have involved some danger that the military did not know about. Finally, Sikorsky must have failed to warn the military about this possible danger. *Id.; Harduvel,* 878 F.2d at 1321. The three elements comprising the third leg of the *Boyle* Test are a significant departure from the government contractor defense enunciated in some circuits prior to the Supreme Court's adoption of the *Boyle* Test. *See Shaw v. Grumman Aerospace Corp.,* 778 F.2d

736, 746 (11th Cir. 1985) (requiring contractor to inform military of design alternatives "reasonably known" to the contractor). In enunciating the third part of the *Boyle* Test, the United States Supreme Court clearly intended to lessen the burden of proof placed on government contractors regarding warnings issued by the contractor to the United States government. In justifying this change, the Supreme Court stated that "it does not seem to us sound policy to penalize, and thus deter, active contractor participation in the design process, placing the contractor at risk unless it identifies all design defects." *Boyle*, 108 S.Ct. at 2518.

The language of the *Boyle* case indicates that this third element requires actual knowledge of the danger by the contractor. *Id.* The Fifth Circuit has squarely so held in *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431 (5th Cir. 2000) as follows:

> The third part of the *Boyle* test requires the contractor to warn the government about those equipment dangers that were known to the contractor, but not to the government. The purpose of this element is *not* to create an incentive to discover latent defects in a product designed for the government. . . The government contractor defense does not require a contractor to warn the government of defects about which it should only have known. "After Boyle, a government contractor is only responsible for warning the government of dangers about which it has actual knowledge." *Trevino*, 865 F.2d at 1487.

*Id.* at 436 (court's emphasis). *See also, Harduvel*, 878 F.2d at 1321; *Trevino*, 865 F.2d at 1487; *Neimann,* 721 F.Supp. at 1028. The Fourth Circuit has held that where there is evidence of pervasive government involvement in the procurement and design process, the third element of the *Boyle* Test is more likely to be established. *Kleemann*, 890 F.2d at 701. Government acceptance tests have been held as probative of the government's knowledge of a product's dangers. The length of time a product is used by the government also shows government knowledge of the dangers in a product. *Zinck v. ITT Corp.*, 690 F.Supp. 1331, 1337-38 (S.D.N.Y. 1988).

---

As was the case with the second leg of the *Boyle* Test, many of the facts related above regarding the first element of the *Boyle* Test also apply to the third leg. There are, however, additional facts that are relevant to the third element of the *Boyle* defense. Extensive communication existed between the Navy and Sikorsky throughout the entire design, production, and delivery phases of the CH-53E program. (Ex. "B", *Guay Aff.*, pp. 3, 9, ¶¶10, 11, 44) (Ex. "C", *Leach Aff.*, pp. 3, 5, ¶¶9, 16, 17). During his tenure as Class Desk Officer, Lieutenant Colonel Guay was in telephone communication with Sikorsky personnel at least once per day. At least once per month he either visited the Sikorsky plant or Sikorsky personnel met with him in Washington, D.C. (Ex. "B", *Guay Aff.*, p. 3, ¶10).

Lieutenant Colonel Guay further notes that "Sikorsky personnel were frank in their discussions with the Navy (NAVAIR and NAVPRO) concerning any dangers in the design and/or use of the CH-53E helicopters," and states that he was never aware of any instance where Sikorsky failed to advise the Navy of any dangers in the design and/or use of the CH-53E helicopters. (Ex. "B", *Guay Aff.*, p. 9, ¶44). Mr. Leach makes the same observation and notes that he is "not aware of any instance in which Sikorsky withheld from the Navy technical information regarding possible dangers in the use of the CH-53E." (Ex. "C", *Leach Aff.*, p. 4, ¶14).

Plaintiff devotes several pages of her Petition alleging that Sikorsky failed to warn the government that the use of NVGs would interfere with helicopter operators' perceptions of low altitude visual warning devices when transitioning from high level lighting to low level lighting. (*See* Plaintiff's Petition pp. 14-16, 21-25)[2]. Yet, the CH-53E specification is devoid of any requirement for use of NVGs. (Ex. "C", *Leach Aff.*, p. 4, ¶13). In fact, at the time of this helicopter's manufacture, the Navy was not regularly using NVGs. (Ex. "B", *Guay Aff.*, p. 10,

---

[2]    Plaintiff's Original Petition, filed in Texas state District Court, is Plaintiff's latest pleading on file.

¶48). No NVG design requirement was imposed on Sikorsky and Sikorsky was under no obligation to build this helicopter for NVG compliance. (Ex. "C", *Leach Aff.*, p. 4, ¶13). Thus, the Navy would have had to have retrofitted this helicopter to become NVG compatible. (Ex. "B", *Guay Aff.*, p. 10, ¶48). In addition, Sikorsky does not even manufacture NVGs. (Ex. "C", *Leach Aff.*, p. 4, ¶13).

ITT Industries, the manufacturer of the NVGs used in this accident, and the United States military would clearly have had superior knowledge as to the limitations, if any, in using NVGs while operating the CH-53E helicopter. In fact, the United States military publishes its own operator's manuals regarding NVG use and more specifically, use of NVGs in operating the CH-53E helicopter. (*See generally*, excerpts from Operator's Manual, Ex. "H"; and excerpts from MAWTS-1 Helicopter Night Vision Device Manual: 5th Edition, Ex. "I").

Because Sikorsky does not manufacture NVGs, it cannot be liable for the design or manufacture of NVGs, or the warnings for NVGs use, as alleged by Plaintiff. (*See* Plaintiff's Petition, p. 16). Regardless, the evidence is clear that the United States government had full knowledge of the dangers of flying from high ambient light to low ambient light levels as is demonstrated by the warning contained in the NVGs Operator's Manual, written by the United States military, which states:

**WARNING**
**Equipment Limitations**

To avoid personal injury and property damage when using the ANVIS,
carefully read and understand the following safety precautions.
. . .
Exercise extreme caution when flying over low-contrast terrain such as . . .
large bodies of water . . .
. . .
Exercise extreme caution when flying from high ambient light conditions to
low ambient light conditions. Under low light conditions, the goggles lose
some of the resolution that they have under high light conditions. Flying

from high light to low light conditions quickly reduces the sharpness and
definition of terrain images.

*(See* excerpts from Operator's Manual, pp. a, 2b, Ex. "H"). The warnings provided by the
military in its Operator's Manual are developed through testing and pilot experiences. (Ex. "K",
Nowak Depo., p. 26:9-19). The warnings pertaining to transitions from high light level flight to
low light level flight have been in the military's Operator's Manual since as early as 1991. (Ex.
"K", Nowak Depo., p. 47:11-15).

Major Paul, the pilot of the second helicopter and a NVG instructor, testified that the
training on transitioning from high light levels to low light levels using NVGs is provided by the
MAWTS manual – which is the manual pilots refer to concerning flying under NVGs. (Ex. "J",
Paul Depo. p. 35:7-17).  Major Paul stated that MAWTS – which stands for Marine Aviation
Weapons and Tactics Squadron – are the "duty experts on night vision goggle devices, how we
fly on the night vision goggles, and they put out the NVG manual which talks specifically and in-
depth about just everything pertaining to the goggles and pertaining to flying on the goggles,
both tactical and administrative flying." (Ex. "J", Paul Depo., pp. 15:20-16:4).  Based on this
testimony, it is clear the United States government was more familiar with the use and operation
of the CH-53E helicopter using NVGs than was Sikorsky.

Additionally, Mr. Glen Nowak, an Army Physicist Scientist, testified that the government
had knowledge of transitioning from high light level to low light level. (Ex. "K", Nowak Depo.,
pp. 36:19-37:1). Mr. Nowak also testified that the military went through testing with pilots using
the NVGs to determine the NVGs performance in going from lighted horizon to a no-horizon
situation. (Ex. "K", Nowak Depo., pp. 70:13-71:1).  Further, Mr. Nowak testified that any design
changes to the CH-53E helicopter, including any modifications, would fall under the
responsibility and authority of NAVAIR. (Ex. "K", Nowak Depo., p. 95:12-16). Thus, the

military would be responsible, as owner of the helicopters, to decide whether or not an additional warning devise for low level flying was needed for NVGs use. (Ex. "K", Nowak Depo., pp. 98:17-99:9).

Last, Plaintiff's expert contends that the low warning light on the radar altimeter is inadequate to alert NVG pilots that they are below a selected altitude and that the radar altimeter manufacturer should have incorporated an aural warning at the same time NVG cockpit compatible lighting was installed. (*See* Ex. "M", Plaintiffs' and Intervenors' Initial Designation of Experts, Edward Monhollen Report, p. 2, Section H, No. 2). This theory fails for multiple reasons. First, Sikorsky did not manufacture the radar altimeters installed in the CH-53E helicopters. (Ex. "C", *Leach Aff.*, p. 4, ¶12). Rather, the radar altimeters were government furnished equipment (GFE) – equipment purchased by the government from a third-party contractor and supplied to Sikorsky for installation in to the helicopter. (Ex. "B", *Guay Aff.*, p. 10, ¶47) (Ex. "C", *Leach Aff.*, p. 4, ¶12). Sikorsky does not, nor did not, design, manufacture or select the radar altimeters for the CH-53E helicopters. (Ex. "B", *Guay Aff.*, p. 10, ¶47) (Ex. "C", *Leach Aff.*, p. 4, ¶12). Consequently, because Sikorsky had no control over the design or manufacture of the radar altimeters, it did not have the ability to install or incorporate an aural warning into the radar altimeters. Second, the United States Navy was responsible for installing NVG cockpit compatible lighting, not Sikorsky. (Ex. "B", *Guay Aff.*, p. 10, ¶48).

Equally compelling is the fact that the United States military determined as early as 1993 that an audible ground proximity warning for the radar altimeters would be useful in possibly preventing the type of accident made the basis of this suit. (Ex. "D", *Lowenstein Aff.*, pp. 2-3, ¶¶3, 4, 5, 6, 7). However, due to budget constraints, testing and other issues, the United States Navy did not begin to install a ground proximity warning system into the H-53 fleet until April,

1999 (the month of this accident). (Ex. "D", *Lowenstein Aff.*, p. 3, ¶10) (*See also* H-53 Safety Action Record, Ex. "L" – detailing discussion history of a ground proximity warning system).

In light of the constant monitoring of all phases of the CH-53E program by the Navy, constant communication between Sikorsky and Navy personnel regarding the helicopters systems, the extensive design specifications imposed by Navy requirements, and the Navy's extensive use of like products prior to delivery, there is no genuine issue as to any material fact regarding the third leg of the *Boyle* defense.

## VI.
## CONCLUSION

The Supreme Court has recognized the vital need to preserve the government's unfettered ability to select military hardware through discretionary decisions. To protect this ability, when results of the decisions conflict with the state laws, the state laws must be preempted by Federal common law to protect the government's interests.

Similarly, the courts have recognized that it is also in the government's interest to protect agents of the government who provide such military hardware and services pursuant to the government's wishes. If the government contractors were not afforded this protection, the financial burden of eventual judgments against these government contractors would ultimately be passed through to the United States itself, and thereby interfere with or preclude the government's unfettered ability to select the most appropriate military hardware. *Boyle*, 108 S.Ct. at 2518. To preserve the government's ability to select military hardware without recourse for design defects, the Supreme Court established a series of criteria which, if adhered to, would provide the government contractor the same immunity from liability for damages as that enjoyed by the United States.

Defendant Sikorsky is entitled to a final summary judgment based on the government contractor defense. Sikorsky has shown that there is no genuine issue of material fact with regard to any of the three elements required under the *Boyle* Test. Moreover, the evidence shows that the equipment about which Plaintiff and Intervenors complain was not designed or manufactured by Sikorsky and that the government was aware of the dangers in using Night Vision Goggles and of the need for an audible low altitude warning in the CH-53E helicopter well before the accident at issue. Having established the government contractor defense, Sikorsky is entitled to summary judgment dismissal of all of Plaintiff's and Intervenors' claims as a matter of law.

WHEREFORE, Sikorsky Aircraft Corporation prays that this Court grant its Motion for Summary Judgment and dismiss all of Plaintiff's and Intervenors' causes of action against it.

Respectfully submitted,

By: _____
ROBERT F. RUCKMAN
Attorney-in-Charge
State Bar No. 17367000
Southern District Bar No. 12018

STUART B. BROWN, JR.
Of Counsel
State Bar No. 24006914
Southern District Bar No. 23545

**JACKSON WALKER L.L.P.**
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:   (214) 953-6000
Telecopy:   (214) 953-5822

ATTORNEYS FOR DEFENDANT
SIKORSKY AIRCRAFT CORPORATION,
A SUBSIDIARY OF UNITED
TECHNOLOGIES CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of May, 2002, a true and correct copy of the above and foregoing document was served on all counsel of record:

**Via Certified Mail, RRR**
Ray R. Marchan
WATTS & HEARD, P.C.
1926 E. Elizabeth
Brownsville, Texas 78520
**ATTORNEY FOR PLAINTIFF**

**Via Certified Mail, RRR**
Joe Valle
Attorney at Law
1120 East 10th Street
Brownsville, Texas 78520
**ATTORNEY FOR INTERVENORS**

**Via Certified Mail, RRR**
Ron A. Sprague
GENDRY & SPRAGUE, P.C.
645 Lockhill Selma
San Antonio, TX 78216-5057
**ATTORNEY FOR ITT INDUSTRIES, INC.**

Robert F. Ruckman

---

**BRIEF IN SUPPORT OF DEFENDANT SIKORSKY AIRCRAFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT** – Page 26

3123862v1 003642/00283

**COPY** 

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 0 3 2002

Michael N. Milby
Clerk of Court

KRISTA SALDANA, Individually and as §
Representative of the ESTATE OF DAVID §
SALDANA and as Next Friend of JAGGER §
SALDANA §
    Plaintiff, §
§
v. §
§
MELQUIADES SALDANA and AURELIA §
SALDANA, §
    Intervenors, §    Civil Action No. B-00-176
§
v. §
§
ITT INDUSTRIES, SIKORSKY §
AIRCRAFT CORPORATION, a Subsidiary §
of UNITED TECHNOLOGIES §
CORPORATION, the ESTATE OF LT. §
COL. MARC LEE HOHLE and the §
ESTATE OF CAPTAIN MATTHEW §
BRENT THOMAS, §
    Defendants. §

## DEFENDANT SIKORSKY AIRCRAFT CORPORATION'S APPENDIX OF PROOF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

ROBERT F. RUCKMAN
Attorney-in-Charge
State Bar No. 17367000
Southern District Bar No. 12018

STUART B. BROWN, JR.
Of Counsel
State Bar No. 24006914
Southern District Bar No. 23545

**JACKSON WALKER L.L.P.**
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:   (214) 953-6000
Telecopy:   (214) 953-5822

ATTORNEYS FOR DEFENDANT SIKORSKY
AIRCRAFT CORPORATION, A SUBSIDIARY OF
UNITED TECHNOLOGIES CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of May, 2002, a true and correct copy of the above and foregoing document was served on all counsel of record:

**Via Certified Mail, RRR**
Ray R. Marchan
WATTS & HEARD, P.C.
1926 E. Elizabeth
Brownsville, Texas 78520
**ATTORNEY FOR PLAINTIFF**


**Via Certified Mail, RRR**
Ron A. Sprague
GENDRY & SPRAGUE, P.C.
645 Lockhill Selma
San Antonio, TX 78216-5057
**ATTORNEY FOR ITT INDUSTRIES, INC.**


**Via Certified Mail, RRR**
Joe Valle
Attorney at Law
1120 East 10th Street
Brownsville, Texas 78520
**ATTORNEY FOR INTERVENORS**

Robert F. Ruckman

**DEFENDANT SIKORSKY AIRCRAFT CORPORATION'S APPENDIX OF PROOF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT – Page 2**

## Table of Contents

JAGMAN Report Excerpts .................................................................................................A

Affidavit of Robert P. Guay.............................................................................................B

Affidavit of Gordon E. Leach .........................................................................................C

Affidavit of Christopher Lowenstein ..............................................................................D

Contract N00019-82-C-0230 Excerpts ...........................................................................E

Detail Specification SD-552-3-6 Excerpts......................................................................F

Material Inspection and Receiving Report (DD-250)......................................................G

Operator's Manual – Aviator's Night Vision Imaging System - Excerpts......................H

MAWTS-1 Helicopter Night Vision Device Manual: 5th Edition Excerpts ...................I

Deposition Excerpts of Major Matthew J. Paul ..............................................................J

Deposition Excerpts of Glen Lewis Nowak.....................................................................K

H-53 Safety Action Record..............................................................................................L

Plaintiffs' and Intervenors' Initial Designation of Experts.............................................M

3157482v1

**DEFENDANT SIKORSKY AIRCRAFT CORPORATION'S APPENDIX OF PROOF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT – Page 3**



**UNITED STATES MARINE CORPS**
MARINE MEDIUM HELICOPTER SQUADRON 262
MARINE AIRCRAFT GROUP 36
UNIT 37238
FPO AP 96603-7238

IN REPLY REFER TO
5830
Legal
11 Jun 99

From: Lieutenant Colonel David W. Samples ████████/7562 USMC
To:    Commanding Officer, Marine Aircraft Group 36

Subj:  COMMAND INVESTIGATION OF THE AIRCRAFT MISHAP THAT OCCURRED
       IN OKINAWA, JAPAN ON 19 APRIL 1999

Ref:   (a)  JAGINST 5800.7C (JAGMAN)
       (b)  JAG Investigation Notebook for Aviation Mishaps of June 1991

Encl:  (1)  Appointing Order, CO, MAG 36 ltr 5800 of 21 APR 99
       (2)  Extension Request, Investigating Officer ltr 5800 of 11 MAY 99
       (3)  MAG-36 OPREP-3 Message DTG 192301Z APR 99
       (4)  Initial General Use Naval Aircraft Mishap Report Message DTG 200210Z APR 99
       (5)  HMH-361's Flight Schedule for 17, 18, 19 APR 99
       (6)  Statement by LCdr C.T. Mallak, USN, Armed Forces Medical Examiner at Lester
            Naval Hospital, dtd 19 MAY 99
       (7)  Flight Personnel Designation Record for LtCol Hohle
       (8)  HMH-361 Squadron Special Order Number 01-99 Billet Assignments dtd 7 JAN 99
       (9)  DIFOPS Orders for LtCol Hohle, CMC (MMOA-2) msg DTG 220400Z JUN 98
       (10) Flight Time Summary for Mishap Aircrew dtd 20 APR 99
       (11) Flight Data Summary for FY 99 for LtCol Hohle dtd 20 APR 99
       (12) HMH-361 Flight Time Hog Board dtd 20 APR 99
       (13) HMH-361 Main Body Pilot Qualifications/Designations dtd 22 MAR 99
       (14) Qualification and Achievements from LtCol Hohle's flight record book
       (15) Aeromedical Clearance for LtCol Hohle dtd 3 SEP 98
       (16) NATOPS Evaluation Report for LtCol Hohle dtd 6 OCT 98
       (17) NATOPS Instrument Rating Request for LtCol Hohle dtd 17 AUG 98
       (18) Accident and Flight Rule Violation Record for LtCol Hohle
       (19) Statement by Captain A. J. Smith, USMC, HMH-361 ASO, dtd 19 MAY 99
       (20) Operational Physiology & Survival Training Record for LtCol Hohle
       (21) NATOPS Monthly Emergency Procedures Certification for LtCol Hohle
       (22) Flight Personnel Training/Qualification Jacket & NSQ(HLL) Designation for Capt
            Thomas
       (23) DIFOPS Orders for Capt Thomas dtd 22 SEP 97
       (24) Flight Data Summary for FY 99 for Capt Thomas dtd 20 APR 99
       (25) Aeromedical Clearance Notice for Capt Thomas dtd 17 AUG 98
       (26) NATOPS Evaluation Report for Capt Thomas dtd 31 MAR 98
       (27) NATOPS Instrument Rating Request for Capt Thomas dtd 31 JUL 98
       (28) Accident and Flight Rule Violation Record for Capt Thomas
       (29) Operational Physiology & Survival Training Record for Capt Thomas
       (30) NATOPS Monthly Emergency Procedures Certification for Capt Thomas

Subj:  COMMAND INVE_ .IGATION OF THE AIRCRAFT MISL. .P THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

(31)  Naval Air Training Command Record for Capt Thomas
(32)  Designation as an Aerial Observer for Sergeant Munoz dtd 10 JAN 96
(33)  Designation as a Helicopter Crewchief for Sgt Munoz dtd 1 FEB 96
(34)  Volunteer for Duty Involving Flying ltr for Sgt Munoz dtd 9 SEP 96
(35)  Assignment of Temporary Indefinite Flight Orders for Sgt Munoz dtd 4 NOV 98
(36)  HMH-361 Enlisted Flight Time Hogboard dtd 20 APR 99
(37)  HMH-361 Main Body Aircrew Qualifications/Designations dtd 22 MAR 99
(38)  Collateral Duty Inspector designation for ALSS dtd 29 MAY 97
(39)  Aeromedical Clearance Notice for Sgt Munoz dtd 7 OCT 98
(40)  NATOPS Evaluation Report for Sgt Munoz dtd 4 MAR 99
(41)  Operational Physiology & Survival Training Record for Sgt Munoz
(42)  NATOPS Monthly Emergency Procedures Certification for Sgt Munoz
(43)  NATOPS Flight Personnel Record & Crew Chief Designation for Corporal Saldana
(44)  Volunteer for Duty Involving Flying ltr for Cpl Saldana dtd 18 JAN 96
(45)  Assignment of Non-Crewmember Temporary Indefinite Flight Orders for Cpl
     Saldana dtd 4 NOV 98
(46)  Collateral Duty Inspector Designation for Cpl Saldana dtd 20 AUG 98
(47)  Aeromedical Clearance Notice for Cpl Saldana dtd 10 SEP 98
(48)  HMH-361 Aircrew Greaseboard dtd 24 MAR 99
(49)  Operational Physiology & Survival Training Record for Cpl Saldana
(50)  NATOPS Monthly Emergency Procedures Certification for Cpl Saldana
(51)  Offenses and Punishments from page 11 of Cpl Saldana's SRB
(52)  ACT/EGRESS Training Roster dtd 4 JAN 99
(53)  Excerpts fm Training and Readiness Manual, Volume 3 chapter 4 for CH/RH-53
(54)  CH-53E T&R Summary
(55)  Excerpts fm ATRIMS Flights Flown Codes dtd 20 APR 99
(56)  Statement from Major (then Capt) M.J. Paul, USMC, fm HMH-361 dtd 10 MAY 99
(57)  Email Statement from Major M.J. Paul, USMC, fm HMH-361, dtd 23 MAY 99
(58)  Statement of Interview Conducted by Capt R. Fleming, USMC, MAG-36 Legal
     Officer to Capt Ruffini, USMC, fm HMH-361 on 23 APR 99
(59)  Email Statement from Capt Ruffini, USMC, fm HMH-361 dtd 15 MAY 99
(60)  Interview Conducted with Cpl J.A. Palmer, USMC, fm HMH-361 on 12 MAY 99
(61)  FAX Statement from Cpl Arroyo, USMC, fm HMH-361 sent on 26 MAY 99 with
     phone conversation note by LtCol Samples on 4 JUN 99
(62)  Weight & Power and Operational Risk Management Forms
(63)  HMH-361 Aircraft Weight & Balance Sheet
(64)  Weather Forecast and Actual Observations for MCAS Futenma for 19 APR 99
(65)  Satellite Image for Okinawa on 19 APR 99
(66)  Sun and Moon Position Report for MCAS Futenma for 19 APR 99
(67)  Mission Packet for 19 APR 99 NVG(LLL) Flight with briefing notes
(68)  NVG South Route
(69)  NVG North Route
(70)  Aircraft Inspection and Acceptance Record (Part A) for BUNO 162007
(71)  OPNAVINST 4790.2G Fuel Sample Log
(72)  Outstanding Maintenance Action Forms for "Tiger 07"

2

Subj:  COMMAND INVESTIGATION OF THE AIRCRAFT MISHAP THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

(73) Statement of LtCol K.B. Ferrell, USMC, C.O. HMM-262, On Scene Commander in
"Cutter 01" dtd 8 JUN 99
(74) Copy of 33rd Rescue Squadron's Duty Logbook and Search & Rescue Mission
Statement for "Rescue 401" on 19 APR 99
(75) Statement from Capt G. Lunde, USMC, in HMM-262's "Cutter 16" dtd 9 JUN 99
(76) Lester Naval Hospital Duty Logbook for 19 and 20 APR 99
(77) "C" Company, 3D Med Battalion, 3D FSSG, Duty Logbook of 20 APR 99
(78) Statement of Chief D. D. Allred, USN, III MEF Master Diver, dtd 19 MAY 99
(79) Statement from Major M. L. Lawrence, USMC, fm HMLA-267 dtd 19 MAY 99
(80) Copy of Memorial Service dtd 23 APR 99
(81) Copy of Marine Corps Base Environmental Assessment dtd 4 MAY 99
(82) USS Patriot Salvage Sitrep Message DTG 251400Z APR 99
(83) USS Patriot Salvage Sitrep Message DTG 270615Z APR 99
(84) Safety Center Investigator Arrival COMNAVSAFECEN 061915Z MAY 99
(85) USNS Narragansett Salvage Sitrep Message DTG 080440Z MAY 99
(86) Crash Site and Wreckage Diagram Fold Out
(87) USNS Narragansett Salvage Sitrep Message DTG 240300Z MAY 99
(88) Estimated Replacement Cost for a CH-53E from 1st MAW Comptroller Office
(89) Pictures of Wreckage at the Naval Facility at White Beach, Okinawa
(90) NADEP Engineer Debrief Notes of LtCol Samples  dtd 25 MAY 99
(91) Statement of Sgt C. D. Knight, USMC, MALS-36 Power Plants dtd 6 JUN 99
(92) Materials Engineering Analysis Report of Light Bulb and Instrumentation
Examination by NADEP Cherry Point dtd 1 JUN 99
(93) Photographs of Cockpit Instrumentation
(94) CH-53E NATOPS excerpt for functioning of the Radar Altimeter
(95) Statement of  Ssgt Whitlock, USMC, MALS-36 QA Inspector  dtd 10 MAY 99
(96) Engine 1000 hour and Phase "B" MAFs
(97) Medical Record / Autopsy Protocol for LtCol Hohle dtd 16 MAY 99
(98) Medical Record / Autopsy Protocol for Captain Thomas dtd 17 MAY 99
(99) Medical Record / Autopsy Protocol for Sergeant Munoz dtd 3 JUN 99
(100) Medical Record / Autopsy Protocol for Corporal Saldana dtd 18 MAY 99
(101) Statement of Lt M. Feenaghty, USN, Flight Surgeon dtd 4 JUN 99
(102) Statement of Lt D. M. Keel, USN, HMH-361 Flight Surgeon dtd 9 JUN 99
(103) Excerpts fm OPNAVINST 3710.7R
(104) Aircrew Systems Record for NVDs used on Mishap Aircraft
(105) Excerpts fm HMH-361 SqdnO P3710.2K (SOP for Air OPS) dtd 22 FEB 94
(106) Excerpts fm MAG-36 Group Order P3710.6D (SOP for Air OPS) dtd 9 JUN 98
(107) Excerpts fm CH-53 Tactical Manual NWP 55-9-CH53  Vol. I
(108) Excerpts fm MAWTS-1 Helicopter Night Vision Device Manual dtd 27 OCT 98
(109) Statement of LtCol R. A. Fleming, USMC, HMH-361 Commanding Officer
(110) Statement of Major R. L. Bowden III, USMC, HMH-361 DOSS, dtd 7 MAY 99
(111) Statement of Capt A. J. Gunderson, USMC, HMH-361 AMO dtd 6 MAY 99 and
notes from conversation w/LtCol Samples on 7 MAY 99

Subj    COMMAND INVESTIGATION OF THE AIRCRAFT MISHAP THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

## PRELIMINARY STATEMENT

1. In accordance with the references and as directed by enclosure (1), a one-officer JAGMAN investigation was initiated on 21APR 99 to inquire into the circumstances surrounding the aircraft mishap on 19 APR 99 that culminated in the destruction of Marine Heavy Helicopter Squadron 361's CH-53E aircraft BUNO 162007 and the deaths of Lieutenant Colonel (select) Marc L. Hohle , Captain Matthew B. Thomas, Sergeant Obdulio R. Munoz III, and Corporal David Saldana.

2. This command investigation was convened to investigate the circumstances surrounding the subject Class A aircraft mishap in compliance with 10 U.S.C. 2255. I, Lieutenant Colonel Samples, the investigation officer, am qualified by law and was selected from a unit other than the mishap unit, as defined in Appendix A-2-a of reference (a).

3. All reasonably available evidence was collected or is forthcoming and the requirements of enclosure (1) and the references were met. Difficulties in conducting this investigation were minimal. Some delays were experienced in obtaining statements from witnesses who returned to the United States as body escorts. All witnesses willingly gave statements and provided full cooperation. Advice and guidance in the conduct of the investigation was provided by the 1st Marine Aircraft Wing (MAW) Staff Judge Advocate, Lieutenant Colonel John Sessoms. As evidenced by enclosure (2), a thirty day extension was approved to gather additional information.

4. At the completion of this investigation, the majority of the subject aircraft was recovered from the impact site located off the east coast of Okinawa in the Pacific Ocean. The wreckage was delivered to the Naval Facility at White Beach, Okinawa for further analysis and is stored in a fenced warehouse lot. The wreckage is controlled by the Senior Member of the Aircraft Mishap Board, Lieutenant Colonel Paul Gillis, DSN 636-2212. The three aircraft engines are located in the Marine Aviation Logistics Squadron (MALS) 36 Power Plants section at MCAS Futenma and are safeguarded by CWO2 M. Mink DSN 636-2863.

5. A special team of engineers from the Cognizant Field Activity (CFA) at Cherry Point arrived on Okinawa to investigate the wreckage. Engineering Investigations are currently being conducting on selected wreckage items. A formal written report from CFA is forthcoming.

6. The remains of the aircrew were recovered and returned to their families for proper burial.

7. Since all four members of the aircrew are deceased, line of duty/misconduct determinations were not made.

8  All times listed in this investigation report are India local (Zulu + 9 hours) unless otherwise noted.

9. Throughout this Investigative Report. CH-53E (BUNO 162007) shall be referred to as the mishap aircraft. Lieutenant Colonel Hohle, Captain Thomas, Sergeant Munoz, and Corporal Saldana will be collectively referred to as the mishap aircrew. The mishap flight was authorized

4

Subj.    COMMAND INVESTIGATION OF THE AIRCRAFT MISHAP THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

in support of squadron training and the mishap aircraft's call sign was "Tiger 07." Julian date
9109 is 19 APR 1999.

10.  The following was read and signed by each person providing a statement:

"My name is Lieutenant Colonel David W. Samples, USMC. I am appointed to conduct a JAG
Manual investigation to gather all the facts and circumstances surrounding the aircraft accident
that occurred on Okinawa, Japan on 19 April 1999. This investigation is separate and distinct
from the mishap investigation conducted under OPNAVINST 3750.6. The purpose of this JAG
investigation is to obtain and preserve all available evidence for use in claims, litigation,
disciplinary actions, adverse administrative proceedings, and for all other purposes. Testimony
before the mishap investigation board is given with the understanding that it can only be used for
mishap prevention purposes and all witnesses are advised that the testimony will be treated in
confidence. However, testimony given in this JAG investigation may be used for any purpose
deemed appropriate by competent authority, and may be publicly disseminated. Do you
understand the difference between the mishap investigation and this JAG investigation?

Yes, I understand the difference between the two investigations and desire to make the following
statement."

Printed Name: _____ Signature: _____ Date: _____

STATEMENT:

11.  All individuals providing statements in this investigation answered that they understood the
differences between the Mishap Investigation and the JAG Investigation after reading the
statement above.

12.  Individual social security numbers have been deleted from witness statements because they
are not required for this investigation. Those social security numbers contained in this
investigation were obtained through official sources and records.

13.  All documentary evidence included herein is certified to be either the original or a copy that
is a true and accurate representation of the original document represented.

## FINDINGS OF FACT

### MISHAP

1.  That a CH-53E helicopter (BUNO 162007) from HMH-361, call sign "Tiger 07", was
involved in an aircraft mishap on 19 APR 99. [encl 3, 4]

2  That the reported location of the mishap was 26 degrees 40.4 minutes North latitude and 128
degrees 17.7 minutes East longitude off the east coast of Okinawa, Japan.  [encl 3, 4]

5

Subj    COMMAND INVE    GATION OF THE AIRCRAFT MIS:  ' THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

3. That the aircraft impacted the water during a low light level (LLL) night vision goggle (NVG) training flight at approximately 2145 local. [encl 3, 4]

4. That the following personnel were onboard the mishap aircraft: [encl 4, 5, 97-100]

    a.  Lieutenant Colonel Marc L. Hohle,███████/7566, age 38, active duty, USMC, from HMH-361, helicopter aircraft commander, deceased, night vision devices (NVDs) used

    b.  Captain Matthew B. Thomas███████/7566, age 27, active duty, USMC, from HMH-361, helicopter co-pilot, deceased, NVDs used

    c.  Sergeant Obdulio R. Munoz III,███████6060, age 33, active duty, USMC, from HMH-361, crew chief, deceased, NVDs used

    d.  Corporal David Saldana,███████6113, age 27, active duty, USMC, from HMH-361, aerial observer, deceased, NVDs used

5. That all four crew members of the mishap aircraft sustained severe blunt force injuries during the aircraft's impact with the water and in every case the injuries were immediately fatal. [encl 6, 97-100]

## MISHAP AIRCREW

6. That LtCol Hohle was designated as a Naval Aviator on 30 NOV 84 and was currently serving in the capacity as the squadron's Operations Officer. [encl 7, 8]

7. That LtCol Hohle was on Duty Involving Flight Operations (DIFOPS) orders at the time of the mishap. [encl 9]

8. That LtCol Hohle had accumulated 3437.1 total flight hours of which 1985.0 hours were in the CH-53E. [encl 10, 11, 12]

9. That LtCol Hohle had accumulated 305.5 total NVG hours of which 226.6 were high light level (HLL) and 78.9 were low light level (LLL). [encl 12]

10. That LtCol Hohle had flown 26.6 hours in the last thirty days of which 11.6 were NVG hours (6.0 HLL & 5.6 LLL). He flew 47.3 hours in the last sixty days of which 14.1 were NVG hours (8.2 HLL & 5.9 LLL). His last NVG flight was on 14 APR 99. [encl 10, 12]

11. That LtCol Hohle's flight designations included: [encl 13, 14]

    a.  Section, Division, and Flight Leader
    b.  Mission Commander
    c.  Assistant Standardization Instructor and Instrument Flight Board
    d.  Terrain Flight Instructor
    e.  Aerial Refueling Instructor
    f.  Carrier landing qualified during day, night, and with NVGs
    g.  Night Systems Qualified in HLL and LLL conditions

Subj: COMMAND INVES...GATION OF THE AIRCRAFT MISH... THAT OCCURRED IN OKINAWA, JAPAN ON 19 APRIL 1999

    h. Night Systems Instructor (designated on 13 JAN 99)
    i. Functional Check Pilot
    j. Weapons and Tactics Instructor

12. That LtCol Hohle's aeromedical clearance notice was valid until 30 AUG 99. [encl 15]

13. That LtCol Hohle's NATOPS qualification was valid until 6 OCT 99. [encl 16]

14. That LtCol Hohle's Instrument Rating was valid until 31 AUG 99. [encl 17]

15. That LtCol Hohle's Flight Log Books indicated that had never been involved in any flight violations or mishaps prior to 19 APR 99. [encl 18, 19]

16. That LtCol Hohle's aviation physiology, water survival, helicopter emergency escape device (HEEDs), and egress training were valid. [encl 20]

17. That LtCol Hohle's NATOPS jacket showed that no record of monthly emergency procedures tests had been taken for February through April of 1999. [encl 21]

18. That LtCol Hohle, as viewed by others in the squadron, was considered to be a top-notch aviator and leader. His knowledge of aircraft and tactics was well beyond those of his contemporaries; an outstanding instructor. He was always cautious and respectful of the flight environment with superior situational awareness. [Encl 109, 110]

19. That LtCol Hohle had no sociological, psychological, or human factors that might have lead to the mishap. The squadron had the weekend off prior to the flight so he was well rested on the day of the flight and was within crew day constraints. [encl 5, 56, 58, 60, 61, 109-111]

20. That Captain Thomas was designated as a Naval Aviator on 22 AUG 97 and was serving in the capacity as the HMH-361 Flight Line Officer. [encl 8, 22]

21. That Captain Thomas was on Duty Involving Flight Operations (DIFOPS) orders at the time of the mishap. [encl 23]

22. That Captain Thomas had accumulated 492.6 total flight hours of which 247.6 hours were in the CH-53E. [encl 10,12, 24]

23. That Captain Thomas had accumulated 31.2 total NVG hours of which 31.2 were HLL and zero hours were LLL. [encl 10,12, 24]

24. That Captain Thomas had flow 8.0 hours in the last thirty days of which 4.5 were NVG hours (4.5 HLL & 0 LLL). He flew 14.9 hours in the last sixty days of which 4.5 were NVG hours (4.5 HLL & 0 LLL). His last NVG flight was on 31 MAR 99. He last flew on 16 APR 99. [encl 10, 12, 24]

Subj.  COMMAND INVE, .GATION OF THE AIRCRAFT MISI. .P THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

25. That Captain Thomas' low flight time in APR 99 was attributed to his participation in a full
time exercise with Marine Air Control Group 18 from 5-15 APR 99. [encl 10, 12, 24]

26. That Capt Thomas' flight designations included: [encl 13, 22]

   a.  CH-53E copilot
   b.  Carrier landing qualified during day and night (unaided)
   c.  Night Systems Qualified (NSQ) in HLL conditions (designated 7 JAN 99)
   d.  TERF qualified

27. That Captain Thomas' aeromedical clearance notice was valid until 30 SEP 99. [encl 25]

28. That Captain Thomas' Naval Aviation Training and Operations Standardization (NATOPS)
qualification found in his NATOPS jacket was valid until 31 MAR 99.  He completed his
NATOPS open and closed book tests and flew his NATOPS checkride with LtCol Hohle on 16
MAR 99.  At the time of the mishap, his new NATOPS Evaluation Report was awaiting review
and signature by the Commanding Officer. [encl 19, 26]

29. That Captain Thomas' Instrument Rating was valid until 31 JUL 99. [encl 27]

30. That Captain Thomas' Flight Log Book indicated that had never been involved in any flight
violations or mishaps prior to 19 APR 99. [encl 28]

31. That Capt Thomas' aviation physiology, water survival, Helicopter Emergency Egress
Device (HEEDs), and egress training were valid. [encl 29]

32. That Capt Thomas' NATOPS jacket showed that monthly emergency procedures tests were
current through MAR 99. [encl 30]

33. That Capt Thomas' Primary, Intermediate, and Helicopter training at the Naval Air Training
Command (NATC) showed no major difficulties or problems noted.  Final helicopter grades
were above the squadron average. [encl 31]

34. That of the four copilots in the squadron, Capt Thomas was considered to be the finest
copilot.  He was the most professional and the hardest worker with great attention to detail and
concern for the welfare of his Marines; always trying to help out; a solid pilot for his experience
level. [encl 57, 109-111]

35. That Capt Thomas had no sociological, psychological, or human factors  that might have
lead to the mishap.  The squadron had the weekend off prior to the flight so he was well rested
on the day of the flight and was within crew day constraints.   [encl 5, 56, 58, 60, 61, 109-111]

36. That Sergeant Munoz was initially designated as an aerial observer on 10 JAN 96 and as a
crewchief on 1 FEB 96. [encl 32, 33]

Subj.  COMMAND INVE:   iATION OF THE AIRCRAFT MISr.    THAT OCCURRED
       IN OKINAWA, JAPAN ON 19 APRIL 1999

37.  That Sergeant Munoz had volunteered for flight status and was assigned to Temporary-Indefinite Flight Orders at the time of the mishap. [encl 34, 35]

38.  That Sergeant Munoz had accumulated 689.3 total flight hours of which all were in the CH-53E. [encl 10, 36]

39.  That Sergeant Munoz had accumulated 95.0 total NVG hours of which 61.5 were high light level and 33.5 were low light level. [encl 36]

40.  That Sergeant Munoz had flow 25.0 hours in the last thirty days of which 0 were NVG hours.  He flew 43.9 hours in the last sixty days of which 1.7 were NVG hours (1.7 HLL & 0 LLL).  His last NVG flight was on 3 MAR 99.  [encl 10, 36]

41.  That Sergeant Munoz' designations included: [encl 37, 38]

   a.  CH-53E plane captain
   b.  CH-53E crew chief
   c.  Aerial gunner
   d.  Terrain Flight (TERF) qualified
   e.  Night Systems Qualified (NSQ) in HLL and LLL conditions
   f.  Day deck landing qualified (DLQ)
   g.  Collateral Duty Inspector (CDI) for Aviation Life Support Systems

42.  That Sergeant Munoz' aeromedical clearance notice was valid until 30 SEP 99. [encl 39]

43.  That Sergeant Munoz' NATOPS qualification was valid until 3 MAR 00. [encl 40]

44.  That Sergeant Munoz' Flight Log Book indicated that had never been involved in any flight violations or mishaps prior to 19 APR 99 at HMH-361. [encl 19]

45.  That Sergeant Munoz' aviation physiology, water survival, HEEDs, and egress training were valid. [encl 41, 48]

46.  That Sergeant Munoz' NATOPS jacket showed that no monthly emergency procedures tests had been taken after OCT 98. [encl 42]

47.  That Sergeant Munoz, as viewed by others in the squadron, was considered to be an outstanding professional Marine NCO; superb leadership and mentoring skills; admired for calm tactful crew coordination skills; one of the best crew chiefs in the squadron; energetic; qualified and competent. [Encl 109, 110]

48.  That Sergeant Munoz had no sociological, psychological, or human factors  that might have lead to the mishap.  The squadron had the weekend off prior to the flight so he was well rested on the day of the flight and was within crew day constraints.  [encl 5, 56, 58, 60, 61, 109-111]

9

Subj  COMMAND INVES . JATION OF THE AIRCRAFT MISH   THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

49. That Corporal Saldana was initially designated as an aerial observer on 14 AUG 97 and as a crewchief on 9 FEB 99. [encl 43]

50. That Corporal Saldana had volunteered for flight status and was assigned to Temporary-Indefinite Flight Orders at the time of the mishap. [encl 44, 45]

51. That Corporal Saldana had accumulated 498.8 total flight hours of which all were in the CH-53E. [encl 10, 36]

52. That Corporal Saldana had accumulated 114.8 total NVG hours of which 58.3 were high light level and 56.5 were low light level. [encl 10, 36]

53. That Corporal Saldana flew 25.9 hours in the last thirty days of which 12.0 were NVG hours (8.5 HLL & 3.5 LLL).  He flew 43.1 hours in the last sixty days of which 12.0 were NVG hours (8.5 HLL & 3.5 LLL).  His last NVG flight was on 8 APR 99.  [encl 10, 36]

54. That Corporal Saldana's designations included: [encl 37, 46]

   a.  CH-53E plane captain
   b.  CH-53E crew chief
   c.  Aerial gunner
   d.  TERF qualified
   e.  Night Systems Qualified (NSQ) in HLL and LLL conditions
   f.  Day, Night (unaided), and NVG DLQ qualified
   g.  Collateral Duty Inspector (CDI) for CH-53E mechanical systems
   h.  Night Systems Instructor

55. That Corporal Saldana's aeromedical clearance notice was valid until 31 AUG 99. [encl 47]

56. That Corporal Saldana's NATOPS qualification was valid until 31 DEC 99. [encl 48]

57. That Corporal Saldana's Flight Log Book indicated that had never been involved in any flight violations or mishaps prior to 19 APR 99 at HMH-361. [encl 19]

58. That Corporal Saldana's aviation physiology, water survival, HEEDs, and egress training were valid. [encl 48, 49]

59. That Corporal Saldana's NATOPS jacket showed that no monthly emergency procedures tests had been taken after SEP 98. [encl 50]

60. 

Subj· COMMAND INVE    GATION OF THE AIRCRAFT MIS}   · THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

61. That Corporal Saldana, as viewed by others in the squadron, was considered to be a fine young Marine NCO; hardworking and disciplined; knew the aircraft and his job well; professional demeanor while flying and very safety conscious [Encl 109, 110]

62. That Corporal Saldana had no sociological, psychological, or human factors  that might have lead to the mishap.  The squadron had the weekend off prior to the flight so he was well rested on the day of the flight and was within crew day constraints.   [encl 5, 56, 58, 60, 61, 109-111]

## MISSION AND PREPARATION

63. That all crewmembers had attended aircrew coordination and egress training on 4 JAN 99. [encl 52]

64. That the 2.5 hour NVG (LLL) training flight was authorized by the HMH-361 Squadron Commander, Lieutenant Colonel R. A. Fleming III for 19 APR 99. [encl 5]

65. That the flight consisted of a section of CH-53E aircraft.  The mishap aircrew in "Tiger 07" was the wingman for the flight. "Tiger 03" was the lead aircraft. [encl 5]

66. That the aircrew in the lead aircraft consisted of: [encl 5, 60, 70]

   a. Captain Matthew J. Paul, active duty, USMC, from HMH-361, aircraft commander and
      designated section leader for the flight
   b. Captain John P. Ruffini, active duty, USMC, from HMH-361, helicopter copilot
   c. Corporal Jason A. Palmer, active duty, USMC, from HMH-361, crew chief
   d. Corporal Gregorio Arroyo, active duty, USMC, from HMH-361, aerial observer

67. That Capt Paul, the section leader, had accumulated 1096.3 total flight hours of which 838.4 hours were in the CH-53E. [encl 12, 13]

68. That Capt Paul had accumulated 200.2 total NVG hours (107.6 HLL & 92.6 LLL) [encl 12]

69. That Capt Paul's flight designations included: [encl 13]

   a. Section, Division, and Flight Leader
   b. Mission Commander
   c. Terrain Flight Instructor
   d. Aerial Refueling Instructor
   e. Defensive Maneuvers Instructor
   f. Carrier landing qualified during day, night, and with NVGs
   g. Night Systems Qualified in HLL and LLL conditions
   h. Night Systems Instructor
   i. Weapons and Tactics Instructor

11

Subj    COMMAND INVE⌐ ⌐GATION OF THE AIRCRAFT MISⱵ ⌐ THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

70. That Capt John P. Ruffini in the lead aircraft was scheduled for an initial training code write off for a TAC-381, LLL tactical mission in a medium threat environment. [encl 5, 53, 59]

71. That Capt Ruffini had already completed six NVG LLL training sorties in the Combat Qualification Training Stage. [encl 54, 55]

72. That Capt Thomas in the mishap aircraft was scheduled for an initial training code write off for CAL-320 (single aircraft confined area landings in LLL) and CAL-321 (section CALs in LLL) [encl 5, 53]

73. That this flight was Capt Thomas' first NVG flight in low light level conditions. [encl 12, 55]

74. That the flight brief commenced at 1700 for a 1930 takeoff. Since this was an initial write off code for Capt Ruffini, he gave the flight brief IAW squadron SOP and the tactical manual. [encl 56, 58]

75. That a MAG-36 Operational Risk Management (ORM) Card was filled out for the flight. The computed risk was 69 (medium risk). The high risk threshold is 75 points. [encl 62]

76. That a weight & balance computation was made for the flight and signed by both aircraft commanders and the ODO. The computation was made for aircraft 02 & 03. Aircraft 02 went down for a bad tire and 07 took it's place. Since acft 07 weighed only 200 pounds more than 02, its affect on weight and balance computations was negligible. Aircraft takeoff weight was computed at 53,000# with a computed Max Gross Wt allowable of 69,750#. Since the aircraft was not carrying any internal or external loads, excess power was available in all regimes of flight and sufficient for the evening's flight. [encl 60, 61, 62, 63]

77. That the weather for the evening from 1800 until midnight local was forecasted to be 1000' ceiling / 3 mile visibility or better. A temporary line existed in the forecast stating scattered clouds at 700' with rain showers in the vicinity but the ceiling would remain at 1000' or above. Satellite imagery showed Okinawa directly under a weather front. [encl 64, 65]

78. That the light level planning calendar for 19 APR 99 showed low light level (.0022 lux or less) throughout the duration of the flight [encl 66]

79. That the aircrews received a standard ODO brief [encl 58, 59, 67]

80. That the scenario for the flight was a simulated recovery mission with one downed pilot evading enemy forces in the northern training area (NTA) in the vicinity of Fire Base Jones. The flight would proceed from MCAS Futenma via the NVG south route and land at the LHA pad on Ie Shima to pick up notional security forces. The flight would proceed along the NVG northern route to the site of the downed pilot once the exact location (Fire Base Jones) was determined. The flight would land at Fire Base Jones and do a lead change. Once the extract was complete,

Subj.   COMMAND INVE~  .GATION OF THE AIRCRAFT MISh. .? THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

the flight would return to Ie Shima to do the confined area landing (CAL) work [encl 56, 59, 60, 61, 67, 68, 69]

81.  That the NVG routes used in the flight were approved NVG training routes. [encl 67, 68, 69]

82.  That after Capt Ruffini's flight brief, the individual cockpits conducted their NATOPS briefs.  [encl 58]

83.  That during the individual aircraft NATOPS briefs, Capt Paul stopped the brief with Capt Ruffini so he could go and do a hot seat shutdown [the helicopter aircraft commander (HAC) assuming custody of the aircraft signs for the aircraft and proceeds out to the aircraft "turning" on the flight line to brief with, and aide the HAC, relinquishing custody of the aircraft, in the proper shutdown of the aircraft precluding the need for maintenance personnel to do a turnaround inspection] in aircraft 03.  Once complete, he returned and they completed their brief. [encl 58, 59]

### AIRCRAFT PREPARATION

84.  That Corporal Arroyo signed the Daily and Turnaround paperwork for aircraft 07 dated 9109.  GySgt Alfredo Hernandez, USMC, signed the Daily and turnaround portion as the maintenance control representative. [encl 70]

85.  That the Aircraft Inspection and Acceptance Record (Part A) was signed by Corporal Palmer as the plane captain, GySgt Hernandez as the maintenance control representative and LtCol Hohle as the pilot in command. [encl 70]

86.  That LtCol Hohle inspected all discrepancy reports and accepted the mishap aircraft for flight. [encl 70]

87.  That no record exists of fuel samples having been taken or recorded on 19 APR 99. [encl 71, 111 ]

88.  That no downing discrepancies in the outstanding Maintenance Action Forms for the mishap aircraft existed. [encl 72]

89.  That "Tiger 07" has a discrepancy with the landing gear so the gear was left in the down position throughout the flight. [encl 72]

### EXECUTION

90.  That the section took off at 1935 with "Tiger 07" in the lead.  Automated Terminal Information System (ATIS) weather at time of takeoff was 500 few, 1000 scattered, 3000 overcast.  Upon climbout to point Kilo, the section leveled off at 700' vice 1000' because of the overhead layer.  Once clear of Kilo, the flight descended and navigated the NVG south route at 200' and 100 knots. [encl 56, 58, 64, 68]

Subj· COMMAND INVE. .GATION OF THE AIRCRAFT MISH. ⸴ THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

91. That when looking toward Okinawa on both the NVG south and north routes, cultural
lighting afforded ample light conditions on NVGs. When looking away from Okinawa, there
was no discernable horizon. The overcast layer made for a dark night and there was no visual
reference as far as the water was concerned. The sky was very hazy with rain showers in the
vicinity. [encl 56, 58, 59, 60, 73, 75]

92. That abeam Bolo Point on the NVG south route, the section conducted the pre-briefed no
communication lead change. Weather on southern route very hazy with a scuz layer at
approximately 800'. Light rain was encountered enroute to Ie Shima. [encl 56, 58, 60]

93. That at approximately the same time the HMH-361 flight was at Bolo Point, LtCol Keith B.
Ferrell, C.O. of HMM-262 in "Cutter 01," took off from MCAS Futenma and proceeded north
towards the CTA. His wingman, "Cutter 16," took off earlier and was at Uki Baru working
externals. LtCol Ferrell reported to his wingman that the CTA was unworkable. Ceiling in CTA
was broken at 900' with light to moderate rain. "Cutter 16" reported that Uki Baru was workable
with ceiling at 1000' and no rain. "Cutter 01" returned to MCAS Futenma for pattern work.
[encl 73]

94. That after the lead change was executed abeam Bolo Point, "Tiger 03" lead the flight into Ie
Shima. "Tiger 03" waved off their approach into the LHA pad. "Tiger 07" landed on spot 7.
[encl 56, 58, 60]

95. That after the waveoff, "Tiger 03" landed behind "Tiger 07" on spot 9. The flight held on
deck until approximately 2045. [encl 56, 58]

96. That at approximately 2045, "Tiger 03" took off from the LHA pad on Ie Shima. "Tiger 07"
took off afterward and joined as a section. [encl 56, 58, 60]

97. That the flight proceeded along the NVG north route and took two turns in holding at Initial
Point (IP) Jeep awaiting a simulated call that the zone was free from enemy activity. [encl 56, 58,
60, 69]

98. That once the flight proceeded inbound to Fire Base Jones, the flight were unable to locate
the landing zone using GPS as the primary reference. The flight circled the area two times then
proceeded back east to the coastline. [encl 56, 58, 60, 61]

99. That once the flight was feet wet [aircraft flight out over the water], "Tiger 03" turned right
(south) and paralleled the coast line. The flight was at 500', ¼ mile off shore at 100 knots. [encl
56]

## LEAD CHANGE

100. That while proceeding south, a discussion arose between LtCol Hohle and Capt Paul as to
the best way to return to Ie Shima. LtCol Hohle noted that the weather was not so good to the

14

south. Clouds were covering the top of the ridge that runs primarily North-South through the
NTA. The original intent was for the flight to have returned to Ie Shima using one of the
transitions in the Central Training Area. [encl 56, 59, 60, 61]

101.  That during the initial brief, "Tiger 07" was supposed to have lead the flight out of Fire
Base Jones back to Ie Shima by doing a lead change on the deck.  The flight was unable to do the
lead change on the deck because they could not find the zone to land. [encl 57]

102.  That while proceeding south, "Tiger 07" (dash 2) was located on "Tiger 03's" right side at
the five o'clock position, 8 rotor separation, with stepdown.  Corporal Palmer was standing in the
main crew door on "Tiger 03" looking aft at "Tiger 07." [encl 56, 57, 59, 60]

103.  To head back north where they knew the weather was clear and to effect the lead change,
Capt Paul told LtCol Hohle to turn first and that he would turn to join on him.  Capt Paul had the
controls and was sitting in the left seat. [encl 56, 57, 60]

104.  That LtCol Hohle replied, "Roger that."  "Tiger 07" (dash 2) started a left turn away from
the coast.  Capt Paul conferred with his aircrew to ascertain which direction "Tiger 07" was
turning before he commenced a turn to the left. [encl 56, 57, 59]

105.  That for Corporal Palmer, this was the first time that he had seen this type of lead change
occur at night. [encl 60]

106.  That Capt Paul and Corporal Arroyo had performed this type of lead change maneuver
previously. [encl 57, 61]

107.  That the lead change maneuver was not one that had been pre-briefed by the pilots. [encl
57]

108.  That none of the crew on "Tiger 03" heard, saw, or sensed anything unusual with "Tiger
07" prior to the mishap. [encl 56, 58, 60, 61]

## MISHAP

109.  That the exact positions of the mishap aircrew within their aircraft at the time of the mishap
cannot be determined conclusively nor who was at the controls at the time the mishap occurred.
[encl 6, 56, 58, 60, 61]

110.  That once "Tiger 07" had passed through the "Tiger 03" six o'clock position, Captain Paul
started a left turn.  Corporal Arroyo was sitting in the jump seat between the pilots on "Tiger 03"
as the turn commenced.  He jumped down and looked out the aerial observer window on the left
side of the aircraft to try to re-acquire "Tiger 07" during the turn.  About half way through the
180 degree turn, a bright flash occurred off the left side of "Tiger 03" at the eight o'clock
position.  The flash shut down everyone's goggles momentarily on "Tiger 03." [encl 56, 58, 60,
61]

15

Subj:  COMMAND INVE.  .GATION OF THE AIRCRAFT MISH..P THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

111.  That once the bright flash occurred, Corporal Arroyo stated, "dash two's down, dash two's
in the water!" [encl 56, 58, 60]

112.  That once the bright flash occurred, Capt Paul leveled wings and told Capt Ruffini to hit
the mark on the GPS. "Tiger 03" commenced a climb in an easterly direction. Capt Paul
transferred controls to Capt Ruffini. Capt Paul then attempted to contact approach control. [encl
56, 58, 60]

113.  That "Tiger 03" commenced a climb to 3000' MSL while proceeding direct to the Kadena
tacan in an attempt to contact approach control on guard. Approach was finally contacted
approximately 5 minutes after "Tiger 07" impacted the water. [encl 56, 58]

114.  That Capt Garrett C. Lunde, USMC, in "Cutter 16" heard the guard call from "Tiger 03" at
2145. [encl 75]

## SEARCH & RESCUE

115.  That after approach was contacted, "Tiger 03" descended to 500' and returned to the site
that they had marked in the GPS in an attempt to locate "Tiger 07". It was raining fairly hard at
this time. [encl 56, 60]

116.  That LtCol Ferrell, USMC, C.O. of HMM-262 in "Cutter 01", was on a training flight that
evening. He heard the radio transmissions on guard and established radio contact with Capt
Paul. "Cutter 01" proceeded north at approximately 2200 and assumed on scene commander
responsibilities after receiving a general location of the mishap. Weather taking off out of
Futenma had a scud layer at 1000'. There was rain in the vicinity with visibility 5+ miles outside
of rain showers and less than 3 miles inside of showers. [encl 56, 58, 60, 73]

117.  That the Air Force's 33rd Rescue squadron alert crew was notified at 2150 by their
command center . The aircraft crew call sign was "Rescue 401." Capt Cedric D. Stark, USAF,
was the mission pilot. [encl 74]

118.  That once "Cutter 01" assumed on-scene commander responsibility and arrived on scene,
"Tiger 03" returned to Futenma and shut down after being advised to do so by LtCol Ferrell.
[encl 56, 58, 60, 73]

119.  That "Cutter 01" set up at search pattern that paralleled the coast. All turns were made
towards the shoreline because of a lack of a horizon over the water. There was a scud layer at
800' MSL with light to medium rain showers in the vicinity. [encl 73]

120.  That after 20 minutes of searching, "Cutter 01" found the wreckage approximately 1/3 of a
mile off the coast generally east of Fire Base Jones. They marked the wreckage with an aerial
observer's strobe light tied to an LPP flotation device. Scud layer was at 700' MSL. [encl 73]

Subj:   COMMAND INVE⌐ _ IGATION OF THE AIRCRAFT MISHAP THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

121.  That "Cutter 16", commanded by Capt Carl W. Gouaux, USMC, established themselves as
a radio relay between the NTA and Camp Schwab.  They noted that the scud layer fluctuated
between 700-1200' with visibility underneath unrestricted. [encl 75]

122.  That "Rescue 401" launched at 2240 and arrived on scene at 2255 to commence search and
rescue.  "Cutter 01" returned to Futenma for fuel once "Rescue 401" was on station. After
refueling, "Cutter 01" returned to Camp Schwab. [encl 73, 74]

123.  That "Rescue 401" recovered Capt Thomas' body at 2355. His body was flown to Camp
Schwab where it was transloaded to "Cutter 01". "Cutter 16" went off station as a radio relay
and returned to Futenma for fuel. [encl 74, 75]

124.  That "Cutter 01" flew to Lester Hospital and arrived at 0015, 20 APR 99.  Capt Thomas'
body was taken inside by hospital personnel. [encl 73, 76]

125.  That "Cutter 01" departed Lester and returned to Futenma.  The aircraft shut down at
approximately 0100 after consultation with Colonel Trautman, the MAG-36 C.O., because of
expiration of crew day and deteriorating weather. [encl 73]

126.  That at 0115, "Cutter 16" took off from Futenma and transported Capt R. M. Montgomery,
USMC, maintenance member on the HMH-361 aircraft mishap board, to Camp Schwab to
coordinate ambulances. [encl 8, 75]

127.  That "Rescue 401" found LtCol Hohle's body at 0135 but had to return to Camp Schwab
for fuel before the recovery could be effected.  "Rescue 401" refueled, arrived back on scene and
recovered his body at 0210. They transported him to Camp Schwab where they again refueled.
LtCol Hohle's body was taken to the Camp Schwab Medical Unit [encl 74, 76]

128.  That "Cutter 16" returned to Futenma after dropping off Capt Montgomery and shut down
at 0215. [encl 75]

129.  That "Rescue 401" took off from Camp Schwab and requested a crew day extension from
their base to retrieve the 3rd body, Corporal Saldana.  Extension was denied due to crew day.
"Rescue 401" returned to Kadena AFB and shut down at 0340. [encl 74]

130.  That the morgue ambulance from Camp Lester arrived at the Camp Schwab Medical Unit
at 0550 and departed with LtCol Hohle's body at 0555, 20 APR 99. [encl 77]

131.  That LtCol Hohle's body arrived at the Lester Hospital at 0630, 20 APR 99. [encl 97]

132.  That at approximately 0745, 20 APR 99, a Japanese Maritime Safety Agency (JMSA) craft
approached the combat rigid raider craft (CRRC) where Chief Boatswains Mate Duncan D.
Allred USN, the III MEF Master Diver with 5th Force Recon Battalion, was located. Chief
Allred was assisting in the surface search for the missing crew members. The JMSA craft, also

Subj:   COMMAND INVEL..IGATION OF THE AIRCRAFT MISHAP THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

assisting in the search, recovered Corporal Saldana's body. Corporal Saldana was transferred to
the CRRC and taken to the port facility in the town of Aha. [encl 78]

133.  That at 0830, 20 APR 99, Major Michael L. Lawrence, USMC, from HMLA-267 at MCAS
Futenma, landed at the Aha port. His aircraft transported Corporal Saldana's body back to the
Lester Hospital where they arrived at approximate 0950. [encl 79]

134.  That Search and Rescue efforts to find Sergeant Munoz continued throughout the week of
19 APR 99. His body would not be found until 27 APR 99. [encl 83, 99]

135.  That a memorial service was conducted on 23 APR 99 at the Marine Corps Base Camp
Foster Chapel in memory of the mishap crewmembers. [encl 80]

### ENVIRONMENTAL ASSESSMENT & SALVAGE OPERATIONS

136.  That on 20 APR 99, aerial flights were conducted to determine the environmental impact of
the mishap. [encl 79]

137.  That on 20 APR 99, Capt J. E. Smith, USMC, the Environmental Operations Officer for
MCB Camp Butler, conducted an assessment for potential environmental impacts. The result
was no impact from petroleum products. [encl 81]

138.  That as part of the environmental cleanup effort, a POL skimmer vessel owned by Marine
Corps Base Camp Butler and operated by the port services at White Beach successfully
recovered nearly 400 gallons of fuel from the ocean. [encl 81]

139.  That on 25 APR 99, the USS Patriot with EOD Mobile Unit Five Det 51 arrived on site and
commenced with an initial sonar search of the wreckage area . The ship used its sonar and Mine
Neutralization Vehicle (MNV) operations, i.e., underwater camera, to identify wreckage and
search for the fourth crew member. [encl 82]

140.  That during salvage operations on 27 APR 99, Sergeant Munoz body was found in the
wreckage and recovered. His body was taken to the Lester Hospital at 1330. [encl 83 ]

141.  That on 8 MAY 99, Mr. John R. Vallaster, a Naval Safety Center Mishap Investigator,
arrived on station to control all wreckage and real evidence. [encl 84]

142.  That on 8 MAY 99, the USNS Narrangansett with (9) NSWU-1 divers embarked arrived on
station to commence recovery and salvage operations. [encl 85]

143.  That based on the work performed by the USS Patriot and the USNS Narrangansett, a
detailed crash site and wreckage diagram was created. The main cabin section came to rest on
the ocean floor at N $26^0$ 41.500' latitude and E $128^0$ 18.065' longitude. With the main cabin at
the center of the debris field, the remainder of the wreckage was scattered in a 160 yard long by

Subj:  COMMAND INVE_ .iGATION OF THE AIRCRAFT MISHAP THAT OCCURRED
       IN OKINAWA, JAPAN ON 19 APRIL 1999

65 yards wide swath.  The long axis of the debris field was oriented on a 120 degree heading.
[encl 86]

144.  That on 24 MAY 99, the USNS Narrangansett completed salvage operations accounting for
94% of the wreckage recovered.  In summary, the ship and crew performed 27 sets of dives for a
total of 54 dives.  Depth range of the dives was 178-188 feet with a total bottom time of 895
minutes. [encl 87]

145.  That the estimated monetary value (cost) for a CH-53E aircraft as provided by the 1st
MAW comptroller office was $30,182,000.00. [encl 88]

146.  That wreckage recovered was moved to the Naval Facility at White Beach, Okinawa. [encl
89]

147.  That the wreckage was immersed in salt water at a depth of almost 200 feet for
approximately 2 ½ weeks before full scale recovery commenced. Upon recovery, extensive
corrosion of susceptible aircraft parts was evident. [encl 85, 87]

148.  That upon impact, the aircraft disintegrated.  Major damage done to the aircraft included:
[encl 89]

   a. The tail rotor separated from the aft pylon
   b. The aft pylon separated from the aircraft aft of the main cabin section
   c. The outboard #1 & # 3 engines separated from the aircraft
   d. Extensive main cabin section damage
   e. The blades on the main rotor head disintegrated
   f. The cockpit section was completely destroyed
   g. The external fuel tanks and landing gear were ripped from the aircraft

## POST-MISHAP EVALUATION: AIRCRAFT

149.  That when the wreckage was salvaged and moved to White Beach, a special team of
engineers from the Cognizant Field Activity at Cherry Point arrived on island to assist with a
preliminary investigation of the wreckage.  The team consisted of: [encl 90]

   a. Kevin Kenrick, Team Leader, H53ISST, NADEP Cherry Point
   b. Lynda Johnson, Metallurgist, Materials Engineering Section, NADEP Cherry Point
   c. Chris Lowenstein, Sikorsky Safety Representative
   d. John R. (AKA - Bob) Vallaster, Naval Safety Center

150.  That the investigation team gave an out brief on 25 MAY 99 to both the AMB and the JAG
Investigator.  From preliminary observations, it appeared that all aircraft systems were
operational at the time of the mishap and that further engineering investigations would be
conducted with written results provided  [encl 90]

Subj·  COMMAND INVE⸺ .GATION OF THE AIRCRAFT MISH∧? THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

151. That the three aircraft engines were delivered to the Power Plants section at MALS-36 for
analysis. Sergeant Curtis D. Knight, USMC, examined the engines and concluded that all three
engines were turning at the time of impact with the water. [encl 91]

152. That the Materials Engineering Analysis Report evaluating selected instruments and
indicators showed the following: [encl 92, 93]

   a. On the Automatic Flight Control System (AFCS) control panel, the indicators for the
      AFCS and Barometric Alt Hold were illuminated showing the systems were at least
      energized in the "on" position
   b. The attitude gyro showed 5 degrees left wing down and 5 degree down pitch
   c. Both vertical speed indicators showed near zero vertical speed of descent
   d. Copilot airspeed indicator was at 70-75 knots
   e. On one of the two radar altimeter indicators, the low altitude warning system power
      "on" switch was in the "off" position. On the other indicator, the low altitude warning
      system power switch was "on" and set to an altitude of approximately 100 feet.

153. That all three Bearing, Distance, Heading Indicators showed a heading of approximately
125 degrees at impact. [encl 93]

154. That the NATOPS manual explains the when the low altitude warning system is set in the
"on" position, the only indication of going below the selected altitude is illumination of a low
altitude warning light marked "LOW." No aural tone is present to indicate low altitude. [encl
94]

155. That the "Tiger 07" aircraft logbooks were reviewed by Staff Sergeant Jeffrey C. Whitlock,
USMC, of the MALS-36 Quality Assurance Division during a material condition inspection of
HMH-361 on 12-16 APR 99. "Tiger 07" was not one of the primary aircraft inspected during the
MCI but Ssgt Whitlock did a cursory look at the "Tiger 07" logbooks to check for a trend he
observed in the two other aircraft inspected. He discovered no safe for flight discrepancies on
"Tiger 07. After the mishap, he again inspected the aircraft logbooks in greater detail from 6-8
MAY 99 at the request of the Investigating Officer. [encl 95]

156. That the #3 engine's 1000 hour inspection interval had been previously rebased incorrectly
by a previous reporting custodian. The engine had overflown it's 1000 hour inspection by 32.5
hours. [encl 95]

157. That while the engine had overflown the inspection interval, the 1000 hour inspection for
all engines had been performed on 2 APR 99. [encl 96]

158. That the last phase inspection occurred on 10 JUN 98. The aircraft had 28.3 hours
remaining until the upcoming "C" phase. [encl 70, 96]

**POST-MISHAP EVALUATION: AUTOPSY & TOXOCOLOGY**

Subj.  COMMAND INVESTIGATION OF THE AIRCRAFT MISHAP THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

159.  That autopsy protocols were performed on all members of the mishap crew at Lester Naval
Hospital. The mishap aircrew medical records were not available for review by the Investigating
Officer.  The records accompanied the deceased aircrew when their bodies were returned to the
United States. [encl 97-100]

160.  That LtCol Hohle died from multiple blunt force injuries. ████████████████████
████████████████████████████████. He was ejected
from his seat even though he was wearing his safety harness. ████████████████████.
Toxicology was negative. [encl 97]

161.  That Capt Thomas died from multiple blunt force injuries. ████████████████████
████████████████. He was ejected from his seat even though he was wearing his
safety harness. ████████████████████████████████. Toxicology was
negative. [encl 98]

162.  That Sergeant Munoz died from multiple blunt force injuries. ████████████████ He
was trapped in the aircraft wreckage for eight days before he was recovered. There was no
positive indication that his gunner's belt was being worn. Toxicology was positive. [encl 99]

163.  That Corporal Saldana died from multiple blunt force injuries. ████████████████
████████████████████████████ He was ejected from the main cabin
area with no positive indication that his gunner's belt was being worn.  Toxicology was negative.
[encl 100]

164.  That the toxicology results were positive for Sergeant Munoz.  He was positive for
phenylpropanolamine in levels that were non-toxic. [encl 99]

165.  That phenylpropanolamine is a common cold/allergy medication. [encl 101]

166.  That the U.S. Navy Flight Surgeon's Manual, NOMI Waiver Guide and OPNAVINST
3710.7 state that over the counter drugs are prohibited unless specifically approved by a flight
surgeon.  It is up to the flight surgeon's discretion to ground personnel for the use of OTC drugs
and many prescription medications, such as phenylpropanolamine. [encl 101]

167.  That Lt Douglas M. Keel, MC, USN, the HMH-361 flight surgeon had prescribed Entex
LA #20 on 4DEC 98 (take 1 by mouth every 12 hours x 10 days) and Dimetapp Extentabs #20
on 15 MAR 99 (take 1 by mouth every 12 hours x 10 days). [encl 102]

168.  That Lt Keel had no knowledge of illnesses or medication use by Sergeant Munoz on the
day of the mishap. [encl 102]

GOVERNING REGULATIONS

169.  That there was no mixing of night vision devices in the mishap aircraft since all the night
vision goggles were Omnibus III types. [encl 103, 104]

Subj:  COMMAND INVESTIGATION OF THE AIRCRAFT MISHAP THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

170. That the HMH-361 SOP for Flight Operations states in the safety during TERF/NVG
Operations Section that "initial training should be slow, thorough, and conducted within the
comfort level of the crewman under training. [encl 105]

171. That the weather minimums section in the MAG-36 SOP for flight OPS section 3113
states: "Minimum weather for specific types of flight are established as the "worst case" criteria.
When weather minimums are not present the flight will not be attempted. There are many
instances when the weather may be reported to be above those minimums but, aircrew
qualifications, aircraft limitations, unfamiliar terrain, etc. may mitigate against launching. The
final decision to launch or continue a flight when airborne rests with the pilot-in-command.
Commanding Officers are expected to be conservative when making "go/no-go" decisions
during training and peacetime missions." [encl 106]

172. That minimum weather for night operations is 1000 feet AGL ceiling/three statute mile
visibility which defines visual meteorological conditions (VMC). The VMC requirement also
requires reference to a visible horizon since flight without a visible horizon defines instrument
meteorological conditions (IMC). [encl 103, 105, 106]

173. That the Night Vision Goggles (NVGs) section in the MAG-36 SOP for flight OPS section
5500 paragraph 11 states: "NVG flight altitudes shall be limited to the minimums for the least
current/least qualified aircrew member in the flight. Flight Leaders shall plan/brief/conduct all
phases of the flight to accommodate the abilities and comfort level of the least capable aircrew
member in the flight." [encl 106]

174. That the CH-53 Tactical Manual states in section 2.3.2.3 Formation Lead Changes: All lead
change procedures shall be prebriefed and initiated by the flight leader using appropriate signals
(see Figure 2-3). Pilots at the controls should occupy seats on complementary sides of the
formation. Visual contact must be established and maintained between the original formation
leader and the new formation leader before a lead change is effected. [encl 107]

175. That the lead change procedure used by the "Tiger" flight prior to the mishap corresponded
to the Tac Turn description found in the CH-53E Tactical Manual. [encl 107]

176. That the MAWTS-1 Helicopter NVD Manual states in chapter IV, Tactical Formations on
NVGs in the Low Light Level Section: "The LLL flight regime is the most difficult and
demanding environment to operate in. It requires detailed briefing, excellent crew coordination
and a vigilant scan. Lack of visual cues, decreased depth perception and poor external lighting
require reduced separation between aircraft (tighter formation) in order to adequately maintain
sight of lead. Under low ambient light conditions and when atmospheric conditions deteriorate,
wingmen should decrease lateral separation to stay close enough to the lead aircraft to recognize
any attitude, altitude, or airspeed changes. TAC turns are not recommended under LLL
conditions." [encl 108]

22

Subj:   COMMAND INVE*   *GATION OF THE AIRCRAFT MISH*P THAT OCCURRED
        IN OKINAWA, JAPAN ON 19 APRIL 1999

177. That the NVD manual states in chapter 7 section IV: Formation flight in the maneuver
element section that: "Experience has shown that due to the limited contrast provided when using
NVGs over a smooth water surface, pilots have difficulty perceiving a gradual loss of altitude.
[encl 108]

178. That the NVD manual chapter 7 section X: NVG LLL considerations and Chapter 8 section
I: NVG mission planning sections contain reference to decreased performance in LLL conditions
and weather consideration in mission planning. [encl 108]

## OPINIONS

1. That the mishap was the result of controlled flight into the water. [FoF 102-111]

2. That the aircraft impacted the water with a five degree left wing down, 5 degree nose down
pitch attitude with zero vertical speed indication on a 125 degree heading at an airspeed of 70-75
knots. From the instrumentation readings and physical injuries sustained by both LtCol Hohle
and Capt Thomas, it appears that at the time of impact they were attempting to recover. [FoF
152, 153, 160, 161]

3. That lack of an aural ground proximity warning system in the aircraft was a contributing
factor in the mishap. [FoF 152, 154]

4. That the mishap aircrew was properly qualified to perform the assigned training mission on
19 APR 99. [FoF 6-63, 66-69, 159-168]

5. That the mishap flight was required for training and that the flight was properly authorized
and briefed. [FoF 64-83]

6. That the mishap, destruction of aircraft 162007, and the deaths of the mishap aircrew were not
the result of fault or negligence on the part of HMH-361 operations/training personnel. Since this
was the first hop in LLL conditions for Capt Thomas and since Sergeant Munoz had not flow an
NVG hop in forty-seven days, the flight would have been better planned and executed to conduct
the single and section confined area landings during the first portion of the flight before
conducting the higher level tactics portion. [FoF 64-83, 90-111, 170, 173]

7. That the weather had an effect on the visible horizon. [FoF 90, 92, 93, 100, 103, 116, 119,
120, 121, 125, 171, 172]

8. That the low light level conditions with no visible horizon when turning away from the
cultural lighting in Okinawa was a contributing factor in this mishap. [FoF 3, 91, 94, 98, 172,
177, 178]

9. That the Night Vision Device (NVD) manual does not adequately address considerations
when transitioning from a high light level area/high cultural lighting/visible horizon to one of no
light/no horizon or from a VFR scan to an immediate IFR scan technique. [FoF 178]

Subj·  COMMAND INVE__ ·IGATION OF THE AIRCRAFT MISHAP THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

10.  That the mishap, destruction of aircraft 162007, and the deaths of the mishap aircrew were
not the result of fault or negligence on the part of HMH-361 maintenance personnel.  While the
fuel samples for the aircraft were not recorded prior to the flight and the #3 engine had
previously overflown a required inspection, the engines were operational at the time of the
mishap. [FoF 76, 84-89, 151, 155-158, 169]

11.  That the presence of phenylpropanolamine in Sergeant Munoz was not a contributing factor
in the mishap. [FoF 40, 41, 47, 48]

12.  That the mishap, destruction of aircraft 162007, and the deaths of the mishap aircrew were
not the result of fault or negligence on the part of Captain Paul, the section leader.  While the
lead change maneuver performed prior to the mishap was not the standard way of performing a
lead change, it was not a prohibited maneuver and was agreed upon by both helicopter aircraft
commanders. [FoF 63, 65-69, 79, 82, 83, 100-108, 110-113]

13.  That search and rescue efforts by all those involved were conducted to the best of every
tasked unit's capabilities. [FoF 112-135, 139, 140]

14.  That salvage operations resulted in the recovery of 94 percent of BUNO 162007 and the
proper disposal of all recoverable hazardous materials.  Because of the depth of the remaining
wreckage, no further environmental remediation of the crash site is required. [FoF 136-138]

15.  That based on the above findings of fact and opinions, it is the opinion of the investigating
officer that the mishap, destruction of Marine Heavy Helicopter Squadron 361's CH-53E aircraft
BUNO 162007 and the deaths of Lieutenant Colonel Marc L. Hohle , Captain Matthew B.
Thomas, Sergeant Obdulio R. Munoz III, and Corporal David Saldana were the result of aircrew
error. [FoF 1-178]

Subj    COMMAND INVE_ _GATION OF THE AIRCRAFT MISHaP THAT OCCURRED
IN OKINAWA, JAPAN ON 19 APRIL 1999

## RECOMMENDATIONS

1. Take no disciplinary or other adverse administrative action against any HMH-361 maintenance, operations/training, or officer personnel.

2. Strike HMH-361's CH-53E aircraft (BUNO 162007) from Naval Records.

3. Recommend to NAVAIRSYSCOM to procure a predictive ground proximity warning system that has an audible as well as a visual indication of low altitude.

4. Update the NVD manual to address considerations and techniques when transitioning from a high light level/high cultural lighting/visible horizon to one of no light/no horizon. Address VFR to an immediate IFR scan techniques and crew coordination required to effect the transition. Also address the effects of weather and other phenomenon that degrade visual cues to the point that a VFR scan cannot be maintained.

5. Reopen the JAG investigation if formal written results from the Engineering Investigations reveal material failure of any kind.

6. Require all squadron Commanding Officers to have their flight surgeons address the issue of self-medication at the next OPPAUSE period.

7. Commend all units involved in the search and rescue efforts for their dedication to duty and teamwork.

8. Per Section 0219(b) of reference (a), in cases of aircraft accidents, advance copies of investigations and endorsements thereon will be forwarded to the Commander, Naval Safety Center, only upon request.

D. W. SAMPLES

My name is Lieutenant Colonel David W. Samples, USMC. I am appointed to conduct a JAG Manual investigation to gather all the facts and circumstances surrounding the aircraft accident that occurred on Okinawa, Japan on 19 April 1999. This investigation is separate and distinct from the mishap investigation conducted under OPNAVINST 3750.6. The purpose of this JAG investigation is to obtain and preserve all available evidence for use in claims, litigation, disciplinary actions, adverse administrative proceedings, and for all other purposes. Testimony before the mishap investigation board is given with the understanding that it can only be used for mishap prevention purposes and all witnesses are advised that the testimony will be treated in confidence. However, testimony given in this JAG investigation may be used for any purpose deemed appropriate by competent authority, and may be publicly disseminated. Do you understand the difference between the mishap investigation and this JAG investigation?

Yes, I understand the difference between the two investigations and desire to make the following statement.

Printed Name: _MATTHEW J. PAUL_ Signature: _Matthew J. Paul_ Date: _10 MAY 99_

STATEMENT:

CERTIFIED TRUE COPY

ENCLOSURE (5b)

10 May 99

From: Maj M. J. Paul ████████ 7566
To:     LtCol D. W. Samples, JAG Investigator c/o Tiger 07 Mishap

Subj:  STATEMENT REGARDING THE TIGER 07 MISHAP OF 19 APR 99.

Ref:    (a) JAG Investigator ltr dtd 7 May 99

1. The following is essentially the statement I wrote the night of the mishap with elaboration where necessary to answer your questions per reference (a).

Our flight briefed at 1700 for a planned 1930 departure. 2.5 hours allotted in order to not be pressed for time since my co-pilot, Captain Ruffini, was briefing his first LLL tactical flight. The brief began on time and was conducted in accordance with squadron SOPs and the Tactical Manual. The scenario was a simulated TRAP mission w/ one downed pilot evading enemy troops in the NTA (vicinity of Firebase Jones). The flight was to proceed from homeplate to USS Essex (FCLP pad, Ie Shima) via the NVG South route, pick up a security force, and proceed via the NVG North route to the site of the downed pilot once his exact location had been ascertained. LtCol Hohle and I both asked questions about the brief, debriefed Captain Ruffini on some briefing techniques, and tied up any loose ends between ourselves as to the conduct of the flight. ATIS weather at the time of takeoff was 500 few, 1000 scattered, 3000 overcast. The section took off at 1935 with Tiger 07 in the lead. Tiger 03 (Paul/Ruffini, actual section leader) was Dash-2. 07 was lead in order to allow Captain Thomas to be the primary navigator for the first half of the flight. We conducted the NVG South route without incident. Weather was better than 1000/3 to the south, but the overcast layer made for a dark night. Visual references were best keeping Dash-1 between us and the cultural lighting on the island. We spoke to Okinawa Approach after ckpt 8 on the NVG South route for clearance to Bolo Pt. At Bolo Pt, we conducted the briefed lead change. Tiger 03 is now the lead aircraft. Captain Ruffini briefed Tiger 07 would make the administrative calls to W-178 and the NTA. LtCol Hohle received clearance into W-178 and the flight proceeded onto the range simulating the FCLP pad as the USS Essex. 03 (Dash-1) waved off the first approach (too high over the spot). Dash-2 landed spot 7. 03 went around the pattern and landed spot 9. The time was approximately 2035. We stayed on the deck for 7-10 minutes discussing ship procedures, where everyone was (notionally) at that point of the mission (detached R/W escorts, etc). Tiger 03 took off first with 07 immediately thereafter and joined as a section departing the range to the North to continue along the NVG North route. The flight proceeded to ckpt 12, rounded the northern tip of the island and turned South down the eastern side of the island. We held for two turns at ckpt 8 of the NVG North route waiting for the notional "winter" call. I gave Captain Ruffini that call after the second turn in holding and we proceeded inbound to Firebase Jones to pick up the notional downed pilot. Tiger 03 is still in the lead. We did not see Firebase Jones on the first pass with GPS as our primary navigation tool. I brought the aircraft back around to the left and did not see the LZ on the second pass. The tactical play of the problem was over at this point and I didn't want to waste more time looking for an LZ we didn't need to land in. I told Dash 2 I was turning to lead back to the coast and we would head back to Ie Shima to do the briefed

CERTIFIED TRUE COPY

*ᴅ͟ℓ͟ℳ͟.͟C͟ ͟e͟*

CALS. Upon going feet wet, we turned right to head South down the coast at 500'. Captain Ruffini hit the BARALT at 500' when called for. At this point, the flight is heading South ¼ mile off shore, 500' agl, 100 kts. Dash-2 was behind me, five o'clock, 8 rotors, w/ stepdown. I discussed with LtCol Hohle which way would be best to head back to Ie Shima. We both agreed back around the northern point of the island (NVG North route counter-clockwise) was best since the clouds were covering the top of the ridge that runs primarily North-South in the NTA. It was briefed Tiger 07 would lead to Ie Shima for the landings. Since -2 was further back than the normal 2-3 rotors (LLL conditions), I told him to turn first and I would turn after him, join him, and he would lead us back to Ie Shima. "Roger that", was the last thing I heard from LtCol Hohle. I asked the crewchief which way was he turning. He replied, "Left Sir". I asked, "Out to sea?". "Yes", he replied. I waited a few seconds then said, "Roger. I'll be coming left." I was about halfway through the turn when I got a bright flash at my 8 o'clock. It shut down my goggles (I was left seat). I rolled back right, didn't have much too look at on the horizon out to sea, then went on the instruments. The aerial observer said, "Dash-2 is down, dash-2 is down!". At this point I looked back to the general direction of the impact and saw nothing. I told Captain Ruffini to hit mark on the GPS. He did. I began to climb and was on instruments only from that point on, generally heading East. Turned the controls over to him and said continue to climb, give me 1000', and go to the head of the needle (I dialed up Kadena TACAN so the needle would point directly at Approach location). He did so. I began trying to call Approach on 335.8. No joy. Captain Ruffini continued the climb. Went to 7700, guard, and kept trying to reach them until we passed 2500 msl. When I did get a hold of them, I was at 3000 msl and approximately 32 DME. I believe it was around 2135 to 2145 when Tiger 07 went into the water. I got a hold of Approach approximately 5 minutes later. Passed to them my wingman was down, not a drill, the lat/long, and get 33rd Rescue rolling. He asked for the information again and I passed it. He asked for souls aboard. I told him 4. He told me to switch to 363.8. He kept trying to get a tacan cut from me but I have no idea what it was and can not receive it down low in the NTA. After information was passed I told him I was going to head back to the site, I took the controls, and began to descend with decent ground references at this point from lights off the eastern coast. We descended to 500', Captain Ruffini put the mark in the GPS, and we headed to the site. Went to the mark and slightly further North but saw nothing. We were at 300-500 agl at this time. We saw one light out to sea. We turned towards it but after going 2 miles we were apparantly not getting any closer to it. At this point I knew it couldn't be from the mishap aircraft. We turned right to head back to the site. It was raining fairly hard at this time. We heard Cutter 01 calling us on 249.9 (our Base frequency). I told him the same information I gave Approach with the addition that we were heading South along the coast after just coming out of Firebase Jones when the mishap occurred. The site was near that geographical location 1/4 to 1/2 mile offshore. Cutter 01 asked whom was he speaking with. I told him. He told me he was LtCol Farrell and he would stay on site until the 33rd arrived. He essentially told us to RTB. I continued to pass information back and forth between Cutter and Approach until I was Pt Golf inbound. I asked tower for Kilo inbound if there was no outbound traffic. Tower approved the request. We entered a right downwind for 06, landed and shutdown.

2. Below are answers to questions posed in reference (a) that were not discussed or answered above:
        - I was sitting left seat in my aircraft.

CERTIFIED TRUE COPY

*[signature]*

- I did not see, hear, or sense anything wrong or out of the ordinary with Tiger 07.

- I did not hear any transmissions from Tiger 07 once they began their left turn.

- I spent most of Sunday and Monday morning with LtCol Hohle. Nothing was visibly bothering him. He seemed his normal, upbeat self. I am unable to speak intelligently on the emotional or psychological state of Captain Thomas, Sergeant Munoz, or Corporal Saldana.

- It is my belief that Captain Thomas was in the left seat and at the controls. I believe this because it is normal procedure amongst the NSIs in our squadron to put the co-pilot in the left seat during initial NVG flights so as to benefit from the additional light provided by the red position light on the left side of the aircraft. If LtCol Hohle were at the controls, left or right seat, I believe he would have chosen a right turn since the lights on the coast to the West provided the best source of reference. Finally, LtCol Hohle runs his cockpit in the following manner, the PNAC makes the radio calls while the PAC flies the aircraft. The last administrative call made was by LtCol Hohle to NTA traffic when entering holding near checkpoint 8. For these reasons, I believe Captain Thomas was left seat and the PAC. However, I did not hear which seat LtCol Hohle assigned Captain Thomas during their brief. Nor was I able to see who was in which seat during start-up and taxi.

- I don't remember anything odd about aircraft 07. I had flown it twice within a week prior to the mishap.

- I don't remember any aircraft assignment issues other than that 07 was originally the back-up. I don't recall what occurred to make it a player for the flight, just that it was worked out before we even finished briefing.

- To the best of my knowledge, no SOP or NATOPS deviations occurred before, during, or after the flight.

- It is my belief that aircraft 07 experienced controlled flight into the water. The only question I have not settled in my mind is what diverted LtCol Hohle's attention long enough to prevent him from recognizing the unintended control input and recovering the aircraft prior to impact.

M. J. PAUL

CERTIFIED TRUE COPY

7 May 99

From:  LtCol D.W. Samples, JAG Investigator
To:      Major Paul, HMH-361

Subj:  Questions for JAG Investigation

1.  I have included a witness statement for you to sign before providing a statement since the
    JAG investigation is separate and distinct from the Aircraft Mishap Board.  Please read and
    sign the witness statement.

2.  Provide a word picture of what happened on the day of the mishap from a your standpoint.
    A simple who, what, when, where, how, and why format will help to compile your ideas.
    Some questions which might help you formulate your statement include:

•  Describe the mission you were conducting
•  Describe the conduct of the entire mission (aircraft preparations and preflight, aircrew
   briefings conducted, conduct of flight before, during, and after the mishap)
•  Describe the weather conditions during the conduct of the mission
•  Describe the heading, altitude, airspeed, and configuration of the mishap aircraft.
•  Where was the mishap aircraft in relation to yours when the mishap occurred?
•  Describe the light level conditions while viewing with NVGs
•  Describe where you were sitting in your aircraft.  Did you observe, hear, smell, or sense
   anything coming from the other aircraft from where you were sitting both before, during, and
   after the mishap.   Unusual noises?  Did anything not look right? Did you hear any radio
   transmissions?

3.  Additionally,  provide any input to the following questions:

•  Can you describe the qualities, attributes, or characteristics of the aircrew involved in the
   mishap?
•  Were there any sociological, psychological, or human factors in any of aircrew that might
   have a bearing into the cause of the accident to include potential stress factors or fatigue,
   family or work related issues?
•  Where were the mishap crew sitting in the other aircraft?  Any idea who was in control of the
   aircraft at the time of the mishap?
•  Were there any aircraft issues in making the flight schedule for the day?  Aircraft swaps, etc.
•  From your recollection, did aircraft 07 have any characteristics that might be a factor in the
   mishap?  For example, I was previously the AMO at HMM-265 and we had one aircraft
   affectionately known as "Christine" because of the number of electrical gripes and
   malfunctions.  Did the aircraft display a certain personality or repeat gripes?
•  To the best of your knowledge, did you witness any deviations from NATOPS or any
   squadron Standard Operating Procedures?
•  What do you think happened to cause this mishap?

CERTIFIED TRUE COPY

4. If you have any questions, call me at work DSN 636-2979/3014 or home DSN 645-5218. My email addresses are:

Work:  samplesdw@1maw.usmc.mil
Home:  sample10@marinemwr.or.jp

D. W. Samples

CERTIFIED TRUE COPY

ENCLOSURE ( )

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| KRISTA SALDANA, Individually and as Representative of the ESTATE OF DAVID SALDANA and as Next Friend of JAGGER SALDANA | § § § § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| MELQUIADES SALDANA and AURELIA SALDANA, | § § § | |
| Intervenors, | § § | Civil Action No. B-00-176 |
| v. | § § | |
| ITT INDUSTRIES, SIKORSKY AIRCRAFT CORPORATION, a Subsidiary of UNITED TECHNOLOGIES CORPORATION, the ESTATE OF LT. COL. MARC LEE HOHLE and the ESTATE OF CAPTAIN MATTHEW BRENT THOMAS, | § § § § § § § § | |
| Defendants. | § | |

## AFFIDAVIT OF ROBERT P. GUAY

| | |
|---|---|
| STATE OF CONNECTICUT | § § |
| COUNTY OF FAIRFIELD | § |

BEFORE ME, the undersigned authority, on this day personally appeared Robert P. Guay, and after being duly sworn by me stated as follows:

1.      I am a retired United States Marine Corps Lieutenant Colonel, having retired from the Marine Corps in 1971 after 21 years of service.

2.      In 1966, during my military service, I was assigned to the Naval Air Systems Command ("NAVAIR") in Washington, D.C.

3.      The technical development and support of Naval aircraft is the responsibility of NAVAIR.

4.      During my assignment at NAVAIR I was the NAVAIR Class Desk Officer for the CH-53 helicopter. I served in this capacity until January of 1970. The Class Desk Officer is responsible for management and coordination of technical planning, budgeting, scheduling, installation, development evaluation, and test and production of assigned aircraft and weapon system projects. As the Class Desk Officer, I provided guidance to and exercised coordinating control over NAVAIR personnel on the CH-53A, CH-53D and CH-53E programs.

5.      In 1971, I joined Sikorsky Aircraft. Between 1978 and 1979 I served as Program Manager for the CH-53E.

6.      I am fully competent and authorized to testify to each of the matters stated herein. I have personal knowledge of the matters stated herein and each of which is true and correct.

7.      My testimony is concerned with the military procurement of the CH-53E helicopter and the cooperation and coordination that occurred between the United States Navy and Sikorsky in developing the CH-53E helicopter, under the supervision of the United States Navy. The CH-53D was the design and production predecessor to the CH-53E involved in this case. The CH-53A was the design and production predecessor to the CH-53D. The United States Navy provided precise specifications for the design of the CH-53E helicopter systems, and that the CH-53E helicopter produced by Sikorsky conformed to those specifications.

**AFFIDAVIT OF ROBERT P. GUAY** - Page 2

8.    NAVAIR maintained a staff of engineers in Washington, D.C. They evaluated contractor design proposals for helicopters and aircraft to determine if the design proposals complied with the military specifications and the type specification.

9.    When Sikorsky was under contract with the Navy for the development and production of Model CH-53E helicopters, NAVAIR maintained a large staff of engineers at Sikorsky's plant in Stratford, Connecticut, called NAVPRO. NAVPRO supervised and monitored the design and qualification testing of the CH-53E helicopter models, and later supervised production, testing and acceptance of each production aircraft.

10.    During the development and testing phases of the CH-53E helicopters, Sikorsky personnel were in continuous communication with the Program Manager, the Class Desk Officer and NAVAIR personnel. During my tenure as Class Desk Officer, I was in telephone communication with Sikorsky personnel at least once a day. At least once each month, I either visited the Sikorsky plant or Sikorsky personnel met with me in Washington, D.C. NAVAIR engineers met regularly with their counterparts at Sikorsky in design review meetings to discuss the progress of and to evaluate all aspects of design and testing of the CH-53E in order to ensure design specification conformance.

11.    Moreover, as CH-53E Program Manager for Sikorsky, I communicated and met frequently with the NAVAIR CH-53E Program Manager, the Class Desk Officer and other NAVAIR personnel to discuss the progress of the design, testing and production of the CH-53E.

12.    In order to discuss the development of the CH-53E, it is first necessary to discuss the development of the CH-53A and CH-53D helicopters.

13.    In 1961, NAVAIR developed a type specification for an H-H(x) helicopter. This type specification defined a new aircraft that would fulfill a specific operational requirement (a

**AFFIDAVIT OF ROBERT P. GUAY** - Page 3

heavy assault helicopter) and interface with existing and future Navy ships and support equipment.

14.    NAVAIR then published a request for proposals and solicited proposals from contractors in the industry to develop the H-H(x) helicopter. In 1962, Sikorsky Aircraft was chosen by NAVAIR to develop the H-H(x) helicopter.

15.    The H-H(x) helicopter was assigned the Department of Defense designation CH-53A. The Navy issued a design and production contract in 1963 designated Contract No. NOw-63-0150f (the 1963 contract). The 1963 contract incorporated detail specification SD-552-1 which in turn stated the government's design, testing and data specifications for the CH-53A helicopter.

16.    Sikorsky submitted design drawings and design data to NAVAIR for every system of the CH-53A helicopter. Navy engineers reviewed the drawings and evaluated them against the requirements of SD-552-1. Modifications were made to the design drawings at the direction of NAVAIR. NAVAIR then approved the drawings as in conformity with SD-552-1 and the drawings became part of the contract specifications. Thereafter, Sikorsky could not make any changes in the design of helicopter parts without Navy approval.

17.    The 1963 contract required that Sikorsky build the prototype helicopters for testing, demonstrations and trials.

18.    The 1963 contract required one CH-53A to be used as a Structural Test Article, and the contract required Structural Tests and Demonstrations required by the Demonstration Requirements for the CH-53A dated 11 Dec 1962.

19.    The Navy and NAVPRO monitored the testing and inspected every part of the helicopters. If NAVPRO and/or NAVAIR identified problems, Sikorsky would propose design

modifications and NAVAIR would approve the design modifications. After approval, Sikorsky made those changes.

20.  The Navy and Sikorsky demonstrated the capabilities of the CH-53A helicopter in ground and flight tests as required by the 1963 contract.

21.  As required by the contract, test aircraft were then delivered to the Naval Bureau of Inspections and Surveys (BIS) for the BIS trials. BIS is an office independent of NAVAIR reporting directly to the Secretary of the Navy. The BIS trials are the final tests to determine whether the helicopter has met all of its contractual requirements. The trials are conducted under the exclusive control of the BIS Board. At the conclusion of the trials, BIS submitted a report with its recommendations for any changes necessary to bring the helicopter into compliance with the contract specifications.

22.  Sikorsky then submitted proposals to NAVAIR to meet each of the BIS recommended changes. After the changes were approved by NAVAIR, Sikorsky completed the required configuration changes and made appropriate revisions to the design drawings to NAVAIR's satisfaction. NAVAIR determined that the CH-53A helicopter met all of the contractual requirements, and recommended to the Secretary of the Navy that the Navy accept for use the CH-53A. The Secretary of the Navy approved NAVAIR's recommendation, and the CH-53A was released for fleet use.

23.  NAVAIR's approval of the design established the baseline configuration or configuration freeze. Thereafter, the contract did not permit Sikorsky to make a change in the CH-53A aircraft design configuration without NAVAIR approval of an engineering change proposal.

AFFIDAVIT OF ROBERT P. GUAY - Page 5

24.    More than 120 CH-53A helicopters were accepted by the Navy and introduced into Marine fleets from 1966 through 1968. During these years, the Marines operated and maintained the fleet and the Navy performed overhauls.

25.    Based on the Marine Corps and Navy experience in Vietnam, the Navy/Marine Corps decided to upgrade the CH-53A helicopter with a larger engine to provide improved performance at high ambient temperatures and greater horsepower for larger payloads. The larger engine required an upgraded transmission system to handle the additional torque. NAVAIR decided that this upgraded version of the CH-53A should be given a new model designation, Model CH-53D.

26.    As Class Desk Officer at the time of the procurement of the CH-53D, I was responsible for coordinating and supervising all aspects of the development, design, testing, and production of the CH-53D.

27.    Recommendations on detail specifications for the CH-53D were requested by the Navy and a proposal was submitted by Sikorsky. This proposal was reviewed by NAVPRO and NAVAIR engineers in conjunction with their counterparts at Sikorsky. On July 12, 1968, the Navy issued SD-552-1-3, "Detail Specification for Model CH-53D Helicopter." This document provided precise specifications and requirements to be adhered to by Sikorsky in manufacturing the CH-53D helicopter.

28.    In December 1968, the Navy issued Contract No. N00019-68-C-0471 (the 1968 contract) which directed Sikorsky to produce 124 CH-53D helicopters. The 1968 contract required that the CH-53D helicopters be delivered in accordance with SD-552-1-3, the Detail Specification. The 1968 contract set forth the design and testing requirements for the CH-53D.

29.    The 1968 contract, as modified by the contract modifications, established the configuration and contract specifications for CH-53D helicopters. Sikorsky was not permitted to deviate from that specified configuration without Navy approval. Under the contract, the Navy could unilaterally change the design but Sikorsky could not change the design without approval of an Engineering Change Proposal by the NAVAIR Aircraft Configuration Control Board. In that way, the Navy retained and controlled the CH-53D helicopter's design specification.

30.    NAVPRO inspectors stationed at Sikorsky supervised the production of the CH-53D helicopters to ensure conformity to the contract specifications.

31.    As required by the 1968 contract, NAVPRO witnessed the acceptance tests and inspected each completed CH-53D helicopter and upon delivery issued a Material Inspection and Receiving Report (DD-250) certifying that all contract requirements were satisfied.

32.    Following delivery, the Department of the Navy (which includes the United States Marine Corps) operated and maintained the CH-53D helicopters.

33.    Throughout my tenure at NAVAIR, Sikorsky personnel were in continuous dialogue with NAVAIR regarding the design of the CH-53A/D. Sikorsky personnel were frank in their discussions with the Navy (NAVAIR and NAVPRO) about any dangers in the design and/or use of the CH-53A/D helicopters. I was never aware of any instances where Sikorsky failed to advise NAVAIR of any dangers in the design and/or use of the CH-53A/D helicopters.

34.    The design, testing and manufacture of CH-53D aircraft conformed in all respects to the SD-552-1-3 Detail Specification provided by NAVAIR.

35.    Based upon the Marine Corps and Navy further experiences in Vietnam, the Marine Corps/Navy decided to upgrade the CH-53D helicopter with larger engines to allow for

the retrieval of all Marine Corps helicopters, including the CH-53E. NAVAIR decided that this upgraded version of the CH-53D should be given a new model designation, Model CH-53E.

36.    As Class Desk Officer at the time of the initial design and testing of the CH-53E, I was responsible for coordinating and supervising all aspects of the development, design, testing, and production of the CH-53E. Moreover, NAVAIR required Sikorsky to provide extensive reporting concerning the development of each phase of the CH-53E. During the development process, Sikorsky produced and the Navy (NAVAIR and NAVPRO) closely examined and approved both a mock-up of the CH-53E with all the instruments and controls and a production prototype. These mock-ups were completed by Sikorsky and approved by the Navy (NAVAIR and NAVPRO) after extensive inspection and testing.

37.    Recommendations on detail specifications for the CH-53E were requested by the Navy and a proposal was submitted by Sikorsky. This proposal was reviewed by NAVPRO and NAVAIR engineers in conjunction with their counterparts at Sikorsky.

38.    On May 21, 1982, the Navy issued SD-552-3-6 (Detail Specification for CH-53E helicopter). This document provided precise specifications and requirements to be adhered to by Sikorsky in manufacturing the CH-53E helicopter at issue.

39.    The Navy issued Contract No. N00019-82-C-0230 (the 1982 contract) which was the production contract for the CH-53E helicopter at issue in this suit. The 1982 contract required that these CH-53E helicopters be supplied in accordance with SD-552-3-6.

40.    The 1982 contract established a configuration and precise contract specifications to be used by Sikorsky in the manufacture of the CH-53E helicopters. **Sikorsky was not permitted to deviate from the specification configuration without Navy approval.** Under the contract, the Navy could unilaterally change the design; Sikorsky could not change the design

AFFIDAVIT OF ROBERT P. GUAY - Page 8

without approval of an Engineering Change Proposal ("ECP") by the NAVAIR Aircraft Configuration Control Board. That way, the Navy retained control over the CH-53E helicopter's design configuration. If an ECP was approved, a Contract Change Notice would be issued by NAVAIR to Sikorsky.

41.    NAVPRO inspectors stationed at Sikorsky supervised the production of the CH-53E helicopters to ensure conformity to the contract specifications.

42.    As required by the 1982 contract, the Navy witnessed the acceptance test and inspected each completed CH-53E helicopter and, upon delivery, issued a Material Inspection and Receiving Report (DD-250) certifying that all contract requirements were satisfied.

43.    Following delivery, the Department of the Navy (which includes the United States Marine Corps) operated and maintained the CH-53E helicopters.

44.    Throughout my tenure at NAVAIR and at Sikorsky, Sikorsky personnel were in continuous dialogue with NAVAIR regarding the design of the CH-53E helicopter. Sikorsky personnel were frank in their discussions with the Navy (NAVAIR and NAVPRO) concerning any dangers in the design and/or use of the CH-53E helicopters. I was never aware of any instances where Sikorsky failed to advise NAVAIR of any dangers in the design and/or use of the CH-53E helicopters.

45.    NAVPRO and NAVAIR ensured that the design, testing and manufacture of the CH-53E helicopter conformed in all respects to Detail Specification SD-552-3-6 provided by NAVAIR.

46.    The design, testing and manufacture of the CH-53E helicopters conformed in all respects to the Detail Specification SD-552-3-6 provided by NAVAIR. Each helicopter was

produced in strict compliance with the Navy design specifications and under extensive scrutiny by NAVPRO and NAVAIR engineers.

47.    It should be noted that Sikorsky did not totally "manufacture" the CH-53E helicopter. Sikorsky was the primary contractor for the CH-53E program. Thus, Sikorsky was responsible for assembling the helicopter, which was made up of parts manufactured by Sikorsky and other companies. Many of the parts that made up the CH-53E are government furnished equipment ("GFE"). The two (2) radar altimeters installed in the CH-53E were GFE. This means, Sikorsky did not design or manufacture the radar altimeters in the CH-53E. Rather, the U.S. Government contracted with an outside vendor to design and manufacture the radar altimeters, and directed Sikorsky to install the GFE radar altimeters into each delivered CH-53E.

48.    Moreover, at the time of this helicopter's manufacture, the Navy was not regularly using Night Vision Goggles ("NVGs") in the CH-53Es. This is evident from the Detail Specification which required red lighting (which is incompatible with NVGs). Thus, this helicopter would have had to have been retrofitted by the Navy to become NVGs compatible. Normally when NAVAIR intends to retrofit any equipment, the retrofit is called out in the aircraft Detail Specification by specifying weight and space provisions. The Detail Specification for this helicopter did not call out weight and space provisions for NVGs. Therefore, the Navy had no intention to configure any CH-53E for NVG use. The United States Navy would have been responsible for installing NVG cockpit compatible lighting.

49.    Attached as Exhibit G to Sikorsky's Brief in Support of Its Motion for Summary Judgment is a true and correct copy of the original DD-250 signed by the U.S. Navy and provided to Sikorsky upon acceptance of the aircraft involved in this case. By signing a DD-250, the government acknowledges that the aircraft conforms in all respects to the design,

AFFIDAVIT OF ROBERT P. GUAY - Page 10

performance, and contract requirements imposed upon the manufacturer by the Navy. By issuing the DD-250, the Navy advised Sikorsky that this particular helicopter conformed to all of the Navy's design specifications, performance, and other contractual requirements relevant to this case. Having accepted this aircraft, the Navy accepted final responsibility for this aircraft. After the Navy's acceptance, Sikorsky's only responsibility involved latent defects as described in the procurement contract.

Further Affiant sayeth not.

_____
Robert P. Guay

SUBSCRIBED AND SWORN TO BEFORE ME on this 29 day of May, 2002.

_____
Notary Public State of Connecticut

_____
Typed or Printed Name of Notary

ELISA C. YOUNG
Notary Public
State of Connecticut
My Comm. expires Aug 31, 2004

My Commission Expires:

_____

**AFFIDAVIT OF ROBERT P. GUAY** - Page 11

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| KRISTA SALDANA, Individually and as Representative of the ESTATE OF DAVID SALDANA and as Next Friend of JAGGER SALDANA<br><br>    Plaintiff,<br><br>v.<br><br>MELQUIADES SALDANA and AURELIA SALDANA,<br><br>    Intervenors,<br><br>v.<br><br>ITT INDUSTRIES, SIKORSKY AIRCRAFT CORPORATION, a Subsidiary of UNITED TECHNOLOGIES CORPORATION, the ESTATE OF LT. COL. MARC LEE HOHLE and the ESTATE OF CAPTAIN MATTHEW BRENT THOMAS,<br><br>    Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § §   Civil Action No. B-00-176 |

## AFFIDAVIT OF GORDON E. LEACH

| | |
|---|---|
| STATE OF MASSACHUSETTS | § |
| | § |
| COUNTY OF PLYMOUTH | § |

BEFORE ME, the undersigned authority, on this day personally appeared Gordon E. Leach, and after being duly sworn by me stated as follows:

1.      My name is Gordon E. Leach. I am over the age of eighteen and fully competent and authorized to make this Affidavit. The following facts and circumstances are within my

**AFFIDAVIT OF GORDON E. LEACH - Page 1**

personal knowledge, based upon my experiences and documents reviewed by me, and are true and correct.

2.      I am retired from Sikorsky Aircraft Corporation ("Sikorsky") after over 22 years of employment.

3.      Between 1977 and 1983 I was Senior Contract Negotiator for Sikorsky.  In that position, I was responsible for the development contract and the initial production contracts for the Navy CH-53E program as well as other Navy Contracts.

4.      From 1983 to 1989 I was Manager of Contracts for Sikorsky.  From 1989 to 1990 I was Government Contracts Director at Sikorsky.

5.      In 1990 I became Contracts Director for Sikorsky which is the position I held until my retirement in 1999.  During the period from 1995 to 1999 I was responsible for the contracting and negotiation of all United States Government production contracts.

6.      As part of the CH-53E program history I learned after being hired by Sikorsky in March 1977, the Navy authorized Sikorsky to perform an Engineering Change Proposal (ECP) for engineering studies and feasibility testing under the final portion of CH-53D production Contract No. N00019-68-C-0471 whereby Sikorsky and the Navy would evaluate the concept for a "heavy lift" helicopter (later to be designated the CH-53E).

7.      Based on the results from the ECP efforts, the Navy received funding and authorization to proceed with the design and fabrication of two prototype helicopters, which were designated YCH-53E, under Contract No. N00019-73-C-0228.

8.      The Navy maintained continuing oversight during the design and fabrication of the two prototypes.  The Navy was also intimately involved in the flight testing of the prototypes.

**AFFIDAVIT OF GORDON E. LEACH - Page 2**

9.    Based on the results of the YCH-53E contract efforts, the Navy received funding and authorization to proceed with the design and fabrication of two pre-production CH-53E helicopters and thus issued Development Contract No. N00019-75-C-0267. The Navy continued their close oversight of all aspects of Sikorsky's design, fabrication and testing activities associated with these helicopters. During the CH-53E's development stage, Sikorsky was required to adhere to the Navy's specific requirements.

10.    As the Development Contract progressed, the Navy was successful in securing funding for a production contract, based in part upon their establishing Detail Specification SD-552-3-1. To initiate their production program, the Navy issued Contract No. N00019-78-C-0146 which required the first production CH-53E helicopters to comply with SD-552-3-1, as well as undergo specific testing requirements. Sikorsky and the Navy continued to utilize the communication and coordination methods established during the development stages in order to monitor each aspect of the contract and the production of the CH-53E helicopters.

11.    On May 21, 1982, the Navy approved SD-552-3-6 which is the Detail Specification for production Lot VI (FY83 Procurement) CH-53E helicopters under Contract No. N00019-82-C-0230. This document provided precise specifications and requirements to be adhered to by Sikorsky in manufacturing the specific CH-53E helicopter (Serial Number 162007) at issue in this suit, which, according to the DD-250, was accepted by the Government on April 18, 1984. The Detail Specification as approved by the Navy was incorporated into the Lot VI production contract and was the criterion to which Sikorsky was to comply. Sikorsky had no authority to alter any of the specification's requirements. True and correct copies of pertinent sections of SD-552-3-6 are attached to Sikorsky's Brief in Support of Its Motion for Summary

Judgment as Exhibit F. A true and correct copy of the DD-250 is attached to Sikorsky's Brief in Support of Its Motion for Summary Judgment as Exhibit G.

12.    The Detail Specification SD-552-3-6 contains items that are provided by the government for inclusion in the CH-53E. These items are known as Government Furnished Equipment (GFE). The radar altimeters in the Lot VI CH-53E helicopters were GFE. Thus, Sikorsky did not design, manufacture or obtain the radar altimeters for inclusion in these CH-53E helicopters. Instead, pursuant to the contract, the U.S. Government obtained the radar altimeters from a third-party supplier of their choosing and provided the units to Sikorsky for installation into the Lot VI CH-53E helicopters.

13.    The CH-53E helicopter specification SD-552-3-6 is devoid of any requirement for use of Night Vision Goggles (NVG). Hence, no NVG design requirement was imposed on Sikorsky and Sikorsky was under no obligation to build this helicopter for NVG compliance. Further, Sikorsky did not, and does not, manufacture NVG.

14.    I am not aware from my position in the Contracts Management Department of any instance in which Sikorsky withheld from the Navy technical information regarding possible dangers in the use of the CH-53E. Beginning with the early design and prototype phases of the CH-53E Program and continuing through the numerous production contracts, the Navy maintained a substantial staff at Sikorsky's Stratford, Connecticut plant to provide oversight of Sikorsky's full compliance with the Navy's contractual requirements. This staff included the Naval Plant Representative Office (NAVPRO). The staff's various disciplines included program management, engineering, quality control, property administration, flight operations, and contract administration.

**AFFIDAVIT OF GORDON E. LEACH - Page 4**

15.    A major responsibility of NAVPRO was acceptance of aircraft. Each aircraft was flown by Navy pilots in accordance with a Government approved acceptance flight test plan. Only after these pilots approved the aircraft would the appropriate NAVPRO representative accept it on behalf of the Government via signature on a DD-250. The Navy acknowledged that the helicopter at issue (Serial Number 162007) complied with the N00019-82-C-0230 contract requirements, including its Detail Specification SD-552-3-6, as set forth on the April 18, 1984 DD-250. No helicopter can be delivered to the United States military without completion of a DD-250.

16.    In my role as contract negotiator for the CH-53E program, I was involved on a daily basis with Navy Procurement, Navy Program Office, Navy Engineering, Navy Logistics, or government employees at the resident NAVPRO pertaining to issues relating to contracts. I also participated in periodic Program Reviews and some specification negotiation meetings on the CH-53E program with Navy personnel.

17.    The United States Navy closely monitored and was intimately involved in every step of the design, component testing, manufacturing, flight testing and acceptance testing of the CH-53E helicopters. The Navy either controlled or approved every aspect of the CH-53E requirements from design inception through each lot of production. Thus, the CH-53E's were manufactured in compliance with very detailed and precise military specifications. In my opinion, it is fair to say that the United States Navy had more knowledge about any potential dangers that might be inherent in the operation of CH-53E helicopters than Sikorsky did as a result of the government's extensive testing and fleet usage.

18.    The CH-53E helicopters produced by Sikorsky under the Navy contracts are, subsequent to delivery, maintained and operated by the Department of the Navy (which includes

AFFIDAVIT OF GORDON E. LEACH - Page 5

the United States Marine Corps), which has exclusive control over the manner in which they are maintained and operated.

Further Affiant sayeth not.

_____
Gordon E. Leach

SUBSCRIBED AND SWORN TO BEFORE ME on this _29_ day of May, 2002.

_____
Notary Public State of Massachusetts

KATHLEEN J. GANGELL
Notary Public - Massachusetts
Typed or Printed Name of Notary
My Commission Expires December 2, 2005

My Commission Expires:

_____

**AFFIDAVIT OF GORDON E. LEACH - Page 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| KRISTA SALDANA, Individually and as Representative of the ESTATE OF DAVID SALDANA and as Next Friend of JAGGER SALDANA | § § § § § | |
| Plaintiff, | § § § | |
| v. | § § | |
| MELQUIADES SALDANA and AURELIA SALDANA, | § § § | Civil Action No. B-00-176 |
| Intervenors, | § § | |
| v. | § § § | |
| ITT INDUSTRIES, SIKORSKY AIRCRAFT CORPORATION, a Subsidiary of UNITED TECHNOLOGIES CORPORATION, the ESTATE OF LT. COL. MARC LEE HOHLE and the ESTATE OF CAPTAIN MATTHEW BRENT THOMAS, | § § § § § § § § § | |
| Defendants. | § | |

## AFFIDAVIT OF CHRISTOPHER LOWENSTEIN

| | |
|---|---|
| STATE OF CONNECTICUT | § |
| | § |
| COUNTY OF FAIRFIELD | § |

BEFORE ME, the undersigned authority, on this day personally appeared Christopher Lowenstein, and after being duly sworn by me stated as follows:

1.      My name is Christopher Lowenstein.  I am over the age of eighteen and fully competent and authorized to make this Affidavit.  The following facts and circumstances are within my personal knowledge, based upon my experiences and documents reviewed by me, and are true and correct.

2.      I am currently Chief of Aircraft Safety Investigation for Sikorsky Aircraft Corporation ("Sikorsky").  I have been employed with Sikorsky for approximately 16 years.  I was the accident investigator assigned to the mishap made the basis of this suit.

3.      Over a period of time beginning in 1993, I, on behalf of Sikorsky Aircraft Corporation ("Sikorsky") attended several meetings of the United States Navy System Safety Working Group ("SSWG") pertaining to H-53 system safety.  Other attendees at these meetings included the CH-53 Engineering Class Desk Officer as well as other military personnel.

4.      The purpose of the SSWG is to bring key members of the H-53 community together to discuss current and potential problems and solutions with the H-53 fleet of helicopters.

5.      At these meetings, various topics were discussed regarding safe operation and maintainability of the H-53 aircraft.  In particular, at the October 19, 1993 meeting, one issue discussed was the adequacy of the low altitude warning system in the H-53 aircraft.

6.      The SSWG was informed at one of these meetings by United States Navy MH-53E squadron HM-19 about the need for an improved low altitude warning system in the H-53 helicopter fleet.  The SSWG was aware of the fact that eleven Navy/Marine aircraft had previously flown into the ground/water unintentionally [referred to as Controlled Flight Into Terrain ("CFIT")], because of the aircrew's loss of situational awareness, due in part to inadequate low altitude warnings.

**AFFIDAVIT OF CHRISTOPHER LOWENSTEIN - Page 2**

7.    At that time, the SSWG felt that the current low altitude warning systems were "...deficient because they do not provide adequate warning of low altitudes"; thus, the SSWG opened a Safety Action Record ("SAR") at a Hazard Risk Index ("HRI") of 1C – meaning the severity is "catastrophic" and the probability is "occasional." An HRI of 1C was one of the highest levels of safety concerns discussed at that working group meeting.

8.    The SAR was updated at several later SSWG's, in 1994, 1995, and 1997, reporting that the United States Navy had been monitoring testing progress on various ground proximity warning systems ("GPWS").

9.    The United States Navy did not begin procurement of GPWS for the H-53 helicopters until June 27, 1997 (GPWS Milestone III production decision). Thereafter, the CH-53E helicopters were to begin being retrofitted with GPWS with estimates indicating that the fleet would be fully retrofitted by fiscal year 2004. The SAR was closed on August 14, 1997 by SSWG #13.

10.    Based upon the foregoing, it is apparent that beginning in 1993 the United States military knew that an improved GPWS may be necessary on the H-53 helicopters to increase the aircrew's situational awareness in order to avoid CFIT accidents. However, due to budget constraints, testing, and other issues outside the control of Sikorsky, the United States Navy did not begin to actually install GPWS in the H-53 fleet of helicopters until April 1999, with the estimated completion date of all H-53 aircraft pushed to fiscal year 2005.

11.    The radar altimeters installed in the CH-53E helicopters are government furnished equipment and are not supplied by Sikorsky. Therefore, Sikorsky was unable to implement any additional warnings for use with the radar altimeters.

AFFIDAVIT OF CHRISTOPHER LOWENSTEIN - Page 3

12.    Last, the helicopter's swashplate was thoroughly examined by the Navy investigators and me during our investigation of this accident. The Navy investigators and I concurred that the helicopter's swashplate had not failed and was thus not a contributing factor in this accident. This was determined by inspection of the wreckage, including observation of the condition(s) of the swashplate, the primary servos, and the stationary and rotating scissors.

Further Affiant sayeth not.

_____
Christopher Lowenstein

SUBSCRIBED AND SWORN TO BEFORE ME on this 28th day of May, 2002.

_____
Notary Public State of Connecticut

Nancy Marcho
_____
Typed or Printed Name of Notary

My Commission Expires:

_____

**My Commission Expires 10/31/06**

**AFFIDAVIT OF CHRISTOPHER LOWENSTEIN - Page 4**

AWARD/CONTRACT

| | | |
|---|---|---|
| N00019-82-C-0230 | | |

N00019-83-PR-MA024

ADMINISTERED BY
(If other than Item 5)

See Section G.

Pre-Award Survey Serial No. NONE

CODE N63331

ISSUED BY
DEPARTMENT OF THE NAVY
Naval Air Systems Command
Washington, D. C. 20361
AIR-21424R  Mr. Rowe
Telephone: Area Code 202, 6°-20945

CONTRACTOR    CODE  78286

UNITED TECHNOLOGIES CORPORATION
Sikorsky Aircraft Division
North Main Street
Stratford, Connecticut  06602

SHIP TO/MARK FOR    CODE

See Section F.

PAYMENT WILL BE MADE BY    CODE  N63331

See Section G.

THIS PROCUREMENT WAS ☐ ADVERTISED ☒ NEGOTIATED PURSUANT TO:  ☒ 10 U.S.C. 2304 (a) (14)  ☐ 41 U.S.C. 252 (c) ( )

ACCOUNTING AND APPROPRIATION DATA

See Appropriation Data Sheet attached hereto.     *N00019-82-PR-MA383

## TABLE OF CONTENTS

ADVANCE ACQUISTION CONTRACT

| SEC | | PAGE |
|---|---|---|
| | PART I—THE SCHEDULE | |
| A | Contract Form (Award/Contract, Standard Form 26) | |
| B | Supplies or Services and Prices (Estimated Cost and Fee, if applicable) | 1-2 |
| C | Description or Specifications | 3-1 |
| D | Packaging and Marking | 4-1 |
| E | Inspection and Acceptance | 5-1 |
| F | Deliveries or Performance | 6-1 |
| G | Contract Administration Data | 7-1 |
| H | Special Provisions | 7-1 |
| | PART II—GENERAL PROVISIONS | |
| I | General Provisions | 8-1 |
| | PART III—LIST OF DOCUMENTS, EXHIBITS, AND OTHER ATTACHMENTS | |
| J | List of Documents, Exhibits, and Other Attachments | 9-1 |
| | PART IV—SOLICITATION INSTRUCTIONS | |
| K | Representations, Certifications, and Other Statements of Offeror/Quoter | |
| | (Not included in this contract) | |
| L | Instructions and Conditions, and Notices to Offerors/Quoters | |
| | (Not included in this contract) | |
| M | Evaluation Factors for Award | |
| | (Not included in this contract) | |

TOTAL AMOUNT OF CONTRACT  $

CONTRACTING OFFICER WILL COMPLETE BLOCK 23 OR 26 AS APPLICABLE

CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return ____ copies to issuing office.)

AWARD (Contractor is not required to sign this document.)

NAME OF CONTRACTOR  UNITED TECHNOLOGIES CORP.

UNITED STATES OF AMERICA

NAME AND TITLE OF SIGNER (Type or print)
Edward B. Fritz, Manager — Pricing
SIKORSKY AIRCRAFT DIVISION

DATE SIGNED
6/30/82

NAME OF CONTRACTING OFFICER (Type or print)
BONNIE L JONES

DATE SIGNED
JUN 30 1982

53100  4884

N00019-82-C-0230

PART I - THE SCHEDULE

## INDEX OF SCHEDULE

The Schedule consists of Section A (Solicitation/Contract Form identified in the Table of Contents on the form), the Index of Schedule on page 1-1, and the following sections:

| Section | Title | Page |
|---------|-------|------|
| B | Supplies or Services............................................... | 1-2 |
| C | Description or Specifications...................................... | 2-1 |
| D | Packaging and Marking.............................................. | 3-1 |
| E | Inspection and Acceptance.......................................... | 4-1 |
| F | Deliveries or Performance.......................................... | 5-1 |
| G | Contract Administration Data....................................... | 6-1 |
| H | Special Provisions................................................. | 7-1 |
| H-1 | Clauses Relating Only To This Advance Acquisition Contract....................................................... | 7-1 |
| H-2 | Ordering--Provisioned Items........................................ | 7-6 |
| H-3 | Government Property For The Performance Of This Contract... | 7-17 |
| H-4 | Special Distribution--Material Inspection And Receiving Report (MIRR)................................................. | 7-23 |
| H-5 | Notification Of Changes............................................ | 7-25 |
| H-6 | Subcontracting Plan--Small Business And Small Disadvantaged Business Concerns......................... | 7-28 |
| H-7 | National Stock Numbers............................................. | 7-29 |
| H-8 | Data Item Descriptions............................................. | 7-30 |
| H-9 | Ground And Flight Risk............................................. | 7-31 |
| H-10 | Additional Definitions With Respect To "Ground And Flight Risk" Clause........................................ | 7-38 |
| H-11 | Configuration Control - Engineering Changes, Deviations And Waivers - DOD-STD-480A............................... | 7-39 |
| H-12 | Weight Control.................................................... | 7-40 |
| H-13 | Technical Data Validation And Review............................... | 7-41 |
| H-14 | Revisions Of Guarantees............................................ | 7-42 |
| H-15 | Design Responsibility.............................................. | 7-43 |
| H-16 | Demonstrations.................................................... | 7-44 |
| H-17 | Trials (Alternate)................................................ | 7-45 |
| H-18 | Acceptance........................................................ | 7-46 |
| H-19 | Defects........................................................... | 7-49 |
| H-20 | Technical Data And Computer Software Identification In Engineering Change Proposals (ECPs).................... | 7-52 |

53100 4885

N00019-82-C-0230

**SCHEDULE**

SECTION B - SUPPLIES OR SERVICES

| Item | Supplies or Services | Quantity | |
|------|---------------------|----------|---|
| 0001 | Model CH-53E Helicopter | 11 | |
| 0002 | Data for Item 0001 | XXX | (See Exhibits A,B,E,F and G) |
| 0003 | Integrated Logistics Support Management Program for Item 0001 | XXX | To Be Determined |
| 0004 | Data for Item 0003 | | (See Exhibit C) |
| 0005 | Logistics Support Analysis for Item 0001 | | To Be Determined |
| 0006 | Data for Item 0005 | XXX | (See Exhibit D) |
| 0007 | Ground Support Equipment (GSE) for Item 0001 (Exhibit identifiers "AA" thru "AH" are assigned for use with Item 0007 | XXX | (See Section H-2) |

53100  4886

1-2

SCHEDULE

SECTION C – DESCRIPTION OR SPECIFICATIONS

Item 0001 – The CH-53E Helicopters to be furnished hereunder shall be in accordance with Detail Specification SD-552-3-6 dated 21 May 1982.  Engineering Data and Tests shall be in accordance with Addendum 547 to MIL-D-8706B(AS) dated 8 June 1982.  Reliability and Maintainability shall be in accordance with Specification AS-4423C dated 2 May 1982.  System Safety shall be in accordance with System Safety Specification dated 25 May 1982.

Items 0002, 0004 and 0006 – The technical data and administrative/financial data to be furnished hereunder shall be in accordance with Exhibit A, Exhibit B, Exhibit C, Exhibit D, Exhibit E, Exhibit F and Exhibit G, Contract Data Requirements List, DD Form 1423.

Items 0003 and 0005 – Integrated Logistics Support Management and Logistics Support Analysis shall be in accordance with Attachment (6), ILS-DS-30A-17 dated 1 March 1982.

Items 0007, 0009, 0012, 0013, 0016, 0018, 0020, 0022, 0024, 0026, 0028, 0032, 0036, 0038, 0039, 0041, 0043 and 0045 – – The supplies or services to be furnished under the items identified above will be ordered in contract modifications issued in accordance with the Section H special provision entitled "Ordering--Provisioned Items."

Items 0008, 0010, 0011, 0014, 0015, 0017, 0019, 0021, 0023, 0025, 0027, 0029, 0033, 0034, 0037, 0040, 0042, 0044 and 0046 – The data called for in Exhibit H, Exhibit Z, Exhibit K, Exhibit L, Exhibit M, Exhibit N, Exhibit P, Exhibit Q, Exhibit R, Exhibit S, Exhibit T, Exhibit U, Exhibit V, Exhibit W, Exhibit X, Exhibit Y, Exhibit AA, Exhibit AB and Exhibit AC, Contract Data Requirements List, DD Form 1423, will be ordered in contract modifications issued in accordance with the Section H special provision entitled, "Ordering—Provisioned Items."

2-1

53100 4892

N00019-82-C-0230

## SCHEDULE

SECTION E - INSPECTION AND ACCEPTANCE

    <u>Items 0001, 0003 and 0005</u> - Inspection and acceptance shall be made at the Contractor's plant(s), Stratford and/or Bridgeport by the NAVPRO, Stratford, Connecticut.

    <u>Items 0002, 0004 and 0006</u> - Inspection and acceptance of the technical data and administrative/financial data to be furnished hereunder shall be in accordance with Exhibit A, Exhibit B, Exhibit C, Exhibit D, Exhibit E, Exhibit F and Exhibit G, Contract Data Requirements List, DD Form 1423.  (Acceptance, when required, will be made by the first addressee listed in the distribution list (Block 14 of DD Form 1423)).

    Items 0007, 0009, 0012, 0013, 0016, 0018, 0020, 0022, <u>0024, 0026, 0028, 0032, 0036, 0038, 0039, 0041, 0043 and 0045</u> - Inspection and acceptance of the supplies or services to be furnished hereunder shall be as specified in contract modifications issued by the ACO in accordance with the Section H special provision entitled, "Ordering--Provisioned Items."

    Items 0008, 0010, 0011, 0014, 0015, 0017, 0019, 0021, 0023, 0025, 0027, 0029, <u>0033, 0034, 0037, 0040, 0042, 0044 and 0046</u> - Inspection and acceptance of the data to be furnished in accordance with Exhibit H, Exhibit Z, Exhibit K, Exhibit L, Exhibit M, Exhibit N, Exhibit P, Exhibit Q, Exhibit R, Exhibit S, Exhibit T, Exhibit U, Exhibit V, Exhibit W, Exhibit X, Exhibit Y, Exhibit AA, Exhibit AB and Exhibit AC, Contract Data Requirements List, DD Form 1423, shall be as specified in contract modifications issued by the ACO in accordance with the Section H special provision entitled, "Ordering—Provisioned Items."

Government procurement quality assurance actions shall be performed at the Contractor's plant(s), Stratford and/or Bridgeport, Connecticut.

53100  4894

Contract N00019-82-C-0230

Advance Acquisition for Labor + Material for 11 FY83 Model CH53E Helicopters (Lot VI)

Contract Attachments

CONTRACT N00019-82-C-0230

ADVANCE ACQUISITION FOR LABOR AND MATERIAL
FOR ELEVEN (11) FY83 MODEL CH-53E HELICOPTERS
(LOT VI)

CONTRACT ATTACHMENTS

# CONTRACT

SIKORSKY 0005

53100  4488

SD-552-3-6

**DEPARTMENT OF THE NAVY**
**NAVAL AIR SYSTEMS COMMAND**
**WASHINGTON, D.C.   20361**

Detail Specification

SD-552-3-6

Model CH-53E Helicopter

FY-83 Procurement



APPROVED _G.T.Nakagawa_
CHIEF ENGINEER

DATE _21 May 1982_

**SIKORSKY 0006**

53100 4489

SD-552-3-6

## TABLE OF CONTENTS

| Title | Paragraph |
|---|---|
| SCOPE | 1. |
| Scope | 1.1 |
| Mission | 1.1.1 |
| Configuration | 1.1.2 |
| Classification | 1.2 |
| Weight and Balance Classification | 1.2.1 |
| APPLICABLE DOCUMENTS | 2. |
| Effectivity of Documents | 2.1 |
| Specifications | 2.1.1 |
| Standards | 2.1.2 |
| Drawings | 2.1.3 |
| Publications | 2.1.4 |
| Supply Catalogs of Navy Material | 2.1.4.1 |
| Contractors Specifications and Parts Indexes | 2.1.4.2 |
| Precedence of Documents | 2.2 |
| International Military Standardization Program | 2.3 |
| Data | 2.4 |
| ECP Changes | 2.5 |
| REQUIREMENTS | 3. |
| Characteristics | 3.1 |
| Three-View Drawing | 3.1.1 |
| Performance | 3.1.2 |
| Performance Guarantees | 3.1.2.1 |
| Additional Performance Curves | 3.1.2.2 |
| Specific Fuel Consumption | 3.1.2.3 |
| Weights | 3.1.3 |
| Gross weight | 3.1.3.1 |
| Useful Load | 3.1.3.2 |
| Crew | 3.1.3.2.1 |
| Passengers | 3.1.3.2.2 |
| Fuel | 3.1.3.2.3 |
| Oxidizer | 3.1.3.2.3.1 |
| Oil | 3.1.3.2.4 |
| Auxiliary (Droppable) Fuel Tank Installation | 3.1.3.2.5 |
| Armament Installation | 3.1.3.2.6 |
| Oxygen Equipment Installation | 3.1.3.2.7 |

i

53100  4490

SIKORSKY 0007

SD-552-3-6

TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Photographic Equipment Installation | 3.1.3.2.8 |
| Miscellaneous Equipment Installation | 3.1.3.2.9 |
| Cargo Installation | 3.1.3.2.10 |
| Unit Weight of Useful Load Items | 3.1.3.2.11 |
| Useful Load Conditions | 3.1.3.2.12 |
| Weight Empty (Guaranteed) | 3.1.3.3 |
| Center of Gravity Locations | 3.1.4 |
| Center of Gravity Envelope | 3.1.4.1 |
| Areas | 3.1.5 |
| Dimensions and General Data | 3.1.6 |
| Rotor Blade Movements and Control Movements | 3.1.7 |
| General | 3.2 |
| General Interior Arrangement | 3.2.1 |
| Selection of Materials and Standard Parts | 3.2.2 |
| Materials | 3.2.2.1 |
| Minimum Gage of Metals (Structural Applications) | 3.2.2.1.1 |
| Steel | 3.2.2.1.2 |
| Selection of Steels | 3.2.2.1.2.1 |
| Corrosion Resistant Steels | 3.2.2.1.2.2 |
| Aluminum Alloys | 3.2.2.1.3 |
| Magnesium Alloys | 3.2.2.1.4 |
| Castings | 3.2.2.1.5 |
| Metallic Structural Parts | 3.2.2.1.6 |
| Threads for Fittings | 3.2.2.1.6.1 |
| Elastomeric Materials | 3.2.2.1.7 |
| Foamed Plastics | 3.2.2.1.8 |
| Leather | 3.2.2.1.9 |
| Stretched Acrylic | 3.2.2.1.10 |
| Standard Parts | 3.2.2.2 |
| Bushings | 3.2.2.2.1 |
| Bearings | 3.2.2.2.2 |
| Plain Bearings | 3.2.2.2.2.1 |
| Control Surface Hinge Bearings | 3.2.2.2.2.2 |
| Bearing Seals | 3.2.2.2.2.3 |

53100 4491

SIKORSKY 0008

SD-552-3-6

TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Fasteners | 3.2.2.2.3 |
| Bolts | 3.2.2.2.3.1 |
| Close-Tolerance Bolts | 3.2.2.2.3.1.1 |
| Safety Bolts | 3.2.2.2.3.1.2 |
| Bolts with Self-Locking Nuts or Slotted (Castellated) Nuts | 3.2.2.2.3.1.2.1 |
| Self-Locking Bolts | 3.2.2.2.3.1.2.2 |
| Self-Retaining Bolts | 3.2.2.2.3.1.2.3 |
| Adjustable Stop Bolts | 3.2.2.2.3.1.3 |
| Bolt Threads in Bearing | 3.2.2.2.3.1.4 |
| Screws | 3.2.2.2.3.2 |
| Nuts | 3.2.2.2.3.3 |
| Self-Locking Nuts | 3.2.2.2.3.3.1 |
| Sheet Spring Nuts | 3.2.2.2.3.3.2 |
| Pins | 3.2.2.2.3.4 |
| Spring Pins | 3.2.2.2.3.4.1 |
| Rivets | 3.2.2.2.3.5 |
| Blind Rivets | 3.2.2.2.3.5.1 |
| Fasteners, Blind, Non-Hole Filling | 3.2.2.2.3.6 |
| Washers | 3.2.2.2.3.7 |
| Hinges (Piano-Type) | 3.2.2.2.3.8 |
| Cartridges, Cartridge Actuated Devices and Electric Initiators | 3.2.2.2.3.9 |
| Cartridges | 3.2.2.2.3.9.1 |
| Cartridge Actuated Devices | 3.2.2.2.3.9.2 |
| Electric Initiators | 3.2.2.2.3.9.3 |
| Couplings | 3.2.2.2.3.10 |
| Nonstandard Parts | 3.2.2.3 |
| Workmanship | 3.2.3 |
| Production, Maintenance and Repair | 3.2.4 |
| Production | 3.2.4.1 |
| Design for Shipment | 3.2.4.1.1 |
| Metal Construction | 3.2.4.1.2 |
| Stress Corrosion Factors | 3.2.4.1.2.1 |
| Fatigue Factors | 3.2.4.1.2.2 |
| Corrosion Protection | 3.2.4.1.2.3 |

53100 4492

**SIKORSKY 0009**

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|-------|-----------|
| Wood Contruction | 3.2.4.1.3 |
| Adhesive-Bonded Construction | 3.2.4.1.4 |
| Reinforced Plastic Construction | 3.2.4.1.5 |
| Sandwich Construction | 3.2.4.1.6 |
| Stretched Acrylic Plastic Construction | 3.2.4.1.7 |
| Metal Covering | 3.2.4.1.8 |
| Wood and Fabric Covering | 3.2.4.1.9 |
| Control Surface Covering | 3.2.4.1.10 |
| Flush Riveting | 3.2.4.1.11 |
| Welding | 3.2.4.1.12 |
| Brazing | 3.2.4.1.13 |
| Soft Soldering | 3.2.4.1.14 |
| Heat Treatment | 3.2.4.1.15 |
| Tolerances on Interference Fitted Parts | 3.2.4.1.16 |
| Turnbuckle Safetying | 3.2.4.1.17 |
| Cable Assemblies | 3.2.4.1.18 |
| Screw Threads | 3.2.4.1.19 |
| Threaded Holes and Threaded Inserts | 3.2.4.1.19.1 |
| Holes (Rivets, Bolts, and Pins) | 3.2.4.1.20 |
| Removal of Foreign Material | 3.2.4.1.21 |
| Foolproofness | 3.2.4.1.22 |
| Safetying | 3.2.4.1.23 |
| Maintenance and Repairs | 3.2.4.2 |
| Accessibility of Engine Accessories | 3.2.4.2.1 |
| Accessibility of Instruments, Automatic Pilot, and Electrical Equipment | 3.2.4.2.2 |
| Accessibility of Electronic Equipment | 3.2.4.2.3 |
| Doors and Removable Sections | 3.2.4.2.4 |
| Walkways, Steps, and Handgrips | 3.2.4.2.5 |
| Time Allowance for Replacement of Items | 3.2.4.2.6 |
| Interchangeability and Replaceability | 3.2.5 |
| Finish | 3.2.6 |
| Exterior Color | 3.2.6.1 |
| Interior Color | 3.2.6.2 |
| Insignia and Marking | 3.2.6.3 |
| Identification and Marking | 3.2.7 |
| Identification of Equipment, Assemblies, and Spares | 3.2.7.1 |

SIKORSKY 0010

53100 4493

┐-552-3-6

TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Rotary Wing Aircraft Nameplate | 3.2.7.2 |
| Radio Call Plate | 3.2.7.2.1 |
| Identification and Modification Plates | 3.2.7.3 |
| Marking of Controls | 3.2.7.4 |
| Marking of Fluid Lines | 3.2.7.5 |
| Marking of Cargo Compartments | 3.2.7.6 |
| Marking of Radioactive Materials | 3.2.7.7 |
| Extreme Temperature Operation | 3.2.8 |
| Prevention of Ice Formation | 3.2.8.1 |
| Climatic Requirements | 3.2.9 |
| Lubrication | 3.2.10 |
| Equipment and Furnishings Installation | 3.2.11 |
| Government Furnished Equipment | 3.2.11.1 |
| Contractor Furnished Equipment | 3.2.11.2 |
| Rotary Wing Aircraft Vulnerability | 3.2.12 |
| Rotary Wing Aircraft Protection Against Fire | 3.2.13 |
| Concentration of Vapors and Gases | 3.2.14 |
| Fail-Safe Requirements | 3.2.15 |
| Structural | 3.2.15.1 |
| Major Systems Structural Information | 3.2.15.2 |
| Controls | 3.2.15.3 |
| Multi-Engine | 3.2.15.4 |
| Ground or Deck Clearances | 3.2.16 |
| Maximum Height (Ship-Based Rotary Wing Aircraft) | 3.2.17 |
| Stowage and Deck Spotting | 3.2.18 |
| Emergency Power | 3.2.19 |
| Reliability, Maintainability, and System Safety | 3.2.20 |
| Reliability | 3.2.20.1 |
| Maintainability | 3.2.20.2 |
| System Safety | 3.2.20.3 |
| Cost Approach in Design | 3.2.21 |
| Human Engineering | 3.2.22 |
| Operational Readiness Checkout Provisions | 3.2.23 |
| Maintenance Checkout Provisions | 3.2.24 |
| Hazards from Electro-Magnetic Radiation (HERO) | 3.2.25 |
| Aerodynamics | 3.3 |

53100 4494

SIKORSKY 0011

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| General | 3:3.1 |
| Stability and Control | 3.3.2 |
| External Stores | 3.3.3 |
| Structural Design Criteria | 3.4 |
| Strength Requirements | 3.4.1 |
| Detail Strength Requirements | 3.4.1.1 |
| Crash Loads | 3.4.1.1.1 |
| Main Rotor | 3.5 |
| Main Rotor Group | 3.5.1 |
| Description | 3.5.1.1 |
| Blade Construction | 3.5.1.2 |
| Blade Extender | 3.5.1.2.1 |
| Blade Retention (Grips) | 3.5.1.3 |
| Rotor Head | 3.5.1.4 |
| Blade Folding | 3.5.1.5 |
| Blade Securing | 3.5.1.6 |
| Blade Restrainers | 3.5.1.7 |
| Blade Tracking | 3.5.1.8 |
| Rotor Tachometer | 3.5.1.9 |
| Pressure Indicator | 3.5.1.10 |
| Wing Group | 3.5.2 |
| Anti-Torque (Tail) Rotor or Tail Group | 3.6 |
| Anti-Torque (Tail) Rotor Group | 3.6.1 |
| Description | 3.6.1.1 |
| Blade Construction | 3.6.1.2 |
| Blade Restrainer | 3.6.1.3 |
| Pressure Indicator | 3.6.1.4 |
| Tail Group | 3.6.2 |
| Description | 3.6.2.1 |
| Stabilizer | 3.6.2.2 |
| Elevators | 3.6.2.3 |
| Fins | 3.6.2.4 |
| Rudders | 3.6.2.5 |
| Elevator and Rudder Stops | 3.6.2.6 |
| Body Group | 3.7 |
| Fuselage | 3.7.1 |
| Description | 3.7.1.1 |
| Construction | 3.7.1.2 |

SIKORSKY 0012

53100 4495

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Crew and Personnel Stations | 3.7.1.3 |
| Pilot's Cockpit | 3.7.1.3.1 |
| Cockpit and Cabin Enclosures | 3.7.1.3.1.1 |
| Cockpit Enclosures | 3.7.1.3.1.1.1 |
| Cabin Enclosures | 3.7.1.3.1.1.2 |
| Windshields | 3.7.1.3.1.2 |
| Vision | 3.7.1.3.1.3 |
| Other Crew Stations | 3.7.1.3.2 |
| Passenger Stations | 3.7.1.3.3 |
| Cargo Compartments | 3.7.1.4 |
| Cargo Compartment Flooring | 3.7.1.4.1 |
| Equipment Compartments | 3.7.1.5 |
| Doors and Hatches | 3.7.1.6 |
| Main Entrance Door | 3.7.1.6.1 |
| Cargo Doors | 3.7.1.6.2 |
| Hatches | 3.7.1.6.3 |
| Rescue Entrance Identification | 3.7.1.6.4 |
| Emergency Escape | 3.7.1.7 |
| Manual Escape Exits | 3.7.1.7.1 |
| Windows and Ports | 3.7.1.8 |
| Flooring (General Requirements) | 3.7.1.9 |
| Boom(s) | 3.7.1.10 |
| Work Platforms | 3.7.1.11 |
| Alighting Gear (Wheel Type) | 3.8 |
| Description | 3.8.1 |
| Main Landing Gear | 3.8.2 |
| Description | 3.8.2.1 |
| Wheels, Brakes, and Brake Control System | 3.8.2.2 |
| Wheels and Brakes | 3.8.2.2.1 |
| Brake Control System | 3.8.2.2.2 |
| Casings and Tubes | 3.8.2.3 |
| Shock Absorbers | 3.8.2.4 |
| Retracting, Extending and Locking | 3.8.2.5 |
| Retraction | 3.8.2.5.1 |
| Extension | 3.8.2.5.2 |
| Locking | 3.8.2.5.3 |
| Alighting Gear Switches | 3.8.2.5.4 |

SIKORSKY 0013

53100 4496

SD-552-3-6

TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Doors and Fairings | 3.8.2.6 |
| Auxiliary Landing Gear (Tailwheel) | 3.8.3 |
| Auxiliary Landing Gear (Nosewheel) | 3.8.4 |
| Description | 3.8.4.1 |
| Wheels | 3.8.4.2 |
| Casings and Tubes | 3.8.4.3 |
| Shock Absorbers | 3.8.4.4 |
| Retracting, Extending and Locking System | 3.8.4.5 |
| Doors and Fairings | 3.8.4.6 |
| Bumper Wheels or Skid | 3.8.4.7 |
| Auxiliary Landing Gear (Other) | 3.8.5 |
| Alighting Gear (Water Type) | 3.9 |
| Flight Control Systems | 3.10 |
| Primary Flight Control Systems | 3.10.1 |
| Flight Station Controls | 3.10.1.1 |
| Servo Units | 3.10.1.1.1 |
| Lateral System | 3.10.1.2 |
| Directional System | 3.10.1.3 |
| Longitudinal System | 3.10.1.4 |
| Collective Pitch System | 3.10.1.5 |
| Trim Control Systems | 3.10.2 |
| Force Augmentation System (FAS) | 3.10.2.1 |
| Automatic Flight Control System (AFCS) | 3.10.3 |
| Alternate Modes of Operation | 3.10.3.1 |
| Engine Section | 3.11 |
| Description | 3.11.1 |
| Construction | 3.11.2 |
| Engine Installation | 3.11.3 |
| (Not Applicable) | 3.11.4 |
| Firewalls | 3.11.5 |
| Cowling | 3.11.6 |
| Cowling Design | 3.11.6.1 |
| Cowling Attachment (Reciprocating Engines) | 3.11.6.2 |
| Integral Engine Working Platforms | 3.11.7 |
| Engine Water-Wash Provision | 3.11.8 |
| Propulsion | 3.12 |
| Description | 3.12.1 |
| Infra-Red Radiation Suppression | 3.12.1.1 |
| Main Propulsion Unit | 3.12.2 |

SIKORSKY 0014

53100 4497

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Residual Oil and Grease (Reciprocating Engines) | 3.12.2.1 |
| Residual Oil and Grease (Turbo Engines) | 3.12.2.2 |
| Ignition System | 3.12.2.3 |
| Drains | 3.12.2.4 |
| Magnetic Chip Detector Indication | 3.12.2.5 |
| Auxiliary Propulsion Units | 3.12.3 |
| Engine-Driven Accessories | 3.12.4 |
| Description | 3.12.4.1 |
| Remote Gearboxes and Drives | 3.12.4.2 |
| Vacuum Pumps | 3.12.4.3 |
| Torquemeter Provision (Turbo Engines) | 3.12.4.4 |
| Air Induction System | 3.12.5 |
| Description | 3.12.5.1 |
| Air Intakes | 3.12.5.2 |
| Air Intakes (Reciprocating Engines) | 3.12.5.2.1 |
| Air Intakes (Turbo Engines) | 3.12.5.2.2 |
| Air Intakes with Particle Separator | 3.12.5.2.3 |
| Ice Protection | 3.12.5.3 |
| Air Intake Preheater (Reciprocating Engines) | 3.12.5.3.1 |
| Alternate Air Intake (Reciprocating Engines) | 3.12.5.3.2 |
| Carburetor Air Temperature (Reciprocating Engines) | 3.12.5.3.3 |
| Thermostatic Switch (Multistage and Supercharged Reciprocating Engines) | 3.12.5.3.3.1 |
| Ice Protection (Turbo Engines) | 3.12.5.3.4 |
| Dust Protection System (Reciprocating Engines) | 3.12.5.4 |
| Intercoolers (Reciprocating Engines) | 3.12.5.5 |
| Exhaust System | 3.12.6 |
| Description | 3.12.6.1 |
| Exhaust Systems (Reciprocating Engines) | 3.12.6.2 |
| Exhaust Systems (Turbo Engines) | 3.12.6.3 |
| Noise Suppression Devices | 3.12.6.4 |
| Cooling System | 3.12.7 |

SIKORSKY 0015

53100 4498

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Description | 3.12.7.1 |
| Cooling Systems (Reciprocating Engines) | 3.12.7.2 |
| Cooling Systems (Turbo Engines) | 3.12.7.3 |
| Temperature Indicating Equipment | 3.12.7.3.1 |
| Lubricating System | 3.12.8 |
| Description | 3.12.8.1 |
| Remote Oiling | 3.12.8.2 |
| Oil Tanks | 3.12.8.3 |
| Oil Tank Capacity | 3.12.8.3.1 |
| Expansion and Foaming Space | 3.12.8.3.2 |
| Piping and Fittings | 3.12.8.4 |
| Temperature and Surge Control | 3.12.8.5 |
| Dilution and Warm-up Provisions | 3.12.8.6 |
| Shut-Off Valve and Control | 3.12.8.7 |
| (Multiengine Rotary Wing Aircraft) | |
| Drainage Provision | 3.12.8.8 |
| Deaeration Provision | 3.12.8.9 |
| Magnetic Chip Detector System | 3.12.8.10 |
| Auxiliary Oil system | 3.12.8.11 |
| Fuel System | 3.12.9 |
| Description | 3.12.9.1 |
| Fuel Pumps | 3.12.9.2 |
| Fuel Tanks (Fixed) | 3.12.9.3 |
| Fuel Tank Capacity | 3.12.9.3.1 |
| Fuel Tank Installation | 3.12.9.3.2 |
| Fuel Tanks (Range Extension) | 3.12.9.3.3 |
| Fuel Tanks (Auxiliary Droppable) | 3.12.9.4 |
| Vent System | 3.12.9.5 |
| Piping and Fittings | 3.12.9.6 |
| Valves | 3.12.9.7 |
| Strainers and Filters | 3.12.9.8 |
| Fuel Quantity Gaging and Flowmeters | 3.12.9.9 |
| Drainage Provision | 3.12.9.10 |
| Drainage (Turbo Engines) | 3.12.9.10.1 |
| Fuel Vapor Inertion | 3.12.9.11 |
| Fuel Evaporation Control | 3.12.9.12 |
| Refueling Provision | 3.12.9.13 |

SIKORSKY 0016

53100 4499

SD-552-3-6

TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Ground Refueling | 3.12.9.13.1 |
| Ground Refueling-Pressure Monitoring System | 3.12.9.13.1.1 |
| Air Refueling Provisions | 3.12.9.13.2 |
| Air-to-Air Refueling Provision | 3.12.9.13.2.1 |
| Probe Mast and Fuel System Fluid Pressure Requirements | 3.12.9.13.2.1.1 |
| Probe Mast and Fuel System Surge Requirements | 3.12.9.13.2.1.2 |
| Aerial Refueling Flow Rates | 3.12.9.13.2.1.3 |
| Thermal Relief | 3.12.9.13.2.1.4 |
| Refueling Panel | 3.12.9.13.2.1.5 |
| Probe Mast | 3.12.9.13.2.1.6 |
| Probe Mast Configuration | 3.12.9.13.2.1.7 |
| Probe Mast Drainage System | 3.12.9.13.2.1.8 |
| Probe Fuel Leakage Prevention | 3.12.9.13.2.1.9 |
| Probe Mast Reflective Properties | 3.12.9.13.2.1.10 |
| Fuel Line Cap | 3.12.9.13.2.1.11 |
| Ship-to-Air Refueling | 3.12.9.13.2.2 |
| Defueling Provision | 3.12.9.14 |
| Fuel Jettisoning | 3.12.9.15 |
| Water-Injection System | 3.12.10 |
| Propulsion System Controls | 3.12.11 |
| Description | 3.12.11.1 |
| Engine Control System | 3.12.11.2 |
| Controls (Turbo Engines) | 3.12.11.2.1 |
| Controls (Multiengine) | 3.12.11.2.2 |
| Induction Air Controls | 3.12.11.3 |
| Starter and Primer Controls | 3.12.11.4 |
| Starter and Primer Controls (Reciprocating Engines) | 3.12.11.4.1 |
| Starter Controls (Turbo Engines) | 3.12.11.4.2 |
| Cooling Air Controls | 3.12.11.5 |
| Water-Injection Controls | 3.12.11.6 |
| Manual Fuel Control System (Turbo Engines) | 3.12.11.7 |
| Starter System | 3.12.12 |
| Description | 3.12.12.1 |
| Starter Installation | 3.12.12.2 |

SIKORSKY 0017

53100 4500

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Cartridge and Combustion Starters | 3.12.12.2.1 |
| Booster Devices | 3.12.12.3 |
| Priming System | 3.12.12.4 |
| Propeller | 3.12.13 |
| Liquid Rocket-Engine Propulsion System | 3.12.14 |
| Transmission System | 3.12.15 |
| Main Rotor Transmission System | 3.12.15.1 |
| Anti-Torque (Tail) Rotor Transmission System | 3.12.15.2 |
| Transmission System Cooling and Lubricating System | 3.12.15.3 |
| Transmission System Magnetic Chip Detectors | 3.12.15.3.1 |
| Rotor Brake | 3.12.15.4 |
| Rotor Engagement | 3.12.15.5 |
| Autorotation | 3.12.15.6 |
| Power Remaining Instruments | 3.12.16 |
| Auxiliary Power Unit | 3.13 |
| Description | 3.13.1 |
| Installation | 3.13.2 |
| Accessories and Controls | 3.13.3 |
| Instruments and Navigation Equipment | 3.14 |
| Instruments | 3.14.1 |
| Compass System | 3.14.1.1 |
| Magnetic Standby Compass | 3.14.1.2 |
| Attitude Indication and Compass Gyro Reference System | 3.14.1.3 |
| Secondary Gyro Reference System | 3.14.1.4 |
| Gyro Reference Systems Comparison Indicator | 3.14.1.5 |
| Attitude Indicator | 3.14.1.6 |
| Standby Attitude Indicator | 3.14.1.6.1 |
| Attitude Warning | 3.14.1.6.2 |
| Flight Load Recorder | 3.14.1.7 |
| Engine Analyzer (Reciprocating Engines) | 3.14.1.8 |
| Pitot-Static System | 3.14.1.9 |
| Contractor-Furnished Instruments | 3.14.1.10 |
| Engine and Nose Gearbox Indicators | 3.14.1.11 |
| Cockpit BIM Indicator | 3.14.1.12 |
| Stick Position Indicators | 3.14.1.13 |
| Navigational Equipment | 3.14.2 |
| Hydraulic and Pneumatic Systems | 3.15 |

53100 4501

SIKORSKY 0018

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

|                                    Title | Paragraph |
|------------------------------------------|-----------|
| Hydraulic System | 3.15.1 |
| Description | 3.15.1.1 |
| Summary of Actuated Items | 3.15.1.2 |
| Provision for Reserve Hydraulic Fluid | 3.15.1.3 |
| Pump | 3.15.1.4 |
| Modular Components | 3.15.1.5 |
| Tubing | 3.15.1.6 |
| Fittings | 3.15.1.7 |
| Tubing Supports | 3.15.1.8 |
| Combined Flight Control/Utility Systems | 3.15.1.9 |
| Heat Exchanger | 3.15.1.10 |
| Pneumatic System | 3.15.2 |
| Electrical | 3.16 |
| Description | 3.16.1 |
| Electrical Power Supply | 3.16.2 |
| Primary Electrical Power | 3.16.2.1 |
| Primary AC Systems | 3.16.2.1.1 |
| Main Power Source | 3.16.2.1.1.1 |
| AC Bus System | 3.16.2.1.1.2 |
| Generator Drives | 3.16.2.1.2 |
| Primary DC System | 3.16.2.1.3 |
| DC Bus System | 3.16.2.1.3.1 |
| Batteries | 3.16.2.1.4 |
| Conversion Power | 3.16.2.2 |
| Mission Completion Power | 3.16.2.3 |
| Emergency Power | 3.16.2.4 |
| Emergency Power Equipment | 3.16.2.4.1 |
| Transfer of Electrical Power | 3.16.2.4.2 |
| Electric Power System Reliability | 3.16.2.5 |
| Essential Bus System | 3.16.3 |
| Power Utilization | 3.16.4 |
| Wiring | 3.16.5 |
| External Power Wiring | 3.16.5.1 |
| Ground Power | 3.16.5.2 |
| External Power | 3.16.5.2.1 |
| Aircraft Generator | 3.16.5.2.2 |
| Equipment Installation | 3.16.6 |
| Control Panels | 3.16.7 |
| Lighting | 3.16.8 |
| Exterior Lighting | 3.16.8.1 |

SIKORSKY 0019

53100 4502

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Search Lights | 3.16.8.1.1 |
| Blade Tip Formation Lights | 3.16.8.1.2 |
| Rotor Head Lights | 3.16.8.1.3 |
| Landing Gear Indicator Light | 3.16.8.1.4 |
| Anti-Collision Lights | 3.16.8.1.5 |
| Fuselage Formation Lights | 3.16.8.1.6 |
| Position Lights | 3.16.8.1.7 |
| Controllable Spotlight | 3.16.8.1.8 |
| Land Hover Lights | 3.16.8.1.9 |
| Probe Mast and MA-2 Nozzle Illumination | 3.16.8.1.10 |
| Droque Canopy Illumination | 3.16.8.1.11 |
| Interior Lighting | 3.16.8.2 |
| Passenger Alarm Signal | 3.16.8.2.1 |
| Visual Signals | 3.16.8.2.2 |
| Cockpit Lighting | 3.16.8.2.3 |
| Cabin Lighting | 3.16.8.2.4 |
| Tie Down Fitting Illumination | 3.16.8.2.5 |
| Cargo Flood Lights | 3.16.8.2.6 |
| Emergency Exit Lights | 3.16.8.2.7 |
| Ignition and Starting Control System | 3.16.9 |
| Reciprocating Engine Rotary Wing Aircraft | 3.16.9.1 |
| Turbo Engine Rotary Wing Aircraft | 3.16.9.2 |
| Receptacles | 3.16.10 |
| Indicators | 3.16.11 |
| Bonding | 3.16.12 |
| Signal Spotlight Provision | 3.16.13 |
| Landing Gear Indicating System | 3.16.14 |
| Static Electricity Discharge | 3.16.15 |
| Static Ground | 3.16.15.1 |
| Airborne Static Discharge | 3.16.15.2 |
| Instrument Electrical System | 3.16.16 |
| Radio Interference | 3.16.17 |
| System Protection | 3.16.18 |
| External Power Protection | 3.16.18.1 |
| Equipment Cooling | 3.16.19 |
| Electronics | 3.17 |
| Description | 3.17.1 |
| Installation | 3.17.2 |
| Provisions | 3.17.2.1 |
| Juliet 28 Provisions | 3.17.2.1.1 |
| Interphone System | 3.17.2.2 |
| Handset | 3.17.2.3 |

xiv

SIKORSKY 0020

53100 4503

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Navigation Indicators | 3.17.2.4 |
| Navigation Indicator/Doppler Interface | 3.17.2.4.1 |
| Infra-Red Warning Receiver | 3.17.2.5 |
| Communications | 3.17.2.6 |
| Performance | 3.17.3 |
| Contractor-Furnished Electronic Equipment | 3.17.4 |
| Identification of Contractor-Furnished Electronic Equipment | 3.17.4.1 |
| Control Panels | 3.17.5 |
| Antennas | 3.17.6 |
| Radomes | 3.17.7 |
| Bonding | 3.17.8 |
| Equipment Cooling | 3.17.9 |
| Radio Interference | 3.17.10 |
| Precipitation Static Control | 3.17.11 |
| Armament | 3.18 |
| Description | 3.18.1 |
| Fixed Guns | 3.18.2 |
| Rockets | 3.18.3 |
| Flexible Guns | 3.18.4 |
| Stores | 3.18.5 |
| Hoisting and Handling | 3.18.5.1 |
| Countermeasure Dispensing Set | 3.18.5.2 |
| Guided Missile Systems | 3.18.6 |
| Mine Countermeasures | 3.18.7 |
| Armament Control Systems | 3.18.8 |
| Passive Defense | 3.18.9 |
| Engines | 3.18.9.1 |
| Pyrotechnics | 3.18.10 |
| Sonar | 3.18.11 |
| Furnishings and Equipment | 3.19 |
| Accommodations for Personnel | 3.19.1 |
| Seats | 3.19.1.1 |
| Pilot's Seats | 3.19.1.1.1 |
| Crew Seats | 3.19.1.1.2 |
| Passenger Seats | 3.19.1.1.3 |
| Troop Seats and Benches | 3.19.1.1.4 |
| Seat Cushions | 3.19.1.2 |
| Safety Belts and Shoulder Harness | 3.19.1.3 |
| Litter Provision | 3.19.1.4 |
| Parachute Stowage | 3.19.1.5 |
| Relief Tubes | 3.19.1.6 |

53100  4504

SIKORSKY 0021

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Drinking Water Containers | 3.19.1.7 |
| Baggage Provision | 3.19.1.8 |
| Oxygen Provision | 3.19.1.9 |
| Anti-Exposure Suit Provisions | 3.19.1.10 |
| Miscellaneous Equipment | 3.19.2 |
| Instrument Panels | 3.19.2.1 |
| Windshield Rain Removal System | 3.19.2.2 |
| Windshield Washers | 3.19.2.3 |
| Windshield Degreasing | 3.19.2.4 |
| Rear View Mirror | 3.19.2.5 |
| Data Cases | 3.19.2.6 |
| Checkoff Lists | 3.19.2.7 |
| Lockers (Miscellaneous Articles) | 3.19.2.8 |
| Portable Ladders | 3.19.2.9 |
| Cargo Handling Provision | 3.19.2.10 |
| Cargo Handling Provision for Carrier Rotary Wing Aircraft | 3.19.2.10.1 |
| Cargo Hook Provisions | 3.19.2.10.2 |
| Single-Point Suspension System | 3.19.2.10.2.1 |
| Two-Point Suspension System | 3.19.2.10.2.2 |
| Cargo Winch | 3.19.2.10.3 |
| Balance Computer | 3.19.2.11 |
| Aerial Towed Target System | 3.19.2.12 |
| Cargo Hoist Provision | 3.19.2.13 |
| Utility Hoist Provision | 3.19.2.14 |
| Surface Towing Provision | 3.19.2.15 |
| Mine Sweeping Provision | 3.19.2.16 |
| Target Retrieval Provision | 3.19.2.17 |
| Furnishings | 3.19.3 |
| Thermal and Acoustical Insulation | 3.19.3.1 |
| Trim (Series CH Rotary Wing Aircraft) | 3.19.3.2 |
| Floor Covering (Series CH Rotary Wing Aircraft) | 3.19.3.3 |
| Sunshades and Curtains | 3.19.3.4 |
| Instrument Glare Shield | 3.19.3.5 |
| Screens | 3.19.3.6 |
| Blackout Covers | 3.19.3.7 |
| Emergency Equipment | 3.19.4 |
| Fire Warning System | 3.19.4.1 |

53100  4505

SIKORSKY 0022

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

| Title | Paragraph |
|---|---|
| Fire-Extinguishing Systems | 3.19.4.2 |
| Fire-Extinguishing Systems for Equipment Compartments | 3.19.4.2.1 |
| Hand Fire Extinguishers | 3.19.4.3 |
| First Aid Kits | 3.19.4.4 |
| Lift Raft Stowage | 3.19.4.5 |
| Emergency Equipment Stowage | 3.19.4.6 |
| Emergency Escape Axes | 3.19.4.7 |
| Emergency Alarm System | 3.19.4.8 |
| Emergency Rescue Equipment | 3.19.5 |
| Emergency Flotation | 3.19.6 |
| Air Conditioning and Anti-Icing Equipment | 3.20 |
| Air Conditioning | 3.20.1 |
| In-Flight Air Conditioning | 3.20.1.1 |
| Occupied Compartments | 3.20.1.1.1 |
| Other Compartments | 3.20.1.1.2 |
| Ground Air Conditioning | 3.20.1.2 |
| Occupied Compartments | 3.20.1.2.1 |
| Other Compartments | 3.20.1.2.2 |
| Anti-Icing | 3.20.2 |
| Anti-Icing of Nontransparent Areas | 3.20.2.1 |
| In-Flight Operation | 3.20.2.1.1 |
| Rotor Blades | 3.20.2.1.1.1 |
| Ground Operation | 3.20.2.1.2 |
| Anti-Icing, Defrosting and Defogging of Transparent Areas | 3.20.2.2 |
| Anti-Icing | 3.20.2.2.1 |
| Defrosting and Defogging | 3.20.2.2.2 |
| Ice Detection System | 3.20.2.3 |
| Controls | 3.20.3 |
| Photographic | 3.21 |
| Auxiliary Gear | 3.22 |
| Towing Provision | 3.22.1 |
| Jacking Provision | 3.22.2 |
| Tie Down and Mooring Provision | 3.22.3 |
| Hoisting Provision | 3.22.4 |
| Leveling | 3.22.5 |
| Rotor Blade Securing Provision | 3.22.6 |

53100 4506

SIKORSKY 0023

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

|                                             | Title | Paragraph |
|---------------------------------------------|-------|-----------|
| Special Equipment                           |       | 3.23      |
| General                                     |       | 3.23.1    |
| Support Equipment                           |       | 3.23.2    |
| Publications                                |       | 3.23.3    |
| Aircraft Logbook                            |       | 3.23.3.1  |
| Aeronautical Equipment Service Record       |       | 3.23.3.2  |
| Flight Handbook                             |       | 3.23.3.3  |
| Handbook of Maintenance Instructions        |       | 3.23.3.4  |
| Engine Service Instruction Handbook         |       | 3.23.3.5  |
| Handbook of Weight and Balance Data         |       | 3.23.3.6  |
| Aircraft Publication Kit Container          |       | 3.23.3.7  |
| Cargo Loading Handbook                      |       | 3.23.3.8  |
| Handbook of Inspection Requirements         |       | 3.23.3.9  |
| Miscellaneous                               |       | 3.23.4    |
| Aerial Towing Equipment                     |       | 3.23.4.1  |
| Baggage Container                           |       | 3.23.4.2  |
| Utility Hoist                               |       | 3.23.4.3  |
| Cargo Hoist                                 |       | 3.23.4.4  |
| Surface Towing                              |       | 3.23.4.5  |
| Mine Sweeping                               |       | 3.23.4.6  |
| Winterization Kit                           |       | 3.23.4.7  |
| Cargo Tie-Down Devices                      |       | 3.23.4.8  |
| Cargo Sling                                 |       | 3.23.4.9  |
| Portable Ladders                            |       | 3.23.4.10 |
| Cantilevered Pylon Assembly Kit             |       | 3.23.4.11 |
| Air-To-Air Refueling Probe Kit              |       | 3.23.4.12 |
| Flexible Guns                               |       | 3.23.4.13 |
| Engine Armor Protection Kits                |       | 3.23.4.14 |
| Pilot's Back Cushion                        |       | 3.23.4.15 |
| Ventilated Seat and Back Cushions           |       | 3.23.4.16 |
| Troop Seats                                 |       | 3.23.4.17 |
| Troop Seat Lap Belts                        |       | 3.23.4.18 |

SIKORSKY 0024

53100 4507

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

| <u>Title</u> | <u>Paragraph</u> |
|---|---|
| SAMPLING, INSPECTION, AND TEST PROCEDURES | 4. |
| PREPARATION FOR DELIVERY | 5. |
| NOTES | 6. |
| Intended Use | 6.1 |
| Superseding Data | 6.2 |
| Explanatory Information | 6.3 |
| NAVAIR | 6.3.1 |
| NAVPRO | 6.3.2 |
| Rotary Wing Aircraft | 6.3.3 |
| Use of General Specification SD-24J Volume II | 6.3.4 |
| Additional Information | 6.4 |
| Rotary Wing Aircraft Procured for U.S. Army and U.S. Air Force | 6.4.1 |
| Deviations | 6.4.2 |
| Definitions | 6.5 |
| Complete Provision for | 6.5.1 |
| Weight Provision for | 6.5.2 |
| Power Provision for | 6.5.3 |
| Space Provision for | 6.5.4 |
| Rotary Wing Aircraft Parts | 6.5.5 |
| Critical Parts | 6.5.5.1 |
| Shall be Provided | 6.5.6 |
| Shall be Installed | 6.5.7 |
| Not Included in Normal Weight | 6.5.8 |
| Unusable Fuel | 6.5.9 |
| Unusable Oil | 6.5.10 |
| Nonstructural | 6.5.11 |
| Personal Equipment | 6.5.12 |
| Fireproof | 6.5.13 |
| Fire Resistant | 6.5.14 |
| Relation to Firewall | 6.5.15 |
| As Directed By NAVAIR | 6.5.16 |

53100  4508

SIKORSKY 0025

SD-552-3-6

## TABLE OF CONTENTS (Cont'd)

### Title

LIST OF APPENDICES

    Appendix 1  Master Government Furnished
               Equipment List

    Appendix 2  List of ECP Changes Applicable to SD-552-3-6

LIST OF REFERENCES

    Reference 1: Sikorsky Aircraft, General
                Arrangement Drawing No.
                65010-00052, Revision D

    Reference 2: Sikorsky Aircraft, Inboard
                Profile Drawing No.
                65020-00040, Revision C

    Reference 3: General Electric Co., Model
                Specification E1190A
                Reprinted October 1979

53100 4509

SIKORSKY 0026

SD-552-3-6

DETAIL SPECIFICATION
FOR
MODEL CH-53E HELICOPTER
FY-83 PROCUREMENT

1.          SCOPE

1.1          SCOPE - This detail specification covers the
             essential requirements for the design and
construction of a three-engine transport helicopter which
shall be capable of performing the missions specified in
1.1.1.

| | |
|---|---|
| Navy rotary wing aircraft model designation: | CH-53E |
| Designer's name and model designation: | Sikorsky Assault Transport Helicopter |
| Number and kind of engines: | Three (3) General Electric Model T64-GE-416 |
| Number of rotors (Location and Type): | Single Main and Tail (Anti-Torque) |
| Number of blades (Per rotor) (Main and Tail): | Main, Seven (7):  Tail, Four (4) |
| Number and places for crew: | Three (3):  Pilot, Copilot, and Crew Chief |
| Number and places for Passengers: | Fifty-five (55) Combat-Equipped Troops |

1

53100 4510

SIKORSKY 0027

SD-552-3-6

1.1          MISSION - The CH-53E helicopter shall be employed
             in the movement of cargo and equipment, in the
transportation of troops, and in amphibious assault and sub-
sequent operations ashore.  When equipped with approved kits,
the helicopter may be used for vertical on-board delivery of
cargo and equipment from ship-to-ship, ship-to-shore and
shore-to-ship, and in the performance of emergency mine counter-
measure (MCM) missions, and the towing of vehicles and ships.
The helicopter shall be equipped to be operationally compatible
with LHA, LPD and LPH-2 class ships.

1.1.2        CONFIGURATION - Reference to the prototype herein
             shall mean CH-53E helicopter Serial No. 162001
configured as described in SD-552-3-5, dated 15 February 1982
which is Attachment 1 to Contract N00019-81-C-0481.  Items common
to the FY-82 production CH-53E helicopter shall be as configured
for the FY-81 production CH-53E.

1.2          CLASSIFICATION - Applicable.

1.2.1        WEIGHT AND BALANCE CLASSIFICATION - The weight
             and balance classification of this helicopter,
as defined in MIL-W-25140, shall be Class 2.

2.           APPLICABLE DOCUMENTS - This specification has
             been prepared in accordance with the format and
requirements of "General Specification for Design and
Construction of Aircraft Weapons Systems", SD-24J, Volume II,
dated 27 June 1963, including Change Submittal No. 1, dated
1 February 1966.  General Specification SD-24J forms a part of
this specification and shall be followed, where applicable,
except as otherwise specifically stated in the corresponding
paragraphs of this specification.

2.1          EFFECTIVITY OF DOCUMENTS - Unless otherwise
             specified herein, applicable documents shall be as
specified in paragraph 2.1 of Detail Specification SD-552-3-5,
dated 15 February 1982 which is Attachment 1 to Contract
N00019-81-C-0481 for the FY-82 Production CH-53E helicopter.
Later revisions of Government material and process specifica-
tions may be used without change in any terms of the Contract.

2

53100 4511

SD-552-3-6

2.1.1          SPECIFICATIONS - Applicable.  (See also 2.1.4.2.)

2.1.2          STANDARDS - Applicable.  (See also 2.1.4.2.)

2.1.3          DRAWINGS - Applicable.  (See also 2.1.4.2.)

2.1.4          PUBLICATIONS - Applicable.

2.1.4.1        SUPPLY CATALOGS OF NAVY MATERIAL - Applicable.

2.1.4.2        CONTRACTOR SPECIFICATIONS AND PARTS INDEXES -
               Except as otherwise specified herein, applicable
Sikorsky Aircraft Material and Process Specification Index (dated
October 1976) and/or Sikorsky Aircraft Preferred Parts Index
(dated October 1976) with such subsequent revisions, deletions,
or additions thereto, shall be used in the selection of materials,
parts, and processes.

2.2            PRECEDENCE OF DOCUMENTS - Applicable.

2.3            INTERNATIONAL MILITARY STANDARDIZATION PROGRAMS -
               Not applicable.

2.4            DATA - Data are not required by this specifica-
               tion or by applicable documents referenced in
paragraph 2, unless specified in the contract.

2.5            ECP CHANGES - Appendix 2 to this specification
               contains a listing of approved Engineering
Change Proposals (ECP's) and effectivities applicable to this
specification.

SIKORSKY 0029

53100 4512

S⁻ · 2-3-6

3.1.2        (Cont'd)

    NOTES    (Cont'd)

            (e)  Landing reserve:  Fuel for twenty (20)
                 minutes with payload, at a speed not
                 less than 100 knots true airspeed.

        5.   Combined Retrieval Gross Weight:  The com-
             bined gross weight at retrieval shall be the
             sum of the actual weight empty plus the
             Useful Load of 3.1.3.2.12c(1) for the
             retrieved aircraft, and the actual weight
             empty plus the Useful Load of 3.1.3.2.12c(2)
             minus the items of 3.1.3.2.12c(3) for the
             retrieving aircraft.

        6.   Take-off gross weight shall be the actual
             weight empty plus the Useful Load of
             3.1.3.2.12a herein.

3.1.2.2      ADDITIONAL PERFORMANCE CURVES - Not required.

3.1.2.3      SPECIFIC FUEL CONSUMPTION - Applicable.

3.1.3        WEIGHTS - The weights for the CH-53E shown
             herein shall consist of gross weight, useful
loads, and guaranteed weight empty.  Weights specified herein
shall be adjusted for the weight variation of Government-
responsibility changes and Government-furnished equipment.

3.1.3.1      GROSS WEIGHT - Applicable.  The gross weight of
             the Combat Radius Mission (Internal) is estimated
to be 49110 pounds.  (See 3.1.3.).

3.1.3.2      USEFUL LOAD - Applicable.  (See 3.1.3.2.12.)

3.1.3.2.1    CREW - The crew shall consist of pilot, copilot
             and crew chief.

3.1.3.2.2    PASSENGERS - Complete provisions shall be made for
             seats for fifty-five (55) combat equipped troops.
(See 3.19.1.1.4.)

SIKORSKY 0034

53100 4517

\-552-3-6

1.3.2.3        FUEL - Fuel shall be considered in the following categories:

        (1)  Internal
        (2)  Auxiliary (External)
        (3)  Unusable
        (4)  Unusable  (External)

3.1.3.2.3.1    OXIDIZER - Not applicable.

3.1.3.2.4      OIL - Oil shall be considered in the following categories:

        (1)  Engine
        (2)  Trapped in System

3.1.3.2.5      AUXILIARY (DROPPABLE) FUEL TANK INSTALLATION - (see 3.12.9.4 and 3.12.9.4.1.)

3.1.3.2.6      ARMAMENT INSTALLATION - The armament installation shall consist of the armament provisions specified in 3.18.4 and 3.18.5.2.

3.1.3.2.7      OXYGEN EQUIPMENT INSTALLATION - Not required.

3.1.3.2.8      PHOTOGRAPHIC EQUIPMENT INSTALLATION - Not required.

3.1.3.2.9      MISCELLANEOUS EQUIPMENT INSTALLATION - Applicable, except that certain items of miscellaneous equipment may be included in Weight Empty as specified herein.

3.1.3.2.10     CARGO INSTALLATION - The cargo installation shall be as specified in 3.19.2.10.

3.1.3.2.11     UNIT WEIGHT OF USEFUL LOAD ITEMS - Applicable.

SIKORSKY 0035

53100 4518

SD-552-3-6

3.1.3.2.12     USEFUL LOAD CONDITIONS - The Useful Loads shall be
               as follows:

```
a.    COMBAT RADIUS MISSION (INTERNAL):              -    15936 Pounds
        CREW (3) (Including Flak Suits)              660
        CARGO (Internal)                            8000
        FUEL (JP-5):                                6202
          Engine (906.5 gallons)          6164
          Unusable and Trapped
          level flight (5.6 gallons
          estimated)                        38
        WINDSHIELD WASHER FLUID                       13
        ENGINE AIR PARTICLE SEPARATORS               224
        PORTABLE LADDER                                5
        INTERNAL CARGO HANDLING SYSTEM               440
        UTILITY HOIST                                 80
        CANTILEVERED PYLON ASSEMBLIES (2)            312

b.    COMBAT RADIUS MISSION (EXTERNAL):                   38545 Pounds
        CREW (3) (Including Flak Suits)              660
        CARGO (External)                           32000
        FUEL (JP-5):                                4718
          Engine (688.2 gallons)          4680
          Unusable and Trapped
          level flight (5.6 gallons
          estimated)                        38
        WINDSHIELD WASHER GLUID                       13
        ENGINE AIR PARTICLE SEPARATORS               224
        PORTABLE LADDER                                5
        SINGLE POINT SUSPENSION SYSTEM               266
        PARTIAL INTERNAL CARGO
         HANDLING SYSTEM:                            267
          Stowage Box                       41
          Cargo Winch                      210
          Centerline Skid Rail              16
        UTILITY HOIST                                 80
        CANTILEVERED PYLON ASSEMBLIES (2)            312
```

**SIKORSKY 0036**

53100 4519

SD-552-3-6

3.1.3.2.12    (Cont'd)

    c.  SELF-RETRIEVED MISSION:    2279 Pounds

      (1) RETRIEVED AIRCRAFT (Main    1119
          Rotor Blades removed
          and stowed in cabin):

| | |
|---|---|
| TRAPPED FLUIDS AND MISCELLANEOUS | 56 |
| TWO-POINT SUSPENSION SYSTEM | 231 |
| INTERNAL CARGO HANDLING SYSTEM | 440 |
| UTILITY HOIST | 80 |
| CANTILEVERED PYLON ASSEMBLIES (2) | 312 |

        ITEMS TO BE REMOVED
        FROM RETRIEVED AIRCRAFT:    -1025

| | |
|---|---|
| No. 2 ENGINE AIR PARTICLE SEPARATOR | - 99 |
| CARGO CONVEYORS | -136 |
| GUIDE RAILS | -123 |
| RAMP FLIPPERS | - 51 |
| STOWAGE BOX | - 41 |
| CENTERLINE SKID RAIL | - 16 |
| UTILITY HOIST | - 80 |
| CANTILEVERED PYLON ASSEMBLIES (2) | -312 |
| MAIN GEARBOX OIL (drained) | -167 |

      (2) RETRIEVING AIRCRAFT:    3204

| | |
|---|---|
| CREW (3) (Including Flak Suits) | 660 |
| TRAPPED FLUIDS AND MISCELLANEOUS | 56 |
| TWO-POINT SUSPENSION SYSTEM | 231 |
| SLING | 420 |
| RETURN FUEL | 1837 |

      (3) ITEMS TO BE REMOVED
        FROM RETRIEVING AIRCRAFT:    -1019

| | |
|---|---|
| REAR DOOR-RAMP | -313 |
| SOUNDPROOFING | -261 |
| CARGO CONVEYORS | -136 |
| ENGINE COWLINGS | -224 |
| PERSONNEL DOOR | - 34 |
| RT-648/ARC-94 RECEIVER-TRANSMITTER | - 51 |

53100 4520

SIKORSKY 0037

SD-552-3-6

3.1.3.3        WEIGHT EMPTY (Guaranteed) - The guaranteed Weight
               Empty shall be as specified herein and shall con-
               sist of sub-items estimated to be as follows:

```
WEIGHT EMPTY (Guaranteed)                                  33174 Pounds
      MAIN ROTOR GROUP                              6359
      TAIL GROUP:                                    747
            Tail Rotor                        582
            Horizontal Stabilizer             165
      BODY GROUP                                    7718
      ALIGHTING GEAR GROUP-LAND TYPE                1211
      FLIGHT CONTROLS GROUP                         1852
      ENGINE SECTION                                 698
      PROPULSION GROUP:                            10670
            Engines (3)                      2129
            Accessory Gearbox                 218
            Air Induction System             213
            Exhaust System                     83
            Lubrication System               203
            Fuel System                      1293
            Engine Controls                    73
            Starting System                   187
            Drive System                     6271
      AUXILIARY POWER PLANT GROUP                    279
      INSTRUMENTS AND NAVIGATIONAL EQUIPMENT:        235
            Instruments                       235
            Navigational Equipment            -
      HYDRAULIC GROUP                                191
      ELECTRICAL GROUP                               827
      ELECTRONICS GROUP                              657
      ARMAMENT GROUP                                  24
      FURNISHINGS AND EQUIPMENT GROUP                989
      AIR CONDITIONING AND ANTI-ICING
        EQUIPMENT GROUP:                             312
            Air Conditioning Equipment        244
            Anti-icing Equipment               68
      AUXILIARY GEAR GROUP                           323
      CONTINGENCY                                     82
```

12

SIKORSKY 0038

53100 4521

SD-552-3-6

3.2.11          EQUIPMENT AND FURNISHINGS INSTALLATION

3.2.11.1        GOVERNMENT FURNISHED EQUIPMENT - Applicable.

                Government-furnished equipments are specified in
the following referenced paragraphs:

                    Impulse Cartridges (see 3.2.2.2.3.9.1)
                    Rotor Tachometer (see 3.5.1.9)
                    Main Propulsion Unit (see 3.12.2)
                    Engine Driven Accessories (see 3.12.4.1)
                    Fuel Tanks (Auxiliary Droppable) (see 3.12.9.4)
                    Hydraulic Starter (see 3.12.12.1)
                    Main Rotor Transmission System (tachometer
                      generators) (see 3.12.15.1)
                    Auxiliary Power Unit (see 3.13.2)
                    Instruments (see 3.14.1, 3.14.1.3, and 3.14.1.4)
                    Main Power Source (see 3.16.2.1.1)
                    Conversion Power (see 3.16.2.2)
                    Electronics (see 3.17.2, 3.17.2.1, 3.17.2.1.1,
                      and 3.17.2.4)
                    Antennas (see 3.17.6)
                    Countermeasure Dispensing Set (see 3.18.5.2)
                    Safety Belts and Shoulder Harness (see 3.19.1.3)
                    Anti-Exposure Suit Provisions (see 3.19.1.10)
                    Rescue Hoist Provision (sling) (see 3.19.2.14)
                    First Aid Kits (see 3.19.4.4)
                    Publications (see 3.23.3)

3.2.11.2        CONTRACTOR FURNISHED EQUIPMENT - Applicable.

3.2.12          ROTARY WING AIRCRAFT VULNERABILITY - Applicable.

3.2.13          ROTARY WING AIRCRAFT PROTECTION AGAINST FIRE -
                Applicable.  Engine, heater exhausts, and external
lights shall be located so as to reduce the possibility of
starting grass or brush fires and so as to prevent interference
with normal loading or unloading of the aircraft.

3.2.14          CONCENTRATION OF VAPORS AND GASES - Applicable.

SIKORSKY 0051

53100 4534

SD-552-3-6

3.14          INSTRUMENTS AND NAVIGATION EQUIPMENT

3.14.1        INSTRUMENTS - The following Government-furnished
              instruments, except as noted, shall be installed
convenient to the pilot and copilot:

| Title | CFE Power Requirements (Per Indicator) | Range |
|---|---|---|
| 2 Triple Torquemeter Indicator (CFE) | 115V AC | 0-160 percent |
| 2 Airspeed Indicator | | 0-250 knots |
| 2 Remote Attitude Indicator including Turn and Slip Indicator (CFE) | 26VA, 115 VAC | 360 degrees pitch and roll attitude $\pm$30 degrees inclinometer $\pm$3 degrees/sec rate of turn |
| 2 Radar Altimeter Indicator, ID-1345/APN-171(V) | | |
| 2 Tachometer Quadruple Main Rotor and Power Turbine (CFE) | | 0-130 percent (expanded scale between 90-110 percent) |
| 3 Bearing, Distance, Heading Indicator, ID-663 C/U | | |
| 2 Vertical Velocity Indicator, AAU-9/A | | 0-6000 FPM, 3-inch |
| 2 Clock, Elapsed Time, Type ABU-9/A | | |
| 1 Standby Magnetic Compass, MB-1 | | |
| 1 Outside Air Temperature (CFE) | | -70 degrees C +50 degrees C |
| 1 AAU-32/A Altimeter Encoder (Pilot) | | -1000-50,000 feet |
| 1 AAU-31/A Pressure Altimeter (Copilot) | | -1000-50,000 feet |
| 3 Gas Generator Tachometer Indicator | | |
| 3 Power Turbine Inlet Temperature Indicator | | |
| 3 Fuel Quantity Indicator (Main Tanks) (CFE) | 3.5VA, 35W, 115VAC | 0-2500 lbs main |
| 3 Fuel Flow Indicator (CFE) | 10VA, 10W, 115VAC | 0-2500 PPH |
| 3 Engine Oil Temperature Indicator, EHU-18/A | | |
| 2 Course Indicator, ID-387( )/ARN | | |
| 1 Cargo Hook Load Indicator (CFE) | | |
| 1 Cyclic Stick Position Indication (CFE) | | |

53100 4589

**SIKORSKY 0105**

SD-552-3-6

3.14.1          (Cont'd)

| Title | CFE *power Requirements (Per Indicator) | Range |
|---|---|---|
| 1 Transmission Oil Temperature Indicator, EHU-18/A | | |
| 1 Transmission Oil Pressure Indicator, Type II | | |
| 1 Hydraulic Fluid Quantity Indicator (Three Channel) (CFE) | 12VA, 26V AC | |
| 1 Hydraulic Pressure Indicator, 1st Stage | | 0-4000 psi |
| 1 Hydraulic Pressure Indicator, 2nd Stage | | 0-4000 psi |
| 1 Hydraulic Pressure Indicator, Utility | | 0-4000 psi |
| 2 Engine Nose Gearbox Oil Temperature Indicator, EHU-18/A | | |
| 1 Magnetic Chip Detecting System (CFE) (9 Indicators) | 2.25W, 28V DC | |
| 1 APU Tachometer Indicator, Type MU-1 (CFE) | | 0-110 percent |
| 1 APU Exhaust Gas Temperature Indicator (CFE) | | 0-1000 degrees C |
| 2 Fuel Quantity Indicator (external tanks) (CFE) | 7VA, 26VAC | 0-4500 lb |
| 1 Fuel Quantity Indicator (Fuel Totalizer) (CFE) | 7VA, 26VAC | |

NOTE 1:  For engine oil pressure and engine nose gearbox oil
         pressure indicators, (see 3.14.1.11) (CFE).

   *2:  Power requirements are exclusive of panel lighting.
        Add approximately 1.5W, at 5VAC, per indicator, for
        lighting.

Additional Government-furnished instrument/navigational equipment
to be installed in the aircraft shall include the following:

                Two - Rate Gyroscope Transmitter (Type TRU-2A/A)
                One - Heading Attitude Reference System A/A24G-39
                One - Vertical Gyro, Lear Model 1080Y (or equivalent)
                One - ML-1 Transmitter, Remote Compass
                One - Gyro, Displacement, Rate Switching
                One - Transmssion Oil Pressure Transmitter (0-250psi)
                Three-Hyraulic Pressure Transmitter, Type MJ-1
                      (0-4000 psi)

**SIKORSKY 0106**

53100 4590

SD-552-3-6

3.17            ELECTRONICS

3.17.1          DESCRIPTION - Electronic equipment shall be as
                specified herein.

3.17.2          INSTALLATION - Applicable.  The installations shall
                be designed to maintain continuous operation of the
equipment in helicopter operating ambient temperatures up to 115°F.
The following Government-furnished (except as noted) electronics
equipment shall be installed in accordance with applicable
specifications:

QTY             DESCRIPTION

1       AN/ARC-159(V)-1 Radio Set
1       AN/AIC-14 Interphone System (NOTE:  Two (2) C-2644
        Controls shall have CFE plastic lighting plates
        similar to MS25491-9, and one (1) C-2644 Control
        shall have a CFE plate similar to MS25491-10.
1       AN/ARN-118(V) Navigational Set, TACAN
1       AN/APN-171(V) Radar Altimeter
        Set
1       AN/ARC-114A Radio Set (VHF/FM)
1       CU942B or CU942C Coupler (CFE)
7       J-1013A/AIC Interconnecting Box
        (for AN/AIC-14)
1       CX-4620/AR ICS Cord Set
        (75 foot)
        (Contractor Modified)
7       CX-4621 Headset, Microphone
        Cord
2       Handsets (CFE)
1       RE-120A/ARA-25 Solenoid Relay
1       MT-1042/ARA-25 Mounting
1       AN/APX-72 IFF Transponder Set
1       C-6280A(P)/APX Transponder Control (5-volt red)
1       TS-1843A or TS-1843B/APX Transponder Test Set
        (with MT-3513A Mounting)
1       Female Connector (ONO 89560-1)
1       MT-4578/U Mounting (for KIT-1A/TSEC)
1       VIR-31A VOR/LOC/GS (CFE) (As directed by NAVAIR)

53100  4608

**SIKORSKY 0124**

SD-552-3-6

3.17.2          (Cont'd)

QTY                 DESCRIPTION

1       AN/ARN-89A Direction Finder Set
2       C-8057/ARC Control, Radio Set
          (one (1) each for UHF and FM
          Radio Sets)
1       AN/ARA-50 Direction Finder
          Group
1       AN/ARC-94 Radio Set
          (HF/SSB 2-30MC)
1       AN/APN-154 Radar Beacon Set
1       490T-1 Coupler, Antenna
1       790Y-3 Tray

3.17.2.1      PROVISIONS - Provisions only shall made for the
              following Government-furnished electronics
equipment:

        1   AN/ASN-128 Lightweight Doppler Navigation
            System (LDNS)**
        1   Signal Conditioning Interface Unit (CFE)**
        1   KIT-1A/TSEC*
        2   TSEC/KY-28*

(* Appendix 1, Type B installation)

(**Space, power, partial wiring with connectors clamped in place and
circuit breakers secured in the OPEN position with tie wraps, partial
mounting, cover plates, and structural provisions only shall be pro-
vided for this equipment.  Proofing of these provisions shall not be
a requirement.)

53100 46009

SD-552-3-6

## LIST OF APPENDICES

1    Master Government-Furnished Equipment List (attached)

      Type A Government Furnished Equipment - Contractor
      Installed

      Type B Government Furnished Equipment - Government
      Installed

2    List of ECP Changes Applicable to SD-552-3-6

## LIST OF REFERENCES

1.    Sikorsky Aircraft, General Arrangement Drawing No. 65010-00052,
Revision D

2.    Sikorsky Aircraft, Inboard Profile Drawing No. 65020-00040,
Revision C

3.    General Electric Co., Model Specification E1190A
Reprinted October 1979

SIKORSKY 0152

53100 4636

SD-552-3-6

## MASTER GOVERNMENT FURNISHED EQUIPMENT LIST (Cont'd)

| Item Number | Nomenclature | Specification Number | Drawing Number | Effectivity | Units Per | Type Inst | Weight (Pounds) |
|---|---|---|---|---|---|---|---|
| 200 | AAU-31/A Altimeter | MILA81851A | | 1- | 1 | A | 1.7 |
| 201 | Indicator Gas Generator Tachometer | MILI22596B | MS21971-2 | 1- | 3 | A | 2.4 |
| 202 | Indicator Power Turbine Inlet Temperature | MILI27209C-2 | MS24569-1D | 1- | 3 | A | 3.6 |
| 203 | EHU-18/A Indicator Oil Temperature | MILI7749A-1 | | 1- | 6 | A | 2.4 |
| 204 | Indicator Transmission Oil Pressure Type III | MILI6856B | | 1- | 1 | A | 0.3 |
| 205 | Indicator Hydraulic Pressure 0-4000 PSI | MILI7084A | MS28010-5C | 1- | 3 | A | 1.5 |

53100 4638

SIKORSKY 0154

SD-552-3-6

## MASTER GOVERNMENT FURNISHED EQUIPMENT LIST (Cont'd)

| Item Number | Nomenclature | Specification Number | Drawing Number | Effectivity | Units Per | Type Inst | Weight (Pounds) |
|---|---|---|---|---|---|---|---|
| 215 | MB-1 Compass Standby | MILC5604B-3 | MS17983-2 | 1- | 1 | A | 0.7 |
| 216 | Gyro Displ Rate Switching | MILG23083C | MS17399B-1C | 1- | 1 | A | 1 ' |
| 217 | AAU-32/A Altimeter Encoder | MILA81852 | | 1- | 1 | A | 2.1 |
| 218 | ML-1 Transmitter Remote Compass | MILT19576A-1 | MS25396C | 1- | 1 | A | 1.1 |
| 219 | A/A24G-39 Control Assembly Gyroscope, Attitude | MILC38418D-3 | | 1- | 1 | A | 18.3 |
| 219- 01 | SBK-11A/A24G-26 Gyroscope Displacement | MILC38418D-3 | | 1- | 1 | A | 9.8 |
| 219- 02 | ASK-44 Amplifier Electronic Control | MILC38418D-3 | | 1- | 1 | A | 7.0 |
| 219- 03 | DCK-129/A24G Controller Compass System (Red Lighted) | MILC38418D-3 | | 1- | 1 | A | 1.' |
| 220 | ID-663C/U Indicator,Bearing, Distance, Heading | MILI22075B | | 1- | 3 | A | 9.0 |
| 221 | ID-387( )/ARN Course Indicator | MILI9229-3 | | 1- | 2 | A | 5.8 |

131

SIKORSKY 0156

SD-552-3-6

## MASTER GOVERNMENT FURNISHED EQUIPMENT LIST (Cont'd)

| Item Number | Nomenclature | Specification Number | Drawing Number | Effectivity | Units Per | Type Inst | Weight (Pounds) |
|---|---|---|---|---|---|---|---|
| 311 | AN/APN-171(V) Electronic Altimeter Set | MILA81296C | | 1- | 1 | A | 18.8 |
| 311-01 | RT-829/APN-171(V) Radar Receiver-Transmitter | MILA81296C | | 1- | 1 | A | 12 |
| 311-02 | ID-1345/APN-171(V) Indicator Height | MILA81296C | | 1- | 2 | A | 2.8 |
| 311-03 | AS-1858/APN-171(V) Antenna (NSN 9F-5841-00-899-0817) | MILA81296C | | 1- | 2 | A | 1.4 |
| 311-04 | MT-4167/APN-171(V) Mounting Rack | MILA81296C | | 1- | 1 | A | 1.9 |
| 312 | KIT-1A/TSEC Computer NOTE ITEM 312 CNO Forwards Funds to NSA. | DOD AIMS 66-901 | | 1- | 1 | B | 11.0 |

135

53100 4644

SIKORSKY 0160

SD-552-3-6

APPENDIX 2

LIST OF ECP CHANGES APPLICABLE
TO SD-552-3-6

FY-83 AIRCRAFT NUMBERS
(for Information Only)

| | | | |
|---|---|---|---|
| 1st | - Serial No. 162002 | 8th | - Serial No. 162009 |
| 2nd | - Serial No. 162003 | 9th | - Serial No. 162010 |
| 3rd | - Serial No. 162004 | 10th | - Serial No. 162011 |
| 4th | - Serial No. 162005 | 11th | - Serial No. 162012 |
| 5th | - Serial No. 162006 | | |
| 6th | - Serial No. 162007 | | |
| 7th | - Serial No. 162008 | | |

| ECP NO. | TITLE | MOD. | EFFECTIVITY |
|---|---|---|---|
| 2000R1S1 | Installation of a Single Centerline Cargo Winch System, Phase II | Contract | 1st and Subs. |
| 2005R1 | Incorporation of XM-218 and M-60D Armament Special Provisions Kits | Contract | 1st and Subs. |
| 2006R1 | Incorporation of Aircraft Provisions to Accommodate the GFE AN/ALE-39 Counter-measurers Dispensing Set | Contract | 1st and Subs. |
| 2009 | Change from T64-GE-415 to T64-GE-416 Engine | Contract | 1st and Subs. |
| 2011R1 | Incorporation of Hydraulic Heat Exchanger System Improvements | Contract | 1st and Subs. |
| 2012 | ICS Control Panel Face Plate, Change from GFE to CFE | Contract | 1st and Subs. |
| 2014 | Incorporation of Engine and Tail Rotor Overtorque Warning System | Contract | 1st and Subs. |
| 2015R1 | Addition of Engine Ignition Circuit Breakers | Contract | 1st and Subs. |
| 2016 | Deletion of the AN/ASN-128 Doppler Navigation System | Contract | 1st and Subs. |
| 2017 | Incorporation of No. 1 and 3 Engine Reduced Area Exhaust Ducts | Contract | 1st and Subs. |

146

53100 4654

SIKORSKY 0170

SD-552-3-6

APPENDIX 2 (Cont'd)

| ECP NO. | TITLE | MOD. | EFFECTIVITY |
|---------|-------|------|-------------|
| 2018 | Incorporation of a Strengthened Nose Landing Gear Axle | Contract | 1st and Subs. |
| 2019 | Incorporation of a Common Spline Adapter for the Utility Hydraulic System Pump | Contract | 1st and Subs. |
| 2021 | Incorporation of Motor Driven Hydraulic Isolation Valves | Contract | 1st and Subs. |
| 2024R1 | Improved Installation of Cargo Floor Centerline Skid Rail | Contract | 1st and Subs. |
| 2025 | Replacement of MIL-C-6092A Balance Computer with a TI-58 Calculator | Contract | 1st and Subs. |
| 2026 | Incorporation of GFAE 40 KVA Generator P/N 28B58-57A, in Lieu of P/N 28B58-53 | Contract | 1st and Subs. |
| 2027 | Incorporation of Inward Pull Release for Cabin Windows | Contract | 1st and Subs. |
| 2030 | Modification of Frame at Fuselage Station 242 for AMCM Configuration Provisions | Contract | 1st and Subs. |
| 2035 | Modification of External Auxiliary Fuel Tank Support Structure/Fairing | Contract | 1st and Subs. |
| 2036 | Strengthened Main Rotor Blade Tip Cap Assembly | Contract | 1st and Subs. |
| 2039R1 | Modification of Main Rotor Head Damper Assembly to Prevent Leakage | Contract | 1st and Subs. |
| 2040 | Improved Crashworthy Battery Support Assembly | Contract | 1st and Subs. |
| 2041 | Improved Collective Stick Detent for Blade Fold | Contract | 1st and Subs. |

53100 4655

SIKORSKY 0171

SD-552-3-6

## APPENDIX 2 (Cont'd)

| ECP NO. | TITLE | MOD. | EFFECTIVITY |
|---|---|---|---|
| 2043 | Improved Gearbox Oil Filler/Breather | Contract | 1st and Subs. |
| 2044 | Incorporation of a Restrictor in Pitot-Static Lines | Contract | 1st and Subs. |
| 2045 | Improvements to Auxiliary Power Plant Installation | Contract | 1st and Subs. |
| 2046 | Shot Peening of Tail Rotor Spindle | Contract | 1st and Subs. |
| 2047 | Tail Rotor Servo Cylinder Assembly Improvements | Contract | 1st and Subs. |
| 2049 | Elimination of EMI in Fuel Quantity Indicators | Contract | 1st and Subs. |
| 2050 | Replacement of Tail Rotor Pitch Change Link Bolts | Contract | 1st and Subs. |
| 2051R1 | Improvements to APU Clutch Assembly | Contract | 1st and Subs. |
| 2052 | Improvements to Longitudinal Bias Actuator | Contract | 1st and Subs. |
| 2054R1 | APU Clutch Assembly Improvements | Contract | 1st and Subs. |
| 2055 | Shot Peening of Main Rotor Spindle | Contract | 1st and Subs. |
| 2056 | Incorporation of Improvements to Tail Rotor Blades | Contract | 1st and Subs. |
| 2057 | Incorporation of Filters for FAS Actuator | Contract | 1st and Subs. |
| 2060 | Main Rotor Head Damper Assembly Improvement | Contract | 1st and Subs. |
| 2067 | Replacement of Main Rotor Blade and Extenter Attachment Bolts | Contract | 1st and Subs. |
| 2068 | Reconfiguration of Main Rotor Pylon No. 1 Hydraulic System Line Installation | Contract | 1st and Subs. |

148

**SIKORSKY 0172**

53100 4656

SD-552-3-6

## APPENDIX 2 (Cont'd)

| ECP NO. | TITLE | MOD. | EFFECTIVITY |
|---------|-------|------|-------------|
| 2069 | Replacement of Instrument Panel Indicators With Qualified Units | Contract | 1st and Subs. |
| 2072 | Cockpit Lighting and Indicator EMI Modifications | Contract | 1st and Subs. |
| 2079 | Replacement of Main Rotor Blade (MRB) Fairings | Contract | 1st and Subs. |

149

SIKORSKY 0173

53100  4657

No. 275038

| MATERIAL INSPECTION AND RECEIVING REPORT | 1 PROC INSTRUMENT IDEN (CONTRACT) N00019-82-C-0230 | (ORDER) NO | 6 INVOICE NO | 7 PAGE 1 | OF 3 |
|---|---|---|---|---|---|
| | | | DATE | 8 ACCEPTANCE POINT S | |

| 2 SHIPMENT NO STR 0011 | 3 DATE SHIPPED 18/APR/84 | 4 B/L TCN | | 5 DISCOUNT TERMS NET CASH |
|---|---|---|---|---|

| 9 PRIME CONTRACTOR            CODE | 10 ADMINISTERED BY            CODE N63331 |
|---|---|
| UNITED TECHNOLOGIES SIKORSKY AIRCRAFT Stratford, Connecticut  06602  U.S.A. | Naval Plant Representative United Technologies Corporation Sikorsky Aircraft Division Stratford, Connecticut  06497           A |

| 11 SHIPPED FROM (If other than 9)     CODE         FOB S | 12 PAYMENT WILL BE MADE BY            CODE N63331 |
|---|---|
| See Block 9 | Disbursing and Accounting Branch Naval Plant Representative Sikorsky Aircraft Division Stratford, Connecticut  06497 |

| 13 SHIPPED TO         CODE N63331 | 14 MARKED FOR            CODE |
|---|---|
| Naval Plant Representative United Technologies Corporation Sikorsky Aircraft Division Stratford, Connecticut  06497 | |

| 15 ITEM NO | 16 STOCK/PART NO DESCRIPTION (Incl. case number of shipping containers - type of container - container number) | 17 QUANTITY SHIP'D/REC'D • | 18 UNIT | 19 UNIT PRICE | 20 AMOUNT |
|---|---|---|---|---|---|
| 0001 | Model CH-53E Helicopter Serial Number 162007 in accordance with the requirements of Detail Specification SD-552-3-6 dated 21 May 1982. | 1 | EA | | |

| 21 | PROCUREMENT QUALITY ASSURANCE | | 22 RECEIVER'S USE |
|---|---|---|---|
| | A ORIGIN | B DESTINATION | QUANTITIES SHOWN IN COLUMN 17 WERE RECEIVED IN APPARENT GOOD CONDITION EXCEPT AS NOTED |
| | ☒ POA ☒ ACCEPTANCE OF LISTED ITEMS HAS BEEN MADE BY ME OR UNDER MY SUPERVISION AND THEY CONFORM TO CONTRACT, EXCEPT AS NOTED HEREIN OR ON SUPPORTING DOCUMENTS | ☐ POA ☐ ACCEPTANCE OF LISTED ITEMS HAS BEEN MADE BY ME OR UNDER MY SUPERVISION AND THEY CONFORM TO CONTRACT, EXCEPT AS NOTED HEREIN OR ON SUPPORTING DOCUMENTS | DATE RECEIVED        SIGNATURE OF AUTH GOVT REP |
| 84 APR 18      SIGNATURE OF AUTH GOVT REP | DATE        SIGNATURE OF AUTH GOVT REP | | TYPED NAME AND OFFICE |
| TYPED NAME AND OFFICE   R. JOHNSON   N63331 | TYPED NAME AND TITLE | | • IF QUANTITY RECEIVED BY THE GOVERNMENT IS THE SAME AS QUANTITY SHIPPED, INDICATE BY (✓) MARK, IF DIFFERENT, ENTER ACTUAL QUANTITY RECEIVED BELOW QUANTITY SHIPPED AND ENCIRCLE. |

| 23 CONTRACTOR USE ONLY Sikorsky Serial Number 65484 Engine Serial Numbers    No. (1) GE-E-269324    No. (2) GE-E-269333    No. (3) GE-E-269330 | BOX NO | CONTAINER | DIMENSIONS | | | | WEIGHTS | |
|---|---|---|---|---|---|---|---|---|
| | | | LENGTH | WIDTH | HEIGHT | CUBIC | GROSS | NET |

YELLOW COPY IS MASTER COPY

| MATERIAL INSPECTION AND RECEIVING REPORT<br>*C O N T I N U A T I O N  S H E E T* | | CC 275038 | PAGE<br>2 | OF<br>3 |
|---|---|---|---|---|

| SHIPMENT NO<br>STR 0011 | DATE SHIPPED<br>18/APR/84 | PROC. INSTRUMENT IDEN<br>N00019-82-C-0230 | ORDER NO | INVOICE NO |
|---|---|---|---|---|

| ITEM NO. | STOCK/PART NO<br>DESCRIPTION<br>(Indicate number of shipping containers - type of<br>container - container number ) | | QUANTITY<br>SHIP'D/REC'D | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| | **MODIFICATION NUMBERS**<br><br>P00001, P00012, P00013, P00014, P00015,<br>P00017, P00018, P00019, P00020, P00025,<br>P00026, P00027, P00028, P00029, P00030,<br>P00033, P00034, P00035, P00036, P00037,<br>P00038, P00044, and P00046.<br><br>**HELICOPTER PARTS SHORTAGES**<br><br>Helicopter Serial Number 162007 is short<br>certain parts as described in List "A"<br>attached.<br><br>**QUALIFICATION REQUIREMENTS**<br><br>The parts installed in Helicopter Serial<br>Number 162007 for which qualification is<br>incomplete are described in List "B"<br>attached.<br><br>**NOTE**<br><br>ECP SA-CH-53E-2014 has not been incor-<br>porated in this aircraft. | | | | | |

| MATERIAL INSPECTION AND RECEIVING REPORT | | | | | CC 275038 | PAGE 3 | OF 3 |
|---|---|---|---|---|---|---|---|
| CONTINUATION SHEET | | | | | | | |

| SHIPMENT NO | DATE SHIPPED | PROC. INSTRUMENT IDEN. | | ORDER NO | INVOICE NO. | | |
|---|---|---|---|---|---|---|---|
| STR 0011 | 18/APR/84 | N00019-82-C-0230 | | | | | |

| ITEM NO. | STOCK/PART NO DESCRIPTION (Indicate number of shipping containers - type of container - container number ) | QUANTITY SHIP'D/REC'D | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | Provisional acceptance of CH-53E Helicopter Serial Number 162007 authorized in accordance with K0A3/dnf N00019-82-C-0230, Ser: 84-K0A3-115 dated 11 April 1984, subject to the following withholdings. | | | | |
| | | | | | Withholding* |
| | GFE Part Shortages - List A | | | | $450 |
| | Component Qualification and Fatigue Testing - List B | | | | 250 |
| | TOTAL WITHHOLDING | | | | $700 |
| | *The above withholding shall be reduced or liquidated upon installation, completion, or verification of required actions. The withholding shall be released to the Contractor by the ACO upon concurrence by the Government of installation, completion, or verification, as the case may be. | | | | |
| | Deviation: Deviations SA-CH-53E-D0006/R1/R2 and SA-CH-53E-D0011 have been installed in this aircraft. | | | | |
| | Waiver: Waivers W0003 through W0008 and W0011 through W0017, inclusive, are applicable to this aircraft. | | | | |

D D FORM 250C - 1 OCT 66                                                                                      SA 57 REV.A

LIST A

PART SHORTAGES

AIRCRAFT SERIAL NUMBER 162007

| Part Number | Nomenclature | QTY | Withholding |
|---|---|---|---|
| | **GFE** | | |
| C-2645/AIC-14 | ICS Control Panel | 7 | $350 |
| FPU-7-A | Auxiliary Fuel Tanks | 2 | - |
| ID 387/ARN | Course Indicator | 2 | 100 |
| | TOTAL | | $450 |

**LIST B**

**COMPONENT QUALIFICATION AND FATIGUE TESTING**

**AIRCRAFT SERIAL NUMBER 162007**

**CH-53E COMPONENT QUALIFICATION**

| System | Part Number | Item | Withholding |
|---|---|---|---|
| Mission Oriented System | 65861-04177-101 | Load Sensor | $250 |
| | | TOTAL | $250 |
| | 65397-04228-104 | Disc Pack Assembly | – |
| | 65410-07111-101 | Actuator | – |
| | 65506-09115-104 | Container | – |
| | 65506-09116-104 | Container | – |
| | 65662-07201-105 | Tail Rotor Servo | – |
| | 65664-09208-101 | Switch | – |
| | 65664-09801-102 | Value Shut Off | – |

This copy is a reprint which includes current pages from Changes 1 and 2.

ARMY TM 11-5855-263-10
AIR FORCE TO 12S10-2AVS6-1
NAVY NAVAIR 16-35AVS-7

# OPERATOR'S MANUAL

AVIATOR'S NIGHT VISION

IMAGING SYSTEM (ANVIS)

AN/AVS-6(V)1
(NSN 5855-01-138-4749) (EIC:IPQ)
AN/AVS-6(V)2
(NSN 5855-01-138-4748) (EIC:IPR)
AND
AN/AVS-6(V)1A
(NSN 5855-01-439-1745 (EIC:N/A)

**Equipment Description**
**Page 1-12**

**Operator's Checks**
**Page 2-5**

**Image-Intensifier**
**Inspection Criteria**
**Page 2-19**

**Operation**
**Page 2-26**

**DISTRIBUTION STATEMENT C.** Distribution authorized to U.S. Government agencies and their contractors. This publication is required for administration and operational purposes, as determined 7 June 1991. Other requests for this document shall be referred to either: Commander, U.S. Army Communications-Electronics Command and Fort Monmouth, ATTN: AMSEL-LEO-E-ED-P, Fort Monmouth, NJ 07703-5000; Warner-Robins ALC/TILTA, 255 2nd St., Suite 122, Bldg. 301, Robins AFB, GA 31098-1637; or Commanding Officer, Naval Air Technical Services Facility, 700 Robbins Ave., Philadelphia, PA 19111.

**DESTRUCTION NOTICE** – For unclassified, limited documents, destroy by any method that will prevent disclosure of contents or reconstruction of the document.

**DEPARTMENTS OF THE ARMY, THE AIR FORCE, AND THE NAVY**
**1 March 1994**

## WARNING

### Equipment Limitations

To avoid personal injury and property damage when using the ANVIS, carefully read and understand the following safety precautions.

- The equipment requires some night light (moonlight, starlight, etc.) to operate. The level of performance depends on the level of light.

- Night light is reduced by such factors as passing cloud cover and objects that produce shadows.

- The equipment is less effective viewing into shadows and other darkened areas.

- The equipment is less effective through rain, fog, sleet, snow, smoke, and other reflective materials.

- Adjust speed and altitude to prevent overflying the field of view when conditions of possible reduction or loss of vision exist.

- Exercise extreme caution when flying over low-contrast terrain such as snow-covered territory, sandy desert environments, large bodies of water, or grassy hills. Under ambient starlight conditions, low-contrast environments degrade visibility, thereby disguising or masking changes in the terrain. This is especially true under low-light conditions (e.g. starlight and overcast starlight) and higher speeds.

**a**

**WARNING**

### Equipment Limitations (cont.)

- Exercise extreme caution when flying from high ambient light conditions to low ambient light conditions. Under low light conditions, the goggles lose some of the resolution that they have under high light conditions. Flying from high light to low light conditions quickly reduces the sharpness and definition of terrain images.

- Some goggles may experience a measurable loss of performance at temperatures above 100ºF (38ºC). This is caused by ambient heat beginning to increase thermonic emissions of the photocathode. If this begins to occur, it will appear although you are looking through eyeglasses that are starting to fog or develop a slight haze.

- The equipment has a field-of-view limited to 4Oº, which requires appropriate continuous side-to-side head movements.

- If eyeglasses are worn, the upper rims of the eyeglasses can obscure the low-battery indicator and reduce the field-of-view.

- Do not attach the lanyard to the flight helmet. Attaching the lanyard to the flight helmet may cause head and neck injuries in a survivable accident. The only authorized way of attaching the lanyard to the flight helmet, is with the use of the Neck Cord Holder and Formed Lanyard Loop, as shown in figure 2-14b.

**WARNING**

- Do not use mercury or rechargeable Nicad batteries. Using any batteries other than BA-5567/U lithium 3.0 Vdc 6135-01-090-5365, AA alkaline 1.5 Vdc 6135-00-985-7845 or AA lithium 1.5 Vdc 6135-01-333-6101 batteries could result in a system failure.

**Change 2   b**

**TM 11-5855-263-10**
**C2**

Change

No. 2

HEADQUARTERS
DEPARTMENTS OF THE ARMY,
THE AIR FORCE, AND THE NAVY
Washington, DC. 1 June 1998

Operator's Manual
AVIATORS NIGHT VISION IMAGING SYSTEM (ANVIS)
AN/AVS-6(V)1 (NSN 5855-01-138-4749) ( EIC: IPR)
AN/AVS-6(V)2 (NSN 5855-01-138-4748) ( EIC: IPQ)
AN/AVS-6(V)1A (NSN 5855-01-439-1745) (EIC: N/A)

TM 11-5855-263-10, 1 March 1994, is changed as follows:
**(See Front Cover for publication numbers of other Services.)**

1. Remove old pages and insert new pages as indicated below. New or
changed material is indicated by a vertical bar in the margin of the page.

| *Remove pages* | *Insert pages* |
|---|---|
| *a and b* | *a and b* |
| *iii and iv* | *iii and iv* |
| *1-15 and 1-16* | *1-15 thru 1-16* |
| *1-19 and 1-20* | *1-19 thru 1-20.2* |
| *2-27 and 2-28* | *2-27 and 2-28* |
| *2-39 thru 2-42* | *2-39 thru 2-42* |
| *2-61 thru 2-64* | *2-61 thru 2-64* |
| *B-1 thru B-6* | *B-1 thru B-6* |
| *C-1 and C-2* | *C-1 and C-2* |
| *Cover 1* | *Cover 1* |

2. File this change sheet in front of the manual for reference purposes.

Distribution authorized to US Government agencies and their contractors
only for official use or for administrative or operational purposes. This
determination was made on 7 June 1991. Other requests for this document
will be referred to either: Commander, U.S. Army CECOM, ATTN: AMSEL-
LC-LEO-E-ED-P, Ft. Monmouth, NJ 07703-5000; Warner-Robins ALC/
TILTA, 255 2nd St., Suite 122, Bldg. 301, Robins AFB. GA 31098-1637; or
Commanding Officer, Naval Air Technical Services Facility, 700 Robbins
Ave., Philadelphia, PA 19111.

By Order of the Secretary of the Army:

DENNIS J. REIMER
*General, United States Army*
*Chief of Staff*

Official:

JOEL B. HUDSON
*Administrative Assistant to the*
*Secretary of the Army*

By Order of the Secretary of the Navy:

WALTER H. CANTRELL
*Rear Admiral, United States Navy*
*Commander, Space and Naval Warfare*
*Systems Command*

By Order of the Secretary of the Air Force:

MICHAEL E. RYAN
*General, United States Air Force*
*Chief of Staff*

Official:

GEORGE T. BABBITT
*General, United States Air Force*
*Commander, AFMC*

**DISTRIBUTION:**

To be distributed in accordance with the initial distribution number (IDN) 363425, requirements for TM 11-5855-263-10.

**ARMY  TM 11-5855-263-10**
**AIR FORCE  TO 12S10-2AVS6-1**
**NAVY  NAVAIR 16-35AVS-7**
**C1**

Change                                DEPARTMENTS OF THE
                                      ARMY, AIR FORCE, AND NAVY

No. 1                                 Washington, DC, 1 November 1996

## Operator's Manual

### AVIATOR'S NIGHT VISION IMAGING SYSTEM (ANVIS)
### AN/AVS-6(V)1  (NSN 5855-01-138-4749) (EIC: IPR)
### AN/AVS-6(V)2  (NSN 5855-01-138-4748) (EIC: IPQ)

TM 11-5855-263-10, 1 March 1994, is changed as follows:

1. Remove old pages and insert new pages as indicated below. New or changed material is indicated by a vertical bar in the margin of the page.

| Remove pages | Insert pages |
| --- | --- |
| C-1 and C-2 | C-1 and C-2 |

2. File this change sheet in front of the manual for reference purposes.

Distribution authorized to US Government agencies and their contractors for official use or for administrative or operational purposes only. This determination was made on 7 June 1991. Other requests for this document will be referred to Commander, US Army Communications-Electronics Command and Fort Monmouth, ATTN: AMSEL-LC-LEO-P-MM-T, Fort Monmouth, New Jersey 07703-5007

DESTRUCTION NOTICE -- Destroy by any method that will prevent disclosure of contents or reconstruction of the document.

By Order of the Secretary of the Army:

DENNIS J. REIMER
*General, United States Army*
*Chief of Staff*

Official:

JOEL B. HUDSON
*Administrative Assistant to the*
*Secretary of the Army*    02951

By Order of the Secretary of the Navy:

WALTER H. CANTRELL
*Rear Admiral, United States Navy*
*Commander, Space and Naval Warfare*
*Systems Command*

By Order of the Secretary of the Air Force:

RONALD R. FOGLEMAN
*General, United States Air Force*
*Chief of Staff*

Official:

HENRY VICCELLIO, JR.
*General, United States Air Force*
*Commander, AFMC*

DISTRIBUTION:

To be distributed in accordance with the initial
distribution number (IDN) 363425, requirements
for TM 11-5855-263-10.

TECHNICAL MANUAL
NO. 11-5855-263-10*
TECHNICAL ORDER
NO. 12S10-2AVS6-1
TECHNICAL MANUAL
NO. NAVAIR 16-35AVS-7

DEPARTMENTS OF THE ARMY,
THE AIR FORCE, AND THE NAVY

Washington DC,  1 March 1994

## OPERATOR'S MANUAL

## AVIATOR'S NIGHT VISION IMAGING SYSTEM
### AN/AVS-6(V)1
### (NSN 5855-01-138-4749) (EIC: IPR)
### AND
### AN/AVS-6(V)2
### (NSN 5855-01-138-4748) (EIC: IPQ)

---

REPORTING ERRORS AND RECOMMENDING IMPROVEMENTS

You can help improve this manual.  If you find any mistakes or if you know of a way to improve the procedures, please let us know.  Mail your letter or DA Form 2028 (*Recommended Changes to Publications and Blank Forms*) directly to:  Commander, U.S. Army Communications-Electronics Command and Fort Monmouth, ATTN: AMSEL-LC-LM-LT, Fort Monmouth, New Jersey 07703-5007.  Send your AFTO Form -22 to: Warner-Robins ALC/TILTA, 255 2nd St., Suite 122, Bldg. 301, Robins AFB, GA 30198-1637.  Mail your NAVMC 10772 to: Commanding Officer, Naval Air Technical Services Facility, Code 40, 700 Robbins Ave., Philadelphia, Pennsylvania 19111. A reply will be furnished to you.

---

*This manual supersedes TM 11-5855-263-10 dated June 1991 and 15 September 1991.

**i (ii Blank)**

# TABLE OF CONTENTS

<u>Paragraph</u>                    <u>Title</u>                                    <u>Page</u>

CHAPTER 1    INTRODUCTION                              1-1

Section I     General Information                      1-1
    1-1       Scope                                     1-1
    1-2       Maintenance Forms and Procedures          1-1
    1-3       Corrosion Prevention and Control          1-1
    1-4       Destruction of Army Materiel to Prevent
              Enemy Use                                 1-4
    1-5       Reporting Equipment Improvement
              Recommendations (EIR)                     1-4
    1-6       Warranty Information                      1-5
    1-7       Nomenclature Cross-Reference List         1-5
    1-8       List of Abbreviations                     1-5
    1-9       Glossary                                  1-6

Section II    Equipment Description                    1-12
    1-10      Equipment Characteristics, Capabilities,
              and Features                              1-12
    1-11      Location and Description of Major
              Components                                1-14
    1-12      Differences Between Models                1-19
    1-13      Equipment Data                            1-20.1

Section III   Principles of Operation                  1-23
    1-14      Mechanical Functions                      1-23
    1-15      Optical Functions                         1-24
    1-16      Electronic Circuit Function               1-25

**Change 2   iii**

# TABLE OF CONTENTS (CONT.)

| Paragraph | Title | Page |
|---|---|---|
| CHAPTER 2 | OPERATING INSTRUCTIONS | 2-1 |
| Section I | Description and Use of Operator's Controls and Indicators | 2-1 |
| 2-1 | Operator Controls and Indicators | 2-1 |
| Section II | Operator's Checks | 2-5 |
| 2-2 | Operator's Checks Table | 2-5 |
| 2-3 | Optional Resolution Check Using the TS-4348/UV Test Set | 2-16 |
| 2-4 | Inspection Criteria for Proper Image-Intensifier Assembly Operation | 2-19 |
| Section III | Operation Under Usual Conditions | 2-26 |
| 2-5 | Assembly and Preparation for Use | 2-26 |
| 2-6 | Operating Procedures | 2-40 |
| 2-7 | Preparation for Movement | 2-62.1 |
| Section IV | Operation Under Unusual Conditions | 2-65 |
| 2-8 | Operation in Dusty or Sandy Conditions | 2-65 |
| 2-9 | Operation in Rainy or Humid Conditions | 2-66 |
| 2-10 | Operation in Salt Water Areas | 2-66 |
| 2-11 | Operation in NBC Environments | 2-67 |
| 2-12 | Operation in Laser Threat Environments | 2-67 |
| CHAPTER 3 | MAINTENANCE INSTRUCTIONS | 3-1 |
| Section I | Lubrication Instructions | 3-1 |
| Section II | Troubleshooting Procedures | 3-1 |
| Section III | Maintenance Procedures | 3-4 |

# TABLE OF CONTENTS (CONT.)

| Paragraph | Title | Page |
|---|---|---|
| APPENDIX A | REFERENCES | A-1 |
| APPENDIX B | COMPONENTS OF END ITEM AND BASIC ISSUE ITEMS LIST | B-1 |
| APPENDIX C | ADDITIONAL AUTHORIZATION LIST | C-1 |
| APPENDIX D | EXPENDABLE AND DURABLE ITEMS LIST | D-1 |
| | ALPHABETICAL INDEX | Index-1 |

v

# CHAPTER 1
# INTRODUCTION

---

## Section I. General Information

### 1-1 SCOPE

This manual provides instruction for the operator to use and maintain the Aviator's Night Vision Imaging System (ANVIS) AN/AVS-6(V)1 (see Figure 1-1) and AN/AVS-6(V)2 (see Figure 1-2). The ANVIS is a self-contained night vision device that enables improved night vision using ambient light from the night sky (moon, stars, skyglow, etc.).

### 1-2 MAINTENANCE FORMS AND PROCEDURES

Department of the Army forms and procedures used for equipment maintenance will be those prescribed in DA Pam 738-751, *Functional Users Manual for the Army Maintenance Management System — Aviation (TAMMS-A)*.

Refer to the latest issue of DA Pam 25-30 to determine whether there are new editions, changes or additional publications or forms pertaining to this equipment

### 1-3 CORROSION PREVENTION AND CONTROL

Corrosion prevention and control (CPC) of Army materiel is a continuing concern. It is important that any corrosion problems with this equipment be reported so that the problem can be corrected and improvements made to prevent the problem in future equipment.

**1-1**

By Order of the Secretary of the Army:

GORDON R. SULLIVAN
*General, United States Army*
*Chief of Staff*

Official: *Milton H. Hamilton*

MILTON H. HAMILTON
*Administrative Assistant to the*
*Secretary of the Army*

By Order of the Secretary of the Navy:

ROBERT AILES
*Rear Admiral, United States Navy*
*Commander, Space and Naval Warfare*
*Systems Command*

By Order of the Secretary of the Air Force:

MERRILL A. MCPEAK
*General, United States Air Force*
*Chief of Staff*

Official:

RONALD W. YATES
*General, United States Air Force*
*Commander, AFMC*

Distribution:

To be distributed in accordance with DA Form 12–36–E,
block 3425, Operator's requirements for TM 11–5855–263–10.

☆ GPO : 2000 - 461-711 (20048)



MAWTS-1

Helicopter

Night Vision Device (NVD)

Manual: 5th Edition

A REFERENCE GUIDE FOR THE FLEET MARINE FORCE (FMF) ASSAULT SUPPORT NIGHT FIGHTER



**UNITED STATES MARINE CORPS**
MARINE AVIATION WEAPONS AND TACTICS SQADRON-1
Box 99200
Yuma, Arizona 85369-9200

IN REPLY REFER TO:
3500
ADT&E/ASD
27 Oct 98

# Preface

From: Commanding Officer
To:     Distribution List

Subj: **MAWTS-1 HELICOPTER NIGHT VISION DEVICE (NVD) MANUAL: 5TH EDITION**

1.  This manual is published as a reference guide to assist commanding officers and aircrew operators with the challenges associated with planning, briefing and executing Assault Support Night Vision Device (NVD) aided missions. The intent of this manual is to provide a single source reference for squadron night warfighters. The scope of the manual encompasses the many interrelated topics that are considered fundamental to NVD training effectiveness and ultimately, NVD aided operational mission success. Background information on the night environment is provided to identify the fundamental factors that need to be considered during the planning process in order to effectively optimize both Night Vision Goggle (NVG) image intensification based systems and Forward Looking Infrared (FLIR) thermal imaging based systems. In addition, an in-depth technical description of the AN/AVS-6 is provided to highlight the performance differences between the varying Omnibus contract image intensifier tubes. Information is also provided to assist aircrew with the preflight optimization of the AN/AVS-6 and to highlight the factors critical for NVG aircraft compatibility. The final chapters of this manual outline NVG operations, tactics and safety considerations. This manual attempts to present information at both the introductory and advanced levels in order to serve the broad range of experience that exists in the Fleet Marine Force (FMF).

2.  Fleet change recommendations for the information or procedures presented in this manual are highly encouraged. Questions, comments and change recommendations can be forwarded to either the MAWTS-1 Aeromedical Safety Officer (AMSO) at DSN: 951-3652 or to the appropriate MAWTS-1 Assault Support Department Head or specific Aircraft Division Head (DSN: 951-2195/3469/2133/ 3361/2132).

WILLIAM D. CATTO

Distribution: Special



UNITED STATES MARINE CORPS
MARINE AVIATION WEAPONS AND TACTICS SQUADRON ONE



# MAWTS-1

## Helicopter

# Night Vision Device (NVD)

## Manual: 5th Edition



27 OCTOBER 1998

A REFERENCE GUIDE FOR THE FLEET MARINE FORCE (FMF) ASSAULT SUPPORT NIGHT WARFIGHTER

# Table of Contents

PREFACE: COMMANDING OFFICER, MAWTS-1 ...................................................... i

DISTRIBUTION: SPECIAL .......................................................................... iii

TABLE OF CONTENTS ............................................................................. ix

LIST OF FIGURES ................................................................................. xix

LIST OF TABLES ................................................................................. xxiii

FOREWORD ..................................................................................... xxv

**CHAPTER 1: THE NIGHT ENVIRONMENT** .......................................................... 1-1

    I. INTRODUCTION ............................................................................. 1-1
    II. ELECTROMAGNETIC (EM) SPECTRUM ........................................................ 1-1
        A. Reflected vs. Radiant Energy ............................................................ 1-3
        B. Optical Radiation (Light) Theories ...................................................... 1-5
        C. Thermal Theory and Principles .......................................................... 1-5
    III. NVD SCENE VARIABLES .................................................................... 1-7
        A. Natural Illumination .................................................................... 1-7
        B. Artificial Illumination ................................................................. 1-11
        C. NVG Terrain Considerations ............................................................ 1-12
        D. Sources of Thermal Energy ............................................................. 1-14
        E. Thermal Scene .......................................................................... 1-15
        F. Atmospheric Effects .................................................................... 1-16
    IV. ATMOSPHERIC IMPACT ON NVD PERFORMANCE ............................................... 1-21
        A. Clouds ................................................................................. 1-21
        B. Fog .................................................................................... 1-23
        C. Rain ................................................................................... 1-23
        D. Snow ................................................................................... 1-24
        E. Sand / Dust / Other Obscurants ......................................................... 1-24
        F. Winds .................................................................................. 1-25
        G. Lightning .............................................................................. 1-25
    V. SUMMARY ................................................................................ 1-25

**CHAPTER 2: NIGHT VISION GOGGLE (NVG) TECHNOLOGY** .......................................... 2-1

    I. INTRODUCTION ............................................................................ 2-1
    II. IMAGE INTENSIFIER (I²) TUBE AND NVG TECHNOLOGY ....................................... 2-1
        A. Image Intensifier Tube Technology ...................................................... 2-2
        B. AN/AVS-6 Aviator's Night Vision Imaging System (ANVIS) ................................. 2-6
        C. AN/AVS-6 ANVIS Binocular Assembly Components ........................................... 2-11
        D. AN/AVS-6 ANVIS Performance .............................................................. 2-18

MAWTS-1 HELICOPTER NIGHT VISION DEVICE (NVD) MANUAL: 5TH ED

## TABLE OF CONTENTS

III. AN/AVS-7 ANVIS HEAD UP DISPLAY (HUD) ......................................................... 2-27
  A. Helmet Display Unit (HDU) ........................................................................ 2-28
  B. Signal Data Converter (SDC) ..................................................................... 2-29
  C. Pilot Control Unit (PCU) ........................................................................... 2-29
  D. Converter Control Unit (CCU) .................................................................... 2-29
  E. Basic Principles of Operation .................................................................... 2-29
  F. Controls and Functions ............................................................................. 2-29
  G. Modes of Operation ................................................................................. 2-30
  H. Display Modes ........................................................................................ 2-31
IV. AIRCRAFT SPECIFIC AN/AVS-7 ANVIS HUD SYMBOLOGY .................................. 2-31
  A. CH-46E Master Mode Symbology Set ......................................................... 2-31
  B. UH-1N Master Mode Symbology Set .......................................................... 2-34
  C. CH-53E Master / Navigation Mode Symbology Set ...................................... 2-38
  D. HUD vs. HMD Discussion .......................................................................... 2-46
V. LASER EFFECTS ON NVDs ............................................................................. 2-47
  A. LASER Definition ..................................................................................... 2-48
  B. LASERs and Night Vision .......................................................................... 2-48
  C. LASERs and Night Vision Goggles. ............................................................ 2-49
  D. LASERs and FLIR ..................................................................................... 2-51
  E. LASER Eye Protection .............................................................................. 2-52
VI. ADJUNCTIVE EYE PROTECTION: PARACHUTIST'S GOGGLES ............................. 2-52
VII. SUMMARY ................................................................................................. 2-53

CHAPTER 3: NIGHT VISION DEVICE (NVD) HUMAN FACTORS ............................... 3-1

I. INTRODUCTION ............................................................................................ 3-1
II. VISUAL PERFORMANCE ................................................................................ 3-1
  A. NVG Spatial Orientation .......................................................................... 3-1
  B. Field of View (FOV) / Field of Regard (FOR) ............................................... 3-2
  C. NVD Visual Acuity and Resolution. ........................................................... 3-4
  D. Additional Visual Cues. ............................................................................ 3-9
  E. Dark Adaptation ..................................................................................... 3-10
  F. Unaided Peripheral Cueing ....................................................................... 3-11
  G. Post-Flight Visual Problems ..................................................................... 3-12
III. FATIGUE .................................................................................................... 3-12
  A. Acute Fatigue ......................................................................................... 3-12
  B. Cumulative Fatigue ................................................................................. 3-12
  C. Circadian Fatigue .................................................................................... 3-13
  D. Effects of Fatigue .................................................................................... 3-15
  E. Sleep ...................................................................................................... 3-16
  F. Recommendations for Coping With Fatigue ............................................... 3-16
IV. CREW COORDINATION ................................................................................ 3-19
V. SPATIAL DISORIENTATION .......................................................................... 3-19
VI. COMPLACENCY/OVERCONFIDENCE ............................................................. 3-19
VII. AN/AVS-6 HELMET INTEGRATION ............................................................... 3-19
  A. HGU-67/P ............................................................................................... 3-20
  B. HGU-84/P ............................................................................................... 3-20
VIII. SUMMARY ............................................................................................... 3-21

MAWTS-1 HELICOPTER NIGHT VISION DEVICE (NVD) MANUAL: 5TH ED

## TABLE OF CONTENTS

**CHAPTER 4: NIGHT VISION DEVICE SCENE INTERPRETATION ....................... 4-1**

I. INTRODUCTION ........................................................................................... 4-1
II. TERRAIN ASSESSMENT ............................................................................ 4-2
    A. Density ............................................................................................... 4-2
    B. Terrain Profile. .................................................................................. 4-2
    C. Terrain Gradient. .............................................................................. 4-2
    D. Terrain Slope. ................................................................................... 4-2
    E. Unacquired Vertical Obstructions. .................................................. 4-3
III. COMMON NVD SCENE DESCRIPTIONS ................................................. 4-3
    A. Shadows ............................................................................................ 4-3
    B. Roads. ............................................................................................... 4-4
    C. Water ................................................................................................. 4-5
    D. Open Fields ...................................................................................... 4-5
    E. Desert ................................................................................................ 4-6
    F. Forests .............................................................................................. 4-6
    G. Snow. ................................................................................................ 4-7
    H. Artificial Light Sources .................................................................... 4-7
    I. Thermal Size and Shape. ................................................................. 4-8
    J. Internally Heated Sources ............................................................... 4-8
    K. Day Thermal Scene ......................................................................... 4-9
IV. SUMMARY ................................................................................................. 4-9

**CHPATER 5: AN/AVS-6 PREFLIGHT / POST-FLIGHT CONSIDERATIONS ....................... 5-1**

I. INTRODUCTION ........................................................................................... 5-1
II. AN/AVS-6 ADJUSTMENT AND ASSESSMENT PROCEDURES ............... 5-1
    A. Inspection and Initial Adjustment Procedures ................................ 5-1
    B. Alignment Procedures ..................................................................... 5-7
    C. Focus Procedures ........................................................................... 5-11
    D. NVG Image Assessment Procedures ............................................. 5-14
III. AIRCRAFT GROUND ADJUSTMENT PROCEDURES .............................. 5-18
    A. Confirm IPD and Diopter Settings ................................................... 5-18
    B. NVG Optical Infinity Focus following NVG Eye Lane ..................... 5-18
    C. AN/AVS-6 Optical Infinity Focus following ANV-20/20 or TS-4348 Use ............ 5-18
    D. Set Aircraft Lighting and Display Intensity ..................................... 5-19
    Practice NVG Donning and Removal. ................................................ 5-19
IV. AIRCRAFT AIRBORNE ADJUSTMENT PROCEDURES .......................... 5-19
    A. Vertical Adjustment ......................................................................... 5-19
    B. Tilt Adjustment ................................................................................ 5-19
    C. IPD. .................................................................................................. 5-19
    D. Fore-and-Aft or Eye relief Adjustment ........................................... 5-19
V. NVG CARE IN ADVERSE ENVIRONMENTS ............................................ 5-19
    A. Dust or Sand. ................................................................................... 5-19
    B. Rain, Humidity, or Cold Weather .................................................... 5-20
    C. Salt Water ........................................................................................ 5-20
    D. General Care and Cleaning ............................................................. 5-20
VI. SUMMARY ................................................................................................. 5-21

MAWTS-1 HELICOPTER NIGHT VISION DEVICE (NVD) MₐNUAL: 5ᵀᴴ ED

## TABLE OF CONTENTS

**CHAPTER 6: AIRCRAFT NVG COMPATIBILITY** ................................................................. 6-1

I. INTRODUCTION ............................................................................................ 6-1
II. AIRCRAFT LIGHTING CONSIDERATIONS .................................................... 6-1
    A. Interior Lighting ..................................................................................... 6-2
    B. Exterior Lighting .................................................................................... 6-4
    C. USMC MCO P3500.14 T & R Volume 1: External Lighting Rules ......... 6-7
    D. Spotlights/Landing Lights ...................................................................... 6-8
    E. Preflight Preparation ............................................................................. 6-9
III. SUMMARY ................................................................................................... 6-10

**CHAPTER 7: NIGHT VISION GOGGLE (NVG) AIDED OPERATIONS**

**SECTION I: INTRODUCTORY NVG TRAINING** ........................................................ 7-I-1

I. INTRODUCTION ............................................................................................. 7-I-1
II. LIGHT DEMONSTRATION ............................................................................. 7-I-1
III. GROUND TAXIING ....................................................................................... 7-I-1
    A. Procedures ............................................................................................ 7-I-1
    B. Technique .............................................................................................. 7-I-2
    C. Common Errors ..................................................................................... 7-I-2
IV. AIR TAXI ...................................................................................................... 7-I-3
    A. Procedure .............................................................................................. 7-I-3
    B. Technique .............................................................................................. 7-I-3
    C. Common Errors ..................................................................................... 7-I-3
V. VERTICAL TAKEOFF ..................................................................................... 7-I-3
    A. Procedure .............................................................................................. 7-I-3
    B. Technique .............................................................................................. 7-I-4
    C. Common Errors ..................................................................................... 7-I-4
VI. HOVERING .................................................................................................. 7-I-4
    A. Procedure .............................................................................................. 7-I-4
    B. Technique .............................................................................................. 7-I-4
    C. Common Errors ..................................................................................... 7-I-5
VII. VERTICAL LANDING .................................................................................. 7-I-5
    A. Procedure .............................................................................................. 7-I-5
    B. Technique .............................................................................................. 7-I-6
    C. Common Errors ..................................................................................... 7-I-6
VIII. TURN ON THE SPOT .................................................................................. 7-I-6
    A. Procedure .............................................................................................. 7-I-6
    B. Technique .............................................................................................. 7-I-7
    C. Common Errors ..................................................................................... 7-I-7
IX. NVG TAKEOFF ............................................................................................ 7-I-7
    A. Procedure .............................................................................................. 7-I-7
    B. Technique .............................................................................................. 7-I-7
    C. Common Errors ..................................................................................... 7-I-8
X. NVG APPROACH .......................................................................................... 7-I-8
    A. Procedures ............................................................................................ 7-I-8
    B. Technique .............................................................................................. 7-I-9
    C. Common Errors ..................................................................................... 7-I-9

MAWTS-1 HELICOPTER NIGHT VISION DEVICE (NVD) MANUAL: 5TH ED

## TABLE OF CONTENTS

**SECTION II: TERRAIN FLIGHT** .................................................................. 7-II-1

I. INTRODUCTION ..................................................................................... 7-II-1
II. TRAINING AREAS ................................................................................. 7-II-1
   A. Takeoff ........................................................................................... 7-II-1
   B. Enroute Procedures ....................................................................... 7-II-2
   C. Altitude Changes ........................................................................... 7-II-2
   D. Airspeed ......................................................................................... 7-II-2
   E. Approaches and Landings ............................................................. 7-II-4
   F. Landing Zones ................................................................................ 7-II-4

**SECTION III: NVG GOGGLING PROCEDURES** ..................................... 7-III-1

INTRODUCTION ......................................................................................... 7-III-1
GOGGLE/DE-GOGGLE CONSIDERATIONS ................................................. 7-III-1
   A. Ambient Illumination ..................................................................... 7-III-1
   B. Artificial Illumination on the Battlefield ......................................... 7-III-1
II. NVG GOGGLING/DE-GOGGLING PROCEDURES ................................. 7-III-1
   A. Chock to Chock ............................................................................. 7-III-2
   B. Airborne ......................................................................................... 7-III-2

**SECTION IV: FORMATION FLIGHT** ....................................................... 7-IV-1

I. INTRODUCTION ..................................................................................... 7-IV-1
II. INITIAL NVG FORMATION TRAINING .................................................... 7-IV-1
   A. Procedures ..................................................................................... 7-IV-1
   B. Technique ....................................................................................... 7-IV-1
   C. Common Errors .............................................................................. 7-IV-1
III. MANEUVER ELEMENT .......................................................................... 7-IV-2
   A. Ease of Detection .......................................................................... 7-IV-2
   B. Dispersion Capability ..................................................................... 7-IV-2
   C. Mutual Support .............................................................................. 7-IV-2
IV. TACTICAL FORMATIONS ON NVGS ..................................................... 7-IV-3
   A. High Light Level (HLL) .................................................................... 7-IV-3
   B. Low Light Level (LLL). .................................................................... 7-IV-3
   G. Combat Cruise (NVG) .................................................................... 7-IV-3
   D. Spread ............................................................................................ 7-IV-4
   E. Aircraft Lighting ............................................................................. 7-IV-4
V. SECTION MANEUVERING ON NVGS ..................................................... 7-IV-4
   A. Ambient Light Levels ..................................................................... 7-IV-4
   B. Angle of Bank/Severity of Maneuver ............................................. 7-IV-5
   C. Aircrew Coordination ..................................................................... 7-IV-5
VI. SEPARATION OF AIRCRAFT ................................................................ 7-IV-5
   A. Ambient Lighting ............................................................................ 7-IV-5
   B. Aircraft Lighting ............................................................................. 7-IV-5
VII. ADDITIONAL TACTICAL CONSIDERATIONS ....................................... 7-IV-6
   A. Takeoffs ......................................................................................... 7-IV-6
   B. Landing ........................................................................................... 7-IV-6
   C. Wave-offs ....................................................................................... 7-IV-6

MAWTS-1 HELICOPTER NIGHT VISION DEVICE (NVD) MANUAL: 3rd ED

## TABLE OF CONTENTS

**SECTION V: NVG EXTERNAL OPERATIONS** ................................................................. **7-V-1**

I. INTRODUCTION ...................................................................................................... 7-V-1
   A. Landing Zone Selection .................................................................................... 7-V-1
   B. Landing Zone Preparation ................................................................................. 7-V-1
   C. HST Requirements ............................................................................................ 7-V-3
   D. Lighting Considerations .................................................................................... 7-V-3
II. AIRCREW COORDINATION ...................................................................................... 7-V-4

**SECTION VI: NVG ESCORT CONSIDERATIONS** ........................................................ **7-VI-1**

I. INTRODUCTION ...................................................................................................... 7-VI-1
II. GOGGLE/DE-GOGGLE/TRANSITION PROCEDURES ..................................................... 7-VI-1
III. FORMATIONS ........................................................................................................ 7-VI-1
   A. Airspeed ......................................................................................................... 7-VI-1
   B. Formation Maneuver and Flexibility ................................................................... 7-VI-1
   C. Ambient Light Considerations ............................................................................ 7-VI-2
   D. Lighting .......................................................................................................... 7-VI-2
   E. Formation Join Up Procedures ........................................................................... 7-VI-2
   F. Evasive Actions ............................................................................................... 7-VI-2
IV. LANDING ZONES/HOLDING AREAS ......................................................................... 7-VI-3

**SECTION VII: NVG WEAPONS EMPLOYMENT** ........................................................... **7-VII-1**

I. INTRODUCTION ...................................................................................................... 7-VII-1
II. ACQUISITION RANGE ............................................................................................. 7-VII-1
   A. Personnel ........................................................................................................ 7-VII-1
   B. Vehicular targets ............................................................................................. 7-VII-1
   C. Terrain Features .............................................................................................. 7-VII-1
III. ASSAULT SUPPORT AIRCRAFT ARMAMENT .............................................................. 7-VII-2
   A. Crew Served Weapons ..................................................................................... 7-VII-2
   B. Defensive Armament Subsystem (DAS) .............................................................. 7-VII-2
IV. ATTACK HELICOPTER ARMAMENT .......................................................................... 7-VII-2
   A. AH-1W Night Targeting System Employment ...................................................... 7-VII-2
   B. AH-1W 20mm Cannon ..................................................................................... 7-VII-3
   C. AH-1W TSU Gun Delivery ................................................................................. 7-VII-3
   D. AH-1W HSS (Helmet Sight Subsystem) Delivery ................................................. 7-VII-3
   E. 2.75"/5" Rocket Delivery .................................................................................. 7-VII-4
   F. Artificial Illumination on the Battlefield .............................................................. 7-VII-4
   G. Night Tube Launched, Optically Tracked, Wire Guided (TOW) Missile Firing .......... 7-VII-5
   H. Hellfire .......................................................................................................... 7-VII-5
   I. AIM-9 (Sidewinder) .......................................................................................... 7-VII-5
   J. Sidearm .......................................................................................................... 7-VII-6
V. ALE-39 ................................................................................................................. 7-VII-6
   A. Flares ............................................................................................................. 7-VII-6
   B. IR Flares ......................................................................................................... 7-VII-6
   C. Chaff .............................................................................................................. 7-VII-6
   D. Low Light Level Considerations ......................................................................... 7-VII-6

MAWTS-1 HELICOPTER NIGHT VISION DEVICE (NVD) MANUAL: 5ᵀᴴ ED

## TABLE OF CONTENTS

**SECTION VIII: NVG SHIPBOARD OPERATIONS** .................................................................. 7-VIII-1

  I. INTRODUCTION .................................................................................................. 7-VIII-1
  II. PROCEDURES .................................................................................................. 7-VIII-1
    A. NVGs for Shipboard Personnel ..................................................................... 7-VIII-1
    B. Ship's Lighting .......................................................................................... 7-VIII-2
    C. Aircraft Lighting ........................................................................................ 7-VIII-2
    D. Crew Coordination in the Landing Pattern ...................................................... 7-VIII-2
    E. Approach and Landing.................................................................................. 7-VIII-3

**SECTION IX: NVG AERIAL REFUELING PROCEDEDURES** .......................................... 7-IX-1

  I. INTRODUCTION .................................................................................................. 7-IX-1
  II. CONCEPT OF OPERATIONS ................................................................................ 7-IX-1
  III. MISSION PLANNING ......................................................................................... 7-IX-1
    A. Brief........................................................................................................ 7-IX-1
    B. Rendezvous Procedures .............................................................................. 7-IX-3
    C. Contact/Fuel Transfer ................................................................................. 7-IX-3
    D. Disconnect............................................................................................... 7-IX-4
    E. Training.................................................................................................... 7-IX-4

**SECTION X: LOW LIGHT LEVEL OPERATING CONSIDERATIONS** ........................... 7-X-1

  I. INTRODUCTION .................................................................................................. 7-X-1
  II. NVG PERFORMANCE .......................................................................................... 7-X-1
  III. AIRCRAFT LIGHTING ......................................................................................... 7-X-2
    A. Interior Aircraft Lighting .............................................................................. 7-X-2
    B. Exterior Aircraft Lighting .............................................................................. 7-X-2
    C. Anti-Collision Lights ................................................................................... 7-X-2
    D. Searchlights.............................................................................................. 7-X-2
    E. IR Covert Lighting ...................................................................................... 7-X-3
  IV. TERRAIN FLIGHT .............................................................................................. 7-X-3
    A. Enroute .................................................................................................... 7-X-3
    B. Approaches/Landings .................................................................................. 7-X-3
    C. Formation................................................................................................. 7-X-4
    D. External Operations .................................................................................... 7-X-4
    E. Weapons Employment.................................................................................. 7-X-4
    F. Shipboard Operations ................................................................................. 7-X-4
    G. Planning Considerations .............................................................................. 7-X-5

**CHAPTER 8: NIGHT VISION GOGGLE (NVG) TACITCS**

**SECTION I: NVG MISSION PLANNING** ................................................................... 8-I-1

  I. NVG MISSION PLANNING OVERVIEW ................................................................... 8-I-1
    A. Mission.................................................................................................... 8-I-1
    B. Threat...................................................................................................... 8-I-1
    C. Environmental Considerations....................................................................... 8-I-1
    D. Assets Required ........................................................................................ 8-I-2
    E. Goggle/De-goggle Procedures ...................................................................... 8-I-2

MAWTS-1 HELICOPTER NIGHT VISION DEVICE (NVD) MANUAL: 5TH ED

## TABLE OF CONTENTS

II. NVG MAP PREPARATION CONSIDERATIONS..................................................8-I-3
    A. Joint Operation Graphic (JOG) .............................................................8-I-3
    B. VFR Sectional (CONUS) ....................................................................8-I-3
    C. Tactical Map ......................................................................................8-I-3
    D. Chart Updating Manual (CHUM) .........................................................8-I-3
    E. Other Supplementary Sources ............................................................8-I-3
III. SPECIFIC NVG MISSION PLANNING AREAS .................................................8-I-4
    A. Actions in the Objective Area..............................................................8-I-4
    B. Route Selection.................................................................................8-I-4
    C. Check Point (CP) Selection ................................................................8-I-5
    D. Tactical Airspace Management ...........................................................8-I-6
IV. NVG MISSION PLANNING AND EXECUTION MECHANICS....................................8-I-7
    A. NVG Map Preparation .......................................................................8-I-7
    B. NVG Time-Distance-Heading (TDH) Card ...........................................8-I-8
    C. Timing.............................................................................................8-I-10
    D. Map Interpretation ...........................................................................8-I-10
    E. Escort Requirements.........................................................................8-I-10
    F. Ordnance Requirements ....................................................................8-I-10
    G. Contingencies..................................................................................8-I-10
    H. Forward Arming and Refueling Points (FARP)......................................8-I-11
    I. NVG Mission Checklist.......................................................................8-I-11
    J. Low Light Level Planning Considerations .............................................8-I-11

SECTION II: NVG MISSION BRIEFING .........................................................8-II-1

I. INTRODUCTION .......................................................................................8-II-1
    A. General ...........................................................................................8-II-1
    B. Mission ...........................................................................................8-II-1
    C. Safety Considerations .......................................................................8-II-1
II. NVG BRIEFING GUIDE..............................................................................8-II-2
    A. Light Level Planning Calendar Considerations......................................8-II-2
    B. Goggle/De-goggle Procedures (if applicable)........................................8-II-2
    C. Internal/External Aircraft Lighting .......................................................8-II-2
    D. Radar Altimeter (setting) ...................................................................8-II-2
    E. Hazards...........................................................................................8-II-2
    F. Formation Considerations...................................................................8-II-2
    G. Minimum Essential Equipment/Cargo/Passengers.................................8-II-2
    H. Crew Preparation..............................................................................8-II-2
    I. ROC/Currency Requirements ..............................................................8-II-2
    J. NVG Emergencies, i.e., In flight, Terminal Phase, IMC (if applicable)........8-II-2
    K. LZ Operations (if applicable)..............................................................8-II-3
    L. NVG Preflight (if applicable)...............................................................8-II-3
    M. Ordnance Employment/Coordination...................................................8-II-3
    N. Air Refueling Considerations (if applicable) ..........................................8-II-3
    O. Crew Coordination............................................................................8-II-3
III. SUMMARY .............................................................................................8-II-3

MAWTS-1 HELICOPTER NIGHT VISION DEVICE (NVD) MANUAL: 5ᵀᴴ ED

## TABLE OF CONTENTS

**SECTION III: CREW COORDINATION** ............................................................. 8-III-1

INTRODUCTION ............................................................................................. 8-III-1
   A. Pilot at the Controls ............................................................................. 8-III-1
   B. Pilot Not at the Controls ...................................................................... 8-III-1
   C. Crew Chief ......................................................................................... 8-III-2
   D. Aerial Observers/Gunners ................................................................... 8-III-2
II. SUMMARY .............................................................................................. 8-III-2

**CHAPTER 9: NIGHT VISION GOGGLE (NVG) SAFETY CONSIDERATIONS** ............... 9-1

I. INTRODUCTION ........................................................................................... 9-1
II. EMERGENCY AND SAFETY CONSIDERATIONS ................................................. 9-1
   A. Aircraft Emergencies ............................................................................ 9-1
   B. NVG Malfunction ................................................................................. 9-1
   C. Inadvertent IMC .................................................................................. 9-2
   D. Loss of Situational Awareness (SA) ...................................................... 9-3
   E. Aircrew Coordination ............................................................................ 9-3

**APPENDIX A: NVG PREFLIGHT ADJUSTMENT MODALITIES** .............................. A-1

I. INTRODUCTION ........................................................................................... A-1
II. NVG PREFLIGHT ADJUSTMENT MODALITIES ................................................. A-2
   A. Squadron NVG Eye Lane ...................................................................... A-2
   B. ANV-20/20 Night Vision Device (NVD) Infinity Focus Device .................... A-5
   C. TS-4348 System Specifications ............................................................. A-8
III. SUMMARY .............................................................................................. A-10

**APPENDIX B: AIRCRAFT BLINDFOLDED COCKPIT CHECKS** ............................... B-1

I. INTRODUCTION ........................................................................................... B-1
   A. UH-1N Blindfold Cockpit Check: ............................................................ B-1
   B. AH-1 Blindfold Cockpit Check: ............................................................... B-3
   C. CH-46 Blindfold Cockpit Check .............................................................. B-5
   D. CH-53D Blindfold Cockpit Check ............................................................ B-7
   E. CH-53E Blindfold Cockpit Check ............................................................ B-8

**APPENDIX C: LIGHT LEVEL PLANNING CALENDAR AND SHADOW FORMULA** ......... C-1

I. INTRODUCTION ........................................................................................... C-1
II. LLPC AND SHADOW FORMULA OVERVIEW .................................................... C-1
   A. LLPC .................................................................................................. C-1
   B. Shadow Formula ................................................................................. C-4
III. SUMMARY .............................................................................................. C-6

**APPENDIX D: GLOSSARY** ............................................................................ D-1

I. ABBREVIATIONS AND ACRONYMS .................................................................. D-1
II. TERMS AND DEFINITIONS ........................................................................... D-3

# List of Figures

## CHAPTER 1: THE NIGHT ENVIRONMENT

Figure 1 - 1.  Relative Spectral Response Comparison of the Human Eye, NVGs and FLIR .... 1-2
Figure 1 - 2.  EM Spectrum ........................................................................................................ 1-3
Figure 1 - 3.  Photometric Energy Critical for NVG Aided Operations ................................... 1-4
Figure 1 - 4.  Radiant Energy ..................................................................................................... 1-4
Figure 1 - 5.  Moon Phase and Moon Angle Vs. Illumination................................................... 1-9
Figure 1 - 6.  NVG / Human Eye Spectral Sensitivity Vs. Night Sky Energy Composition ....... 1-10
Figure 1 - 7.  Solar Illumination ................................................................................................ 1-11
Figure 1 - 8.  Thermal Scene Diurnal Cycle ............................................................................. 1-16
Figure 1 - 9.  Atmospheric Absorption Molecules (Ozone, Carbon Dioxide and Water) .......... 1-17
Figure 1 - 10. Relationship Between Relative and Absolute Humidity....................................... 1-18
Figure 1 - 11. Atmospheric Transmission Vs. Relative Humidity............................................... 1-19

## CHAPTER 2: NIGHT VISION GOGGLE (NVG) TECHNOLOGY

Figure 2 - 1.  Image Intensifier Technology .............................................................................. 2-2
Figure 2 - 2.  First Generation (GEN-I) I² Tube Technology...................................................... 2-3
Figure 2 - 3.  Second Generation (GEN-II) I² Tube Technology................................................ 2-4
Figure 2 - 4.  Third Generation (GEN-III) I² Tube Technology.................................................. 2-5
Figure 2 - 5.  AN/AVS-6 System Components ........................................................................... 2-6
Figure 2 - 6.  AN/AVS-6 System Components ........................................................................... 2-7
Figure 2 - 7.  V-1B Quick Don Block Mount ............................................................................. 2-8
Figure 2 - 8.  AN/AVS-6 Power Packs and Batteries ............................................................... 2-9
Figure 2 - 9.  AN/AVS-6 Binocular Assembly Components ...................................................... 2-11
Figure 2 - 10. I² Tube Phosphor Spectral Output...................................................................... 2-14
Figure 2 - 11. Image Intensifier (I²) Tube Identification (Omnibus-II I² Tube shown)................. 2-15
Figure 2 - 12. AN/AVS-6 Eyepiece Lenses ................................................................................ 2-17
Figure 2 - 13. Position Adjustment Shelf (PAS) Comparison .................................................... 2-17
Figure 2 - 14. NVG Spectral Response ...................................................................................... 2-20
Figure 2 - 15. NVG Luminous Gain ............................................................................................ 2-21
Figure 2 - 16. NVG Resolution ................................................................................................... 2-22
Figure 2 - 17. Estimated Omnibus-II, III and IV Detection Distances ........................................ 2-23
Figure 2 - 18. NVG Mission Performance ................................................................................... 2-24
Figure 2 - 19. NVG Image Quality.............................................................................................. 2-25
Figure 2 - 20. NVG Tactical Capability........................................................................................ 2-25
Figure 2 - 21. AN/AVS-7 ANVIS HUD Components ................................................................... 2-27
Figure 2 - 22. HDU Optical Unit Differences .............................................................................. 2-28
Figure 2 - 23. CH-46E Master Symbol Set ................................................................................. 2-33
Figure 2 - 24. UH-1N Master Symbol Set ................................................................................... 2-37
Figure 2 - 25. Bearing Waypoint Symbology .............................................................................. 2-43
Figure 2 - 26. CH-53E MASER Mode Symbology (Airspeed < 60 Knots)................................... 2-43
Figure 2 - 27. CH-53E Master Mode Symbology (Airspeed > 65 Knots).................................... 2-44
Figure 2 - 28. CH-53E Navigation Mode Symbology.................................................................. 2-45
Figure 2 - 29. AH-1W Rear Pilot Station Aircraft HUD .............................................................. 2-46
Figure 2 - 30. LASER Output Wavelengths and Sensor In-Band Spectral Sensitivity .............. 2-48
Figure 2 - 31. Light Interference Filter (LIF) and Container ....................................................... 2-50
Figure 2 - 32. Light Interference Filter (LIF) Installation............................................................. 2-51
Figure 2 - 33. Parachutist's Goggle Eye Protection integrated with AN/AVS-6 ......................... 2-52

MAWTS-1 HELICOPTER NIGHT VISION DEVICE (NVD) MANUAL: 5TH ED

## LIST OF FIGURES

### CHAPTER 3: NIGHT VISION DEVICE (NVD) HUMAN FACTORS

Figure 3 - 1.   AN/AVS-6 Field of View vs. Eye Relief or Vertex Distance.......................... .........3-3
Figure 3 - 2.   USAF Panoramic Night Vision Goggle (PNVG) ....................................................3-4
Figure 3 - 3.   AN/AVS-6 (Ultra I² Tube) NVG Snellen Visual Acuity vs. Target Contrast ..........3-6
Figure 3 - 4.   Spectral Sensitivity of Human Eye (Photopic & Scotopic) .................................3-11
Figure 3 - 5.   Circadian Rhythm Cycle for Performance ..........................................................3-13
Figure 3 - 6.   Desynchronosis ..............................................................................................3-15

### CHAPTER 5: AN/AVS-6 PREFLIGHT/POSTFLIGHT CONSIDERATIONS

Figure 5 - 1.   AN/AVS-6 Inspection and Initial Adjustment Procedures (Steps 1 through 4)......5-2
Figure 5 - 2.   AN/AVS-6 Inspection and Initial Adjustment Procedures (Steps 5 and 6) ...........5-3
Figure 5 - 3.   AN/AVS-6 Inspection and Initial Adjustment Procedures (Step 7)......................5-4
Figure 5 - 4.   AN/AVS-6 Inspection and Initial Adjustment Procedures (Step 8)......................5-5
Figure 5 - 5.   AN/AVS-6 Inspection and Initial Adjustment Procedures (Step 9)......................5-5
Figure 5 - 6.   AN/AVS-6 Inspection and Initial Adjustment Procedures (Step 10)....................5-6
Figure 5 - 7.   AN/AVS-6 Binocular Assembly Mounting...........................................................5-7
Figure 5 - 8.   AN/AVS-6 NVG Alignment and Sight Picture......................................................5-8
Figure 5 - 9.   AN/AVS-6 Alignment Procedures (Steps 1 through 3)........................................5-9
Figure 5 - 10.  AN/AVS-6 Alignment Procedures (Step 4)........................................................5-10
Figure 5 - 11.  Optimal Eyepiece or Diopter Adjustment .........................................................5-12
Figure 5 - 12.  AN/AVS-6 NVG Focus Procedures ..................................................................5-13
Figure 5 - 13.  NVG Image Defects.........................................................................................5-16

### CHAPTER 6: AIRCRAFT NIGHT VISION GOGGLE (NVG) COMPATIBILITY

Figure 6 - 1.   NVG Sensitivity and NVG Compatible Cockpit Lighting Comparison .................6-3
Figure 6 - 2.   UH-1N Electroluminescent Formation Strip Lighting............................................6-6

### CHAPTER 7: NIGHT VISION GOGGLE (NVG) AIDED OPERATIONS

Figure 7-II-1.  Estimated Detection Distances for Omnibus-II AN/AVS-6 NVGs .....................7-II-3
Figure 7-V-1.  NVG LZ Lighting Template ............................................................................. 7-V-2

### CHAPTER 8: NIGHT VISION GOGGLE (NVG) TACTICS

Figure 8-I-1.   Sample NVG Map.............................................................................................8-I-7
Figure 8-I-2.   Sample NVG Time-Distance-Heading (TDH) Navigation Card...........................8-I-9

### APPENDIX A: NVG PREFLIGHT ADJUSTMENT MODALITIES

Figure A - 1.   Computer Generated NVG Resolution Target (20/25 @ 15 ft)..............................A-3
Figure A - 2.   Squadron NVG Eye Lane Light Source................................................................A-4
Figure A - 3.   Squadron NVG Eye Lane Light Source Cover......................................................A-5
Figure A - 4.   ANV-20/20 Night Vision Device (NVD) Infinity Focus Device..............................A-5
Figure A - 5.   ANV-20/20 NVD Infinity Focus Device Front Control Panel ................................A-6
Figure A - 6.   ANV-20/20 NVD Infinity Focus NVG SVA Chart..................................................A-7
Figure A - 7.   TS-4348 Attached to AN/AVS-6........................................................................A-8
Figure A - 8.   TS-4348 Test Set Resolution Pattern ................................................................A-9

LIST OF FIGURES

## APPENDIX C: LOW LIGHT LEVEL PLANNING CALENDAR AND SHADOW FORMULA

Figure C - 1.   Light Level Planning Calendar Printout ............................................................... C-2
Figure C - 2.   Sun and Moon Position Chart Printout ............................................................. C-3
Figure C - 3.   Spot Data for the Sun and Moon Printout......................................................... C-4
Figure C - 4.   Daily Event Times Printout.............................................................................. C-4
Figure C - 5.   Tangent Formula................................................................................................ C-5
Figure C - 6.   Shadow Formula Operational Application ......................................................... C-5

# List of Tables

## CHAPTER 1: THE NIGHT ENVIRONMENT

TABLE 1 - 1.    EM SPECTRUM ....................................................................................1-2
TABLE 1 - 2.    COMMON PHOTOMETRIC CONVERSIONS .....................................1-4
TABLE 1 - 3.    COMMON MATERIAL EMISSIVITY ...................................................1-6
TABLE 1 - 4.    SOLAR AND LUNAR CYCLE ILLUMINATION ...................................1-8
TABLE 1 - 5.    TERRAIN / OBJECT REFLECTIVITY (ALBEDOS) ...........................1-12
TABLE 1 - 6.    SAMPLE TERRAIN CONTRAST ANALYSIS .....................................1-13
TABLE 1 - 7.    WATER VAPOR CAPACITY OF AIR ..................................................1-18
TABLE 1 - 8.    ATMOSPHERIC OBSCURANT PARTICLE SIZE ...............................1-21

## CHAPTER 3: NIGHT VISION GOGGLE (NVG) TECHNOLOGY

TABLE 3 - 1.    HUMAN VISUAL SYSTEM ..................................................................3-2
TABLE 3 - 2.    USMC ASSAULT SUPPORT NVD FIELD OF VIEW (FOV) SPECIFICATIONS. 3-2
TABLE 3 - 3.    HUMAN VISUAL SYSTEM CUEING ..................................................3-5

## CHAPTER 5: AN/AVS-6 PREFLIGHT/POSTFLIGHT CONSIDERATIONS

TABLE 5 - 1.    ALIGNMENT ERROR/OPTICAL DIFFERENCES BETWEEN NVG IMAGES ... 5-8

## CHAPTER 6: AIRCRAFT NIGHT VISION GOGGLE (NVG) COMPATIBILITY

TABLE 6 - 1.    MILITARY SPECIFICATION NVG MINUS BLUE OBJECTIVE LENS FILTERING 6-2
TABLE 6 - 2.    NVG FLASHLIGHT FILTERS, FINGER AND MICROPHONE LIGHTS ............. 6-4

## APPENDIX A: NVG PREFLIGHT ADJUSTMENT MODALITIES

TABLE A - 1.    ANV-20/20 SPECIFICATIONS ..........................................................A-6
TABLE A - 2.    ANV-20/20 GRAY SCALE LUMINANCE ...........................................A-8

## APPENDIX C: LOW LIGHT LEVEL PLANNING CALENDAR (LLPC) AND SHADOW FORMULA

TABLE C - 1.    10 DEGREE MOON ANGLE ..............................................................C-7
TABLE C - 2.    20 DEGREE MOON ANGLE ..............................................................C-8
TABLE C - 3.    30 DEGREE MOON ANGLE ..............................................................C-9
TABLE C - 4.    40 DEGREE MOON ANGLE ..............................................................C-10
TABLE C - 5.    50 DEGREE MOON ANGLE ..............................................................C-11
TABLE C - 6.    60 DEGREE MOON ANGLE ..............................................................C-12
TABLE C - 7.    70 DEGREE MOON ANGLE ..............................................................C-13
TABLE C - 8.    80 DEGREE MOON ANGLE ..............................................................C-14
TABLE C - 9.    90 DEGREE MOON ANGLE ..............................................................C-15

# FOREWORD

This fifth edition of the Marine Aviation Weapons and Tactics Squadron One (MAWTS-1) Helicopter Night Vision Device (NVD) Manual represents a major revision in manual format. A dedicated effort was made to update and upgrade all figures and tables used in the manual, as well as to provide an enhanced appearance to the manual. In addition, the content of this manual has changed significantly since the last edition. All content changes that have been added to the previous MAWTS-1 Helicopter NVD Manual: 4th Edition (October 1995) have been marked with column bars for ease of identification. A synopsis of major changes is provided below.

**Chapter 1**. This chapter remains unchanged with the exception of information concerning the new light level planning calendar, referred to as the Solar/Lunar Almanac Program (SLAP) that is currently under development by the Naval Oceanographic Office.

**Chapter 2**. This chapter has undergone major reorganization that has included enhancing the illustrations and adding a detailed description of the performance differences found between the difference AN/AVS-6 Omnibus contract image intensifier tubes. In addition, the AN/AVS-7 HUD section was rewritten to include more detailed illustrations of the equipment and information on the CH-53 AN/AVS-7 flight symbology set. Information was also provided to on the parachutist's goggles that are used under the AN/AVS-6 in dusty environments to provide adjunctive eye protection.

**Chapter 3**. This chapter remains relatively unchanged with the following exceptions. An Assault Support Night Vision Device (NVD) field of view (FOV) summary table was added to compare and contrast current USMC NVDs. Information on the developmental Panoramic Night Vision Goggle (PNVG) was provided to highlight current developmental efforts aimed at improving NVG FOV. A new illustration was provided that compares the sensitivity of the human eye with the different AN/AVS-6 phosphor screen spectral outputs (P22 and P43). Finally, information was added on the HGU-84/P and the HGU-67/P.

**Chapter 4**. This chapter remains unchanged.

**Chapter 5**. This chapter has been completely rewritten. This chapter now serves as the single reference source for AN/AVS-6 NVG adjustment and assessment procedures. New information is presented on the HGU-84/P and HGU-67/P V-1B Quick Don Block Mount. Adjustment procedures are provided for both the single interpupillary distance (IPD) Position Adjustment Shelf (PAS) and the Omnibus-III and IV dual IPD PAS. AN/AVS-6 adjustment procedures that were presented in Appendix A in the previous edition were integrated into this chapter.

**Chapter 6**. This chapter was rewritten to include a more in-depth discussion on NVG lighting specifications and NVG external lighting. In addition, the current USMC Training and Readiness Manual External Lighting Rules policy was overviewed.

**Chapter 7**. This chapter remains relatively unchanged with the exception of modifications to some of the NVG aided tactical formation positions and a modification to the NVG External Operations landing zone lighting template.

MAWTS-1 HELICOPTER NIGHT VISION DEVICE (NVD) MANUAL: 5TH ED

<u>Chapter 8</u>. This chapter remains relatively unchanged.

<u>Chapter 9</u>. This chapter remains unchanged.

<u>Appendix A</u>. This appendix has been completely rewritten and is to be used to support the AN/AVS-6 Adjustment and Assessment Procedures presented in Chapter 5. This appendix specifically provides set-up and operating procedures for the squadron NVG eye lane, the ANV-20/20 NVD Infinity Focus Device and the TS-4348 Test Set.

<u>Appendix B</u>. This appendix remains relatively unchanged.

<u>Appendix C</u>. This appendix remains relatively unchanged.

<u>Appendix D</u>. This appendix was reorganized from the Glossary of the previous edition. The contents remain relatively unchanged.

One of the purposes of the manual is to provide updated information between Tactical Manual (TACMAN) revisions for specific helicopter communities. As the TACMANs proceed through their periodic updates, the information presented in this manual will be incorporated into them.

Due to the rapid growth of both technology and operational experience with NVDs, this manual must be continually scrutinized and revised to remain relevant. The information in this manual is consistent with current Marine Corps policies and directives in effect at the date of publication. This manual is to be used for reference only and does not constitute authority to deviate from any USMC, FMF or local policies or directives. Although written at MAWTS-1, the foundation of information has been developed through operational experience obtained in the FMF. This manual should be used as a reference guide for individual aircrew in order to build their professional knowledge base in the area of NVD aided flight. Any recommendations or changes should be forwarded to the MAWTS-1 Helicopter Night Vision Device Manual Editor:

> MAWTS-1
> Attn: ADT&E/AMSO
> Box 99200
> MCAS Yuma, Arizona, 85369-9200
>
> DSN Phone: 951-3652 or 2500
> COM Phone: (520)341-3652 or 2500
> DSN or COM FAX: X-2637
> Email: schuttw@yuma.usmc.mil

Only your input will ensure that this manual continues to serve the needs of the FMF.

> LCDR Bill Schutt
> MAWTS-1 Aeromedical Safety Officer (AMSO)
> MAWTS-1 Helicopter Night Vision Device Manual: 5th ED Editor

MAJOR MATTHEW J. PAUL                                    FEBRUARY 11, 2002

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                   BROWNSVILLE DIVISION

4      - - - - - - - - - - - - - - X

5    KRISTA SALDANA, et al.,         :

6                    Plaintiffs, :

7         vs.                       : Civil Action

8    ITT INDUSTRIES, INC., et al, : No. B-00-176

9                   Defendants. :

10     - - - - - - - - - - - - - - X

11

12

13    _____

14            Videotaped Oral Deposition of

15              MAJOR MATTHEW J. PAUL

16               February 11, 2002

17    _____

18          THE ORIGINAL OF THIS TRANSCRIPT

19          WILL BE IN THE CUSTODY OF:

20             RANDY W. YOUNG, ESQ.

21           GENDRY & SPRAGUE, P.C.

22             645 LOCKHILL SELMA

23          SAN ANTONIO, TEXAS 78216-5057

24               (210) 349-0511

25

MAJOR MATTHEW J. PAUL                                    FEBRUARY 11, 2002

Page 3

```
1              A P P E A R A N C E S
2   FOR PLAINTIFFS:
            RAY R. MARCHAN, ESQ.
3           WATTS & HEARD
            1926 E. ELIZABETH STREET
4           BROWNSVILLE, TX  78520-4933
            (956) 544-0500
5
    FOR ITT INDUSTRIES:
6           RANDY W. YOUNG, ESQ.
            GENDRY & SPRAGUE, P.C.
7           645 LOCKHILL SELMA
            SAN ANTONIO, TX  78216-5057
8           (210) 349-0511
9   FOR SIKORSKY:
            JAMES L. WALKER, ESQ.
10          JACKSON WALKER LLP
            112 EAST PECAN STREET, SUTE 2100
11          SAN ANTONIO, TX  78205
            (210) 978-7700
12
    FOR UNITED STATES:
13          MAJOR ERIC C. RISHEL, ESQ.
            U.S. MARINE CORPS
14          3250 CATLIN AVENUE, SUITE 133
            MARINE CORPS BASE
15          QUANTICO, VA  22134-5001
            (703) 784-3691
16
    ALSO PRESENT:  T.J. O'TOOLE, VIDEOGRAPHER
17
18
19
20
21
22
23
24
25
```

Page 15

1    there down to flight equipment, you withdraw your

2    gear, and that's where you withdraw your night

3    vision goggles also at flight equipment.  The

4    proper procedure would be to initially inspect

5    your night vision goggles as far as making sure

6    that nothing is broken on the goggles, making sure

7    that the lenses are clean, the batteries are in

8    place.  Once the batteries are in place, you check

9    it up on your helmet to make sure that the

10   batteries are not dead, that you do in fact have

11   operable goggles before you walk outside.  There

12   is an NVG eye lane provided which allows you to

13   adjust the goggles down to a certain visual

14   acuity, and that is also a step or a procedure

15   that you are supposed to do prior to actually

16   going out and flying on the night vision goggles.

17        Q.    Sir, what guides your inspection of

18   those goggles?

19        A.    The MAWTS manual.

20        Q.    Can you tell the jury what the MAWTS

21   manual is and what MAWTS stands for?

22        A.    Marine Aviation Weapons and Tactics

23   Squadron.  They are the duty experts on night

24   vision goggle devices, how we fly on the night

25   vision goggles, and they put out the NVG manual

Page 16

1    which talks specifically and in-depth about just

2    everything pertaining to the goggles and

3    pertaining to flying on the goggles, both tactical

4    and administrative flying.

5         Q.   When you say "they," you speak of the

6    unit, the MAWTS unit?

7         A.   Yes.

8         Q.   Can you tell us who "they" are, sir?

9         A.   As far as -- I mean, that's the Marine

10   Aviation Weapons and Tactics Squadron, that's the

11   unit I'm speaking of.

12        Q.   So that is a Marine unit then?

13        A.   Yes, sir.

14        Q.   Do you know where they are located,

15   sir?

16        A.   They are in Yuma, Arizona.

17        Q.   Sir, at this time I am going to

18   interrupt you just a little bit.  Let the record

19   reflect I am showing counsel the dash-7 operator's

20   manual for night vision devices.  I will hand that

21   to the witness.

22             MR. MARCHAN:  You said when we speak

23   about goggles, it would be the ANVIS-6?

24             MR. YOUNG:  ANVIS-6.

25             MR. MARCHAN:  Is that the ANVIS-6

Page 35

1    NAVAIR publication.

2         Q.    When you say NAVAIR, who controls that?

3    Or who is NAVAIR, if you will?

4         A.    Well, Naval -- Navy air is what you

5    think when you think NAVAIR.  Who the controlling

6    custodian is, I couldn't tell you.

7         Q.    Sir, have you been, either in flight

8    school or once you left flight school, trained on

9    high light level transitions to low light level

10   transitions under the goggles?

11        A.    Yes.

12        Q.    Who trains you for those procedures?

13        A.    Well, again, the MAWTS manual is the

14   basic ingredient, if you want to call it that.

15   That's the manual we will refer to most often when

16   it comes to having anything to do with flying

17   under the night vision goggles.

18        Q.    Sir, on the night of the mishap, do you

19   recall if during the preadmission brief an

20   inadvertent IMC was briefed?

21        A.    Yes, sir.

22        Q.    If you would explain to the jury

23   inadvertent IMC in the brief that took place, sir.

24        A.    Okay.  You can cover inadvertent IMC in

25   a lot of ways.  All it is is flying in the clouds

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF TEXAS

 3                    BROWNSVILLE DIVISION

 4       - - - - - - - - - - - - - X

 5     KRISTA SALDANA, et al.,         :

 6                      Plaintiffs, :

 7         vs.                      : Civil Action

 8     ITT INDUSTRIES, INC., et al, : No. B-00-176

 9                      Defendants. :

10       - - - - - - - - - - - - - X

11

12              REPORTER'S CERTIFICATION

13       VIDEO DEPOSITION OF MAJOR MATTHEW J. PAUL

14              Monday, February 11, 2002

15         I, MARILYN FELDMAN, certified shorthand

16     reporter in and for the District of Columbia,

17     hereby certify to the following:

18         That the witness, MAJOR MATTHEW J. PAUL, was

19     duly sworn by the officer and that the transcript

20     of the oral deposition is a true record of the

21     testimony given by the witness;

22         That examination and signature of the

23     witness to the deposition transcript was waived by

24     the witness and agreement of the parties at the

25     time of the deposition;
```

MAJOR MATTHEW J. PAUL.                                          February 11, 2002

Page 100

```
 1          That the original deposition was delivered

 2     by  ) certified mail ( ) hand delivery to Randy

 3     Young for safekeeping on _____;

 4          ( ) That counsel has agreed to waive

 5     timekeeping.

 6          ( } That the amount of time used by each

 7     party at the deposition is as follows:

 8          Randy Young

 9          Ray Marchan

10          James Walker

11          That $ 433.00 is the deposition officer's

12     charges for preparing the original deposition

13     transcript and any copies of exhibits, charged to

14     Defendant ITT Industries.

15          That pursuant to information given to the

16     deposition officer at the time said testimony was

17     taken, the following includes all parties of

18     record:

19          Ray R. Marchan, Attorney for Plaintiffs

20          Randy W. Young, Attorney for ITT Industries

21          James L. Walker, Attorney for Sikorsky

22          Major Eric Rishel, Attorney for United States

23          I further certify that I am neither counsel

24     for, related to, nor employed by any of the

25     parties or attorneys in the action in which this
```

ESQUIRE PRODUCTION    202 775 9631         02 25 02  05:15pm  P. 002

# Major Matthew J. Paul

1  proceeding was taken, and further that I am not

2  financially or otherwise interested in the outcome

3  of the action.

4      Sworn to by me this 5th day of

5  April                , 2002.

6

7

8  **MARILYN FELDMAN**

9  1020 19th Street, NW, Suite 620

10  Washington, D.C.  20036

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Glen Lewis Nowak                                    December 18, 2001

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT FOR
              THE SOUTHERN DISTRICT OF TEXAS
 2                        BROWNSVILLE
 3       --------------------------------+
         Krista Saldana, Individually,    ª
 4       and as a representative of the   ª
         Estate of David Saldana, and theª
 5       next friend of Jagge Saldana,    ª
                                          ª
 6                 Plaintiffs,            ª
                                          ªCivil Action No.
 7       -vs-                             ªB-00-176
                                          ª
 8       ITT Industries, Inc. Sikorsky    ª
         Aircraft Corporation, a          ª
 9       Subsidiary of United             ª
         Technologies Corporation, the    ª
10       Estate of Lt. Col. Marc B.       ª
         Hohle, and the Estate of Captainª
11       Matthew Brent Thomas,            ª
                                          ª
12                 Defendants.            ª
         --------------------------------+
13
14                      Deposition of Glen Lewis Nowak
15                      Fort Belvoir, Virginia
16                      Wednesday, December 18, 2001
17
18
19
20
21       Reported by:  Jerome T. Mattingly    COPY
22       Job No. 142220
```

Glen Lewis Nowak                                                    December 18, 2001

Page 2

1    Deposition of Glen Lewis Nowak, commencing at
     9:56 o'clock a.m.

2

3

4             U.S. Army CECOM Belvoir Legal Office
              10170 Beach Road
5             Building 235
              Fort Belvoir, Virginia

6
              Pursuant to Notice, before Jerome Mattingly,
7
              a Notary Public in and for the State of
8
              Virginia

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

1        Appearances:
2        On Behalf of the Plaintiff:
3        Ray R. Marchan, Attorney at Law
         Watts & Heard
4        1926 E. Elizabeth Street
         Brownsville, Texas   78520-4933
5
6
         On Behalf of the Defendant ITT:
7
         Randy W. Young, Attorney at Law
8        Gendry & Sprague, P.C.
         645 Lockhill Selma
9        San Antonio, Texas 78216-5057
10       On behalf of the Defendant Sikorsky:
11       Robert F. Ruckman, Attorney at Law
         Jackson, Walker, LLP
12       901 Main Street
         Suite 6000
13       Dallas, Texas   75202
14
15                      - - -
16
17
18
19
20
21
22

Page 26

1      Q.   Who has that?

2      A.   CECOM.

3      Q.   CECOM has a regulation?

4      A.   How is it to be worded, as well.

5           MR. MARCHAN:  Wait.

6           BY MR. YOUNG:

7      Q.   I'm sorry, you're right. Strike my

8  comments.

9      A.   Okay.  The manual that -- it's a TM,

10  it's instructions how to put the TM together.

11  Where the cautions go, how they're worded, how

12  many should be in there, that type of stuff.  And

13  if, through the experience of the pilots or

14  through our developmental type testing or

15  operational testing, we find that there are things

16  that he should specifically be looking for, then

17  we put them right up front here in the warnings or

18  cautions.  And we also define what a warning and a

19  cause is.  That is what we read the first time.

20           So a caution is not as strict as a

21  warning, but it's making him aware of certain

22  things that he's got to be before he takes off.

Page 36

1      A.    "Adjust speed and altitude to prevent

2   over flying the field of view when conditions of

3   possible reduction or loss of vision exists."

4      Q.    All right, sir.  On the night in

5   question of the mishap, sir, they were also flying

6   over the Pacific Ocean.  In fact, they impacted

7   into the Pacific Ocean.  If you could, sir, read

8   the last bullet under the warning on that page,

9   sir?

10     A.    "Exercise extreme caution when flying

11  over low contrast terrain, such as snow-covered

12  territory, sandy desert, environments, large

13  bodies of water or grassy hills.  Under ambient

14  star light conditions, low contrast environments

15  degrade visibility, therefore, disguising or

16  masking changes in the terrain.  This is

17  especially true under low light conditions, star

18  light and over cast conditions at higher speeds."

19     Q.    Okay, sir.  Sir, is it your testimony,

20  from what you have stated earlier, that the

21  government had knowledge of transitioning from

22  high light level to a low light level?

Page 37

1      A.   Yes, they did.

2      Q.   And again, to summarize your testimony,

3    the government produces this document, do they

4    not?

5      A.   Yes, we do in conjunction with -- well,

6    it's actually published by the government, if that

7    is the question.  But the manufacturer has

8    definitely helped us develop this, especially in

9    the early stages, to make sure that the

10   limitations to the equipment, that the night

11   vision goggles are definitely listed.  We know

12   what they were through testing.

13     Q.   Okay, sir.  And that goes back to the

14   back and forth between ITT and the government?

15     A.   That's correct.

16     Q.   Okay, and --

17     A.   They were actually -- I can tell you the

18   people who were actually on this manual that were

19   making it.  That goes back a long ways, '84, but

20   there was always one or two ITT people there

21   helping to develop this manual.  And they were

22   always helpful, making sure that if changes to the

Page 47

1     A.    Correct.

2     Q.    Produced the specifications for the

3  manufacturer?

4     A.    You're correct.

5     Q.    All right, sir.  And is it your

6  testimony that the AN/AVS 6 performed to those

7  specifications -- those precise specifications?

8     A.    They wouldn't get out the door if they

9  didn't perform.

10    Q.    All right, sir.  And regarding a warning

11  for high light level flight to low light level

12  flight transition from, there have been warnings

13  in this manual as early as 1991, correct?

14    A.    That's the best I can do for you unless

15  I go back and do a little research.

16    Q.    That is fine.  At this time, I would

17  like to enter the Operators Manual as Exhibit

18  Number 6.

19         (Document referred to was marked

20  Deposition Exhibit No. 6 for identification.)

21         MR. MARCHAN:  We have no objection to

22  the manual being attached to this deposition as

Page 70

1        Q.    Where does it talk about the lighted

2   horizon and the no horizon situation?

3        A.    The no horizon?

4        Q.    Yes, sir.

5        A.    That's a different story.

6        Q.    It doesn't address that, does it?

7        A.    No, you have a different thing going on

8   here.  If you can't see, you're not going to fly.

9   Are you talking about seeing -- repeat your

10  question again.

11       Q.    Sure.  Are there any warnings in the

12  manual -- let me rephrase it.

13            Did the government receive any

14  information or warnings from ITT about the

15  performance of their night vision goggles when

16  they're being used by an aviator from going from a

17  lighted horizon to a no horizon situation?

18       A.    I can answer that for you.  They are

19  part of a team that did the developmental testing,

20  operational testing when we went through there.

21  But we didn't rely on the manufacturer to give us

22  that type of thing.  We went through testing with

Page 71

1   pilots.

2        Q.    Okay.

3        A.    So they were part of developing -- this

4   is how this power supply works, this is how it's

5   going to react.  This is how this standard is

6   going to be.  We developed test sets, so you know

7   exactly what that light level was supposed to be.

8        Q.    So I guess, I'm getting to a specific

9   area, did the government receive any warnings

10  information from ITT about the performance of

11  their generation 3 night vision goggles when being

12  used by aviation people, moving from a lighted

13  horizon to a no horizon situation?

14       A.    I can't answer that question.

15       Q.    You didn't receive any such information

16  from them, did you?

17       A.    I got the information from being on

18  forwards and pilots coming in and working, and

19  figuring that stuff out.  And then it was verified

20  in the -- in our test facility at ITT.  So we were

21  able to go in there and say, well, maybe that is

22  not right, maybe that light level has got to be

Page 95

1    Systems Command, to your knowledge?

2         A.    I would have to say that I don't know --

3    yeah, it would have to be under the Navy's

4    control.

5         Q.    All right.  And so there --

6         A.    They would have a group.

7         Q.    So with regard to the original design of

8    the CH 53 helicopter, that would be under the

9    authority of the Naval Air Systems Command, to

10   your knowledge?

11        A.    Yes.

12        Q.    And if there are any design changes to

13   the helicopter, any modifications, that would also

14   be the responsibility or under the authority of

15   the Naval Air Systems Command?

16        A.    That's right.  An example would be that

17   one of these Air Force versions of any aircraft,

18   they might want to modify the dash for some

19   reason, or the wind screen a certain way.  And

20   that wouldn't be applied to all of them.  So there

21   is an example.

22        Q.    So you're saying, for example, the Navy,

Page 98

1    night vision goggles, can the military institute

2    that change?

3        A.    I think to answer you -- the best way to

4    answer your question would be, if we were doing

5    research and it could be an improvement to your

6    helicopter, so it would improve -- so we could

7    make a recommendation to do that, certainly we

8    have gone out and evaluated them and made

9    recommendations, how to improve the lighting, but

10   there are contractors out there that are not

11   military contractors that are doing a lot of this

12   work.

13            I know about the Apache, I know about

14   some of the Black Hawks, the way they were done in

15   the early part of the program.  I'm just not

16   familiar with that one.

17       Q.    Let me ask you, is it the military's

18   decision or not if they -- if the military decides

19   that an additional warning devise for low level

20   flying is appropriate for night vision goggles,

21   who would ultimately make the decision whether or

22   not to make that change?

Page 99

1      A.    Okay, that is an easy question, whoever

2  owns it.

3      Q.    And that would mean whatever military

4  branch owns the aircraft?

5      A.    Whoever owns it, or whoever has it on

6  their property.

7      Q.    If this were a Marine owned helicopter,

8  then the Marine Corps or their authority would

9  make that decision?

10     A.    Yes.

11     Q.    All right.  Going back to Exhibit 6,

12  which is the operators manual, did I understand

13  your testimony that you were involved in

14  personally preparing this manual?

15     A.    Yes.

16     Q.    All right.  And you are familiar with,

17  completely familiar with the contents of this

18  manual?

19     A.    Pretty much.  It's been two years since

20  I used it.  But yeah, I could go back and tell you

21  just about anything.

22     Q.    And Exhibit 6 appears to be a true and

PAGE _____

## ERRATA SHEET

### IN THE UNITED STAES DISTRICT COURT FOR
### THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE

```
KRISTA SALDANA, IND., ET AL        )
                                   )
VS.                                )    Civil Action No. B-00-176
                                   )
ITT INDUSTRIES, INC., ET AL        )
```

### ORAL DEPOSITION OF
### GLEN LEWIS NOWAK
#### December 18, 2001

*The following are corrections to the transcript of my ORAL DEPOSITION, taken on **December 18, 2001**.*

| PAGE | LINE | CORRECTION AND REASON | |
|------|------|-----------------------|---|
| 7 | 15 | GLEN LOUIS NOWAK | Spelling |
| 8 | 2 | LAND WARRIOR | Spellant 92 line 11 |
| 9 | 15 | NIGHT VISION LABORATORY | OMISSION |
| 11 | 8 | ROTOR Clearwater | OMISSION |
| 11 | 22 | remove "and" | not needed |
| 22 | 5 | AN/PVS-7 | Change B to V |
| 22 | 12 | Change OPERATIONAL To DEVELOPMENTAL | |
| 22 | 14 | And (operational) PILOTS, we choose the add operational between and & pilots- | |
| 28 | 3 | AEROmedical | spelling |
| 33 | 3 | ~~scintillations~~ Scintillations | Spelling Page 75 line 3 |
| 55 | 5 | "SUPER" to "SEA" STATION | mis Interpreted 96 line 15 |

**IF YOU DO NOT WISH TO MAKE ANY CHANGES, PLEASE NOTE "NONE" ABOVE.**

NOTE   ANVIS NOMENCLATURE IS AN/AVS-6    *Glen Nowak*

GLEN ~~LEWIS~~ NOWAK
LOUIS

THE STATE OF Virginia
COUNTY OF Fairfax

SUBSCRIBED AND SWORN TO BEFORE me by the said Witness, Glen L. Nowak , on this the 7th day of February , 2002.

*Elizabeth A. Bruley*
Notary Public in and for
The State of Virginia

My Commission Expires October 31, 2005

*US District Court for the Southern District of Texas Brownsville*
*witness Helen Lewis Neasek Civil Action No. 0-00-176*

```
1                    REPORTER'S CERTIFICATE

2              I, Jerome T. Mattingly, the officer

3     before whom the foregoing deposition was taken, do

4     hereby certify that the testimony which appears in

5     the foregoing deposition was duly sworn by me, a

6     Notary Public in and for the Commonwealth of

7     Virginia at Large; that the testimony of said

8     witness was reported by me by stenotype and

9     thereafter reduced to typewritten form under my

10    direction; that said deposition is a true record

11    of the testimony given by said witness to the best

12    of my ability; that I am neither counsel for,

13    related to, nor employed by any of the parties to

14    the action in which this deposition was taken; and

15    further, that I am not a relative of or employee

16    of any attorney or counsel employed by the parties

17    hereto, nor financially or otherwise interested in

18    the outcome of the action.

19

20    _____

21                        Notary Public

      My Commission Expires:
      November 14, 2002
22          Total Cost: 579.00
```

*Deposition was ordered on time.*

112

Glen Lewis Nowak                                              December 18, 2001

Page 113

1    Glen Lewis Nowak
     U.S. Army CECOM Belvoir Legal Office
2    10170 Beach Road
     Building 325
3    Fort Belvoir, Virginia
4            In Re:    Saldana v. ITT Industries, et al
5            As requested at the time of deposition, a copy
     of your deposition transcript is being provided to you
6    through counsel for your review and signature.  The
     deponent should keep in mind that the purpose of
7    review is only to ensure accuracy and not to revise in
     an editorial manner.
8
             If any changes or corrections are necessary,
9    the deponent should prepare an errata sheet listing by
     page and line numbers the change or correction made;
10   i.e., page 15, line 8, change "he said" to "she said".
11           When the errata sheet is completed, it should
     be signed by the deponent.  This signed errata sheet
12   and original signature page of the transcript should
     be sent to the attorney who ordered the original
13   deposition within thirty (30) days, to be attached
     a
     to the original transcript.
14
15
16
17
18
19
20
21
22

Page 111

```
 1
 2                  CERTIFICATE OF THE WITNESS
 3          I have read the foregoing deposition of
 4     ____ pages, which contains a correct transcript of
 5     the answers given by me to the questions recorded
 6     therein.
 7
 8
 9     _____
10
11                         - - -
12     SUBSCRIBED AND SWORN TO before me this _____ day
13     of _____, 2002.
14
15                         _____
16                              Notary Public
17     My Commission Expires:
18     _____
19                         - - -
20
21
22
```

# H-53 SAFETY ACTION RECORD (SAR)

| | |
|---|---|
| TITLE | LACK OF LOW ALTITUDE WARNING |
| AIRCRAFT | C/MH-53E |
| LOG NO. | 72-004 |
| STATUS | CLOSED |
| PRIME RESPONSE | NAVAIRSYSCOM |
| NAVAIR COG DESK | AIR-4.1.1.2 (H-53) |
| SYSTEM | RADAR ALTIMETER |
| COMPONENT | RADAR ALTIMETER |
| REPORTING ORG | HM-19 |
| POC/CODE | |
| INFO SOURCE | SSWG #9 |
| REFERENCES | OR #140-05-87 dtd 28 JAN 87 |
| | OSIP 17-98 |
| | Ground Proximity Warning System (GPWS) |
| | Low-Altitude Warning System (LAWS) |
| | S/A SAR #198 |

**INITIAL DATE:** 10/19/93
**HAZARD RISK INDEX: (INITIAL/CURRENT)** 1C/1C
**HAZARD DESCRIPTION: (UNDESIRED EVENT, CAUSE AND AMPLIFYING INFO)**
Several aircraft have flown into the ground/water unintentionally due in part to inadequate low altitude warnings. Existing H-53 low altitude warning systems are deficient because they do not provide adequate warning of low altitudes.

**CURRENT STATUS/FINAL SOLUTION: SSWG NO: 13 DATE:** 04/01/97
GPWS Milestone III decision (production option) awarded 24 JUN 97. The CH-53E (1st), MH-53E, and CH-53D (order undetermined) will receive the GPWS (in accordance with OR #140-05-87 dated 28 January 1987 and funded by OSIP 17-98). Current estimates indicate complete H-53 fleet retrofitted with GPWS by FY-2004.

SAR closed per SSWG #13.

**CLOSING SIGN-OFF:**

CONTRACTOR: (N) _____ GOV'T PM: (N)_____

---

## NARRATIVE (SUPPORTING INFORMATION) FOR H-53 SAR # 72-004

1 10/19/93 SAR opened by SSWG #9. MH-53E has a low altitude warning system tied into the caution and master warning panels that illuminates with the rad-alt light but only when the landing gear are up. The system provides little assistance to the aircrew that flies into the water just after leaving the ship (gear down). CH-53E just has rad-alt light that illuminates whenever the a/c is below the "low" altitude set on the altimeter. This is very difficult for pilots to see.

2 10/19/93 The H-53 is to be the first helicopter platform to receive the Ground Proximity Warning System (GPWS). The GPWS is an algorithmic system that uses aircraft inputs (pitch, roll, vertical speed, barometric altitude, radar altitude, forward speed, etc.) to provide early warnings to the aircrew of

## H-53 SAFETY ACTION RECORD (SAR)

impending ground contact. Preliminary meetings have been held to discuss incorporation of the GPWS.

3 11/15/94 Review of H-53 mishaps over the past 15 years suggests that the GPWS is not the best current solution to the controlled flight into terrain mishap. The GPWS lacks any "forward looking" capability (i.e. forward looking radar) which severely reduces the effectiveness of the system, especially during NOE flight. HMX-1 is currently testing a Low Altitude Warning System (LAWS) for the CH-53 aircraft. The LAWS provides a tone warning when the aircraft descends below a pre-set altitude.

4 04/12/95 Cubic Incorporated prototype GPWS is currently in Tech-Eval at NAWCAD Patuxent River. Low Altitude Warning System (LAWS), RAMEC L-16-93, is still undergoing tests at HMX-1. Response/evaluations due to COMNAVAIRLANT.

5 10/11/95 Following OT&E of the Low Altitude Warning System (LAWS), HMX-1 forwarded proposed RAMEC with concurrence to COMNAVAIRLANT via message traffic. Following AIRLANT approval, RAMEC will be forwarded to COMNAVAIRPAC for verification.

6 11/02/95 Ground Proximity Warning System (GPWS) still under test at NAWC Patuxent River. COMNAVAIRLANT action to approve and forward Low Altitude Warning System (LAWS) RAMEC (L-16-93) to COMNAVAIRPAC for verification.

7 08/31/96 CH-53E GPWS Flight Test completed at NAWCAD Patuxent River. There were no category I deficiencies. GPWS program awaits Milestone III production decision.

8 04/01/97 GPWS Milestone III decision (production option) scheduled for 24 June 1997. The CH-53E (1st), MH-53E, and CH-53D (order undetermined) will receive the GPWS (in accordance with OR #140-05-87 dated 28 January 1987 and funded by OSIP 17-98). Current estimates indicate complete H-53 fleet retrofitted with GPWS by FY-2004.

9 06/24/97 GPWS received production approval (Milestone III). Contract to be signed with Cubic in 1st quarter of FY-98. System installation will be performed by contractor field teams and should start towards the end of 1998 (systems require approximately 12 months production lead time). Estimated completion of the GPWS installation is FY-04.

08/14/97  SAR closed per SSWG #13.

4.4.00

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

KRISTA SALDANA, INDIVIDUALLY       ß
AND AS REPRESENTATIVE OF           ß
THE ESTATE OF DAVID SALDANA        ß
AND AS NEXT FRIEND OF JAGGER       ß
SALDANA                            ß
                PLAINTIFFS         ß
                                   ß
                                   ß       CIVIL ACTION NO. B-00-176
                                   ß
ITT INDUSTRIES, INC., SIKORSKY     ß
AIRCRAFT CORPORATION, A            ß
SUBSIDIARY OF UNITED               ß
TECHNOLOGIES CORPORATION,          ß
THE ESTATE OF LT. COL. MARC        ß
LEE HOHLE AND THE ESTATE OF        ß
CAPTAIN MATTHEW BRENT THOMAS       ß
                                   ß
                DEFENDANTS         ß

## PLAINTIFFS' AND INTERVENORS' INITIAL DESIGNATION OF EXPERTS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME, Plaintiffs and Intervenors by and through their attorneys of record, and respectfully file these their supplemental designation of experts as follows:

Edward Monhollen & Associates
Consultants in Aviation Safety
13438 Bandera Road
Suite 105A
Helotes, Texas  78023
(210)  695-5810
(210) 695-5811  Fax

Is expected to testify regarding aircraft safety and accident reconstruction. Attached to this designation is Mr. Monhollen's expert report, resume and list of previous testimony.

## CROSS-DESIGNATION OF EXPERTS

Plaintiffs hereby cross-designate and state that they may call any expert identified or designated by an adverse party or an employee or representative of an adverse party to elicit expert opinions subject to any objections Plaintiffs make concerning the designation of experts.

## DESIGNATION OF MEDICAL DOCTORS & NURSES

In addition to the above designations, Plaintiffs refer you to the medical records and nurses notes, from which the identities of medical doctors and nurses may be determined. Plaintiffs hereby designate such doctors, nurses and caregivers as experts who may be called to testify as expert witnesses at the time of trial to prove up the reasonableness and medical necessity of Plaintiffs' expenses.

Respectfully submitted on this the ___9___ day of April, 2002.

WATTS & HEARD, L.L.P.
1926 E. Elizabeth
Brownsville, Texas  78520
(956)  544-0500
(956) 541-0255   Fax


RAY R. MARCHAN
For the Firm
State Bar No. 12969050
Federal I.D. No. 9522
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this the __9__ day of April, 2002, a true and correct copy of the foregoing instrument was delivered to opposing counsel by hand-delivery, via fax or by certified mail, return receipt requested.

RAY R. MARCHAN



# Edward Monhollen & Associates

## Consultants in Aviation Safety

**REPORT OF FINDINGS AND OPINIONS**
**Krista Saldana, et al. vs. ITT Industries, et al.**
**CH-53E Helicopter Accident of 19 April 1999**
**BUNO 162007**

**A. GENERAL:** The following report is submitted in compliance with Rule 26 (a) (2) (A)- (B) of the Federal Rules of Civil Procedure pertaining to the expert testimony the author expects to present in the above stated case.

**B. BACKGROUND:** I have been retained by the firm of Watts & Heard, L.L.P. to review the facts and circumstances surrounding the above stated accident and to provide my opinions as to the cause(s) of the accident.

**C. WITNESS QUALIFICATIONS:** My resume is attached as enclosure 1.

**D. COMPENSATION:** My hourly fee is $125.00. Additionally, I charge $1,200.00 per day for deposition and trial testimony.

**E. PREVIOUS TESTIMONY:** A list of my case involvement for the past 4 years is attached as enclosure 2.

**F. DATA CONSIDERED:** I have reviewed the relevant portions of the documents listed at enclosure 3 in forming my opinions.

**G. SUMMARY OF ACCIDENT:** The mishap flight was to be a low light level (LLL), night vision goggle (NVG) training flight using approved NVG routes and training areas within the vicinity of Okinawa. The forecast weather for the mission was 1000 feet overcast and 3 miles visibility with light rain in the vicinity. The flight was properly briefed and proceeded without incident until their planned landing at Fire Base Jones. Neither aircrew could identify the intended landing area, so the flight continued as planned with Tiger 03 still leading the section. A lead change was scheduled at Fire Base Jones while on the ground, but since the section did not land, Tiger 03 was still in the lead as the flight turned south over water and paralleled the coast of Okinawa. Deteriorating weather to south necessitated a return by the northern route, so the aircrews coordinated the 180 degree turn with a lead change. Tiger 07, the mishap aircraft, was to begin his turn followed by Tiger 03, who would then join on Tiger 07 to complete the lead change. Tiger 07 was observed to begin his turn to the left, toward the open sea, and as he passed through the six o'clock position of Tiger 03, he began his turn to the left. The aircrew of Tiger 03 then

Report, Edward Monhollen                    2

observed a bright flash of light as Tiger 07 impacted the water. All four crewmembers were fatally injured on impact and the aircraft destroyed.

## H. SUMMARY OF EXPECTED TESTIMONY:

1. **Opinion:** That the turn to the left toward the open sea and away from the cultural lighting greatly increased the difficulty of the maneuver, but should have been within LtCol Hohle's capabilities.

   **Bases:** While Captain Thomas was participating in his first LLL mission, LtCol Hohle had accumulated over 300 hours of NVG flight with 79 hours being in LLL conditions. He was also a designated Night Systems Instructor and apparently comfortable with the conditions that night, since he had raised no concerns with the exception of the southern route weather. An argument can be made that LtCol Hohle was distracted, having now to assume the section navigational duties, but I believe this to be unlikely, as well. Finding of fact #99 in the JAGMAN report places Tiger 03 at 500 feet and 100 knots prior to the lead change. Major Paul, on page 48 of his deposition stated that only 12 seconds elapsed from the start of Tiger 07's turn until impact. That translates to an average rate of descent of 2,500 feet per minute; hardly the "gradual loss of altitude" referred to in LtCol Samples deposition as being difficult to perceive with NVG's. This rate of descent would require a substantial reduction in collective pitch to achieve; it would not go unnoticed by the other crewmembers.

2. **Opinion:** That the "Low" warning light on the radar altimeter is inadequate to alert NVG pilots to the fact that they are descending below their selected altitude. The manufacturer should have incorporated an aural warning at the same time NVG cockpit compatible lighting was installed.

   **Bases:** LtCol Samples, the Staff Judge Advocate Investigating Officer, and the author of the JAGMAN report, expresses this same opinion on page 23 of his report and again in his deposition. It has been my experience that the most frequently stated cause for NVG accidents has been "Controlled flight into terrain or water". I'm certain that this will be borne out by statistics gathered from the military data bases; a topic addressed in the paragraphs to follow. Regardless, a manufacturer has the responsibility to warn operators of their products when a situation exists that could result in damage to the aircraft or injury to crew and/or passengers. In this case, Sikorsky Aircraft was certainly aware the NVG were in use in the H-53E helicopters; NVG cockpit compatible lighting bares that out. Further, Sikorsky has access to the same databases that we do, if fact, they participate in the on-site accident investigations. They must be cognizant of the fact that even with radar altimeters installed, controlled flight into terrain or water continues as a major causal factor in NVG related accidents. It doesn't seem a giant step to conclude that the current warning system is inadequate in preventing such occurrences.

Report, Edward Monhollen                    3

**I.  DISCUSSION:**  My investigation is incomplete and has been hampered by unreasonable response times to Freedom of Information Act (FOIA) requests and the lack of sufficient time to coordinate an examination of the aircraft wreckage.  Both of these problems have impacted my investigation and could affect my opinions regarding the cause of this accident.

    1.  FOIA Response Times: On 4 February 2002, my office submitted an FOIA request to the U.S. Navy Safety Center for the releasable portions of the Mishap Investigation Report (MIR).  We have yet to receive the report and subsequent inquiries have generated the response that they are running approximately one year behind in responding to FOIA requests at the Navy Safety Center.  This report is significant in that it normally is much more detailed in damage description and contains more photographic evidence; especially with respect to the aircraft's major components, than the separately written JAGMAN report.  The absence of this report becomes more significant when the aircraft wreckage is not reasonably available for examination, particularly with respect to known mechanical deficiencies that have caused previous aircraft accidents (see paragraph I.2, below).  Another outstanding FOIA request has prevented me from confirming known NVG related cause factors pertinent to this case.

    2.  Wreckage Examination:  I have yet to examine the wreckage of this aircraft.  This has recently taken on added significance both because I have not seen the MIR and I have become aware of a mechanical deficiency that has resulted in 3 other H-53E accidents.  The deficiency involves the duplex bearing assembly in the helicopter's swashplate.  This bearing has failed at least 3 times in the past and went completely unnoticed in one accident by both government and Sikorsky investigators until 1year after the fatal crash of a CH-53E at the Sikorsky plant in May 96.  The latest of these failures occurred off the coast of Corpus Christi, TX in August 00.  The damage description in the JAGMAN report, including photographs, with respect to the main rotor system and swashplate assembly, is insufficient to allow me to rule out duplex bearing failure as a cause of this accident.  In fact, some consistencies with respect to rates of descent and impact angle tend to strengthen my suspicions.

Until I can conclusively rule out duplex bearing failure as causative in this accident, I can offer no further opinions in this accident. However, in the course of ongoing discovery in this matter, should additional substantive information be gained, the above conclusions or their bases may be supplemented, amended, or abandoned depending on the nature of the discovery.

**J.  EXHIBITS:**  I expect to use the following exhibits at trial:

    1.  Various photos and diagrams.
    2.  Aircraft models and/or computer simulations.

Report, Edward Monhollen                4

April 1, 2002
Respectfully submitted,

EDWARD MONHOLLEN & ASSOCIATES
Edward Monhollen
President

Enclosures



# Edward Monhollen & Associates

### Consultants in Aviation Safety

## EDWARD L. MONHOLLEN
## AIRCRAFT ACCIDENT RECONTRUCTION

Mr. Monhollen is an aircraft accident reconstruction expert and president of Edward Monhollen & Associates (EMA), an aviation safety consulting firm. EMA is a multi-faceted company that provides a wide range of services to legal firms, insurance companies, government agencies, manufacturers, and trade organizations. These services include accident reconstruction, 3D animation, trial exhibit construction, and audio/visual services. EMA capabilities are supplemented by other respected facilities that provide technical support in disciplines such as metallurgical, materials, and mechanical engineering services. Projects ranging from the simplest aviation accident to complex investigations involving commercial airliners or hundreds of accidents with similar causes are undertaken.

Mr. Monhollen was a Senior Airworthiness Engineer with Sikorsky Aircraft Division of United Technologies Corporation for 5 years before founding EMA in 1993. His primary duties involved the worldwide investigation of accidents involving Sikorsky helicopters, participation in the Products Safety Board, management of in-house engineering investigations, and safety audits of Sikorsky facilities. These experiences provided Mr. Monhollen a broad understanding of the aircraft manufacturing process, an understanding of the responsibilities of a government contractor, and an in-depth knowledge of Sikorsky Helicopters. He was involved with investigations of electromagnetic interference (EMI) affects on aircraft systems, transmissions and drive components, composite materials, engines, component non-volatile memory, and cockpit voice recorder and flight data recorder analysis. Each major investigation entailed a review of the operators' maintenance forms, records, and procedures, aircrew training, standardization, crew selection, and qualification. Mr. Monhollen also participated in aircraft accident investigations involving products manufactured by Pratt & Whitney and Hamilton Standard, both divisions on United Technologies Corporation.

Mr. Monhollen has over 30 years experience in aviation safety, beginning with his designation as a Army Aviator in 1968. His military career spanned 20 years, culminating with his retirement as a Major in 1987. He is a highly decorated veteran of Vietnam having flown over 900 hours of combat time in helicopters. His combat tour

**13438 Bandera Rd, Suite 105A • Helotes, TX 78023 (210) 695 - 5810 Fax: (210) 695 - 5811**
**www.emasafety. com**

was cut short when he was involved in the crash of a UH-1B helicopter gunship. He spent one year recovering from the injuries sustained in the crash. This was followed by his assignment as an instructor pilot at the Army's Primary Helicopter School, attendance at the Army Safety Officer's Course, completion of his Bachelor of Science degree, and ultimately his assignment as a Board President, investigating accidents for the Department of the Army. Upon his retirement, he held the following ratings: Commercial, Multi-engine, Airplane, Instrument and Commercial, Rotorcraft, CFII with over 3000 hours of total flight time.

Mr. Monhollen has investigated over 500 aviation accidents and has qualified in court as an expert in aircraft accident reconstruction and aviation maintenance management. He has investigated accidents ranging from the R-22 to the MD-82 and, most recently, the A-300. His participation as a reconstruction expert for the government in a recent case was instrumental in their winning a settlement of over 60 million dollars. He continues to carry an average of 12 to 17 cases at any given time.

March 2002

## EDWARD L. MONHOLLEN

**Areas of Expertise:**

      Aircraft accident reconstruction, fixed and rotary wing.
      Aircraft fire and explosion investigation.
      Aircraft handling qualities.
      Night vision flight techniques.
      Aircraft maintenance management.
      Human factors investigation.
      Risk assessment and management.
      Turbine engine investigation.
      Cockpit resource management.

**Education:**

      International Center for Safety Education, 1990
            Aircraft fire and explosion investigation
      Sikorsky Aircraft / Flight Safety International, 1988
            Pilot Familiarization, S-76B, UH-60A/L, CH-53E, SH-60B
      Transportation Safety Institute, 1984
            Rotorcraft Safety and Investigation
      Transportation Safety Institute, 1983
            FAA Basic and Advanced Accident Investigation
      Embry-Riddle Aeronautical University, 1975
            Bachelor of Science, Professional Aeronautics / Aviation Safety
            Management
      University of Southern California, 1971
            U.S. Army Safety Officer's Course, Aircraft and Vehicle Accident
            Investigation Certificate.

**Positions Held:**

      Edward Monhollen & Associates, San Antonio, Texas
            President and Accident Recontructionist, 1993 – Present

      Sikorsky Aircraft Division, Stratford, Connecticut
            Senior Airworthiness Engineer, 1987 – 1993

      U.S. Army, Fort Rucker, Alabama
            Major, Master Army Aviator, Accident Investigator, 1967 –1987

**Professional Affiliations:**

        International Society of Air Safety Investigators
                Member Number – M03023
        Transportation Safety Institute
                Former Associate Staff
        Army Aviation Association of America
                Former Alamo Chapter President
        Vietnam Helicopter Pilots Association
                Member

**Flight Experience:**

        Helicopter and Airplane Multi-engine Land, Instrument, Instructor
                Total time 3000+ hours.

| | |
|---|---|
| AS 350 D | T-41 |
| AH-1 | T-42 |
| B 204 / 205 | B-200/300 |
| B 206 | Schweizer 269 / 300 |
| CH-47D | MD-500 |
| CH-53E | UH-60 A/L |
| SH-60B | S-76 A/B |

**Awards and Decorations:**

        Meritorious Service Medal (1 Oak Leak Cluster)
        Air Medal with "V" device for Valor (16 Oak Leaf Clusters)
        Vietnam Service Medal with 3 Bronze Stars
        Republic of Vietnam Cross of Gallantry with Palm
        Master Army Aviator Badge

**Major Investigations:**

        Case Involvement available on request.

                                                    March 2002

# Case Involvement

## Edward Monhollen
### 1993 - Present

1993        Carberry, et al. v. Aerospatiale Helicopter Corporation
            U. S. District Court, Washington.        AS –350D,  Defense,

1993        Eagle Air v. Aerospatiale Helicopter Corporation.
            U. S. District Court, Washington.  AS-350D, Defense

1993        House v. United Technologies Corporation
            U. S. District Court of Southern California.  SH-60B, Defense.
            Gray, Cary, Frye, & Friedenrich..

1994        Slaven, et al.  v. United Technologies Corporation
            U. S. District Court, Arizona.  UH-60A.  Defense.
            Gust, Rosenfeld, & Henderson.

1996        Cary, et al.  v. Sikorsky Aircraft Division.(UTC)
            U. S. District Court, Kentucky.  S-76A, Defense,
            Neal & Harwell.

1996        Moore  v.  Bell Helicopter Company
            U. S. District Court, Louisana..  B-206B.  Plaintiff.
            Lambert & Nelson.

1996        Tower  v.  The United States
            U. S. District Court of Southern California.  SH-60B.  Defense.
            USDOJ, Robert A.K. Doehl.

1996        Johnson, et al.  v.  Bell Helicopter Company.
            U. S. District Court, Louisana..  B-206A.  Plaintiff.
            Lambert & Nelson.

1996        Federico  v.  The United States
            U. S. District Court of Southern California. Champion 7EC.  Defense.
            USDOJ, Mr. Robert A.K. Doehl

1996        California Helicopter v. The City of San Antonio.
            U. S. District Court of Southern Texas.  S-58.  Defense

1996        Through Transport v. Boeing
            U. S District Court of Maryland.  CH-47D.  Defense.
            Gardere & Wynne.

1997  Rollins v. The United States, et. al.
    U. S. District Court of Texas, Eastern District. Defense
    USDOJ

1997  Rudd v. The United States
    U. S. District Court of Alabama, Northern District. Defense
    USDOJ

1997  Deloach v. The United States
    U. S. District Court of Georgia. UH-60A. Defense.
    USDOJ

1997  Burnett v. Marathon Oil Company
    U.S. District Court of Louisiana. B-206B. Plaintiff.
    Lambert & Nelson

1999  Moss v. Bell Helicopter Textron et al.
    District Court of Galveston County Texas. B-206B. Plaintiff.
    Provost & Umphrey.

1999  Scott v. Altair, et al.
    District Court of Tarrant County Texas. PA 28-235. Plaintiff.
    Slack & Davis.

1999  Tiller v. Piper et al.
    District Court of Jefferson County Texas. PA60-602P. Plaintiff.
    Slack & Davis.

2000  USA ex rel. Brett Roby v. The Boeing Company.
    Southern District Court of Ohio. CH-47D (7 Accidents). Plaintiff.
    USDOJ. Frauds Division. Mr. Dennis Phillips

2000  Mclerran v. American Airlines.
    Circuit Court of Pulaski County Arkansas. MD-82. Plaintiff.
    Slack & Davis.

2001  William T. Miles, Jr. v. The United States of America. Beechcraft Queen
    Air. Defendant.. US District Court for the Southern District of Florida.
    USDOJ. Mr. Justin Chretien

2002  USA ex rel. Daniel Jordan v Northrop Grumman Corporation.
    United States District Court, Central District of California. BQM-74E
    Target Drone. Plaintiff.
    USDOJ. Frauds Division. Mr. Dennis Phillips.

## DATA CONSIDERED

1. JAGMAN Report, dated 16 Jun 99, of Aircraft Mishap, BUNO 162007, occurring on 19 Apr 99.
2. Deposition of Major Matthew J. Paul.
3. Deposition of LtCol David Samples.
4. Deposition of Mr. Glen L. Nowak