# ORIGINAL

46

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**JUN 2 5 2002**

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| KRISTA SALDANA, Individually and<br>as Representative of the ESTATE OF<br>DAVID SALDANA and as Next Friend<br>of JAGGER SALDANA | § § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| MELQUIADES SALDANA and<br>AURELIA SALDANA, | § § § | |
| Intervenors, | § § | Civil Action No. B-00-176 |
| v. | § § | |
| ITT INDUSTRIES, SIKORSKY<br>AIRCRAFT CORPORATION, a<br>Subsidiary of UNITED<br>TECHNOLOGIES CORPORATION, the<br>ESTATE OF LT. COL. MARC LEE<br>HOHLE and the ESTATE OF CAPTAIN<br>MATTHEW BRENT THOMAS, | § § § § § § § § § | |
| Defendants. | § § | |

## DEFENDANT SIKORSKY AIRCRAFT CORPORATION'S
## MOTION TO EXCLUDE PLAINTIFF'S AND INTERVENORS' EXPERT WITNESS
## EDWARD L. MONHOLLEN, JR. AND BRIEF IN SUPPORT

TO THE HONORABLE HILDA G. TAGLE, UNITED STATES DISTRICT JUDGE:

COMES NOW Sikorsky Aircraft Corporation, a subsidiary of United Technologies

Corporation ("Sikorsky"), one of the Defendants in the above-styled and numbered cause, and

files this its Motion to Exclude Plaintiff's and Intervenors' Expert Witness Edward L.

Monhollen, Jr. and Brief in Support and would respectfully show the Court the following:

# I.
## BACKGROUND/INTRODUCTION

Plaintiff and Intervenors (collectively referred to herein as "Plaintiff") allege liability on the part of Sikorsky for the death of Corporal David Saldana arising from the crash of a Marine Corps helicopter into the Pacific ocean near Okinawa, Japan on April 19, 1999.

On April 9, 2002, Plaintiff and Intervenors filed their Initial Designation of Experts. (*See* Plaintiffs' and Intervenors' Initial Designation of Experts, attached as Ex. A). In this designation, Plaintiff names Edward Monhollen and provides an expert report from Mr. Monhollen setting forth his opinions as to the cause of the accident at issue.

On June 3, 2002, Plaintiff noticed the deposition of Chris Lowenstein, a Sikorsky expert, to be taken on June 21, 2002. On June 17, 2002, counsel for Sikorsky received a letter from Ray Marchan, Plaintiff's counsel, advising that his expert, Ed Monhollen, would be attending such deposition. (*See* Letter from Plaintiff's counsel, dated June 17, 2002, attached as Ex. E and First Amended Notice of Intention to Take Video Deposition, attached as Ex. F).

Upon learning of Monhollen's attendance, Sikorsky's counsel, by letter dated June 18, 2002, objected to Monhollen's attendance and further advised Plaintiff's counsel of Sikorsky's concern with Monhollen's involvement in this case on behalf of Plaintiff. (*See* Letter from Sikorsky's counsel, dated June 18, 2002, attached as Ex. G). Counsel for Plaintiff elected not to proceed with the deposition of Sikorsky's expert without Monhollen present. (*See* Lowenstein Depo. pp. 6:24-7:3, Ex. H).

As is evidenced from Mr. Monhollen's Resume, attached to his report, Monhollen was employed with Sikorsky Aircraft as a senior airworthiness engineer from 1987 to 1993. In this position Monhollen participated in 19 accident investigations involving Sikorsky aircraft. (*See*

*Aff. of Cliff Parizo*, ¶ 4, Ex. B).  At least two of these investigations involved mishaps where night vision goggles were utilized ("NVGs") and two of these investigations involved H-53E aircraft – the aircraft at issue in this suit.  (*Aff. of Cliff Parizo*, ¶ 4, Ex. B).

Sikorsky respectfully submits that Monhollen be excluded from offering expert testimony for Plaintiff or from serving as a consulting expert in this matter for two reasons: (i)  Monhollen executed an Intellectual Property Agreement while employed with Sikorsky which prevents him from using, among other things, technical, proprietary or business information acquired while employed at Sikorsky except for Sikorsky's benefit. (*See Aff. of William R. Bowles*, ¶ 5, Ex. C); and (ii) as set forth in the recent opinion issued May 20, 2002 from the Second District Court of Appeals, Fort Worth, Texas, of *In re Bell Helicopter Textron, Inc., Bell Helicopter Textron, a Division of Textron Canada Ltd., and Textron, Inc.*, Monhollen's possession of confidential information about Sikorsky's litigation strategies and attorney work product precludes Monhollen from serving as an expert on behalf of Plaintiff in this matter.  *See In re Bell Helicopter Textron, Inc., et al.*, 2002 Tex. App. LEXIS 3656 (Tex.App.—Fort Worth May 20, 2002), Ex. D.

## II.
## ARGUMENT

**A.    The Intellectual Property Agreement Bars Monhollen's Participation**

On January 22, 1998, Monhollen executed an Intellectual Property Agreement with United Technologies Corporation (Sikorsky's parent corporation) wherein he agreed during and after his employment with Sikorsky, to not "use, publish, or otherwise disclose," except for Sikorsky's benefit, "any technical or business information developed by, for or at the expense" of Sikorsky, or assigned or entrusted to Sikorsky unless such information is generally known

outside of Sikorsky. (*See* Intellectual Property Agreement, attached to Aff. of William R.

Bowles, as Ex. C-1).

In his expert report, Monhollen makes the following statement:

> It has been my experience that the most frequently stated cause for NVG accidents has been 'Controlled flight into terrain or water.'

*See* Ex. A, Monhollen Report at p. 2.

Moreover, Monhollen's resume states:

> Mr. Monhollen was a Senior Airworthiness Engineer with Sikorsky Aircraft Division of United Technologies Corporation for 5 years before founding EMA in 1993. His primary duties involved the worldwide investigation of accidents involving Sikorsky helicopters, participation in the Products Safety Board, management of in-house engineering investigations, and safety audits of Sikorsky facilities. **These experiences provided Mr. Monhollen a broad understanding of the aircraft manufacturing process, an understanding of the responsibilities of a government contractor, and an in-depth knowledge of Sikorsky Helicopters.**

*See* Ex. A, Monhollen Resume at p. 1 (emphasis added).

In light of Monhollen's execution of the Intellectual Property Agreement, and his own

statements found in his report and resume, it is clear that Monhollen is utilizing technical and/or

business information acquired while employed at Sikorsky against Sikorsky in this matter, in

clear violation of the Agreement. Therefore, Sikorsky requests that Monhollen be excluded from

testifying on behalf of Plaintiff herein.

**B.     The Recent Opinion of *In re Bell Helicopter* Further Bars Monhollen's Participation**

The crux of the court's opinion in *In re Bell Helicopter* focused on Bell's attempt to

disqualify plaintiffs' trial counsel on the basis that plaintiffs' counsel employed as a consulting

expert a former Bell employee (Caren Vale) who knew a substantial amount of Bell's

confidential information concerning issues in the underlying lawsuit.[1]  The Second District Court of Appeals found that the consulting expert could not be "effectively screened" and thus, found that plaintiffs' counsel should be disqualified. *In re Bell Helicopter*, p. 1, <u>Ex. D</u>.

Just as Caren Vale did with Bell, as a Sikorsky accident investigator, Monhollen worked on numerous accidents involving various Sikorsky aircraft.  In this capacity, Monhollen worked with Sikorsky's in-house and outside counsel to develop legal strategies for defending against lawsuits that arose out some of these accidents. (*Aff. of Ron Bowles*, ¶ 4, <u>Ex. C</u>).

Moreover, Monhollen was trained on the procedures for investigating mishaps involving Sikorsky aircraft, including the CH-53E aircraft. (*Aff. of Clifford Parizo*, ¶ 6, <u>Ex. B</u>).  During on-site accident investigations, Sikorsky accident investigators frequently call the Sikorsky office to report the status of the investigation.  A representative from Sikorsky's legal department is oftentimes present during these telephone calls.  Once the investigator returns from an investigation, a debriefing is typically held at Sikorsky's offices. A representative from Sikorsky's legal department is usually present during these debriefings. (*Aff. of Clifford Parizo*, ¶¶ 7-8, <u>Ex. B</u>).

In *In re Bell*, when Bell's counsel discovered that Vale was to attend a deposition, they moved to quash the deposition and disqualify Vale as an expert. *Bell,* pp. 1-2.  The motion to quash was granted, but the court did not rule on Vale's disqualification.  Soon after, Bell moved to disqualify plaintiffs' counsel because of "Vale's possession of Bell's work product and confidential litigation information." *In re Bell*, p. 2.

---

[1]      In the *Bell* case, Bell sought to disqualify both plaintiffs' counsel and their expert.  Sikorsky, at this time, does not seek to disqualify Plaintiff's counsel, only Plaintiff's expert Monhollen.

Likewise, Sikorsky was first notified by letter from Plaintiff's counsel that Monhollen would be attending the deposition of Christopher Lowenstein, a Sikorsky expert, on June 17, 2002 (four days before said deposition – which had been noticed on June 1, 2002, by Plaintiff's counsel). (*See* Letter from Plaintiff's counsel, dated June 17, 2002, attached as Ex. E and First Amended Notice of Intention to Take Video Deposition, attached as Ex. F).

Upon learning of Monhollen's attendance, Sikorsky's counsel, by letter dated June 18, 2002, objected to Monhollen's attendance and further advised Plaintiff's counsel of Sikorsky's concern with Monhollen's involvement in this case on behalf of Plaintiff. (*See* Letter from Sikorsky's counsel, dated June 18, 2002, attached as Ex. G).

As previously noted, this lawsuit arises out of a crash of a CH-53E aircraft, manufactured by Sikorsky. The evidence establishes that Monhollen was present at meetings with Sikorsky's in-house and outside counsel where legal strategy related to various lawsuits was discussed. (*Aff. of William R. Bowles*, ¶ 4, Ex. C). Thus, just as in *In re Bell*, there is evidence that Monhollen was privy to confidential information about legal matters involving Sikorsky. *See In re Bell*, p. 3. Consequently, as with Vale in *In re Bell*, Monhollen should be subject to the "conclusive presumption that confidences and secrets about" Sikorsky's cases involving Sikorsky aircraft were imparted to him. *Id.* Additionally, just as with Vale, Monhollen cannot be effectively screened since Monhollen worked on litigation matters involving Sikorsky aircraft and is therefore, privy to Sikorsky's trial strategies and tactics.

In disqualifying plaintiffs' counsel, the *Bell* court found the following:

- When Vale worked for Bell, she obtained confidential information about the aircraft at issue in the suit.

- Vale also obtained confidential information about Bell's litigation strategies and attorney work product in lawsuits involving the aircraft at issue in the suit.

- Plaintiffs' counsel cannot effectively screen Vale since she would be required to work on the other side of litigation that is substantially related to litigation on which she previously worked.

*In re Bell*, p. 6.

Similarly, Sikorsky moves to exclude Monhollen based on facts comparable to those found by the *Bell* court.

- When Monhollen worked for Sikorsky, he obtained confidential information about the CH-53E aircraft at issue in this suit and how to investigate mishaps involving the CH-53E. In fact as shown, Monhollen was involved in at least two H-53E mishap investigations.

- Monhollen has also obtained confidential information about Sikorsky's litigation strategies and attorney work product in lawsuits involving Sikorsky aircraft.

- Plaintiff's counsel cannot effectively screen Monhollen since he would be working on litigation adverse to Sikorsky.

Based upon the foregoing facts and circumstances, Sikorsky requests that Monhollen be excluded from providing expert testimony for Plaintiff or from consulting with Plaintiff in any manner in this suit. Monhollen's participation as an expert for Plaintiff would constitute a breach of his Intellectual Property Agreement with Sikorsky, would be a conflict of interest based upon his prior employment with Sikorsky and would be highly prejudicial.

WHEREFORE, Defendant Sikorsky Aircraft Corporation respectfully prays that its Motion to Exclude Plaintiff's Expert Witness be granted, and that Sikorsky be granted such other and further relief, at law or in equity, as the Court may deem appropriate.

Respectfully submitted,

By: _____

ROBERT F. RUCKMAN
Attorney-in-Charge
State Bar No. 17367000
Southern District Bar No. 12018

STUART B. BROWN, JR.
Of Counsel
State Bar No. 24006914
Southern District Bar No. 23545

**JACKSON WALKER L.L.P.**
901 Main Street, Suite 6000
Dallas, Texas 75202
Telephone:    (214) 953-6000
Telecopy:    (214) 953-5822

ATTORNEYS FOR DEFENDANT SIKORSKY
AIRCRAFT CORPORATION, A SUBSIDIARY OF
UNITED TECHNOLOGIES CORPORATION

## <u>CERTIFICATE OF CONFERENCE</u>

On June 21, 2002, Counsel for movant held a conference with respondent's counsel regarding the merits of this motion.    Agreement could not be reached.    Therefore, it is submitted to the Court for a determination.

_____
Robert F. Ruckman

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of June, 2002, a true and correct copy of the above and foregoing document was served on all counsel of record:

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Ray R. Marchan
WATTS & HEARD, P.C.
1926 E. Elizabeth
Brownsville, Texas 78520
**ATTORNEY FOR PLAINTIFF**

**Via Certified Mail**
**Return Receipt Requested**
Joe Valle
Attorney at Law
1120 East 10th Street
Brownsville, Texas 78520
**ATTORNEY FOR INTERVENORS**

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Ron A. Sprague
GENDRY & SPRAGUE, P.C.
645 Lockhill Selma
San Antonio, TX 78216-5057
**ATTORNEY FOR ITT INDUSTRIES, INC.**

Robert F. Ruckman

**DEFENDANT SIKORSKY AIRCRAFT CORPORATION'S**
**MOTION TO EXCLUDE PLAINTIFF'S AND INTERVENOR'S**
**EXPERT WITNESS EDWARD L. MONHOLLEN, JR. AND BRIEF IN SUPPORT** – Page 9

3172462v2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| KRISTA SALDANA, INDIVIDUALLY | ß | |
| AND AS REPRESENTATIVE OF | ß | |
| THE ESTATE OF DAVID SALDANA | ß | |
| AND AS NEXT FRIEND OF JAGGER | ß | |
| SALDANA | ß | |
| PLAINTIFFS | ß | |
| | ß | |
| | ß | CIVIL ACTION NO. B-00-176 |
| | ß | |
| ITT INDUSTRIES, INC., SIKORSKY | ß | |
| AIRCRAFT CORPORATION, A | ß | |
| SUBSIDIARY OF UNITED | ß | |
| TECHNOLOGIES CORPORATION, | ß | |
| THE ESTATE OF LT. COL. MARC | ß | |
| LEE HOHLE AND THE ESTATE OF | ß | |
| CAPTAIN MATTHEW BRENT THOMAS | ß | |
| | ß | |
| DEFENDANTS | ß | |

## PLAINTIFFS' AND INTERVENORS' INITIAL DESIGNATION OF EXPERTS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME, Plaintiffs and Intervenors by and through their attorneys of record, and respectfully file these their supplemental designation of experts as follows:

> Edward Monhollen & Associates
> Consultants in Aviation Safety
> 13438 Bandera Road
> Suite 105A
> Helotes, Texas   78023
> (210) 695-5810
> (210) 695-5811   Fax

Is expected to testify regarding aircraft safety and accident reconstruction. Attached to this designation is Mr. Monhollen's expert report, resume and list of previous testimony.



DEFENDANT'S EXHIBIT A

## CROSS-DESIGNATION OF EXPERTS

Plaintiffs hereby cross-designate and state that they may call any expert identified or designated by an adverse party or an employee or representative of an adverse party to elicit expert opinions subject to any objections Plaintiffs make concerning the designation of experts.

## DESIGNATION OF MEDICAL DOCTORS & NURSES

In addition to the above designations, Plaintiffs refer you to the medical records and nurses notes, from which the identities of medical doctors and nurses may be determined. Plaintiffs hereby designate such doctors, nurses and caregivers as experts who may be called to testify as expert witnesses at the time of trial to prove up the reasonableness and medical necessity of Plaintiffs' expenses.

Respectfully submitted on this the ___9___ day of April, 2002.

WATTS & HEARD, L.L.P.
1926 E. Elizabeth
Brownsville, Texas  78520
(956)  544-0500
(956) 541-0255   Fax


RAY R. MARCHAN
For the Firm
State Bar No. 12969050
Federal I.D. No. 9522
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this the __9__ day of April, 2002, a true and correct copy of the foregoing instrument was delivered to opposing counsel by hand-delivery, via fax or by certified mail, return receipt requested.

_____
RAY R. MARCHAN



# Edward Monhollen & Associates

Consultants in Aviation Safety

**REPORT OF FINDINGS AND OPINIONS**
**Krista Saldana, et al. vs. ITT Industries, et al.**
**CH-53E Helicopter Accident of 19 April 1999**
**BUNO 162007**

**A.  GENERAL:** The following report is submitted in compliance with Rule 26 (a) (2) (A)- (B) of the Federal Rules of Civil Procedure pertaining to the expert testimony the author expects to present in the above stated case.

**B.  BACKGROUND:** I have been retained by the firm of Watts & Heard, L.L.P. to review the facts and circumstances surrounding the above stated accident and to provide my opinions as to the cause(s) of the accident.

**C.  WITNESS QUALIFICATIONS:** My resume is attached as enclosure 1.

**D.  COMPENSATION:** My hourly fee is $125.00. Additionally, I charge $1,200.00 per day for deposition and trial testimony.

**E.  PREVIOUS TESTIMONY:** A list of my case involvement for the past 4 years is attached as enclosure 2.

**F.  DATA CONSIDERED:** I have reviewed the relevant portions of the documents listed at enclosure 3 in forming my opinions.

**G.  SUMMARY OF ACCIDENT:** The mishap flight was to be a low light level (LLL), night vision goggle (NVG) training flight using approved NVG routes and training areas within the vicinity of Okinawa. The forecast weather for the mission was 1000 feet overcast and 3 miles visibility with light rain in the vicinity. The flight was properly briefed and proceeded without incident until their planned landing at Fire Base Jones. Neither aircrew could identify the intended landing area, so the flight continued as planned with Tiger 03 still leading the section. A lead change was scheduled at Fire Base Jones while on the ground, but since the section did not land, Tiger 03 was still in the lead as the flight turned south over water and paralleled the coast of Okinawa. Deteriorating weather to south necessitated a return by the northern route, so the aircrews coordinated the 180 degree turn with a lead change. Tiger 07, the mishap aircraft, was to begin his turn followed by Tiger 03, who would then join on Tiger 07 to complete the lead change. Tiger 07 was observed to begin his turn to the left, toward the open sea, and as he passed through the six o'clock position of Tiger 03, he began his turn to the left. The aircrew of Tiger 03 then

observed a bright flash of light as Tiger 07 impacted the water. All four crewmembers were fatally injured on impact and the aircraft destroyed.

## H. SUMMARY OF EXPECTED TESTIMONY:

1. Opinion: That the turn to the left toward the open sea and away from the cultural lighting greatly increased the difficulty of the maneuver, but should have been within LtCol Hohle's capabilities.

   Bases: While Captain Thomas was participating in his first LLL mission, LtCol Hohle had accumulated over 300 hours of NVG flight with 79 hours being in LLL conditions. He was also a designated Night Systems Instructor and apparently comfortable with the conditions that night, since he had raised no concerns with the exception of the southern route weather. An argument can be made that LtCol Hohle was distracted, having now to assume the section navigational duties, but I believe this to be unlikely, as well. Finding of fact #99 in the JAGMAN report places Tiger 03 at 500 feet and 100 knots prior to the lead change. Major Paul, on page 48 of his deposition stated that only 12 seconds elapsed from the start of Tiger 07's turn until impact. That translates to an average rate of descent of 2,500 feet per minute; hardly the "gradual loss of altitude" referred to in LtCol Samples deposition as being difficult to perceive with NVG's. This rate of descent would require a substantial reduction in collective pitch to achieve; it would not go unnoticed by the other crewmembers.

2. Opinion: That the "Low" warning light on the radar altimeter is inadequate to alert NVG pilots to the fact that they are descending below their selected altitude. The manufacturer should have incorporated an aural warning at the same time NVG cockpit compatible lighting was installed.

   Bases: LtCol Samples, the Staff Judge Advocate Investigating Officer, and the author of the JAGMAN report, expresses this same opinion on page 23 of his report and again in his deposition. It has been my experience that the most frequently stated cause for NVG accidents has been "Controlled flight into terrain or water". I'm certain that this will be borne out by statistics gathered from the military data bases; a topic addressed in the paragraphs to follow. Regardless, a manufacturer has the responsibility to warn operators of their products when a situation exists that could result in damage to the aircraft or injury to crew and/or passengers. In this case, Sikorsky Aircraft was certainly aware the NVG were in use in the H-53E helicopters; NVG cockpit compatible lighting bares that out. Further, Sikorsky has access to the same databases that we do, if fact, they participate in the on-site accident investigations. They must be cognizant of the fact that even with radar altimeters installed, controlled flight into terrain or water continues as a major causal factor in NVG related accidents. It doesn't seem a giant step to conclude that the current warning system is inadequate in preventing such occurrences.

Report, Edward Monhollen                3

**I. DISCUSSION:** My investigation is incomplete and has been hampered by unreasonable response times to Freedom of Information Act (FOIA) requests and the lack of sufficient time to coordinate an examination of the aircraft wreckage. Both of these problems have impacted my investigation and could affect my opinions regarding the cause of this accident.

1. FOIA Response Times: On 4 February 2002, my office submitted an FOIA request to the U.S. Navy Safety Center for the releasable portions of the Mishap Investigation Report (MIR). We have yet to receive the report and subsequent inquiries have generated the response that they are running approximately one year behind in responding to FOIA requests at the Navy Safety Center. This report is significant in that it normally is much more detailed in damage description and contains more photographic evidence; especially with respect to the aircraft's major components, than the separately written JAGMAN report. The absence of this report becomes more significant when the aircraft wreckage is not reasonably available for examination, particularly with respect to known mechanical deficiencies that have caused previous aircraft accidents (see paragraph I.2, below). Another outstanding FOIA request has prevented me from confirming known NVG related cause factors pertinent to this case.

2. Wreckage Examination: I have yet to examine the wreckage of this aircraft. This has recently taken on added significance both because I have not seen the MIR and I have become aware of a mechanical deficiency that has resulted in 3 other H-53E accidents. The deficiency involves the duplex bearing assembly in the helicopter's swashplate. This bearing has failed at least 3 times in the past and went completely unnoticed in one accident by both government and Sikorsky investigators until 1 year after the fatal crash of a CH-53E at the Sikorsky plant in May 96. The latest of these failures occurred off the coast of Corpus Christi, TX in August 00. The damage description in the JAGMAN report, including photographs, with respect to the main rotor system and swashplate assembly, is insufficient to allow me to rule out duplex bearing failure as a cause of this accident. In fact, some consistencies with respect to rates of descent and impact angle tend to strengthen my suspicions.

Until I can conclusively rule out duplex bearing failure as causative in this accident, I can offer no further opinions in this accident. However, in the course of ongoing discovery in this matter, should additional substantive information be gained, the above conclusions or their bases may be supplemented, amended, or abandoned depending on the nature of the discovery.

**J. EXHIBITS:** I expect to use the following exhibits at trial:

1. Various photos and diagrams.
2. Aircraft models and/or computer simulations.

Report, Edward Monhollen                    4

April 1, 2002
Respectfully submitted,

EDWARD MONHOLLEN & ASSOCIATES
Edward Monhollen
President

Enclosures



# Edward Monhollen & Associates
## Consultants in Aviation Safety

### EDWARD L. MONHOLLEN
### AIRCRAFT ACCIDENT RECONTRUCTION

Mr. Monhollen is an aircraft accident reconstruction expert and president of Edward Monhollen & Associates (EMA), an aviation safety consulting firm. EMA is a multi-faceted company that provides a wide range of services to legal firms, insurance companies, government agencies, manufacturers, and trade organizations. These services include accident reconstruction, 3D animation, trial exhibit construction, and audio/visual services. EMA capabilities are supplemented by other respected facilities that provide technical support in disciplines such as metallurgical, materials, and mechanical engineering services. Projects ranging from the simplest aviation accident to complex investigations involving commercial airliners or hundreds of accidents with similar causes are undertaken.

Mr. Monhollen was a Senior Airworthiness Engineer with Sikorsky Aircraft Division of United Technologies Corporation for 5 years before founding EMA in 1993. His primary duties involved the worldwide investigation of accidents involving Sikorsky helicopters, participation in the Products Safety Board, management of in-house engineering investigations, and safety audits of Sikorsky facilities. These experiences provided Mr. Monhollen a broad understanding of the aircraft manufacturing process, an understanding of the responsibilities of a government contractor, and an in-depth knowledge of Sikorsky Helicopters. He was involved with investigations of electromagnetic interference (EMI) affects on aircraft systems, transmissions and drive components, composite materials, engines, component non-volatile memory, and cockpit voice recorder and flight data recorder analysis. Each major investigation entailed a review of the operators' maintenance forms, records, and procedures, aircrew training, standardization, crew selection, and qualification. Mr. Monhollen also participated in aircraft accident investigations involving products manufactured by Pratt & Whitney and Hamilton Standard, both divisions on United Technologies Corporation.

Mr. Monhollen has over 30 years experience in aviation safety, beginning with his designation as a Army Aviator in 1968. His military career spanned 20 years, culminating with his retirement as a Major in 1987. He is a highly decorated veteran of Vietnam having flown over 900 hours of combat time in helicopters. His combat tour

was cut short when he was involved in the crash of a UH-1B helicopter gunship. He spent one year recovering from the injuries sustained in the crash. This was followed by his assignment as an instructor pilot at the Army's Primary Helicopter School, attendance at the Army Safety Officer's Course, completion of his Bachelor of Science degree, and ultimately his assignment as a Board President, investigating accidents for the Department of the Army. Upon his retirement, he held the following ratings: Commercial, Multi-engine, Airplane, Instrument and Commercial, Rotorcraft, CFII with over 3000 hours of total flight time.

Mr. Monhollen has investigated over 500 aviation accidents and has qualified in court as an expert in aircraft accident reconstruction and aviation maintenance management. He has investigated accidents ranging from the R-22 to the MD-82 and, most recently, the A-300. His participation as a reconstruction expert for the government in a recent case was instrumental in their winning a settlement of over 60 million dollars. He continues to carry an average of 12 to 17 cases at any given time.

March 2002

## EDWARD L. MONHOLLEN

**Areas of Expertise:**

       Aircraft accident reconstruction, fixed and rotary wing.
       Aircraft fire and explosion investigation.
       Aircraft handling qualities.
       Night vision flight techniques.
       Aircraft maintenance management.
       Human factors investigation.
       Risk assessment and management.
       Turbine engine investigation.
       Cockpit resource management.

**Education:**

       International Center for Safety Education, 1990
           Aircraft fire and explosion investigation
       Sikorsky Aircraft / Flight Safety International, 1988
           Pilot Familiarization, S-76B, UH-60A/L, CH-53E, SH-60B
       Transportation Safety Institute, 1984
           Rotorcraft Safety and Investigation
       Transportation Safety Institute, 1983
           FAA Basic and Advanced Accident Investigation
       Embry-Riddle Aeronautical University, 1975
           Bachelor of Science, Professional Aeronautics / Aviation Safety
           Management
       University of Southern California, 1971
           U.S. Army Safety Officer's Course, Aircraft and Vehicle Accident
           Investigation Certificate.

**Positions Held:**

       Edward Monhollen & Associates, San Antonio, Texas
           President and Accident Recontructionist, 1993 – Present

       Sikorsky Aircraft Division, Stratford, Connecticut
           Senior Airworthiness Engineer, 1987 – 1993

       U.S. Army, Fort Rucker, Alabama
           Major, Master Army Aviator, Accident Investigator, 1967 –1987

**Professional Affiliations:**

  International Society of Air Safety Investigators
    Member Number – M03023
  Transportation Safety Institute
    Former Associate Staff
  Army Aviation Association of America
    Former Alamo Chapter President
  Vietnam Helicopter Pilots Association
    Member

**Flight Experience:**

  Helicopter and Airplane Multi-engine Land, Instrument, Instructor
    Total time 3000+ hours.

| | |
|---|---|
| AS 350 D | T-41 |
| AH-1 | T-42 |
| B 204 / 205 | B-200/300 |
| B 206 | Schweizer 269 / 300 |
| CH-47D | MD-500 |
| CH-53E | UH-60 A/L |
| SH-60B | S-76 A/B |

**Awards and Decorations:**

  Meritorious Service Medal (1 Oak Leak Cluster)
  Air Medal with "V" device for Valor (16 Oak Leaf Clusters)
  Vietnam Service Medal with 3 Bronze Stars
  Republic of Vietnam Cross of Gallantry with Palm
  Master Army Aviator Badge

**Major Investigations:**

  Case Involvement available on request.

               March 2002

# Case Involvement

## Edward Monhollen
### 1993 - Present

1993        Carberry, et al. v. Aerospatiale Helicopter Corporation
           U. S. District Court, Washington.      AS –350D,  Defense,

1993        Eagle Air v. Aerospatiale Helicopter Corporation.
           U. S. District Court, Washington.  AS-350D, Defense

1993        House v. United Technologies Corporation
           U. S. District Court of Southern California.  SH-60B, Defense.
           Gray, Cary, Frye, & Friedenrich..

1994        Slaven, et al.  v. United Technologies Corporation
           U. S. District Court, Arizona.  UH-60A.  Defense.
           Gust, Rosenfeld, & Henderson.

1996        Cary, et al.  v. Sikorsky Aircraft Division.(UTC)
           U. S. District Court, Kentucky.  S-76A, Defense,
           Neal & Harwell.

1996        Moore  v.  Bell Helicopter Company
           U. S. District Court, Louisana..  B-206B.  Plaintiff.
           Lambert & Nelson.

1996        Tower  v.  The United States
           U. S. District Court of Southern California.  SH-60B.  Defense.
           USDOJ, Robert A.K. Doehl.

1996        Johnson, et al.  v.  Bell Helicopter Company.
           U. S. District Court, Louisana..  B-206A.  Plaintiff.
           Lambert & Nelson.

1996        Federico  v.  The United States
           U. S. District Court of Southern California. Champion 7EC.  Defense.
           USDOJ, Mr. Robert A.K. Doehl

1996        California Helicopter v. The City of San Antonio.
           U. S. District Court of Southern Texas.  S-58.  Defense

1996        Through Transport v. Boeing
           U. S District Court of Maryland.  CH-47D.  Defense.
           Gardere & Wynne.

| 1997 | Rollins v. The United States, et. al.<br>U. S. District Court of Texas, Eastern District. Defense<br>USDOJ |
|---|---|
| 1997 | Rudd v. The United States<br>U. S. District Court of Alabama, Northern District. Defense<br>USDOJ |
| 1997 | Deloach v. The United States<br>U. S. District Court of Georgia. UH-60A. Defense.<br>USDOJ |
| 1997 | Burnett v. Marathon Oil Company<br>U.S. District Court of Louisiana. B-206B. Plaintiff.<br>Lambert & Nelson |
| 1999 | Moss v. Bell Helicopter Textron et al.<br>District Court of Galveston County Texas. B-206B. Plaintiff.<br>Provost & Umphrey. |
| 1999 | Scott v. Altair, et al.<br>District Court of Tarrant County Texas.  PA 28-235. Plaintiff.<br>Slack & Davis. |
| 1999 | Tiller v. Piper et al.<br>District Court of Jefferson County Texas. PA60-602P. Plaintiff.<br>Slack & Davis. |
| 2000 | USA ex rel. Brett Roby v. The Boeing Company.<br>Southern District Court of Ohio.  CH-47D (7 Accidents). Plaintiff.<br>USDOJ. Frauds Division. Mr. Dennis Phillips |
| 2000 | Mclerran v. American Airlines.<br>Circuit Court of Pulaski County Arkansas.  MD-82. Plaintiff.<br>Slack & Davis. |
| 2001 | William T. Miles, Jr. v. The United States of America.  Beechcraft Queen<br>Air.  Defendant..  US District Court for the Southern District of Florida.<br>USDOJ.  Mr. Justin Chretien |
| 2002 | USA ex rel. Daniel Jordan v Northrop Grumman Corporation.<br>United States District Court, Central District of California.  BQM-74E<br>Target Drone. Plaintiff.<br>USDOJ. Frauds Division. Mr. Dennis Phillips. |

## DATA CONSIDERED

1   JAGMAN Report, dated 16 Jun 99, of Aircraft Mishap, BUNO 162007, occurring on
19 Apr 99.
2   Deposition of Major Matthew J. Paul.
3.  Deposition of LtCol David Samples.
4   Deposition of Mr. Glen L. Nowak

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| KRISTA SALDANA, Individually and<br>as Representative of the ESTATE OF<br>DAVID SALDANA and as Next Friend<br>of JAGGER SALDANA | § § § § § | |
|      Plaintiff, | § § | |
| v. | § § | |
| MELQUIADES SALDANA and<br>AURELIA SALDANA, | § § § | |
|      Intervenors, | § § | Civil Action No. B-00-176 |
| v. | § § | |
| ITT INDUSTRIES, SIKORSKY<br>AIRCRAFT CORPORATION, a<br>Subsidiary of UNITED<br>TECHNOLOGIES CORPORATION, the<br>ESTATE OF LT. COL. MARC LEE<br>HOHLE and the ESTATE OF CAPTAIN<br>MATTHEW BRENT THOMAS, | § § § § § § § § | |
|      Defendants. | § § | |

## AFFIDAVIT OF CLIFFORD A. PARIZO

| | |
|---|---|
| STATE OF CONNECTICUT | § § |
| COUNTY OF FAIRFIELD | § |

BEFORE ME, the undersigned authority, on this day personally appeared Clifford A. Parizo, and after being duly sworn by me stated as follows:

1.     My name is Clifford A. Parizo. I am over the age of eighteen and fully competent and authorized to make this Affidavit. The following facts and circumstances are within my



personal knowledge, based upon my experiences and documents reviewed by me, and are true and correct.

2.      I am currently Manager of Product Safety – Processes and Metrics for Sikorsky Aircraft Corporation ("Sikorsky"). I have been employed with Sikorsky for over 25 years.

3.      I worked for Sikorsky during the period of time when Edward L. Monhollen, Jr. was also employed as an accident investigator in my department.

4.      Attached hereto as Exhibit B-1, is a summary I prepared detailing the various mishap investigations and seminars attended by Mr. Monhollen during his employment with Sikorsky. This summary establishes that Mr. Monhollen participated in 19 on-site mishap investigations for Sikorsky. Of these investigations, two involved the H-53E helicopter and two involved accidents that occurred while utilizing night vision goggles.

5.      As a Sikorsky employee, Mr. Monhollen was involved in litigation support on behalf of Sikorsky.

6.      During his tenure at Sikorsky, Mr. Monhollen became familiar with Sikorsky's methods for investigating mishaps involving Sikorsky aircraft (including the CH-53E) as well as other non-Sikorsky aircraft.

7.      During on-site accident investigations, the investigator will frequently call the Sikorsky office to report the status of the investigation. A representative from Sikorsky's legal department is oftentimes present during these telephone calls.

8.      Additionally, once the investigator returns from an accident investigation, a debriefing is typically held at Sikorsky's offices. A representative from Sikorsky's legal department is usually present during these debriefings.

**AFFIDAVIT OF CLIFFORD A. PARIZO** - Page 2

Further Affiant sayeth not.

_Cliff A. Parizo_____
Clifford A. Parizo

SUBSCRIBED AND SWORN TO BEFORE ME on this 24 day of June, 2002.

_Nancy Marcho_____
Notary Public State of Connecticut

_Nancy Marcho_____
Typed or Printed Name of Notary

My Commission Expires:

_____

My Commission Expires 10/31/06

**AFFIDAVIT OF CLIFFORD A. PARIZO - Page 3**

**Travel History for Edward L. Monhollen Jr.**

| From | Until | To | Purpose |
|------|-------|-----|---------|
| 10/7/87 | 10/7/87 | -- | First Day at Sikorsky |
| 10/27/87 | 10/29/87 | Dallas, TX | DOT Presentation |
| 12/8/87 | 12/10/87 | Dallas, TX | DOT Presentation |
| 1/5/88 | 1/7/88 | Columbus, OH | S-76 Mishap Investigation |
| 1/22/88 | 1/26/88 | Franklin, VA | MH-53E Mishap Investigation |
| 1/27/88 | 1/31/88 | Ft Stewart, GA | UH-60A Mishap Investigation |
| 1/31/88 | 2/2/88 | Dallas, TX | DOT Presentation |
| 3/9/88 | 3/17/88 | Ft Campbell, KY | Mishap Investigation |
| 4/7/88 | 4/10/88 | Ft Rucker, AL | US Army Safety Center Meeting |
| 4/19/88 | 4/21/88 | Dallas, TX | DOT Presentation |
| 5/14/88 | 5/20/88 | Charlotte, NC | UH-60A Mishap Investigation (85-24419) |
| 6/5/88 | 6/11/88 | Tempe, AZ | Fire & Explosion Course |
| 6/21/88 | 6/24/88 | Troy, AL | UH-60A Engine Teardown - ref. 1/27/88 Stewart |
| 7/16/88 | 8/12/88 | Aberdeen, Scotland | S-61N North Sea Mishap Investigation |
| 9/14/88 | 9/19/88 | London, England | S-61N North Sea Mishap Investigation (BIH) |
| 9/29/88 | 10/1/88 | Tustin, CA | CH-53E Mishap Investigation |
| 10/12/88 | 10/15/88 | Ft Bragg, NC | Mishap Investigation |
| 10/18/88 | 10/20/88 | Dallas, TX | DOT Presentation |
| 11/14/88 | 11/22/88 | Aberdeen, Scotland | S-61N North Sea Mishap Investigation (G-BDES) |
| 1/17/89 | 1/21/89 | Mayport, FL | SH-60B Mishap Investigation (ref. 12/14/88 Brunswick, ME) |
| 1/25/89 | 1/27/89 | Lynn,  MA | SH-60B Engine Teardown (ref. 12/14/88 Brunswick, ME) |
| 1/31/89 | 2/2/89 | Mayport, FL | SH-60B Mishap Investigation (ref. 12/14/88 Brunswick, ME) |
| 4/9/89 | 4/22/89 | WPB, FL | S-76 Pilot Fam Course - Flight Safety International |
| 5/1/89 | 5/2/89 | Lynn,  MA | Meet with GE and AAIB on BIH S-61N Mishap (G-BEID) |
| 7/1/89 | 7/8/89 | North Island, CA | SH-60B Mishap Investigation (163236) |
| 8/8/89 | 8/10/89 | Pensacola, FL | SH-60B Mishap Investigation (163236) |
| 8/10/89 | 8/12/89 | Ft Rucker, AL | UH-60A Mishap Investigation (Guatemala 80-23504) |
| 10/18/89 | 10/20/89 | Dallas, TX | DOT Presentation |
| 11/7/89 | 11/8/89 | Dallas, TX | DOT Presentation |
| 1/10/90 | 1/19/90 | Ft Irwin, CA | UH-60A Mishap Investigation (89-26144) |
| 1/20/90 | 1/29/90 | CCAD, TX | UH-60A Mishap Investigation (89-26144) |
| 2/11/90 | 2/16/90 | CCAD, TX | UH-60A Mishap Investigation (89-26144) |
| 3/11/02 | 3/13/02 | Dallas, TX | DOT Presentation |
| 5/15/90 | 5/18/90 | Panama City, Panama | MH-60A Mishap Investigation (84-23997) |
| 5/19/90 | 5/25/90 | CCAD, TX | MH-60A Mishap Investigation (84-23997) |
| 6/20/90 | 6/25/90 | Monterrey, Mexico | NTSB/DGAC Mishap Investigation Course on CRS |
| 7/31/90 | 8/3/90 | London, England | S-61 Mishap Investigation (G-BEWL 25 July 90) |
| 10/10/90 | 10/15/90 | Ft Rucker, AL | Investigation of SSSI Refueling Fire |
| 10/17/90 | 10/19/90 | Dallas, TX | DOT Presentation |
| 11/5/90 | 10/7/90 | Dallas, TX | DOT Presentation |
| 1/31/91 | 2/1/91 | Pensacola, FL | Litigation Support - SH-60B Pt Loma (House vs. UTC) |
| 2/26/91 | 2/28/91 | Dallas, TX | DOT Presentation |
| 4/17/91 | 4/20/91 | Princeton, NJ | S-76A Mishap Investigation (760286 - Dow Jones) |
| 6/19/91 | 6/20/91 | Toronto, Canada | EMB-120 Mishap Investigations (DHC-8 and ATR-42) |
| 8/15/91 | 8/16/91 | Washington DC | EMB-120 Mishap Investigation |
| 9/11/91 | 9/17/91 | Houston, TX | EMB-120 Miahap Investigation (Continental Express) |
| 2/26/92 | 3/9/92 | Malatya, Turkey | S-70C Mishap Investigation (TLF 701614) |
| 4/7/92 | 4/12/92 | Ft Rucker, AL | Litigation Support - SSSI vs. St. Francis |
| 8/7/92 | 8/15/92 | Frankfort, KY | S-76A Mishap Investigation (760059 - State of Kentucky) |
| 8/24/92 | 8/26/92 | Washington DC | S-76A Mishap Investigation (760059 - State of Kentucky) |
| 11/6/92 | 11/6/92 | -- | Last Day at Sikorsky |

DEFENDANT'S EXHIBIT B-1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

KRISTA SALDANA, Individually and   §
as Representative of the ESTATE OF   §
DAVID SALDANA and as Next Friend   §
of JAGGER SALDANA   §
  §
    Plaintiff,   §
  §
v.   §
  §
MELQUIADES SALDANA and   §
AURELIA SALDANA,   §
  §
    Intervenors,   §     Civil Action No. B-00-176
  §
v.   §
  §
ITT INDUSTRIES, SIKORSKY   §
AIRCRAFT CORPORATION, a   §
Subsidiary of UNITED   §
TECHNOLOGIES CORPORATION, the   §
ESTATE OF LT. COL. MARC LEE   §
HOHLE and the ESTATE OF CAPTAIN   §
MATTHEW BRENT THOMAS,   §
  §
    Defendants.   §

## AFFIDAVIT OF WILLIAM R. BOWLES

STATE OF CONNECTICUT   §
  §
COUNTY OF FAIRFIELD   §

BEFORE ME, the undersigned authority, on this day personally appeared William R.

Bowles, and after being duly sworn by me stated as follows:

1.    My name is William R. Bowles.  I am over the age of eighteen and fully

competent and authorized to make this Affidavit.  The following facts and circumstances are

**AFFIDAVIT OF WILLIAM R. BOWLES - Page 1**



within my personal knowledge, based upon my experiences and documents reviewed by me, and are true and correct.

2.      I am currently Associate General Counsel for Sikorsky Aircraft Corporation ("Sikorsky"). I have been employed with Sikorsky for over 20 years.

3.      I worked for Sikorsky during the period of time when Edward L. Monhollen, Jr. was also employed.

4.      As an accident investigator, Mr. Monhollen was present at numerous meetings with Sikorsky's in-house and outside counsel where legal strategy relating to various lawsuits was discussed.  In some instances, Mr. Monhollen assisted in-house and outside counsel in developing legal strategies for defending against lawsuits arising out of accidents involving Sikorsky aircraft.

5.      Moreover, Mr. Monhollen executed an Intellectual Property Agreement with United Technologies Corporation (Sikorsky's parent corporation) wherein he agreed not to utilize, among other things, technical, proprietary or business information acquired while employed at Sikorsky except for Sikorsky's benefit. A true and correct copy of this Intellectual Property Agreement is attached hereto as Exhibit C-1.

6.      All Sikorsky accident investigators participate in presentations offered by the legal department which familiarize the investigators with the legal process (depositions, discovery, procedural rules, etc.) and Sikorsky's internal policies and procedures for assisting its counsel in defending claims brought against Sikorsky.

Further Affiant sayeth not.

William R. Bowles

**AFFIDAVIT OF WILLIAM R. BOWLES** - Page 2

SUBSCRIBED AND SWORN TO BEFORE ME on this 24 day of June, 2002.

Notary Public State of Connecticut

Typed or Printed Name of Notary

My Commission Expires:

_____

My Commission Expires 10/31/06

**AFFIDAVIT OF WILLIAM R. BOWLES** - Page 3

## INTELLECTUAL PROPERTY AGREEMENT

As an employee of UNITED TECHNOLOGIES CORPORATION, or any of its direct or indirect subsidiaries, their successors or assigns (hereinafter referred to collectively as the EMPLOYER), I, the EMPLOYEE named below, agree as follows:

1. Unless the EMPLOYER has acquired specific authorization, I will not disclose to or use in my work with the EMPLOYER any proprietary information of others, including any of my prior employers.

2. I will not, either during or after my employment, use, publish or otherwise disclose, except for the EMPLOYER's benefit in the course of such employment, any technical or business information developed by, for or at the expense of the EMPLOYER, or assigned or entrusted to the EMPLOYER by me or anyone else, unless such information is generally known outside of the EMPLOYER; and I will deliver to or leave with the EMPLOYER all written and other materials containing such information upon termination of my employment.

3. I agree that all trade secrets, all inventions, all works of authorship (including illustrations, writings, mask works, software and computer programs), and all other business or technical information created or conceived by me, either alone or with others, while employed by the EMPLOYER and related to the existing or contemplated business or research of the EMPLOYER or resulting from my work with the EMPLOYER, belong to the EMPLOYER. Until proven otherwise, any invention shall be presumed to have been conceived during such employment if within one (1) year after termination of such employment it is disclosed to others, or it is completed, or it has a patent application filed thereon.

4. I will promptly disclose to the EMPLOYER all trade secrets, inventions, works of authorship, and information which belong to the EMPLOYER under paragraph 3 above; and I will assign to the EMPLOYER, or to others as directed by the EMPLOYER, all of my interest in such inventions and works of authorship, and I will execute any papers and do any acts which the EMPLOYER may consider necessary to secure to it any and all rights relating to such inventions and works of authorship, including all patents and copyrights (and renewals thereof) in any country.

5. I understand that the EMPLOYER agrees to pay to me, in addition to my salary and wages, the sum of One Hundred Dollars ($100.00) upon the granting of a United States Patent on an invention assigned under the provisions of paragraph 4.

This Agreement shall become effective immediately upon and in consideration of my receiving a promotion or an increase in salary or wages subsequent to the date executed, and upon becoming effective shall supercede all prior oral or written agreements with respect to the subject matter hereof. This Agreement does not alter nor shall it be deemed to alter, the employment relationship, whether at-will or contractual, between the EMPLOYER and the EMPLOYEE.

I acknowledge receipt of an executed copy of this Agreement.

This Agreement is executed this _22_ day of _JANUARY_, 19 _88_, at _STRATFORD_____, _CT_____
City                                    State

UNITED TECHNOLOGIES CORPORATION
BY
Signature _____
Print Name WESLEY N. SHAFER
Title CHIEF - AIRCRAFT SAFETY INVESTIGATION

EMPLOYEE
Signature _____
Print Name EDWARD L. MANHOLLEN JR
Residence 16 POINT BEACH DR.
City MILFORD
State CT        ZIP 06460

UTC-1E CORP U.S. 1-87

RIGHTS AND COUNSEL COPY

06/18/2002 TUE 11:32



## IN RE RELATORS BELL HELICOPTER TEXTRON, INC., BELL HELICOPTER TEXTRON, A DIVISION OF TEXTRON CANADA LTD., AND TEXTRON, INC.

### NO. 2-02-058-CV

### COURT OF APPEALS OF TEXAS, SECOND DISTRICT, FORT WORTH

*2002 Tex. App. LEXIS 3656*

**May 20, 2002, Delivered**

**DISPOSITION:**
Petition for Mandamus conditionally granted.

**COUNSEL:**
ATTORNEYS FOR RELATOR: SMITH & MOORE, L.L.P. AND CHARLES H. SMITH, JOHN W. MOORE, JOHN J. REENAN, AND DAVID V. DENNY OF DALLAS, TX.

ATTORNEYS FOR REAL PARTIES: SYDOW, KORMANIK, CARRIGAN, AND ECKERSON, L.L.P. AND MICHAEL D. SYDOW, RONALD J. KORMANIK, AND DWAIN DENT OF HOUSTON, TX.

**JUDGES:**
[*1]    PANEL B: DAY, LIVINGSTON, and GARDNER, JJ.

**OPINIONBY:**
TERRIE LIVINGSTON

**OPINION:**

ORIGINAL PROCEEDING

### I. Introduction

Relators Bell Helicopter Textron Inc., Bell Helicopter Textron, a Division of Textron Canada Ltd., and Textron Inc., defendants in the trial court, seek mandamus relief from the trial court's order denying their motion to disqualify plaintiffs' trial counsel in the underlying lawsuit. The real parties in interest (RPIs) in this original proceeding are the plaintiffs below. Relators contend that RPIs' counsel should be disqualified because they have employed as a consulting expert a former Bell employee who knows a great deal of Bell's confidential information about the issues in the underlying suit. Relators contend that a "Chinese wall" cannot be used effectively in this case. Because we agree that Bell's former employee cannot be effectively screened, we conditionally grant the petition for writ of mandamus.

### II. Background Facts

RPIs are suing relators for damages allegedly caused by a Bell 412 helicopter crash that occurred in August 1997. RPIs have hired as a consulting expert a former Bell Helicopter Textron (Bell) employee, Caren Vale. Vale worked for Bell for [*2] over ten years, from 1977 to 1987.

While at Bell, Vale worked as an engineer in Bell's System Safety Group. She worked on the development of safety systems for aircraft manufactured by Bell, including crash-resistant fuel systems and energy-attenuating seats, at least some of which were on the model 412 aircraft. Later, she became an accident investigator and then Chief of Flight Safety. In these latter two capacities, Vale worked with Bell's inhouse and outside counsel to develop legal strategies for defending against lawsuits that arose out of helicopter crashes involving Bell's helicopters, including the model 412 helicopter.

Relators discovered that RPIs had hired Vale as a consulting expert in the underlying case when they were noticed for a deposition and the notice disclosed that Vale would also attend. Upon learning this, relators immediately moved to quash the deposition. At the hearing on the motion to quash, relators also sought to have Vale disqualified as an expert. The trial court granted the motion to quash, but refused to rule on relators' disqualification request because no motion



2002 Tex. App. LEXIS 3656, *

requesting Vale's disqualification as an expert had been filed.

Relators later moved [*3] to disqualify RPIs' counsel because of Vale's possession of Bell's work product and confidential litigation information. Relators contended that, while Vale worked for Bell, she was privy to Bell's confidential information, trial strategy, work product, and attorney-client communications that arose in matters substantially related to those in the underlying case. Relators contended that RPIs could not effectively screen Vale's work for them so that there was no threat that she would divulge Bell's confidential information to RPIs. The trial court denied relators' motion to disqualify, and relators seek mandamus relief from that ruling.

### III. Standard of Review

The granting or denial of a motion to disqualify is reviewable by mandamus. *See Nat'l Med. Enters., Inc. v. Godbey, 924 S.W.2d 123, 133, 39 Tex. Sup. Ct. J. 698 (Tex 1996)* (orig. proceeding); *In re Bahn, 13 S.W.3d 865, 872 (Tex. App.--Fort Worth 2000, orig. proceeding)*. Mandamus will issue only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy at law. *In re Daisy Mfg. Co., 17 S.W.3d 654, 658, 43 Tex. Sup. Ct. J. 624 (Tex. 2000)* (orig. proceeding). [*4] A trial court clearly abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker v Packer, 827 S.W.2d 833, 839 (Tex. 1992)* (orig. proceeding).

With respect to the resolution of factual issues or matters committed to the trial court's discretion, we may not substitute our judgment for that of the trial court unless the relator establishes that the trial court could reasonably have reached only one decision and that the trial court's decision is arbitrary and unreasonable. *Id. at 839-40* This burden is a heavy one. *Canadian Helicopters, Ltd. v. Wittig, 876 S.W.2d 304, 305 (Tex. 1994)* (orig. proceeding).

Our review is much less deferential with respect to a trial court's determination of the legal principles controlling its ruling because a trial court has no discretion in determining what the law is or in applying the law to the facts *Walker, 827 S W 2d at 840* Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion and may result in mandamus. *Id.*

### IV. Attorney [*5] Disqualification Based on Nonattorney's Possession of Confidential Information

Whenever counsel undertakes representation of an interest that is adverse to that of a former client, the lawyer is disqualified from representing the new client if the matters embraced in the former lawsuit are "substantially related" to the factual matters involved in the pending lawsuit. *Phoenix Founders, Inc. v. Marshall, 887 S.W.2d 831, 833 (Tex. 1994)* (orig. proceeding); *Petroleum Wholesale, Inc. v. Marshall, 751 S.W.2d 295, 299 (Tex. App.--Dallas 1988, orig. proceeding)*. This strict rule is based on a conclusive presumption that confidences were imparted to the attorney during the prior representation. *Phoenix Founders, 887 S.W.2d at 833*. The purpose of the presumption is to prevent the party seeking disqualification from being forced to reveal the very confidences sought to be protected. *In re Am. Home Prods. Corp., 985 S.W.2d 68, 74, 42 Tex. Sup. Ct. J. 252 (Tex. 1998)* (orig. proceeding). This conclusive presumption has also been applied to legal secretaries, paralegals, legal assistants, and freelance consultants. Such a support staff member who has [*6] worked on a case "must be subject to ... a conclusive presumption that confidences and secrets were imparted." *Id.*

Similarly, if an attorney moves from one law firm to another, there is a conclusive presumption that an attorney who obtained confidential information from the prior firm shares it with the members of his new firm. *Phoenix Founders, 887 S.W.2d at 834*. This latter presumption is not automatically applied to paralegals and other nonlawyers, however, in order not to unnecessarily impede their mobility for employment purposes. *Id. at 834-35*. Instead, the new firm can rebut application of the presumption if (1) it strictly adheres to a screening process and (2) the nonlawyer does not reveal any information relating to the former employer's clients to any person in the new firm. *Id. at 834.*

The screening process requires the following steps:

. The newly hired nonlawyer must be cautioned not to disclose any information relating to the representation of a client of the former employer.

. The nonlawyer must be instructed not to work on any matter on which she worked during the prior employment, or regarding which she [*7] has information relating to the former employer's representation.

. The new firm should take other reasonable steps to ensure that the nonlawyer does not work in connection with matters on which she worked during the prior employment, absent client consent after consultation.

*Id. at 835.*

To determine whether the screening has been effective, courts should consider: the substantiality of the relationship between the former and current matters; the time elapsed between the matters; the size of the firm;

the number of individuals presumed to have confidential information; the nature of their involvement in the former matter; and the timing and features of any measures taken to reduce the danger of disclosure. *Id. at 836* Also, if the old firm and the new firm represent adverse parties in the same proceeding, rather than in different proceedings, the danger of improper disclosure by the nonlawyer is increased. *Id* But even if the new employer uses the screening process, disqualification will always be required--absent the former client's consent--under some circumstances, such as:

. when information relating to the representation of an adverse [*8] client has in fact been disclosed; or

. when screening would be ineffective or the nonlawyer necessarily would be required to work on the other side of a matter that is the same as or substantially related to a matter on which the nonlawyer has previously worked.

*Id at 835.*

To show that a substantial relationship requiring disqualification exists, the party seeking disqualification must prove that the facts and issues involved in both the former and present litigation are so similar that there is a genuine threat that confidences revealed to the party's former counsel will be divulged to his present adversary. *In re Epic Holdings, Inc , 985 S.W 2d 41, 51 (Tex 1998)* (orig. proceeding), *NCNB Tex. Nat'l Bank v. Coker, 765 S W 2d 398, 399-400 (Tex 1989)* (orig. proceeding); *see also Texaco, Inc. v. Garcia, 891 S.W 2d 255, 257 (Tex. 1995)* (orig. proceeding) (holding that substantial relationship existed where cases involved similar liability issues, scientific issues, defenses, and strategies). To meet its burden of proof, the movant must provide evidence of specific similarities capable of being recited in [*9] the disqualification order. *Coker, 765 S.W.2d at 400* If this burden is met, the movant is entitled to a conclusive presumption that confidences and secrets were imparted to the former attorney. *Id.* The actual disclosure of confidences need not be proven; the issue is whether a genuine threat of disclosure exists because of the similarity of the matters. *Epic Holdings, 985 S.W.2d at 51; Grant v Thirteenth Court of Appeals, 888 S W.2d 466, 467 (Tex 1994)* (orig. proceeding).

**A. Vale is Privy to Confidential Information About Bell's Cases Involving the Model 412 Aircraft**

In this case, RPIs' pleadings show that the suit against relators arises out of a model 412 Bell helicopter crash RPIs contend, among other things, that relators were negligent in designing and installing an unsafe fuel system on the helicopter, in deciding not to retrofit the aircraft with a safe fuel system even though relators

knew one was available, and in not warning RPIs about the unsafe system. The record shows that, as an accident investigator and Chief of Flight Safety for Bell, Vale was present at numerous meetings with Bell's inhouse and [*10] outside counsel where legal strategy related to numerous lawsuits was discussed, including suits involving the model 412 aircraft. Topics of discussion included attorney mental processes related to the design and manufacture of aircraft systems. n1 Vale also worked on developing crash-resistant fuel systems for Bell aircraft, including the model 412 aircraft. Thus, there is ample evidence that Vale was privy to confidential information about matters substantially similar to the matters involved in the underlying lawsuit.

n1 Vale's other duties as an accident investigator and Chief of Flight Safety included acting as manufacturer's representative and working with investigating authorities, such as the National Transportation Safety Board and the Federal Aviation Administration. But there is no evidence, as RPIs suggest, that the NTSB or FAA were privy to Bell's litigation strategies, attorney work product, or client communications.

Based on this evidence, Vale is clearly subject to the conclusive presumption that [*11] confidences and secrets about Bell's cases involving model 412 aircraft were imparted to her. *See Am. Home Prods. Corp., 985 S.W.2d at 74.* Also, this evidence is specific enough that it is capable of being recited in a disqualification order. *See Coker, 765 S.W.2d at 400.* Because Vale is not a lawyer, however, we cannot conclusively presume that Vale has shared or will share the information she obtained while working for Bell with RPIs' attorneys. *See Phoenix Founders, 887 S.W.2d at 834.* Instead, we must determine whether RPIs' attorneys can effectively screen Vale's work so that there is no threat that Vale may reveal any of Bell's confidential information to RPIs. In making this determination, we focus not on Vale's credibility but on the similarity of the matters at issue. *See Epic Holdings, 985 S.W.2d at 51; Grant, 888 S.W.2d at 467.*

**B. Vale Cannot be Effectively Screened**

To show that they have effectively screened Vale's work, RPIs tendered two affidavits from Vale. In her first affidavit, Vale states that she has never violated any confidentiality agreement, divulged Bell's proprietary [*12] information or trade secrets, or discussed or revealed any of Bell's trial strategies, attorney-client privileged information, or attorney work product. These statements are merely conclusory and are therefore not

probative evidence on the disqualification issue. *See Am Home Prods Corp , 985 S W.2d at 74* (holding that lawyer's and paralegal's conclusory, uncontroverted opinions about what constituted "confidential information" had no probative value and did not raise a fact issue about whether counsel should be disqualified); *see also* TEX. R. CIV. P. 166a(c) (providing that, in a summary proceeding, the testimony of an interested witness must be of the type that can be readily controverted). Vale also states that Bell has not made her aware of any trial tactics and she has no confidential information that may have a bearing on the case. These bald assertions do not controvert relators' specific evidence that Vale was privy to many of Bell's legal strategies in suits involving aircraft safety systems and the model 412 aircraft.

In her second affidavit, Vale states that she has never worked "on the case involving the incident in Cuernavaca for Bell or anyone else. **[*13]** " We presume, for purposes of this opinion, that this is a reference to the underlying lawsuit. Vale also states that she has agreed not to disclose to RPIs any information regarding legal representation of Bell that she acquired while associated with Bell or from anyone who represented Bell and not to work on any "legal matter" she worked on while associated with Bell. She states that, in her association with RPIs' attorneys, she has relied exclusively on her general engineering and aviation knowledge, skill, and experience. Relators also stipulated in the trial court that, at the time they moved to disqualify RPIs' counsel, they had no direct evidence that Vale had shared any privileged or confidential information with RPIs' attorneys or that RPIs' attorneys had requested such information from Vale.

These representations about Vale's working arrangement with RPIs or relators' stipulation are not evidence of effective screening. Vale worked for Bell on litigation involving the safety systems on the model 412 aircraft, and the underlying case involves a model 412 aircraft with an allegedly unsafe fuel system design. Thus, the issues in the underlying case and those in the lawsuits **[*14]** on which Vale worked for Bell are substantially related, and the genuine threat of disclosure exists simply because of the similarity of the matters involved in the former and the current cases. Vale's actual disclosure of confidences need not be proven before disqualification is required. *See Epic Holdings, 985 S.W 2d at 51* To the contrary, because RPIs have hired Vale to work on the underlying case that is against Bell, as one of the relators, Vale will be required to work on the other side of a litigation matter that is substantially related to other litigation on which she has previously worked for Bell. Under these circumstances, disqualification is required despite RPIs' attempts to

effectively screen Vale. *See Phoenix Founders, 887 S.W.2d at 835* (stating that disqualification will always be required when the nonlawyer necessarily would be required to work on the other side of the same or a substantially related matter).

RPIs also claim that their screening of Vale's work is effective because of the great amount of time that elapsed between Vale's employment for Bell and her work in the underlying case--nearly fourteen years--and the immediate **[*15]** timing of the measures taken to reduce the danger of disclosure. However, because Vale worked on litigation for Bell involving substantially the same matters related to the model 412 aircraft that are at issue in the underlying case and because the nature of Vale's involvement in the cases on which she worked for Bell was significant, RPIs cannot effectively screen Vale despite their thorough efforts to do so.

### V. Waiver

Regardless of whether Vale can be effectively screened, RPIs further contend that any knowledge Vale has is discoverable because Bell has designated Vale as a testifying expert on many occasions, including cases involving the fuel system on the model 412 aircraft. RPIs contend that relators have thereby waived whatever privileges they assert existed regarding Vale's confidential knowledge. To support their position, RPIs rely on the discovery rules governing testifying experts.

The discovery rules provide that a party may obtain the following information from testifying experts:

. the subject matter on which the expert will testify;

. the facts known by the expert that relate to or form the basis of the expert's mental impressions and opinions formed or made **[*16]** in connection with the case in which the discovery is sought, regardless of when and how the factual information was acquired;

. the expert's mental impressions and opinions concerning the case, any methods used to derive them, and a brief summary of the basis for the impressions and opinions; and

. all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony.

TEX. R. CIV. P. 192.3(e); 194.2(f).

The supreme court has held that if communications with an expert may be discovered during the course of litigation by opposing counsel, that information cannot be considered confidential, and the fact that it has been shared with opposing counsel cannot be the basis for

disqualification. *Am. Home Prods. Corp., 985 S W.2d at 73-74.* RPIs contend that, because Vale's mental impressions and opinions and her factual knowledge underlying those impressions and opinions were discoverable in prior litigation due to her testifying-expert status, they are not confidential in the underlying litigation. RPIs further contend that, because Vale testified for [*17] Bell as an expert witness in several prior lawsuits, *any* information she has acquired is discoverable, regardless of when or how the information was acquired. We do not read the discovery rules this broadly. Rule 192.3(e) provides only that the testifying expert's mental impressions and opinions *concerning the case*, and the facts known by the expert that relate to or form the basis for the expert's mental impressions and opinions *formed or made in connection with the case in which discovery is sought*, are discoverable. TEX. R. CIV P. 192.3(e); *see also Aetna Cas & Sur. Co. v. Blackmon, 810 S W 2d 438, 440* (Tex. App.--Corpus Christi 1991, orig. proceeding) (holding that designation of party employee as a testifying expert waived attorney-client, work product, and party communications privileges only as to the privileged information the expert relied on in forming his mental impressions and opinions related to the case). Accordingly, the facts known to Vale concerning the model 412 aircraft and its safety systems are discoverable based on her status as a former testifying expert for Bell only if she has been designated as a testifying expert with regard [*18] to those matters. n2

> n2 The discovery rules provide that the facts known to an expert and underlying the expert's mental impressions and opinions related to a case are discoverable "regardless of when and how the factual information was acquired." TEX. R. CIV. P. 192.3(e)(3). Because, as we discuss below, there is no evidence that Vale has served as a testifying expert for Bell with regard to the model 412 aircraft, we need not decide whether this phrase refers to information acquired regarding matters that would otherwise be protected by the attorney-client or attorney work product privileges.

There is some evidence in the mandamus record that Vale has acted as a testifying expert for Bell. David Broiles, who has worked as outside counsel for Bell on numerous cases states by affidavit that Vale, as a Bell employee, served "as an assistant and expert with the litigation team." Vale's own affidavit states, "In some matters I have represented Bell as a consultant and expert witness." The record also contains a [*19] "Preliminary Report of Aircraft Accident" that was prepared by Vale and Bell in 1987. The report appears to be an expert's report and contains conclusions about the probable cause of the accident discussed in the report. Finally, the record contains an excerpt from a deposition given by Vale, to which is attached a list of cases in which she served "either as a witness, consultant or expert" for Bell. While none of these documents specifically state that Vale was a testifying expert, as opposed to a consulting one, the facts that Vale gave a deposition and produced a report on at least one accident are some evidence that she acted as a testifying expert.

Nonetheless, there is no evidence that Vale served as a testifying expert for Bell with regard to the model 412 aircraft. The accident report refers to the Bell model 212 aircraft, not the 412. In addition, none of the aircraft models mentioned in the list of cases in which Vale served as a witness, consultant, or expert is the model 412 aircraft. Several of the cases listed match those in Broiles's affidavit. They are: Canada (model UH-18 or UH-1B), Murphy (model UH-IE), Krissinger (model AH-IS), Seastrunk (model OH-58), Higgins [*20] (model AH- IS), Miller (model AH-IG), Dowd/Ellis (model AH-IS), Stultz (model 206), Nakahira (model AH-IS), Ramsey (model 206), and Martinez (model 206). Broiles's affidavit does not state, however, that he worked with Vale on any litigation involving the 412 aircraft. While this evidence is sufficient to show that Vale served as a testifying expert for Bell with regard to several models of aircraft, it does not establish that Bell was a testifying expert regarding the model 412. Further, there is no evidence in the record that the model 412 aircraft or its fuel safety system is substantially similar to the aircraft for which Vale may have served as a testifying expert.

Because the record does not show that Vale served as a testifying expert for Bell regarding the model 412 aircraft or that any of the aircraft for which Vale served as a testifying expert are substantially similar to the model 412 aircraft, there is no evidence that relators have waived their right to assert that the information Vale knows about the model 412 aircraft and its fuel safety system or about Bell's litigation strategies involving the model 412 aircraft is confidential.

## VI. Vale as a Fact Witness [*21]

RPIs also assert that whatever information Vale knows that is relevant to the underlying case is discoverable because she has first-hand knowledge of relevant facts and must therefore be designated as a fact witness. The supreme court has held that a party cannot shield its employees who have knowledge of facts relevant to a case from the discovery process simply by designating them as consulting-only experts. *Axelson,*

2002 Tex. App. LEXIS 3656, *

*Inc. v. McIlhany,* 798 S W 2d 550, 554-55 *(Tex 1990)* (orig. proceeding). If employees obtain factual information relevant to a case simply by virtue of their employment as employees, rather than as consulting experts, that information is discoverable. *Id.* Indeed, while the identity, mental impressions, and opinions of a consulting expert whose mental impressions and opinions have not been reviewed by a testifying expert are *not* discoverable, the facts known first-hand to the consulting expert *are* discoverable. TEX. R. CIV. P. 192.3(e); *Axelson,* 798 S W 2d at 554. n3

> n3 This rule does not, however, extend to consulting-only experts whose only source of factual information was the consultation. *Axelson,* 798 S.W.2d at 554.

**[*22]**

Relators appear to agree with RPIs that Vale is or will be a fact witness in the underlying case. Relators asserted in the trial court that Vale was a fact witness for Bell, "not only internally with design, but externally with investigations for Bell that she conducted." In fact, at the hearing on their motion to quash a deposition at which Vale was scheduled to attend as a consulting expert for RPIs, relators asserted that Vale should not be allowed to attend the deposition because of her status as a fact witness for Bell. *See* TEX. R. CIV. P. 199.5(d) (providing that an oral deposition must be conducted in the same manner as if the testimony were being obtained in court during trial); TEX. R. CIV. P. 267 (providing that witnesses on both sides may be placed "under the rule" so they cannot hear the testimony of any other witness in the case); TEX. R. EVID. 614 (same). Relators contended that Vale was not "a person whose presence is ... essential to the presentation of the cause"-- an exception to the exclusionary reach of rules 267 and 614--because she was a fact witness. TEX. R. CIV. P. 267(b)(3); TEX. R. EVID. 614(3).

Information that may be discovered from a fact witness **[*23]** does not, however, include information about an opponent's litigation strategies, attorney work product, or other information exempted from discovery by the attorney-client privilege. *See* TEX. R. CIV. P. 192.3(c) ("A person has knowledge of relevant facts

when that person has or may have knowledge of any *discoverable* matter.") (emphasis added); *id.* (providing that an expert can be a fact witness only with regard to knowledge obtained first-hand and not obtained in preparation for trial or in anticipation of litigation). Accordingly, while factual information about the model 412 aircraft that Vale knows first-hand because of her employment with Bell may be discoverable because she has been or should be designated as a fact witness, Vale's knowledge about Bell's litigation strategies, attorney work product, and privileged communications is not discoverable based on her fact-witness status.

**VII. Conclusion**

The record shows that, while Vale worked for Bell, she obtained confidential information about the model 412 aircraft and its fuel safety system, as well as confidential information about Bell's litigation strategies and attorney work product in lawsuits involving **[*24]** the model 412 aircraft. RPIs cannot effectively screen Vale because, as a consulting expert, she will be required to work on the other side of litigation that is substantially related to litigation on which she has previously worked for Bell. Relators have not waived their right to assert that the information Vale knows about the model 412 aircraft and its fuel safety system or about Bell's litigation strategies involving the model 412 aircraft is confidential because the record does not specifically show that Vale has served as a testifying expert for Bell regarding the model 412 aircraft or any aircraft that is substantially similar to the model 412. In addition, Vale's knowledge of Bell's litigation strategies, attorney work product, and privileged communications concerning the model 412 aircraft is not discoverable based on Vale's fact-witness status.

Because RPIs' counsel cannot effectively screen Vale, they must be disqualified from representing RPIs in the underlying lawsuit. The trial court abused its discretion by denying relators' motion to disqualify RPIs' counsel. We direct the trial court to vacate its order denying relators' motion to disqualify and enter an order granting **[*25]** the motion. Our writ will issue only if the trial court fails to act in accordance with this opinion.

TERRIE LIVINGSTON

JUSTICE

06/17/02  MON 14:31 FAX 956 541 0255          WATTS & HEARD LLP                                    ☑001



# WATTS & HEARD LLP

*Attorneys at Law*

Ray R. Marchan                                              Telephone. (956) 546-0333
Attorney at Law                                             Facsimile (956) 541-0255

June 17, 2002

**via fax**

Mr. Robert F. Ruckman
Jackson Walker, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202

Re:    Civil Action No. B-00-176
       Krista Saldana, et al vs. ITT Industries, et al

Dear Mr. Ruckman:

Please be informed that my expert, Mr. Ed Monhollen, will be present for the taking of Chris Lowenstein's deposition this Friday.

Should you have any questions, please do not hesitate to call me.

Yours truly,

WATTS & HEARD, LLP

Ray R. Marchan

RRM;lety
Encs.
cc:    Mr. Ron A. Sprague
       Ms. Nancy Masso
       Mr. Joe Valle



Houston • Corpus Christi • San Antonio • Brownsville • McAllen
1926 East Elizabeth Street • Brownsville, Texas 78520 • Email: rrmarchan@wattsheard.com

06/17/2002 MON 14:35  [TX/RX NO 9958]  ☑001

03/03/02  MON 15:17 FAX 956 541 0255        WATTS & HEARD LLP                                  @003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| KRISTA SALDANA, INDIVIDUALLY | ß | |
| AND AS REPRESENTATIVE OF | ß | |
| THE ESTATE OF DAVID SALDANA | ß | |
| AND AS NEXT FRIEND OF JAGGER | ß | |
| SALDANA | ß | |
| PLAINTIFFS | ß | |
| | ß | |
| | ß | CIVIL ACTION NO..: B-00-176 |
| | ß | |
| ITT INDUSTRIES, INC., SIKORSKY | ß | |
| AIRCRAFT CORPORATION, A | ß | |
| SUBSIDIARY OF UNITED | ß | |
| TECHNOLOGIES CORPORATION, | ß | |
| THE ESTATE OF LT. COL. MARC | ß | |
| LEE HOHLE AND THE ESTATE OF | ß | |
| CAPTAIN MATTHEW BRENT THOMAS | ß | |
| | ß | |
| DEFENDANTS | ß | |

## FIRST AMENDED NOTICE OF INTENTION TO TAKE VIDEO DEPOSITION

TO:  Sikorsky Aircraft Corporation, by and through their counsel of record, Mr.
Robert F. Ruckman, at Jackson Walker, L.L.P., 901 Main Street, Ste 6000, Dallas,
Texas 75202.

ITT Industries, Inc., defendant, by and through its attorney of record, Mr. Ron A.
Sprague, at Gendry & Sprague, P.C., 645 Lockhill Selma, San Antonio, Texas
78216.

PLEASE TAKE NOTICE that, under Federal R.Civ.P. 30, Claimants Krista

Saldana, Individually and As Representative of the Estate of David Saldana and as Next

Friend of Jagger Saldana will take the oral deposition of Chris Lowenstein on June 21,

2002, at 10:00 o'clock a.m. Jackson Walker, L.L.P., 901 Main Street, Suite 6000, Dallas,

Texas 75202, before Esquire Depositions Services. The deposition will continue from

day to day until completed.

The deposition will be taken before a court reporter appointed or designated

under Fed R.Civ.P. 28. All parties are invited to attend and cross-examine.



In addition to the stenographic recording of the deposition, Plaintiffs intend to video tape the deposition.

Respecfully submitted this the __3__ day of June, 2002.

WATTS & HEARD, L.L.P
1926 E. Elizabeth
Brownsville, Texas  78520
(956) 544-0500
(956) 541-0255  FAX


_____
RAY R. MARCHAN
State Bar No. 12969050
Federal I.D. No. 9522

<u>CERTIFICATE OF SERVICE</u>

On this the __3__ day of June, 2002, a true and correct copy of the foregoing instrument was forwarded to all parties via fax, by hand-delivery or by certified mail, return receipt requested.


_____
RAY R. MARCHAN



JACKSON WALKER L L P

ATTORNEYS & COUNSELORS
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 953-6000, Fax (214) 953-5822
www.jw.com

Robert I Ruckman
(214) 953-6024
rruckman@jw.com

June 18, 2002

**VIA FACSIMILE**
Ray R. Marchan
WATTS & HEARD, P.C.
1926 E. Elizabeth
Brownsville, Texas 78520

Re:    Civil Action No. B-00-176; *Krista Saldana, et al. v. ITT Industries, Inc., et al.*, in
the United States District Court, Southern District of Texas, Brownsville Division

Dear Ray:

I am in receipt of your letter of June 17th in which you advise that your expert, Ed
Monhollen, plans to attend the deposition of Chris Lowenstein scheduled for Friday, June 21st.

Your request brings to a head a concern which we have regarding your use of Ed
Monhollen as an expert in this case  As you are aware, Mr. Monhollen is a former employee of
Sikorsky Aircraft, the Defendant herein.  As described in his own resume, Mr. Monhollen was a
senior airworthiness engineer whose primary duties "involved the worldwide investigation of
accidents involving Sikorsky helicopters, participation in the Products Safety Board,
management of in-house engineering investigations, and safety audits of Sikorsky facilities."

First, in case Mr  Monhollen has not brought this to your attention, enclosed is a copy of
an Intellectual Property Agreement signed by Mr  Monhollen which prohibits him from
disclosing any technical information obtained during his employment at Sikorsky

Second, enclosed is a recent opinion in *In re Bell Helicopter Textron, Inc.* involving a
former Bell Helicopter employee and investigator who was retained by plaintiff's counsel to
serve as a consulting expert against Bell.  The Fort Worth Court of Appeals not only found that
the expert was disqualified but also that the plaintiff's counsel was disqualified as well.  We feel
that the Bell facts are directly on point with your retention of Mr. Monhollen in your case against
Sikorsky Aircraft.

At this time, we are willing to forego seeking a disqualification of you as trial counsel if
you can agree that Mr. Monhollen will not be used either as a consulting or testifying expert
against Sikorsky in this case and that you have not been provided confidential information to
date by Mr. Monhollen, which he obtained from Sikorsky

Austin
Dallas
Fort Worth
Houston
Richardson
San Angelo
San Antonio

Member of GLOBALAW™

DEFENDANT'S
EXHIBIT
13

Ray R. Marchan
June 18, 2002
Page 2

Please let me know whether we **can resolve** these issues prior to Mr. Lowenstein's deposition on Friday, June 21st. We will obviously object to Mr. Monhollen's attendance under these circumstances.

Very truly yours,

Robert F. Ruckman

RFR/kjw
Enclosure

cc:    **VIA FACSIMILE**
       Ron A. Sprague
       GENDRY & SPRAGUE, P.C.
       645 Lockhill Selma
       San Antonio, TX 78216-5057
       (*w/encl* )

       **VIA FACSIMILE**
       Joe Valle
       Attorney at Law
       1120 East Tenth Street
       Brownsville, Texas  78520
       (*w/encl.*)

## INTELLECTUAL PROPERTY AGREEMENT

As an employee of UNITED TECHNOLOGIES CORPORATION, or any of its direct or indirect subsidiaries, their successors or assigns (hereinafter referred to collectively as the EMPLOYER), I, the EMPLOYEE named below, agree as follows:

1.  Unless the EMPLOYER has acquired specific authorization, I will not disclose to or use in my work with the EMPLOYER any proprietary information of others, including any of my prior employers.

2.  I will not, either during or after my employment, use, publish or otherwise disclose, except for the EMPLOYER's benefit in the course of such employment, any technical or business information developed by, for or at the expense of the EMPLOYER, or assigned or entrusted to the EMPLOYER by me or anyone else, unless such information is generally known outside of the EMPLOYER; and I will deliver to or leave with the EMPLOYER all written and other materials containing such information upon termination of my employment.

3.  I agree that all trade secrets, all inventions, all works of authorship (including illustrations, writings, mask works, software and computer programs), and all other business or technical information created or conceived by me, either alone or with others, while employed by the EMPLOYER and related to the existing or contemplated business or research of the EMPLOYER or resulting from my work with the EMPLOYER, belong to the EMPLOYER.  Until proven otherwise, any invention shall be presumed to have been conceived during such employment if within one (1) year after termination of such employment it is disclosed to others, or it is completed, or it has a patent application filed thereon.

4.  I will promptly disclose to the EMPLOYER all trade secrets, inventions, works of authorship, and information which belong to the EMPLOYER under paragraph 3 above; and I will assign to the EMPLOYER, or to others as directed by the EMPLOYER, all of my interest in such inventions and works of authorship, and I will execute any papers and do any acts which the EMPLOYER may consider necessary to secure to it any and all rights relating to such inventions and works of authorship, including all patents and copyrights (and renewals thereof) in any country.

5.  I understand that the EMPLOYER agrees to pay to me, in addition to my salary and wages, the sum of One Hundred Dollars ($100.00) upon the granting of a United States Patent on an invention assigned under the provisions of paragraph 4.

This Agreement shall become effective immediately upon and in consideration of my receiving a promotion or an increase in salary or wages subsequent to the date executed, and upon becoming effective shall supercede all prior oral or written agreements with respect to the subject matter hereof.  This Agreement does not alter nor shall it be deemed to alter, the employment relationship, whether at-will or contractual, between the EMPLOYER and the EMPLOYEE.

I acknowledge receipt of an executed copy of this Agreement.

This Agreement is executed this _22_ day of _JANUARY_, 19_88_, at _STRATFORD_, _CT_.
                                City                    State

UNITED TECHNOLOGIES CORPORATION
BY
Signature _Wesley N. Shafer_
Print Name _WESLEY N. SHAFER_
Title _CHIEF - AIRCRAFT SAFETY INVESTIGATION_

UTC-1E CORP U.S. 1-87

EMPLOYEE
Signature _Edward J. Monholler Jr._
Print Name _EDWARD L. MONHOLLEN JR_
Residence _16 POINT BEACH DR._
City _MILFORD_
State _CT_          ZIP _06460_



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-02-058-CV

IN RE                                                                    RELATORS
BELL HELICOPTER TEXTRON, INC.,
BELL HELICOPTER TEXTRON, A DIVISION
OF TEXTRON CANADA LTD., AND TEXTRON, INC.

------------

### ORIGINAL PROCEEDING

------------

## OPINION

------------

### I. Introduction

Relators Bell Helicopter Textron Inc., Bell Helicopter Textron, a Division of Textron Canada Ltd., and Textron Inc., defendants in the trial court, seek mandamus relief from the trial court's order denying their motion to disqualify plaintiffs' trial counsel in the underlying lawsuit. The real parties in interest (RPIs) in this original proceeding are the plaintiffs below. Relators contend that RPIs' counsel should be disqualified because they have employed as a

consulting expert a former Bell employee who knows a great deal of Bell's confidential information about the issues in the underlying suit. Relators contend that a "Chinese wall" cannot be used effectively in this case. Because we agree that Bell's former employee cannot be effectively screened, we conditionally grant the petition for writ of mandamus.

## II.  Background Facts

RPIs are suing relators for damages allegedly caused by a Bell 412 helicopter crash that occurred in August 1997. RPIs have hired as a consulting expert a former Bell Helicopter Textron (Bell) employee, Caren Vale. Vale worked for Bell for over ten years, from 1977 to 1987.

While at Bell, Vale worked as an engineer in Bell's System Safety Group. She worked on the development of safety systems for aircraft manufactured by Bell, including crash-resistant fuel systems and energy-attenuating seats, at least some of which were on the model 412 aircraft. Later, she became an accident investigator and then Chief of Flight Safety. In these latter two capacities, Vale worked with Bell's inhouse and outside counsel to develop legal strategies for defending against lawsuits that arose out of helicopter crashes involving Bell's helicopters, including the model 412 helicopter.

Relators discovered that RPIs had hired Vale as a consulting expert in the underlying case when they were noticed for a deposition and the notice

2

disclosed that Vale would also attend. Upon learning this, relators immediately moved to quash the deposition. At the hearing on the motion to quash, relators also sought to have Vale disqualified as an expert. The trial court granted the motion to quash, but refused to rule on relators' disqualification request because no motion requesting Vale's disqualification as an expert had been filed.

Relators later moved to disqualify RPIs' counsel because of Vale's possession of Bell's work product and confidential litigation information. Relators contended that, while Vale worked for Bell, she was privy to Bell's confidential information, trial strategy, work product, and attorney-client communications that arose in matters substantially related to those in the underlying case. Relators contended that RPIs could not effectively screen Vale's work for them so that there was no threat that she would divulge Bell's confidential information to RPIs. The trial court denied relators' motion to disqualify, and relators seek mandamus relief from that ruling.

### III. Standard of Review

The granting or denial of a motion to disqualify is reviewable by mandamus. *See Nat'l Med. Enters., Inc. v. Godbey,* 924 S.W.2d 123, 133 (Tex. 1996) (orig. proceeding); *In re Bahn,* 13 S.W.3d 865, 872 (Tex. App.—Fort Worth 2000, orig. proceeding). Mandamus will issue only to correct

3

a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy at law. *In re Daisy Mfg. Co.,* 17 S.W.3d 654, 658 (Tex. 2000) (orig. proceeding). A trial court clearly abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding).

With respect to the resolution of factual issues or matters committed to the trial court's discretion, we may not substitute our judgment for that of the trial court unless the relator establishes that the trial court could reasonably have reached only one decision and that the trial court's decision is arbitrary and unreasonable. *Id.* at 839-40. This burden is a heavy one. *Canadian Helicopters, Ltd. v. Wittig,* 876 S.W.2d 304, 305 (Tex. 1994) (orig. proceeding).

Our review is much less deferential with respect to a trial court's determination of the legal principles controlling its ruling because a trial court has no discretion in determining what the law is or in applying the law to the facts. *Walker,* 827 S.W.2d at 840. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion and may result in mandamus. *Id.*

4

IV.    Attorney Disqualification Based on Nonattorney's Possession
of Confidential Information

Whenever counsel undertakes representation of an interest that is adverse

to that of a former client, the lawyer is disqualified from representing the new

client if the matters embraced in the former lawsuit are "substantially related"

to the factual matters involved in the pending lawsuit. *Phoenix Founders, Inc.*

*v. Marshall*, 887 S.W.2d 831, 833 (Tex. 1994) (orig. proceeding); *Petroleum*

*Wholesale, Inc. v. Marshall*, 751 S.W.2d 295, 299 (Tex. App.—Dallas 1988,

orig. proceeding).  This strict rule is based on a conclusive presumption that

confidences were imparted to the attorney during the prior representation.

*Phoenix Founders,* 887 S.W.2d at 833.  The purpose of the presumption is to

prevent the party seeking disqualification from being forced to reveal the very

confidences sought to be protected.  *In re Am. Home Prods. Corp.,* 985 S.W.2d

68, 74 (Tex. 1998) (orig. proceeding).  This conclusive presumption has also

been applied to legal secretaries, paralegals, legal assistants, and freelance

consultants.  Such a support staff member who has worked on a case "must

be subject to . . . a conclusive presumption that confidences and secrets were

imparted."  *Id.*

Similarly, if an attorney moves from one law firm to another, there is a

conclusive presumption that an attorney who obtained confidential information

5

from the prior firm shares it with the members of his new firm. *Phoenix Founders*, 887 S.W.2d at 834. This latter presumption is not automatically applied to paralegals and other nonlawyers, however, in order not to unnecessarily impede their mobility for employment purposes. *Id.* at 834-35. Instead, the new firm can rebut application of the presumption if (1) it strictly adheres to a screening process and (2) the nonlawyer does not reveal any information relating to the former employer's clients to any person in the new firm. *Id.* at 834.

The screening process requires the following steps:

- The newly hired nonlawyer must be cautioned not to disclose any information relating to the representation of a client of the former employer.

- The nonlawyer must be instructed not to work on any matter on which she worked during the prior employment, or regarding which she has information relating to the former employer's representation.

- The new firm should take other reasonable steps to ensure that the nonlawyer does not work in connection with matters on which she worked during the prior employment, absent client consent after consultation.

*Id.* at 835.

To determine whether the screening has been effective, courts should consider: the substantiality of the relationship between the former and current matters; the time elapsed between the matters; the size of the firm; the number

6

of individuals presumed to have confidential information; the nature of their

involvement in the former matter; and the timing and features of any measures

taken to reduce the danger of disclosure. *Id.* at 836. Also, if the old firm and

the new firm represent adverse parties in the same proceeding, rather than in

different proceedings, the danger of improper disclosure by the nonlawyer is

increased. *Id.* But even if the new employer uses the screening process,

disqualification will always be required—absent the former client's

consent—under some circumstances, such as:

- when information relating to the representation of an adverse
  client has in fact been disclosed; or

- when screening would be ineffective or the nonlawyer
  necessarily would be required to work on the other side of a
  matter that is the same as or substantially related to a matter
  on which the nonlawyer has previously worked.

*Id.* at 835.

To show that a substantial relationship requiring disqualification exists,

the party seeking disqualification must prove that the facts and issues involved

in both the former and present litigation are so similar that there is a genuine

threat that confidences revealed to the party's former counsel will be divulged

to his present adversary. *In re Epic Holdings, Inc.,* 985 S.W.2d 41, 51 (Tex.

1998) (orig. proceeding); *NCNB Tex. Nat'l Bank v. Coker,* 765 S.W.2d 398,

399-400 (Tex. 1989) (orig. proceeding); *see also Texaco, Inc. v. Garcia,* 891

7

S.W.2d 255, 257 (Tex. 1995) (orig. proceeding) (holding that substantial relationship existed where cases involved similar liability issues, scientific issues, defenses, and strategies).  To meet its burden of proof, the movant must provide evidence of specific similarities capable of being recited in the disqualification order.  *Coker,* 765 S.W.2d at 400.  If this burden is met, the movant is entitled to a conclusive presumption that confidences and secrets were imparted to the former attorney.  *Id.*  The actual disclosure of confidences need not be proven; the issue is whether a genuine threat of disclosure exists because of the similarity of the matters.  *Epic Holdings,* 985 S.W.2d at 51; *Grant v. Thirteenth Court of Appeals,* 888 S.W.2d 466, 467 (Tex  1994) (orig. proceeding).

### A.  Vale is Privy to Confidential Information About Bell's Cases Involving the Model 412 Aircraft

In this case, RPIs' pleadings show that the suit against relators arises out of a model 412 Bell helicopter crash.  RPIs contend, among other things, that relators were negligent in designing and installing an unsafe fuel system on the helicopter, in deciding not to retrofit the aircraft with a safe fuel system even though relators knew one was available, and in not warning RPIs about the unsafe system.  The record shows that, as an accident investigator and Chief of Flight Safety for Bell, Vale was present at numerous meetings with Bell's

8

inhouse and outside counsel where legal strategy related to numerous lawsuits was discussed, including suits involving the model 412 aircraft. Topics of discussion included attorney mental processes related to the design and manufacture of aircraft systems.[1] Vale also worked on developing crash-resistant fuel systems for Bell aircraft, including the model 412 aircraft. Thus, there is ample evidence that Vale was privy to confidential information about matters substantially similar to the matters involved in the underlying lawsuit.

Based on this evidence, Vale is clearly subject to the conclusive presumption that confidences and secrets about Bell's cases involving model 412 aircraft were imparted to her. *See Am. Home Prods. Corp.,* 985 S.W.2d at 74. Also, this evidence is specific enough that it is capable of being recited in a disqualification order. *See Coker,* 765 S.W.2d at 400. Because Vale is not a lawyer, however, we cannot conclusively presume that Vale has shared or will share the information she obtained while working for Bell with RPIs' attorneys. *See Phoenix Founders,* 887 S.W.2d at 834. Instead, we must determine whether RPIs' attorneys can effectively screen Vale's work so that

---

[1] Vale's other duties as an accident investigator and Chief of Flight Safety included acting as manufacturer's representative and working with investigating authorities, such as the National Transportation Safety Board and the Federal Aviation Administration. But there is no evidence, as RPIs suggest, that the NTSB or FAA were privy to Bell's litigation strategies, attorney work product, or client communications.

9

there is no threat that Vale may reveal any of Bell's confidential information to RPIs. In making this determination, we focus not on Vale's credibility but on the similarity of the matters at issue. *See Epic Holdings,* 985 S.W.2d at 51; *Grant,* 888 S.W.2d at 467.

### B. Vale Cannot be Effectively Screened

To show that they have effectively screened Vale's work, RPIs tendered two affidavits from Vale. In her first affidavit, Vale states that she has never violated any confidentiality agreement, divulged Bell's proprietary information or trade secrets, or discussed or revealed any of Bell's trial strategies, attorney-client privileged information, or attorney work product. These statements are merely conclusory and are therefore not probative evidence on the disqualification issue. *See Am. Home Prods. Corp.,* 985 S.W.2d at 74 (holding that lawyer's and paralegal's conclusory, uncontroverted opinions about what constituted "confidential information" had no probative value and did not raise a fact issue about whether counsel should be disqualified); *see also* TEX. R. CIV. P. 166a(c) (providing that, in a summary proceeding, the testimony of an interested witness must be of the type that can be readily controverted). Vale also states that Bell has not made her aware of any trial tactics and she has no confidential information that may have a bearing on the case. These bald assertions do not controvert relators' specific evidence that Vale was privy to

10

many of Bell's legal strategies in suits involving aircraft safety systems and the model 412 aircraft.

In her second affidavit, Vale states that she has never worked "on the case involving the incident in Cuernavaca for Bell or anyone else." We presume, for purposes of this opinion, that this is a reference to the underlying lawsuit. Vale also states that she has agreed not to disclose to RPIs any information regarding legal representation of Bell that she acquired while associated with Bell or from anyone who represented Bell and not to work on any "legal matter" she worked on while associated with Bell. She states that, in her association with RPIs' attorneys, she has relied exclusively on her general engineering and aviation knowledge, skill, and experience. Relators also stipulated in the trial court that, at the time they moved to disqualify RPIs' counsel, they had no direct evidence that Vale had shared any privileged or confidential information with RPIs' attorneys or that RPIs' attorneys had requested such information from Vale.

These representations about Vale's working arrangement with RPIs or relators' stipulation are not evidence of effective screening. Vale worked for Bell on litigation involving the safety systems on the model 412 aircraft, and the underlying case involves a model 412 aircraft with an allegedly unsafe fuel system design. Thus, the issues in the underlying case and those in the

11

lawsuits on which Vale worked for Bell are substantially related, and the genuine threat of disclosure exists simply because of the similarity of the matters involved in the former and the current cases.  Vale's actual disclosure of confidences need not be proven before disqualification is required.  *See Epic Holdings,* 985 S.W.2d at 51.  To the contrary, because RPIs have hired Vale to work on the underlying case that is against Bell, as one of the relators, Vale will be required to work on the other side of a litigation matter that is substantially related to other litigation on which she has previously worked for Bell.  Under these circumstances, disqualification is required despite RPIs' attempts to effectively screen Vale.  *See Phoenix Founders,* 887 S.W.2d at 835 (stating that disqualification will always be required when the nonlawyer necessarily would be required to work on the other side of the same or a substantially related matter).

RPIs also claim that their screening of Vale's work is effective because of the great amount of time that elapsed between Vale's employment for Bell and her work in the underlying case—nearly fourteen years—and the immediate timing of the measures taken to reduce the danger of disclosure.  However, because Vale worked on litigation for Bell involving substantially the same matters related to the model 412 aircraft that are at issue in the underlying case and because the nature of Vale's involvement in the cases on which she

12

worked for Bell was significant, RPIs cannot effectively screen Vale despite their thorough efforts to do so.

### V. Waiver

Regardless of whether Vale can be effectively screened, RPIs further contend that any knowledge Vale has is discoverable because Bell has designated Vale as a testifying expert on many occasions, including cases involving the fuel system on the model 412 aircraft. RPIs contend that relators have thereby waived whatever privileges they assert existed regarding Vale's confidential knowledge. To support their position, RPIs rely on the discovery rules governing testifying experts.

The discovery rules provide that a party may obtain the following information from testifying experts:

- the subject matter on which the expert will testify;

- the facts known by the expert that relate to or form the basis of the expert's mental impressions and opinions formed or made in connection with the case in which the discovery is sought, regardless of when and how the factual information was acquired;

- the expert's mental impressions and opinions concerning the case, any methods used to derive them, and a brief summary of the basis for the impressions and opinions; and

- all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or

13

prepared by or for the expert in anticipation of the expert's testimony.

TEX. R. CIV. P. 192.3(e); 194.2(f).

The supreme court has held that if communications with an expert may be discovered during the course of litigation by opposing counsel, that information cannot be considered confidential, and the fact that it has been shared with opposing counsel cannot be the basis for disqualification. *Am. Home Prods. Corp.*, 985 S.W.2d at 73-74. RPIs contend that, because Vale's mental impressions and opinions and her factual knowledge underlying those impressions and opinions were discoverable in prior litigation due to her testifying-expert status, they are not confidential in the underlying litigation. RPIs further contend that, because Vale testified for Bell as an expert witness in several prior lawsuits, *any* information she has acquired is discoverable, regardless of when or how the information was acquired. We do not read the discovery rules this broadly. Rule 192.3(e) provides only that the testifying expert's mental impressions and opinions *concerning the case,* and the facts known by the expert that relate to or form the basis for the expert's mental impressions and opinions *formed or made in connection with the case in which discovery is sought,* are discoverable. TEX. R. CIV. P. 192.3(e); *see also Aetna Cas. & Sur. Co. v. Blackmon,* 810 S.W.2d 438, 440 (Tex. App.—Corpus Christi

14

1991, orig. proceeding) (holding that designation of party employee as a testifying expert waived attorney-client, work product, and party communications privileges only as to the privileged information the expert relied on in forming his mental impressions and opinions related to the case). Accordingly, the facts known to Vale concerning the model 412 aircraft and its safety systems are discoverable based on her status as a former testifying expert for Bell only if she has been designated as a testifying expert with regard to those matters.[2]

There is some evidence in the mandamus record that Vale has acted as a testifying expert for Bell. David Broiles, who has worked as outside counsel for Bell on numerous cases states by affidavit that Vale, as a Bell employee, served "as an assistant and expert with the litigation team." Vale's own affidavit states, "In some matters I have represented Bell as a consultant and expert witness." The record also contains a "Preliminary Report of Aircraft Accident" that was prepared by Vale and Bell in 1987. The report appears to

---

[2]The discovery rules provide that the facts known to an expert and underlying the expert's mental impressions and opinions related to a case are discoverable "regardless of when and how the factual information was acquired." Tex. R. Civ. P. 192.3(e)(3). Because, as we discuss below, there is no evidence that Vale has served as a testifying expert for Bell with regard to the model 412 aircraft, we need not decide whether this phrase refers to information acquired regarding matters that would otherwise be protected by the attorney-client or attorney work product privileges.

be an expert's report and contains conclusions about the probable cause of the accident discussed in the report. Finally, the record contains an excerpt from a deposition given by Vale, to which is attached a list of cases in which she served "either as a witness, consultant or expert" for Bell. While none of these documents specifically state that Vale was a testifying expert, as opposed to a consulting one, the facts that Vale gave a deposition and produced a report on at least one accident are some evidence that she acted as a testifying expert.

Nonetheless, there is no evidence that Vale served as a testifying expert for Bell with regard to the model 412 aircraft. The accident report refers to the Bell model 212 aircraft, not the 412. In addition, none of the aircraft models mentioned in the list of cases in which Vale served as a witness, consultant, or expert is the model 412 aircraft. Several of the cases listed match those in Broiles's affidavit. They are: Canada (model UH-18 or UH-1B), Murphy (model UH-IE), Krissinger (model AH-IS), Seastrunk (model OH-58), Higgins (model AH-IS), Miller (model AH-IG), Dowd/Ellis (model AH-IS), Stultz (model 206), Nakahira (model AH-IS), Ramsey (model 206), and Martinez (model 206). Broiles's affidavit does not state, however, that he worked with Vale on any litigation involving the 412 aircraft. While this evidence is sufficient to show that Vale served as a testifying expert for Bell with regard to several models of

16

aircraft, it does not establish that Bell was a testifying expert regarding the model 412. Further, there is no evidence in the record that the model 412 aircraft or its fuel safety system is substantially similar to the aircraft for which Vale may have served as a testifying expert.

Because the record does not show that Vale served as a testifying expert for Bell regarding the model 412 aircraft or that any of the aircraft for which Vale served as a testifying expert are substantially similar to the model 412 aircraft, there is no evidence that relators have waived their right to assert that the information Vale knows about the model 412 aircraft and its fuel safety system or about Bell's litigation strategies involving the model 412 aircraft is confidential.

### VI. Vale as a Fact Witness

RPIs also assert that whatever information Vale knows that is relevant to the underlying case is discoverable because she has first-hand knowledge of relevant facts and must therefore be designated as a fact witness. The supreme court has held that a party cannot shield its employees who have knowledge of facts relevant to a case from the discovery process simply by designating them as consulting-only experts. *Axelson, Inc. v. McIlhaney*, 798 S.W.2d 550, 554-55 (Tex. 1990) (orig. proceeding). If employees obtain factual information relevant to a case simply by virtue of their employment as

17

employees, rather than as consulting experts, that information is discoverable. *Id.* Indeed, while the identity, mental impressions, and opinions of a consulting expert whose mental impressions and opinions have not been reviewed by a testifying expert are *not* discoverable, the facts known first-hand to the consulting expert *are* discoverable. TEX. R. CIV. P. 192.3(e); *Axelson,* 798 S.W.2d at 554.[3]

Relators appear to agree with RPIs that Vale is or will be a fact witness in the underlying case. Relators asserted in the trial court that Vale was a fact witness for Bell, "not only internally with design, but externally with investigations for Bell that she conducted." In fact, at the hearing on their motion to quash a deposition at which Vale was scheduled to attend as a consulting expert for RPIs, relators asserted that Vale should not be allowed to attend the deposition because of her status as a fact witness for Bell. *See* TEX. R. CIV. P. 199.5(d) (providing that an oral deposition must be conducted in the same manner as if the testimony were being obtained in court during trial); TEX. R. CIV. P. 267 (providing that witnesses on both sides may be placed "under the rule" so they cannot hear the testimony of any other witness in the case); TEX.

---

[3]This rule does not, however, extend to consulting-only experts whose only source of factual information was the consultation. *Axelson,* 798 S.W.2d at 554.

R. EVID. 614 (same).  Relators contended that Vale was not "a person whose presence is . . . essential to the presentation of the cause"—an exception to the exclusionary reach of rules 267 and 614—because she was a fact witness TEX. R. CIV. P. 267(b)(3); TEX. R. EVID. 614(3).

Information that may be discovered from a fact witness does not, however, include information about an opponent's litigation strategies, attorney work product, or other information exempted from discovery by the attorney-client privilege.  *See* TEX. R. CIV. P. 192.3(c) ("A person has knowledge of relevant facts when that person has or may have knowledge of any *discoverable* matter.") (emphasis added); *id.* (providing that an expert can be a fact witness only with regard to knowledge obtained first-hand and not obtained in preparation for trial or in anticipation of litigation).  Accordingly, while factual information about the model 412 aircraft that Vale knows first-hand because of her employment with Bell may be discoverable because she has been or should be designated as a fact witness, Vale's knowledge about Bell's litigation strategies, attorney work product, and privileged communications is not discoverable based on her fact-witness status.

19

## VII. Conclusion

The record shows that, while Vale worked for Bell, she obtained confidential information about the model 412 aircraft and its fuel safety system, as well as confidential information about Bell's litigation strategies and attorney work product in lawsuits involving the model 412 aircraft. RPIs cannot effectively screen Vale because, as a consulting expert, she will be required to work on the other side of litigation that is substantially related to litigation on which she has previously worked for Bell. Relators have not waived their right to assert that the information Vale knows about the model 412 aircraft and its fuel safety system or about Bell's litigation strategies involving the model 412 aircraft is confidential because the record does not specifically show that Vale has served as a testifying expert for Bell regarding the model 412 aircraft or any aircraft that is substantially similar to the model 412. In addition, Vale's knowledge of Bell's litigation strategies, attorney work product, and privileged communications concerning the model 412 aircraft is not discoverable based on Vale's fact-witness status.

Because RPIs' counsel cannot effectively screen Vale, they must be disqualified from representing RPIs in the underlying lawsuit. The trial court abused its discretion by denying relators' motion to disqualify RPIs' counsel. We direct the trial court to vacate its order denying relators' motion to

20

disqualify and enter an order granting the motion. Our writ will issue only if the trial court fails to act in accordance with this opinion.

TERRIE LIVINGSTON
JUSTICE

PANEL B:   DAY, LIVINGSTON, and GARDNER, JJ.

PUBLISH
[DELIVERED MAY 20, 2002]

21

1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
2                        BROWNSVILLE DIVISION
3    KRISTA SALDANA, INDIVIDUALLY    *
     AND AS REPRESENTATIVE OF THE    *
4    ESTATE OF DAVID SALDANA AND AS  *
     NEXT FRIEND OF JAGGER SALDANA   *
5            PLAINTIFFS              *
                                     * CIVIL ACTION NO.:
6    VS.                             * B-00-176
                                     *
7    ITT INDUSTRIES, INC., SIKORSKY  *
     AIRCRAFT CORPORATION, A         *
8    SUBSIDIARY OF UNITED            *
     TECHNOLOGIES CORPORATION, THE   *    **ORIGINAL**
9    ESTATE OF LT. COL. MARC LEE     *
     HOHLE, AND THE ESTATE OF        *
10   CAPTAIN MATTHEW BRENT THOMAS    *
             DEFENDANTS              *
11
12   ****************************************************
13          ORAL DEPOSITION OF CHRIS LOWENSTEIN
14   ****************************************************
15
16       ANSWERS AND DEPOSITION OF CHRIS LOWENSTEIN,
17   produced as a witness at the instance of the
18   Plaintiff, taken in the above-styled and -numbered
19   cause on June 21, 2002, A.D., beginning at 10:07
20   a.m., before Rochelle Felice Hopkins, a Certified
21   Shorthand Reporter in and for the State of Texas, in
22   the offices of Jackson Walker, LLP, located at 901
23   Main Street, Suite 6000, Dallas, Texas, in accordance
24   with the Federal Rules of Civil Procedure and the
25   agreements hereinafter set forth.

DEFENDANT'S EXHIBIT
H

2

```
 1                A P P E A R A N C E S
 2    FOR THE DEFENDANT, SIKORSKY AIRCRAFT CORPORATION:
          MR. ROBERT F. RUCKMAN
 3        MR. BRAD BROWN
          901 Main Street, Suite 6000
 4        Dallas, Texas 75202
          (214) 953-6000
 5        (214) 953-5822 (Fax)
 6    FOR THE DEFENDANT, ITT INDUSTRIES, INC.:
          MR. RANDY W. YOUNG
 7        GENDRY & SPRAGUE, PC
          645 Lockhill Selma
 8        San Antonio, Texas 78216-5057
          (210) 349-0511
 9        (210) 349-2760 (Fax)
10    WITNESS ADDRESS:
          6900 Main Street # S300A
11        Stratford, Connecticut 06615
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

5

1                  P R O C E E D I N G S

2              (Exhibits 1 - 3 marked.)

3                  CHRIS LOWENSTEIN,

4    having been first duly cautioned and sworn to testify

5    to the truth, the whole truth, and nothing but the

6    truth, testified on his oath as follows:

7                          EXAMINATION

8    BY MR. RUCKMAN:

9         Q.   Could you state your full name, please, sir?

10        A.   Christopher O'Meara Lowenstein.

11        Q.   How are you employed, sir?

12        A.   I'm employed as chief of aircraft safety

13   investigation by Sikorsky Aircraft Corporation.

14        Q.   Where are you employed?

15        A.   In Stratford, Connecticut.

16        Q.   Mr. Lowenstein, are you here in Dallas,

17   Texas today to give your deposition in connection

18   with a case called Saldana versus ITT Industries and

19   Sikorsky Aircraft?

20        A.   Yes, I am.

21        Q.   Let me show you Exhibit 1, sir.  Is this a

22   notice to take your deposition for today, June 21,

23   2002, at 10 o'clock at the offices of Jackson Walker,

24   LLP in Dallas, Texas?

25        A.   Yes, that is true.

6

1    Q.  All right.  And you are prepared to proceed

2  with that deposition, aren't you?

3    A.  Yes, I am.

4         MR. RUCKMAN:  And also here today, for

5  the record, is Randy Young, counsel for ITT, along

6  with myself and Brad Brown for the defendant,

7  Sikorsky Aircraft.

8         For the record, I would like to

9  introduce Exhibit 2, which is a letter that was sent

10  to me dated June 17, 2002, from plaintiff's counsel,

11  Ray Marchan, in which he advised that Mr. Ed

12  Monhollen, an expert retained by Mr. Marchan, would

13  be attending Mr. Lowenstein's deposition.

14         Also attached to the record as Exhibit

15  3 is my response dated the following date, June 18,

16  2002, to Mr. Marchan in which we announced or stated

17  our objection to the attendance of Mr. Monhollen at

18  the deposition today because Mr. Monhollen is a

19  former employee of Sikorsky.  And he should be

20  disqualified as an expert in this case because of

21  that prior employment for the reasons set forth in my

22  letter of June 18, 2002, which is attached to this

23  deposition as Exhibit 3.

24         This morning, I did receive a telephone

25  call from Mr. Marchan advising that he was not

7

1  prepared to go forward with the deposition today

2  without Mr. Monhollen; and, therefore, announced that

3  he would not be appearing today and that he would be

4  filing a motion with the Court to seek permission for

5  Mr. Monhollen's approval.  Therefore, this deposition

6  is not taking place today for that reason.

7                    Mr. Young, do you have anything to add?

8                    MR. BROWN:  No, sir, do not.

9                    MR. RUCKMAN:  That is the end of our

10  record.

11                    THE REPORTER:  Since he did give

12  testimony, do you want reading and signing?

13                    MR. RUCKMAN:  We'll waive the

14  signature.

15                    THE REPORTER:  I will send the original

16  to you?

17                    MR. RUCKMAN:  Yes, please.

18                    THE REPORTER:  I will attach the

19  original exhibits to the original transcript.  This

20  deposition is concluded.

21                    (Deposition concluded at 10:13 a.m.)

22

23

24

25

1   STATE OF TEXAS   )

2      I, Rochelle Felice Hopkins, a Certified

3   Shorthand Reporter in and for the State of Texas, do

4   hereby certify that, pursuant to the agreement

5   hereinbefore set forth, there came before me on June

6   21, 2002, A.D. at 10:07 a.m., at the offices of

7   Jackson Walker, LLP, located at 901 Main Street,

8   Suite 6000, in the City of Dallas, State of Texas,

9   the following named person, to-wit:   CHRIS

10   LOWENSTEIN, who was by me duly cautioned and sworn to

11   testify the truth, the whole truth, and nothing but

12   the truth of his knowledge touching and concerning

13   the matters in controversy in this cause; and that he

14   was thereupon carefully examined upon his oath and

15   his examination reduced to writing by me and under my

16   supervision; that the deposition is a true record of

17   the testimony given by the witness, signature being

18   waived, pursuant to the agreement of the parties.

19        I further certify that I am neither

20   attorney nor counsel for, nor related to or employed

21   by, any of the parties to the action in which this

22   deposition is taken, and further that I am not a

23   relative or employee of any attorney or counsel

24   employed by the parties hereto, or financially

25   interested in the action.

10

1       I further certify that before the completion of

2    the deposition the deponent __X__, and/or the

3    Plaintiff/Defendant ____did __X__did not

4    request to review the transcript.

5       In witness whereof, I have hereunto set my hand

6    and affixed my seal this _21st_ day of

7    _____June_____, A.D., 2002.

8

9

10       _Rochelle Hopkins_____

            Rochelle Felice Hopkins, CSR, RPR

11       Esquire Deposition Services

            703 McKinney Avenue, Suite 320

12       Dallas, Texas  75202

            Certification No. 6498

13       Certification Expires 12/31/02

14

    Taxable Cost:  $_____

15

16

17

18

19

20

21

22

23

24

25